**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------------X

| | |
|---|---|
| CHARLES OAKLEY, : | |
| : | |
| Plaintiff, : | Civil Case No.: |
| : | |
| v. : | |
| : | **COMPLAINT** |
| JAMES DOLAN, in his individual and professional : | |
| capacities, MSG NETWORKS, INC., THE MADISON : | |
| SQUARE GARDEN COMPANY and MSG SPORTS & : | **Jury Trial Demanded** |
| ENTERTAINMENT, LLC, : | |
| : | |
| Defendants. : | |

----------------------------------------------------------------------X

Plaintiff Charles Oakley ("Plaintiff" or "Mr. Oakley"), through his lawyers, Wigdor LLP,

hereby alleges as follows:

### PRELIMINARY STATEMENT

1.      Charles Oakley, or "Oak," as he is often referred to by adoring fans of the New

York Knicks (the "Knicks"), was the heart and soul of one of the most successful periods in the

history of the franchise, one which saw the Knicks assume their place among the most successful

teams in the NBA.

2.      While he never specialized in the type of flashy plays of some of his more famous

contemporaries, countless Knicks fans who experienced the gritty and successful teams of the

1990s undoubtedly have memories of Mr. Oakley going toe to toe with some of the legends of

the sport, single name icons such as "Michael," "Reggie" and "Magic."  What became the

hallmark of Mr. Oakley's career was that, no matter how famous the opponent, he never backed

down and defended the lane at Madison Square Garden (the "Garden") as if he were protecting

his own home.  This passion, commitment and toughness made Mr. Oakley a legend in New

York, and especially among Knicks fans.

3.     However, one person who could not abide by Mr. Oakley's refusal to meekly submit to people in positions of power was Defendant James Dolan, who inherited control of the Knicks from his father a year after Mr. Oakley's career with the team came to an end.  Whether it was because of resentment for Mr. Oakley's passionate following among Knicks fans, anger that Mr. Oakley would not "kiss the ring" of the heir to the Madison Square Garden empire, or petty insecurities driven by his own personal demons, Defendant Dolan constantly disrespected Mr. Oakley, refusing to make eye contact or shake his hand during meetings, denying him the type of fan appreciation nights given to much less popular and successful members of the Knicks, and even making him purchase his own tickets to attend games at the arena he called home for a decade.

4.     Defendants' animosity came to a head on February 8, 2017, when Mr. Oakley returned to the Garden to watch a Knicks game.  Within minutes of unobtrusively taking his seat, Defendant Dolan directed that security forcibly remove Mr. Oakley from the Garden and publicly embarrass him on live television.  Adding insult to injury, Defendants proceeded to ban Mr. Oakley from the Garden indefinitely.  Despite his immense contributions to the franchise, Mr. Oakley was treated like a common criminal by Defendant Dolan and Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC (together, "MSG").

5.     As if their public mistreatment of Mr. Oakley was not embarrassing and shameful enough, over the ensuing days Defendants Dolan and MSG launched a coordinated and defamatory public relations campaign against Mr. Oakley, baselessly accusing him of abusing fans and staff, acting inappropriately and struggling with alcoholism.  By propagating these blatant lies about Mr. Oakley, Defendants Dolan and MSG have caused irreparable harm to his

name and career and discriminated against him based on the false perception that he is an alcoholic, all in a transparent attempt to denigrate his standing among Knicks fans. However, as he did throughout his playing career, Mr. Oakley has refused to walk to the bench in shame. Instead, holding his head up high, Mr. Oakley files this Complaint to set the record straight and to hold Defendants responsible for their reprehensible conduct.

6.      In doing so, Mr. Oakley seeks redress for Defendants' unlawful conduct in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12182, *et seq.* ("ADA"), the New York State Human Rights Law, New York Executive Law §§ 290, *et seq*. ("NYSHRL") and the New York City Human Rights Law, New York City Administrative Code §§ 8-101, *et seq.* ("NYCHRL"), as well as various state tort laws.

## PARTIES

7.      Plaintiff Charles Oakley is a former All-Star power forward for the New York Knicks, a 17-year veteran of the NBA, and a resident of the State of Ohio.

8.      Defendant James Dolan is a resident of the State of New York and at all relevant times was Executive Chairman of MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC.

9.      Defendant MSG Networks, Inc. is a publicly-traded, foreign corporation with its principal place of business located at Two Pennsylvania Plaza, New York, New York 10121. At all relevant times, MSG Networks, Inc. owned and operated Madison Square Garden and the New York Knicks.

10.     Defendant The Madison Square Garden Company is a wholly-owned subsidiary of MSG Networks, Inc., with its principal place of business located at Two Pennsylvania Plaza,

New York, New York 10121.  At all relevant times, The Madison Square Garden Company

owned and operated Madison Square Garden and the New York Knicks.

11.    Defendant MSG Sports & Entertainment, LLC is a wholly-owned subsidiary of

MSG Networks, Inc., with its principal place of business located at Two Pennsylvania Plaza,

New York, New York 10121.  At all relevant times, MSG Sports & Entertainment, LLC owned

and operated Madison Square Garden and the New York Knicks.

## JURISDICTION AND VENUE

12.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as this

action involves citizens of different states and the amount in controversy in this matter exceeds

$75,000.

13.    The Court further has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331

and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights

under the ADA.  The Court has supplemental jurisdiction over Plaintiff's related claims arising

under state law pursuant to 28 U.S.C. § 1367(a ).

14.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a

substantial part of the events or omissions giving rise to this action, including the unlawful

practices alleged herein, occurred in this district.

## FACTUAL ALLEGATIONS

## I.    MR. OAKLEY'S LEGENDARY CAREER FOR THE NEW YORK KNICKS

15.    Mr. Oakley, a third-year power forward at the time, was traded to the Knicks on

June 27, 1988.

16.    Over the next ten years, Mr. Oakley was instrumental in ushering in one of the

most successful eras in Knicks history.

17.     At the time of the trade, the Knicks, once one of the NBA's premier franchises in its largest market, had fallen into disarray, having advanced as far as the second round of the playoffs only twice in the previous ten years.

18.     Though the kind of highlight reel dunks and no look passes that made stars of other players in the league were not part of Mr. Oakley's game, his talents – defense, an indomitable will to win and hardnosed play – made him a fan favorite and the engine driving the Knicks' resurgence.

19.     Over the next ten years, coinciding with Mr. Oakley's tenure, the Knicks enjoyed their most sustained run of excellence and reassumed their place among the league's elite teams, making the second round of the playoffs every single year except for one while Mr. Oakley was on the team, in large part due directly to his contributions.

20.     By way of example, in 1994 – a season during which Mr. Oakley was instrumental in leading the Knicks to within one win of a NBA championship – he was both named to the All-Defensive First Team and appeared in the NBA All-Star Game.

21.     Additionally, Mr. Oakley was named to the All-Defensive First Team in 1998, his final year with the franchise.

22.     Even now, nearly two decades after he stopped playing for the Knicks, Mr. Oakley ranks among the top three players in franchise history in offensive rebounds, defensive rebounds, minutes played and steals, making him inarguably the greatest power forward in Knicks history.

23.     Put simply, Mr. Oakley is an iconic figure in Knicks history, whose name is synonymous with the widely celebrated 1990s-era Knicks.

## II.   DEFENDANT DOLAN'S HISTORY OF MISTREATING FORMER EMPLOYEES

24.     In 1999, Defendant Dolan inherited control of MSG, the Garden and the Knicks from his father, Charles Dolan.

25.     Since Defendant Dolan became chairman of the Knicks, they almost immediately relinquished their status as one of the NBA's premiere teams, winning only a single lone playoff series since the turn of the century.

26.     Indeed, the Knicks have unfortunately become a laughingstock in the NBA, decried for their incompetence both on and off the court.

27.     The Knicks' reputation sunk to unfathomable new lows in 2007 when Defendants Dolan and Madison Square Garden LP were found liable for retaliating against a former employee, Anucha Browne Sanders, who had complained of having been sexually harassed by the then-coach of the Knicks.

28.     In fact, the jury found Defendant Dolan personally liable for retaliating against Ms. Sanders, and awarded her $3 million in punitive damages from him for his unlawful conduct.

29.     This pattern of retaliating against Defendants' former employees who refused to accept Defendant Dolan's unlawful conduct sadly repeated itself with Mr. Oakley.

## III.   DEFENDANT DOLAN'S ANIMOSITY TOWARDS MR. OAKLEY

30.     Mr. Oakley had never met Defendant Dolan during his playing career, or for several years thereafter.

31.     Eager to bury the hatchet with the newly installed owner of the Knicks, given what the franchise meant to him and all he had done for it, Mr. Oakley approached NBA Commissioner Adam Silver to set up a meeting with Defendant Dolan.

32.     Despite Mr. Oakley's best efforts, even Mr. Silver was unable to convince to Defendant Dolan to agree to a meeting.

33.     To this day, Mr. Oakley does not know the source of Defendant Dolan's animosity toward him.  However, the ongoing nature of the animosity is obvious and well-known, as illustrated by, among other things, the fact that Mr. Oakley – a true Knicks legend – has repeatedly been forced to purchase tickets to Knicks games out of his own pocket, whereas Defendant Dolan has routinely treated countless other retired Knicks players to courtside seats.

IV.     **THE FEBRUARY 8, 2017 INCIDENT AT THE GARDEN**

34.     On February 8, 2017, Mr. Oakley attended a Knicks game at the Garden against the Los Angeles Clippers.

35.     Notably, Mr. Oakley was neither intoxicated nor otherwise behaving inappropriately when he arrived at the Garden and was allowed to enter the arena without incident.

36.     Mr. Oakley's seats coincidentally were located several rows behind where Defendant Dolan was sitting (Mr. Oakley obviously had no way of knowing whether Defendant Dolan would even be attending this particular game, let alone where he would be seated if he did so).

37.     Nevertheless, Mr. Oakley proceeded to his seats without speaking to Defendant Dolan or acknowledging him in any way.

38.     Incredibly, within a few minutes of reaching his seats, Mr. Oakley was approached by three large men identifying themselves as being members of Madison Square Garden's security team who ordered him, without explanation, to leave the arena.

39.     Understandably confused, Mr. Oakley asked them why he was being forced to leave when he had done nothing more than sit among friends in publicly available seats.  Rather than respond to Mr. Oakley's reasonable question, one of the security guards proceeded to berate him publicly by demanding loudly, "Why are you sitting so close to Mr. Dolan?"

40.     At that point, it became clear to Mr. Oakley that the security guards had been sent to carry out Defendant Dolan's orders.

41.     Embarrassed that Defendant Dolan was clearly attempting to publicly humiliate him in front of the same fans who spent a decade cheering for him, Mr. Oakley responded that he had done nothing wrong and had every right to attend the game.

42.     Mr. Oakley then proceeded to turn around and return to his seat.

43.     As he did so, two of the security guards grabbed him and pushed him to the ground.

44.     When he got back to his feet, the security guards loudly reiterated their demand that Mr. Oakley leave the Garden immediately, despite the fact that he had done nothing wrong.

45.     When Ms. Oakley continued to protest this outrageous behavior, the security guards started to physically grab at Mr. Oakley to forcibly compel him to leave.

46.     Fearing for his safety surrounded by several large security guards, Mr. Oakley pushed their hands away in self-defense.

47.     Within seconds, Mr. Oakley was turned around so his back faced security, grabbed by six officials and thrown onto the ground.

48.     He was then put into restraints and the security guards roughly threw him out of the Garden, again dragging him to the ground in the process.

49.     Mr. Oakley was ultimately taken outside of the arena, arrested and charged with assault.

50.     The incident caused an enormous spectacle during the game and was incredibly embarrassing for Mr. Oakley.

51.     Mr. Oakley was also completely bewildered by the incident because, according to the security guard who first approached him, all he had done was sit too closely to Defendant Dolan.

52.     Following the incident, it was announced that Mr. Oakley was banned indefinitely from Knicks games and the Garden generally.

## V.     DEFAMATORY STATEMENTS BY DEFENDANTS

53.     Not content with humiliating Mr. Oakley on national television, Defendants proceeded to launch a coordinated smear campaign in a further attempt to ruin his reputation.

54.     Indeed, over the next approximately 48 hours, Defendants made a series of outrageous and patently false statements to the national media with the sole intent of defaming Mr. Oakley.

### A.     Statements by MSG

55.     On February 8, 2017, shortly after the incident, the Knicks public relations Twitter account (@NY_KnicksPR) tweeted:

> Charles Oakley came to the game tonight and ***behaved in a highly inappropriate and completely abusive manner***.   He has been ejected and is currently being arrested by the New York City Police Department.   He was a great Knick and ***we hope he gets some help soon***.

(emphasis added).

56.     This statement is completely false and Defendants knew it was false at the time it was made.  Mr. Oakley at no time acted inappropriately or abusively.  To the extent that Mr. Oakley ever touched anyone, it was only after he had been roughly grabbed by Defendants' personnel, in a clear act of self-defense.  But at no point did Mr. Oakley initiate contact or attempt to physically engage in an altercation with any of Defendants' employees.

57.     The statement by the Knicks that the organization hoped Mr. Oakley would "get[] some help soon" was similarly defamatory, as it blatantly insinuated that Mr. Oakley had a substance abuse problem of some kind.

58.     It would later become apparent that this statement by the Knicks was part of a coordinated media strategy by Defendants designed to propagate the lie that Mr. Oakley is an alcoholic.

59.     The next day, on February 9, 2017, the Knicks organization doubled down on its defamatory statement that Mr. Oakley had somehow been "abusive" and issued a blanket denial of Mr. Oakley's statements to the media that he had done nothing to warrant the physical abuse from the security guards.  Specifically, the @NY_KnicksPR tweet read:

> Updated statement (2/9):  There are dozens of security staff, employees and NYPD that witnessed ***Oakley's abusive behavior***.  It started when he entered the building and continued until he was arrested and left the building.  ***Every single statement we have received is consistent in describing his actions***.  ***Everything he said since the incident is pure fiction***.

(emphasis added).

60.     Upon information and belief, Defendants misrepresented the statements of their security guards and witnesses, several of whom supported Mr. Oakley's account of events and were silenced.

B.      **Statements by Defendant Dolan**

61.     On February 10, 2017, Defendant Dolan appeared on the ESPN Radio's, "The

Michael Kay Show" and spoke about the dispute with Mr. Oakley.

62.     Defendant Dolan arrived at the show with a binder labeled, "Preparation."

63.     Once the show began, Defendant Dolan confirmed that Mr. Oakley was banned

from the Garden indefinitely, and unleashed a litany of defamatory statements.

64.     On banning Mr. Oakley from the Garden, Defendant Dolan said: "I think the most

important thing with that is we need to keep the Garden safe for anybody who goes there . . . So

***anybody drinking too much alcohol, looking for a fight, they're going to be ejected and they're***

***going to be banned***."

65.     Defendant Dolan went on to accuse Mr. Oakley several more times of being an

alcoholic and/or having been overly impaired during the game:

> ***To me, Charles has got a problem. We've said it before; he's his***
> ***own worst problem. People have to understand that. He has a***
> ***problem with anger. He's both physically and verbally abusive.***
> ***He may have a problem with alcohol.***
>
>                                     . . .
>
> ***We know he said on TV that he was drinking beforehand. We***
> ***heard statements from police that he appeared to be impaired.***
> ***Our staff clearly could see that***.
>
>                                     . . .
>
> ***When you have issues like this, the first step for anybody is to ask***
> ***for help***.

66.     Defendant Dolan's statements were and are entirely without basis in fact, as

Defendant Dolan was well aware.  Mr. Oakley has never had a problem with excessive anger nor

has he ever abused alcohol or any other drug.

67.    During the interview, Defendant Dolan also repeatedly accused Mr. Oakley of

putting the safety of Knicks fans at risk, and somehow having abused them:  "***The No. 1 concern***

***has to be the safety and comfort of the fans***."

68.    Defendant Dolan elaborated, again stating that Mr. Oakley somehow put others at

risk and treated them abusively, when in reality he had done nothing but attempt to attend the

game:

> We'll probably hear chants [in support of Mr. Oakley] tonight.
> But I would like for those people to look around and look at the
> people working at Madison Square Garden and ***realize that the guy***
> ***they're chanting for might have been a great Knick player, but he***
> ***was terribly abusive to them***.
>
> . . .
>
> ***There were security people there who were abused. There were***
> ***service people who were abused. The same people who help fans***
> ***get to their seats, they were abused. With racial overtones, sexual***
> ***overtones.*** How do you bring your kids to a game if you think
> that's going to happen?

69.    Perhaps feeling he needed to justify his decision to have him removed and banned

indefinitely from the Garden, Defendant Dolan further defamed Mr. Oakley by stating that Mr.

Oakley had come to the game with an "agenda" to take some unspecified action against him:

> ***It's very clear to us that Charles Oakley came into the Garden***
> ***with an agenda. From the moment he stepped into the Garden, he***
> ***began with this behavior. Abusive behavior, stuff you wouldn't***
> ***want to say on the radio*** . . . ***It just accelerated and accelerated***
> ***and accelerated*** . . . I'm not inside of Charles Oakley's mind. ***He***
> ***did say a bunch of things along the way that looked like he was***
> ***headed in my direction. I didn't hear them myself but we heard***
> ***from our employees that he was using my name a lot.*** But this isn't
> because I'm nervous. This is because you can't do what he did and
> stay. We clearly did not — we weren't perfect here, and I think
> Charles never should have made it to his seats. And that's on us,
> and we're doing things to remedy that and make sure that never
> happens again. … I can't say for sure.

70.     As with virtually all of Defendant Dolan's statements during this show, he was fully aware that these too were complete fabrications.  Mr. Oakley had made no effort to confront Defendant Dolan and did nothing to otherwise incite Defendants to forcibly remove him from the Garden.

71.     At no point was Mr. Oakley abusive towards any of Defendants' employees or staff, as evinced by the fact that he was allowed to proceed to his seat without interruption, despite being in full view of the public.

72.     It was only when Defendant Dolan first caught sight of Mr. Oakley that issues arose.

**C.**     **Defendant Dolan's History of Baselessly Accusing Critics of Alcoholism**

73.     Tellingly, this was not the first time that Defendant Dolan has attempted to malign individuals who upset him with unsupported accusations that they were alcoholics.

74.     In February 2015, Defendant Dolan accused a fan of being an alcoholic merely based on the fan's sending an angry e-mail to him, writing:

> Why would anybody write such a hateful letter. I am just guessing but ill bet your life is a mess and you are a hateful mess. What have you done that anyone would consider positive or nice. I am betting nothing. In fact ill bet you are negative force in everyone who comes in contact with you. You most likely have made your family miserable. **Alcoholic maybe. I just celebrated my 21 year anniversary of sobriety. You should try it**.

(emphasis added).

75.     In fact, less than two months after the incident with Mr. Oakley, Defendant Dolan accused another fan of purportedly drunkenly heckling him, telling the press "he had an open bottle of beer and smelled of alcohol," an accusation that the fan vehemently denied.

76.     Indeed, it is clear that Defendant Dolan's knee jerk response when confronted by anyone that he does not like is to level unsupported accusations that his critics suffer from

alcoholism, a particularly sad pattern in light of his own struggles with alcohol that he referenced in the February 2015 e-mail.

## FIRST CAUSE OF ACTION
### (Defamation *Per Se*)
### *Against All Defendants*

77.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

78.     Defendants defamed Plaintiff by publicly accusing him of having committed the serious crime of assault.

79.     Defendants further defamed Plaintiff by accusing him of suffering from the loathsome disease of alcoholism.

80.     Defendants made defamatory statements that caused serious injury to Plaintiff's professional and personal reputation.

81.     None of these assertions by Defendants had any factual basis.

82.     In making these statements, Defendants were acting with actual malice as they were at all times aware that none of the statements were true.

83.     As a direct and proximate result of Defendants' defamatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under law.

## SECOND CAUSE OF ACTION
### (Libel)
### *Against Defendants MSG Networks, Inc.,*
### *The Madison Square Garden Company*
### *and MSG Sports & Entertainment, LLC*

84.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

85.     Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC defamed Plaintiff by, *inter alia*, publicly accusing him on Twitter of having committed assault, having subjected other individuals to abusive conduct and being an alcoholic.

86.     None of these assertions by Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC have any factual basis.

87.     Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC were aware at all times that the statements were false and made the statements in reckless disregard of their falsity.

88.     As a direct and proximate result of Defendants MSG Networks, Inc.'s, The Madison Square Garden Company's and MSG Sports & Entertainment, LLC's libelous conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under law.

### THIRD CAUSE OF ACTION
### (Slander)
### *Against All Defendants*

89.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

90.     Defendants defamed Plaintiff by, *inter alia*, publicly accusing him of having committed assault, having subjected other individuals to abusive conduct and being an alcoholic.

91.     None of these assertions by Defendants had any factual basis.

92.     Defendants made the statements despite being fully aware that they were not true and for the sole purpose of attacking Mr. Oakley's reputation.

93.     As a direct and proximate result of Defendants' slanderous conduct, Plaintiff has

suffered and continues to suffer harm for which he is entitled to an award of damages to the

greatest extent permitted under law.

### FOURTH CAUSE OF ACTION
**(Assault)**
*Against Defendants MSG Networks, Inc.,*
*The Madison Square Garden Company*
*and MSG Sports & Entertainment, LLC*

94.     Plaintiff hereby repeats and realleges each and every allegation in the preceding

paragraphs as if set forth fully herein.

95.     Defendants MSG Networks, Inc., The Madison Square Garden Company and

MSG Sports & Entertainment, LLC intentionally placed Plaintiff in imminent fear of harmful

and/or offensive conduct when, *inter alia*, they physically and forcibly removed Plaintiff from

the Garden and subsequently detained him until police could arrive to unjustifiably arrest him.

96.     As a direct and proximate result of Defendants MSG Networks, Inc.'s, The

Madison Square Garden Company's and MSG Sports & Entertainment, LLC's tortious conduct,

Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of

damages to the greatest extent permitted under law.

### FIFTH CAUSE OF ACTION
**(Battery)**
*Against Defendants MSG Networks, Inc.,*
*The Madison Square Garden Company*
*and MSG Sports & Entertainment, LLC*

97.     Plaintiff hereby repeats and realleges each and every allegation in the preceding

paragraphs as if set forth fully herein.

98.     Defendants MSG Networks, Inc., The Madison Square Garden Company and

MSG Sports & Entertainment, LLC intentionally and wrongfully physically contacted Plaintiff

without his consent when, *inter alia*, they physically and forcibly removed Plaintiff from the Garden and subsequently detained him until police could arrive to unjustifiably arrest him.

99.     As a direct and proximate result of Defendants MSG Networks, Inc.'s, The Madison Square Garden Company's and MSG Sports & Entertainment, LLC's tortious conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under law.

**SIXTH CAUSE OF ACTION**
**(False Imprisonment)**
*Against Defendants MSG Networks, Inc.,*
*The Madison Square Garden Company*
*and MSG Sports & Entertainment, LLC*

100.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

101.     Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC intentionally confined Plaintiff, with Plaintiff's knowledge and awareness and without his consent, when, *inter alia*, they physically and forcibly removed Plaintiff from the Garden and subsequently detained him until police could arrive to unjustifiably arrest him.

102.     Defendants MSG Networks, Inc.'s, The Madison Square Garden Company's and MSG Sports & Entertainment, LLC's confinement of Plaintiff was not privileged in any way.

103.     As a direct and proximate result of Defendants MSG Networks, Inc.'s, The Madison Square Garden Company's and MSG Sports & Entertainment, LLC's slanderous conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under law.

## SEVENTH CAUSE OF ACTION
### (Abuse of Process)
### *Against All Defendants*

104.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

105.     Defendants caused process to be issued to Plaintiff in the form of a criminal charge.

106.     Defendants caused Plaintiff to be charged with an intent to do harm and without excuse or justification.

107.     Defendants caused Plaintiff to be charged in a perverted manner with the intent to accomplish the collateral objective of publicly embarrassing Plaintiff and destroying his reputation.

108.     As a direct and proximate result of Defendants' tortious conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under law.

## EIGHTH CAUSE OF ACTION
### (Denial of a Public Accommodation in Violation of the ADA)
### *Against All Defendants*

109.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

110.     Defendants own and operate the Garden, a place of public accommodation.

111.     Defendants discriminated against Plaintiff by denying him access to the Garden based on their perception that he suffers from alcoholism, a disability.

112.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an injunction prohibiting Defendants from further discriminating against him.

### NINTH CAUSE OF ACTION
**(Denial of a Public Accommodation in Violation of the NYSHRL)**
***Against All Defendants***

113.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

114.     Defendants own and operate the Garden, a place of public accommodation.

115.     Defendants discriminated against Plaintiff by denying him access to the Garden based on their perception that he suffers from alcoholism, a disability.

116.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under law.

### TENTH CAUSE OF ACTION
**(Denial of a Public Accommodation in Violation of the NYCHRL)**
***Against All Defendants***

117.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

118.     Defendants own and operate the Garden, a place of public accommodation.

119.     Defendants discriminated against Plaintiff by denying him access to the Garden based on their perception that he suffers from alcoholism, a disability.

120.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages, to the greatest extent permitted under law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants for the following relief:

A.  A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.  An injunction and order permanently restraining Defendants from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.  An award of damages, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages incurred as a result of Defendants' unlawful actions;

D.  An award of damages to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputation;

E.  An award of damages to be determined at trial, to compensate Plaintiff for emotional distress and/or mental anguish incurred as a result of Defendants' unlawful actions;

F.  An award of punitive damages to be determined at trial, to deter Defendants from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

G.  An award of Plaintiff's reasonable attorneys' fees and costs; and

H.  Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: September 12, 2017
      New York, New York

                                     Respectfully submitted,

                                     **WIGDOR LLP**

By: _____
                                     Douglas H. Wigdor
                                     Renan F. Varghese
                                     Alex H. Hartzband

                                     85 Fifth Avenue
                                     New York, NY 10003
                                     Telephone: (212) 257-6800
                                     Facsimile: (212) 257-6845
                                     dwigdor@wigdorlaw.com
                                     rvarghese@wigdorlaw.com
                                     ahartzband@wigdorlaw.com

                                     *Attorneys for Plaintiff*