**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
:
CHARLES OAKLEY,
:
              Plaintiff,
:
        v.
:          Case No. 17-cv-6903 (RJS)
:
JAMES DOLAN, in his individual and
professional capacities, MSG NETWORKS,   :      <u>Oral Argument Requested</u>
INC., THE MADISON SQUARE GARDEN
COMPANY and MSG SPORTS &
ENTERTAINMENT, LLC,
:
            Defendants.
:
--------------------------------------------------------x


**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**<u>MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................. 1

FACTUAL BACKGROUND ................................................................... 5

    A.   OAKLEY'S RELATIONSHIP WITH THE NEW YORK KNICKS ........................... 5

    B.   THE FEBRUARY 8, 2017 INCIDENT & RELATED CRIMINAL ACTION ............. 5

    C.   DEFENDANTS' ALLEGED DEFAMATORY STATEMENTS ................................ 8

    D.   OAKLEY'S POST-INCIDENT CONDUCT ................................................. 9

    E.   OAKLEY'S HISTORY OF SIMILAR ACTS ........................................... 10

LEGAL STANDARD .......................................................................... 11

    A.   OAKLEY'S PLEADING BURDEN UNDER RULE 12(B)(6) ................................ 11

    B.   EXTRINSIC EVIDENCE THE COURT MAY CONSIDER ON THIS
        MOTION .............................................................................. 11

ARGUMENT .................................................................................... 16

    A.   OAKLEY'S DEFAMATION CLAIMS FAIL FOR MULTIPLE REASONS ........... 16

    B.   OAKLEY FAILS TO STATE A CLAIM FOR ASSAULT OR BATTERY ............. 30

    C.   OAKLEY'S FALSE IMPRISONMENT CLAIM ALSO FAILS ................................ 34

    D.   OAKLEY'S ABUSE OF PROCESS CLAIM FAILS BECAUSE IT IS
        CONCLUSORY AND LEGALLY INSUFFICIENT ................................... 35

    E.   OAKLEY'S DISABILITY CLAIMS FAIL BECAUSE HE ALLEGES NO
        FACTS SUPPORTING UNLAWFUL DISCRIMINATION ..................................... 38

CONCLUSION .................................................................................. 40

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbitt v. Carrube*,
  No. 101678/15, 2018 WL 1094157 (1st Dep't Mar. 1, 2018) ................................28

*Agnant v. Shakur*,
  30 F. Supp. 2d 420 (S.D.N.Y. 1998)...................................................................22

*Almazan v. Almazan*,
  No. 14-cv-311 (AJN), 2015 WL 500176 (S.D.N.Y. Feb. 4, 2015) ..................27, 40

*Amadsau v. Bronx Lebanon Hosp. Ctr.*,
  No. 03-cv-6450 (LAK) (AJP), 2005 WL 121746 (S.D.N.Y. Jan. 21, 2005)..........25

*Ann-Margret v. High Soc'y Magazine, Inc.*,
  498 F. Supp. 401 (S.D.N.Y. 1980).....................................................................39

*Armstrong v. Simon & Schuster, Inc.*,
  649 N.E.2d 825 (N.Y. 1995).............................................................................17

*Aronson v. Wiersma*,
  483 N.E.2d 1138 (N.Y. 1985)............................................................................21

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................................11, 12, 26

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007).....................................................................................11, 25

*Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*,
  151 F. Supp. 3d 287 (E.D.N.Y. 2015) ................................................................29

*Biro v. Conde Nast*,
  807 F.3d 541 (2d Cir. 2015)..............................................................................25

*Biro v. Conde Nast*,
  883 F. Supp. 2d 441 (S.D.N.Y. 2012)...........................................................16, 26

*Biro v. Conde Nast*,
  963 F. Supp. 2d 255 (S.D.N.Y. 2013)...........................................................25, 26

*Brian v. Richardson*,
  621 N.Y.S.2d 48 (1st Dep't 1995) ......................................................................29

*Burdick v. Verizon Commc'ns, Inc.*,
    305 A.D.2d 1030 (4th Dep't 2003) ........................................................................19

*Chamberlain v. City of White Plains*,
    986 F. Supp. 2d 363 (S.D.N.Y. 2013) ..............................................................3, 14

*Chau v. Lewis*,
    771 F.3d 118 (2d Cir. 2014) ...............................................................................16

*Chrysler Corp. v. Fedders Corp.*,
    540 F. Supp. 706 (S.D.N.Y. 1982) .....................................................................38

*Church of Scientology Int'l v. Behar*,
    238 F.3d 168 (2d Cir. 2001) ...............................................................................25

*Condit v. Dunne*,
    317 F. Supp. 2d 344 (S.D.N.Y. 2004) ...............................................................12

*Cortec Indus., Inc. v. Sum Holding L.P.*,
    949 F.2d 42 (2d Cir. 1991) ...........................................................................12, 13

*Cortes v. Twenty-First Century Fox Am., Inc.*,
    No. 17-cv-5634 (RWS), 2018 WL 348862 (S.D.N.Y. Jan. 9, 2018) ...................16

*Cotz v. Mastroeni*,
    476 F. Supp. 2d 332 (S.D.N.Y. 2007) ...............................................................39

*Curiano v. Suozzi*,
    480 N.Y.S. 2d 466 (N.Y. 1984) .........................................................................38

*Dillon v. City of New York*,
    704 N.Y.S.2d 1 (1st Dep't 1999) ........................................................................28

*Dluhos v. Floating & Abandoned Vessel*,
    162 F.3d 63 (2d Cir. 1998) ...............................................................................40

*Doron Precision Sys., Inc. v. FAAC, Inc.*,
    423 F. Supp. 2d 173 (S.D.N.Y. 2006) ...........................................................12, 16

*Dunlop-McCullen v. Rogers*,
    No. 00-cv-3274 (JSR) (JCF), 2002 WL 1205029 (S.D.N.Y. Feb. 21, 2002) .............24, 25, 26

*Fernandez v. Zoni Language Ctrs.*,
    No. 15-cv-6066 (PKC), 2016 WL 2903274 (S.D.N.Y. May 18, 2016) ..................12

*Franklin v. Daily Holdings, Inc.*,
    21 N.Y.S.3d 6 (1st Dep't 2015) .........................................................................22

*Fuji Photo Film U.S.A., Inc. v. McNulty*,
   669 F. Supp. 2d 405 (S.D.N.Y. 2009) ....................................................................14

*Galland v. Johnston*,
   No. 14-cv-4411 (RJS), 2015 WL 1290775 (S.D.N.Y. Mar. 19, 2015) ..............................27, 28

*Gearren v. McGraw-Hill Cos., Inc.*,
   690 F. Supp. 2d 254 (S.D.N.Y. 2010) ....................................................................37

*Gilman v. Marsh & McLennan Cos.*,
   868 F. Supp. 2d 118 (S.D.N.Y. 2012) ....................................................................38

*Gisel v. Clear Channel Commc'ns, Inc.*,
   942 N.Y.S.2d 751 (4th Dep't 2012) .......................................................................30

*Gottlieb v. Sullivan Cty. Harness Racing Ass'n*,
   25 A.D.2d 798 (3d Dep't 1966) .......................................................................31, 32

*Green v. City of New York*,
   465 F.3d 65 (2d Cir. 2006) ................................................................................31

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
   491 U.S. 657 (1989) ........................................................................................26

*Hauser v. Bartow*,
   273 N.Y. 370 (1937) ........................................................................................38

*Hays v. City of New York*,
   No. 14-cv-10126 (JMF), 2017 WL 782496 (S.D.N.Y. Feb. 28, 2017) .......................3, 14, 36

*Hobbs v. Imus*,
   698 N.Y.S.2d 25 (1st Dep't 1999) .........................................................................29

*Hotel Emps. & Rest. Emps. Union v. City of N.Y. Dep't of Parks & Recreation*,
   311 F.3d 534 (2d Cir. 2002) ...............................................................................12

*Huggins v. Povitch*,
   No. 131164/94, 1996 WL 515498 (N.Y. Sup. Ct. 1996) ..............................................29

*Ithaca Coll. v. Yale Daily News Pub. Co.*,
   445 N.Y.S.2d 621 (3d Dep't 1981) ........................................................................18

*Jacobus v. Trump*,
   51 N.Y.S.3d 330 (N.Y. Sup. Ct. 2017) ...................................................................29

*Jacques v. DiMarzio, Inc.*,
   216 F. Supp. 2d 139 (E.D.N.Y. 2002) ...................................................................39

*Jones v. Maples/Trump*,
    No. 98-cv-7132 (SHS), 2002 WL 287752 (S.D.N.Y. Feb. 26, 2002) ..............................37, 38

*Kahn v. Friedlander*,
    456 N.Y.S.2d 482 (3d Dep't 1982)...................................................................................36, 38

*Kalimantano GmbH v. Motion In Time, Inc.*,
    939 F. Supp. 2d 392 (S.D.N.Y. 2013)..............................................................................20, 22

*Kalyanaram v. Am. Ass'n of Univ. Professors at the N.Y. Inst. of Tech., Inc.*,
    742 F.3d 42 (2d Cir. 2014)..................................................................................................3, 12

*Kanciper v. Lato*,
    989 F. Supp. 2d 216 (E.D.N.Y. 2013) ....................................................................................38

*Kirch v. Liberty Media Corp.*,
    449 F.3d 388 (2d Cir. 2006)...................................................................................................27

*L.W.C. Agency, Inc. v. St. Paul Fire and Marine Ins. Co.*,
    509 N.Y.S.2d 97 (2d Dep't 1986)...........................................................................................23

*Levy v. Grandone*,
    14 A.D.3d 660 (2d Dep't 2005)...............................................................................................36

*Lewis v. Brown*,
    No. 15-cv-5084 (NRB), 2017 WL 1091986 (S.D.N.Y. Mar. 15, 2017)..............................3, 14

*Liberman v. Gelstein*,
    605 N.E.2d 344 (N.Y. 1992)...................................................................................................18

*Marino v. Jonke*,
    No. 11-cv-430 (VB), 2012 WL 1871623 (S.D.N.Y. Mar. 30, 2012)................................19, 20

*McGowan v. United States*,
    825 F.3d 118 (2d Cir. 2016)...................................................................................................34

*McHenry v. Bell*,
    No. 13-cv-0657, 2015 WL 2354438 (N.D.N.Y. May 15, 2015) ............................................37

*Medcalf v. Walsh*,
    938 F. Supp. 2d 478 (S.D.N.Y. 2013).....................................................................................21

*Mitchell v. New York Univ.*,
    No. 150622/13, 2014 WL 123255 (N.Y. Sup. Ct. Jan. 8, 2014)..................................31, 32, 33

*Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*,
    14 F. Supp. 3d 191 (S.D.N.Y. 2014).......................................................................................38

*Oakley v. Aria Resort & Casino*
(Nev. D. Ct. July 13, 2011)................................................................................................10

*Oakley v. Aria Resort & Casino*
(Nev. D. Ct. May 12, 2011)................................................................................................11

*Oakley v. City of Henderson*
(Nev. D. Ct. July 13, 2011)................................................................................................11

*Obilo v. City Univ. of City of N.Y.*,
No. 01-cv-5118 (DGT), 2003 WL 1809471 (E.D.N.Y. Apr. 7, 2003) ...................................15

*Oparaji v. N.Y.C. Dep't of Educ.*,
No. 03-cv-4105, 2005 WL 1398072 (E.D.N.Y. June 14, 2005), *aff'd*,
172 Fed. App'x 352 (2d Cir. 2006).....................................................................................37

*Pippen v. NBC Universal Media, LLC*,
No. 11-cv-8834, 2012 WL 12903167 (N.D. Ill. Aug. 2, 2012) ............................................25

*Posr v. Doherty*,
944 F.2d 91 (2d Cir. 1991)................................................................................................36

*Radin v. Tun*,
No. 12-cv-1393 (ARR) (VMS), 2015 WL 4645255 (E.D.N.Y. Aug. 4, 2015) ......................35

*Ratajack v. Brewster Fire Dep't, Inc.*,
178 F. Supp. 3d 118 (S.D.N.Y. 2016)................................................................................28

*Reisner v. Stoller*,
51 F. Supp. 2d 430 (S.D.N.Y. 1999)..................................................................................38

*Rothman v. Gregor*,
220 F.3d (2d Cir. 2000).....................................................................................................15

*Rotondi v. The Madison Square Garden Co.*,
No. 150097/2015, 2017 WL 4083093 (N.Y. Sup. Ct. Sept. 12, 2017)..................................28

*Ruderman v. Stern*,
No. 39179/97, 2004 WL 3153217 (N.Y. Sup. Ct. Oct. 25, 2004) .........................................19

*Sachs v. Musa*,
No. 10-cv-1663 (JPO), 2014 WL 1855615 (S.D.N.Y. May 8, 2014)....................................34

*Savino v. City of New York*,
331 F.3d 63 (2d Cir. 2003)...................................................................................36, 37, 38

*Schaeffer v. Cavallero*,
54 F. Supp. 2d 350 (S.D.N.Y. 1999).......................................................................32, 34, 36

*Silverman v. Clark*,
   822 N.Y.S.2d 9 (1st Dep't 2006) ...................................................................28

*Sleepy's LLC v. Select Comfort Wholesale Corp.*,
   133 F. Supp. 3d 483 (E.D.N.Y. 2015) ............................................................16

*Sorvillo v. St. Francis Prepatory Sch.*,
   607 F. App'x 22 (2d Cir. 2015) .....................................................................30

*Sprewell v. NYP Holdings, Inc.*,
   772 N.Y.S.2d 188 (N.Y. Sup. Ct. 2003) .........................................................19

*Steinhilber v. Alphonse*,
   501 N.E.2d 550 (N.Y. 1986) .....................................................................27, 28

*Stepanov v. Dow Jones & Co., Inc.*,
   987 N.Y.S.2d 37 (1st Dep't 2014) .............................................................2, 17

*Stinnett v. Delta Air Lines, Inc.*,
   278 F. Supp. 3d 599 (E.D.N.Y. 2017) ............................................................40

*Tacopina v. Kerik*,
   No. 14-cv-749 (LTS) (FM), 2016 WL 1268268 (S.D.N.Y. Mar. 31, 016).............21

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
   864 F.3d 236 (2d Cir. 2017) .........................................................................30

*TC v. Valley Cent. Sch. Dist.*,
   777 F. Supp. 2d 577 (S.D.N.Y. 2011) ............................................................19

*Time, Inc. v. Johnston*,
   448 F.2d 378 (4th Cir. 1971) ........................................................................25

*Torain v. Casey*,
   No. 16-cv-2682 (VEC) (JCF), 2016 WL 6780078 (S.D.N.Y. Sept. 16, 2016).......14

*U.S. v. McKeon*,
   738 F.2d 26 (2d Cir. 1984)........................................................................12, 14

*Van Ever v. N.Y. State Dep't of Corr. Servs. At Sing Sing Corr. Facility*,
   No. 99-cv-12348 (SAS), 2000 WL 1727713 (S.D.N.Y. Nov. 21, 2000)...............40

*Vessa v. City of White Plains*,
   No. 12-cv-6989 (ER), 2014 WL 1271230 (S.D.N.Y. Mar. 27, 2014)...................38

*Walker v. Urban Compass, Inc.*,
   No. 652554/2016, 2017 WL 608308 (N.Y. Sup. Ct. Feb. 15, 2017).....................21

*Wang v. Pataki*,
   396 F. Supp. 2d 446 (S.D.N.Y. 2005)................................................................................12

*Wells Fargo Bank*, *N.A. v. Wrights Mill Holdings, LLC*,
   127 F. Supp. 3d 156 (S.D.N.Y. 2015)..........................................................................12, 13

*Wilson v. Tarricone*,
   No. 12-cv-5337 (LTS), 2013 WL 12084504 (S.D.N.Y. Sept. 26, 2013)..............................21

*Zsigray v. Cty. Comm'n of Lewis Cty.*,
   No. 16-cv-64, 2017 WL 462011 (N.D. W.Va. Feb. 2, 2017) .................................................34

*In re Zyprexa Prods. Liab. Litig.*,
   549 F. Supp. 2d 496 (E.D.N.Y. 2008) ..........................................................................12, 15

**Statutes**

42 U.S.C. § 12182(a) .......................................................................................................................39

N.Y. Exec. Law § 296(2)(a)..............................................................................................................39

N.Y. Penal Law § 120.00(1)–(3) .....................................................................................................19

N.Y. Penal Law § 120.05 ................................................................................................................19

**Other Authorities**

Restatement (Second) of Torts § 572..............................................................................................19

## **PRELIMINARY STATEMENT**

This is a meritless lawsuit brought by a famous former Knick who shamed himself while attending a game at Madison Square Garden ("MSG" or the "Garden") and is now looking to shift the blame for his own misconduct.  The harm that Plaintiff Charles Oakley caused to himself and others— including the MSG security guards he assaulted in full view of NYPD officers—is a sad, even heartbreaking fall from grace for this self-described Knicks "legend."  During the Knicks' nationally-televised game on February 8, 2017, Oakley became disruptive, yelling obscenities and disturbing those around him.  When MSG security personnel asked him to exit the arena (revoking his license to be there), he refused to comply.  Instead, in a shocking incident captured in its entirety on video, Oakley repeatedly struck the MSG security guards who, along with NYPD officers, were attempting to escort him out of the arena, exercising remarkable restraint under the circumstances.  As a result, Oakley was immediately arrested, then criminally charged with multiple offenses, and eventually agreed to a plea deal barring him from the Garden for one year.  In other words, Oakley's removal and arrest were the inevitable consequence of his own actions that night.  He has no one to blame but himself.  And he has no viable claim against anyone else.  This Court should therefore reject his attempt to shift blame to others through litigation and dismiss his Amended Complaint with prejudice.

Despite his deplorable public behavior for all to see, his immediate arrest by police at the scene, and the resulting criminal charges over his misconduct, Oakley now compounds his offense by bringing this vexatious lawsuit.  In an effort to save face in the eyes of the public, Oakley tries to make scapegoats of MSG and Jim Dolan, blaming them for problems of his own making.  But he can't rewrite his own sordid history:  the factual allegations he asserts are demonstrably false, and the 10 legal causes of action he lodges are all defective on their face.  Indeed, even after having been afforded the opportunity to amend his pleading, Oakley has once again failed to state any viable claim:  his Amended Complaint cures none of the defects in his original pleading and, if anything, is even weaker in material respects.

For example, Oakley's centerpiece defamation claims fail for multiple reasons.  The statements that Oakley is challenging are simply not defamatory *per se*:  none fall within any of the *per se* categories.  This Court previously indicated as much, and Oakley himself now backpedals, alleging, as a fallback, defamation by implication.  Under New York law, however, a plaintiff alleging such defamation is held to a much more "rigorous" standard in order "[t]o survive a motion to dismiss."  *Stepanov v. Dow Jones & Co., Inc.*, 987 N.Y.S.2d 37, 44 (1st Dep't 2014).  In his amended pleading, Oakley does not even attempt to satisfy this demanding standard, nor could he.  On that basis alone, Oakley's defamation claims should now be dismissed.  In addition, they warrant dismissal because (i) the amended pleading fails to adequately allege special damages, (ii) the amended pleading fails to adequately allege actual malice—a necessary element for all of the defamation claims Oakley advances as a public figure, and (iii) the alleged defamatory statements either constitute protected opinion or could not be construed as defamatory in any event.

The rest of Oakley's claims also remain deficient, despite the opportunity to replead them.  His state common law tort claims for assault, battery, and false imprisonment fail because, by his own admission, Oakley refused to leave MSG after an express directive that he do so.  Oakley's admitted defiance gave MSG the right to forcibly remove him from the property as a trespasser as a matter of law.  Oakley's false imprisonment claim also fails because he does not allege—and cannot—that the Defendants' personnel alone chose to restrain and detain him.  That is because NYPD officers were present at all times and responsible for handcuffing and arresting him.  And Oakley's abuse of process claim fails for several independent reasons, including that he has not alleged Defendants caused his criminal process, had a collateral objective for doing so, or caused him to suffer any special damages as a result.  Finally, Oakley's federal and state statutory disability discrimination claims are defective

because he fails to allege any facts showing discrimination based on any actual or perceived disability.[1] Indeed, there remains an irreconcilable tension between Oakley's defamation claims alleging he was supposedly falsely accused of being an alcoholic and his statutory claims alleging he was supposedly discriminated against because Defendants mistakenly perceived him to be an alcoholic. He cannot have it both ways: either Defendants maliciously accused him of being an alcoholic, knowing that he is not, or Defendants discriminated against him, believing him, in fact, to be an alcoholic, but both propositions cannot be true as a matter of fact. Because these diametrically opposed factual allegations are advanced in the same pleading and must be taken as true, neither the discrimination nor defamation claims can stand. Hence, for all of these reasons, this Court should now dismiss Oakley's Amended Complaint in its entirety, with prejudice, under Rule 12(b)(6).

Of note, while this Court need not consider anything beyond the pleading itself in order to dismiss this Amended Complaint, it has every right to consider and take judicial notice of extrinsic evidence—including court filings, public postings, and internal MSG Arena Camera footage capturing the entire incident on film—that was in the possession of Oakley's counsel before this civil case was filed, is "integral" to the Amended Complaint's core allegations, has been incorporated by reference into Oakley's pleadings, and/or is capable of judicial notice.[2] It makes no difference that Oakley's counsel has now removed all pleading references to this incident as "nationally televised" and captured on "live television." *Compare* Dkt. 1, *with* Am. Compl. Artful pleading can't obscure the truth: the best evidence of what actually happened that night is all on video that Oakley's counsel has admitted possessing from earlier criminal case discovery and that this Court now has every right to review. And

---

[1] Oakley has now dropped his deficient cause of action under New York City's Human Rights Law.

[2] *Kalyanaram v. Am. Ass'n of Univ. Professors at the N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014); *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 374 n.1 (S.D.N.Y. 2013) (Seibel, J.) (considering "video recordings of the incident" as "integral to the Complaint"); *Lewis v. Brown*, No. 15-cv-5084 (NRB), 2017 WL 1091986, at *8 (S.D.N.Y. Mar. 15, 2017) (Buchwald, J.) (considering surveillance video); *Hays v. City of New York*, No. 14-cv-10126 (JMF), 2017 WL 782496, at *1 (S.D.N.Y. Feb. 28, 2017) (Furman, J.) (considering video of "incident at issue").

what that video shows is *Oakley* striking a first blow—and then striking again and again—while MSG security guards and two NYPD officers, exercising remarkable restraint, attempted to remove him from the arena as he resisted, even throwing himself onto the ground at one point and clinging to the railing to try to prevent his removal.  Indeed, this video proves that Oakley has made demonstrably false allegations in multiple, material ways. It is a breach of trust with this Court that Oakley's counsel has now doubled down on those false allegations, even after admitting to having the video footage all along.

Oakley's counsel has also broken faith with this Court by reneging on an express commitment that Oakley would "not alleg[e] . . . special damages,"[3] and then advancing a special damages allegation that is deficient on its face, and, even worse, pure fiction.  While Oakley contends for the first time that he was "not able to receive" an appearance fee from the Rebound Institute, Am. Compl. ¶ 95, he never claims—as he would have to do to show special damages—that he lost the fee because that organization came to view him as an alcoholic, based on Defendants' statements.  Nor could he, because any such claim would be demonstrably false.  Indeed, the Rebound Institute has continued to feature Oakley as a face of the organization on its own website and social media postings—including just weeks after the February 8 incident—of which this Court may take judicial notice.  *See* REBOUND, https://www.reboundinstitute.com/about-us.  In other words, this new allegation is not only insufficient on its face to state special damages, but also disingenuous.

Unfortunately, this is not the first time Oakley has misbehaved and then resorted to litigation as cover for his own misconduct.  Indeed, Oakley's "trouble[d]" history of "many physical altercations" post-retirement was weighing on Jim Dolan when he spoke publicly of this latest incident.[4]  Over the

---

[3]  Jan. 12, 2018 Hearing Tr. ("Tr.") at 27:11-24 ("<u>Mr. Wigdor</u>:  On the repleading, your Honor . . . I am not saying we are not going to replead at all.  <u>The Court</u>:  Okay, but you are certainly not alleging damages let alone special damages.  <u>Mr. Wigdor</u>:  That's correct[.]").

[4]  Oakley's "trouble[d]" history is relevant here because Dolan acknowledged his awareness of it at the time he made the statements Oakley now challenges, as it shows that Dolan lacked any actual malice at the time he made the statements and that Dolan disclosed the facts underlying his opinion.

past decade, Oakley has repeatedly clashed with police and security from Las Vegas to Cleveland to Georgia, and then brought suits against the very police officers and security guards who were the victims of his abuse.  While not alone grounds for dismissal, it is regrettable to see Oakley turning to the same playbook here:  abusing the litigation process to try to deflect blame for his own actions onto others.  This Court should not stand for it.  The time has therefore come to dismiss this specious lawsuit.

## FACTUAL BACKGROUND

### A.    OAKLEY'S RELATIONSHIP WITH THE NEW YORK KNICKS

Charles Oakley is a "former All-Star power forward" who enjoyed a nearly two-decade-long career in the NBA, most of which he played for the Knicks.  Am. Compl. ¶¶ 6, 14–15.  A self-described "Knicks legend" and "inarguably the greatest power forward in Knicks history," Oakley contributed in "large part" to the Knicks' "most sustained run of excellence" in the 1990s.  *Id.* ¶¶ 15–17, 54.  Today, Oakley is still remembered—especially in this City—as one of the greatest Knicks.  *Id.* ¶ 17.  Oakley left the Knicks in 1998; Dolan assumed ownership over the team and MSG in 1999.  *Id.* ¶¶ 14–15, 18.  Oakley "never met . . . Dolan during his playing career, or for several years thereafter."  *Id.* ¶ 23.

### B.    THE FEBRUARY 8, 2017 INCIDENT & RELATED CRIMINAL ACTION

The entirety of the incident at issue in this case was captured on internal MSG surveillance footage.  Key parts of the incident were also captured live on the ESPN national broadcast of the February 8, 2017 game and on other publicly-available videos.  While the Court can—and should—dismiss the entire Amended Complaint on the face of the pleading alone, without resort to any extrinsic evidence, the Court also has every right to consider the objective video evidence of the incident for multiple reasons, including that, as Oakley's counsel has admitted, he had possession of these videos so integral to this case before filing the Complaint.  Therefore, the account below detailing the incident is derived from the pleading itself and the incontrovertible video evidence.

On February 8, 2017, Oakley "attended a Knicks game at the Garden."  *Id.* ¶ 30.  Minutes into

the game, Oakley began shouting obscenities from his seat at a group of MSG security guards standing near an NYPD officer.[5]   S. Kushner Decl., Ex. 2.a (Internal MSG Arena Cam Footage ("MSG Arena Cam")) at 8:13:36–14:05.[6]   After gesturing and yelling at the security guards, Oakley, who was sitting near Dolan, Am. Compl. ¶ 32, began pointing to Dolan, Ex. 2.a at 8:14:37.7.   Oakley then turned back to the group of security personnel and continued shouting in their direction, cupping his hands around his mouth to amplify his voice.   *Id.* at 8:15:12.2.[7]   A few minutes later, Oakley began to yell specifically at one of the security guards in that group who had walked over to Dolan's seat during a timeout.   *Id.* at 8:18:40–44.   Oakley's attention remained fixed on that security guard until he returned to his post; Oakley then resumed yelling at the entire group.   *Id.* at 8:18:50–55, 8:19:00–10.   Oakley's behavior led the security guards and NYPD officer to approach Oakley and ask him to leave.   Am. Compl. ¶¶ 34, 44.   Oakley refused to comply with that peaceful request.   *See id.* ¶¶ 34–46.   Instead, he protested and became aggressive and violent towards the security guards and police officer.   *See id.*; Ex. 2.a at 8:19.

The first security guard who approached Oakley at his seat asked him to leave without touching him.   *See* Am. Compl. ¶ 34.   Oakley refused, jumped up, and invaded the security guard's personal space.   *See id.* ¶¶ 35–41; Ex. 2.a at 8:19:25–47.   The security guard raised his arms to defend his face, and the NYPD officer tried to diffuse the situation and get Oakley to step back, but Oakley nevertheless reached out with his right hand and violently lunged at the security guard.   Ex. 2.a at 8:19:45–51.   The

---

[5]   During the course of the incident that night, Oakley called MSG security personnel and the NYPD officers names like "rat bastard[s]," "white boys," and "mother***ers," and shouted at them phrases like:   "What the f*** are you guys looking at?," "Watch the f***ing game," "All you whites over there get your story straight," "F*** all you white boys," and "[you] suck Dolan's d***."   *MSG Security 'Testimony':  Oakley Alleged Racism, Ranted About Dolan*, N.Y. Post (Feb. 10, 2017), *available at* https://nypost.com/2017/02/10/msg-security-testimony-oakley-called-us-racist-henchmen/.

[6]   All Exhibits ("Ex.") cited herein refer to the exhibits attached to Sarah Kushner's Declaration.

[7]   Although the MSG Arena Cam footage does not contain audio, it does show Oakley repeatedly turning towards the security guards and police officer, cupping his hands around his mouth, and opening it widely while facing their direction. At various points, these actions prompted the security guards and police officer to look over at Oakley and then look back at each other.   These facts, combined with audio from public videos of the incident—on which Oakley can clearly be heard shouting obscenities at MSG security and police officers at the scene—confirm that, during the game, Oakley did, in fact, repeatedly shout at MSG security and NYPD officers, and acted in an aggressive, disorderly manner.

officer and the other security guards then tried to stop Oakley, but he resisted, and turned around to go back to his seat. Am. Compl. ¶ 40. He tripped and fell trying to return to his seat, but quickly stood back up, and then yelled "that's some bullshit." Exs. 3–4 (*New York Times* Video at :04–14; YouTube Video at :12–14). A security guard asked him to "please walk." Ex. 3 at :08–11. Oakley then placed his body up against the security guard's, shoved his finger in the security guard's face, and shouted "get the fuck out of my face." *Id.* at :09–22. The security guard calmly said "no problem" and tried to walk away, but Oakley stepped in front of and intentionally bumped the security guard with his chest, while shouting "I said it to your motherfucking face, motherfucker." *Id.* at :19–26. In plain view of the NYPD officer, Oakley then struck that security guard in the face, forcing the man's head backwards, evoking audible gasps and stunned "nos!" from the MSG crowd. *Id.* at :29–31.

Another security guard then rested his open hand on Oakley's back in an effort to calm him down. *Id.* at :33–35. Oakley screamed "get off of me," punched downward on the security guard's arm, and, with both hands, shoved the security guard into a row of seats and then shoved the security guard again. *Id.* at :35–39; *see also* Ex. 1 (ESPN Broadcast) at :01.[8] The NYPD officer and security guards who had witnessed the totality of Oakley's conduct, including his violent striking and shoving of two security guards, had no choice but to physically escort Oakley out of the arena. *See* Ex. 1.

As the officer and security guards began to escort Oakley to the nearest exit, Oakley began to remove his gold watch and shouted to his friend, "hold my watch." Ex. 3 at 00:37–44. Right before reaching the nearest exit, Oakley threw himself onto the ground, rebuffed the NYPD officer's efforts to help him up, and yelled at the NYPD officer to "get the fuck off of me." Ex. 4 at 1:07–16. While Oakley was on the ground, a second uniformed NYPD officer joined the first officer to assist in escorting Oakley out of the arena. Oakley, however, remained on the ground and continued to protest and

---

[8]   By that point, the broadcast of the game—which Oakley explicitly referenced in his original Complaint (Dkt. 1 ¶¶ 4, 53)—had panned to the incident, capturing this second shove and much of the rest of the incident in the arena as it unfolded.

physically resist his removal, prompting the first NYPD officer to handcuff him.  *See* Am. Compl. ¶ 49.

The officer affixed one cuff to Oakley's right wrist while Oakley—who mocked "why you acting all

tough?" and tried to strike the officer with his handcuffed arm—remained on the ground.  Ex. 4 at 2:18–

31.  The NYPD officers and security guards eventually got Oakley up off the ground, but even then,

Oakley refused to cooperate:  he grabbed onto a railing with both hands, requiring the officers and MSG

guards to pry his fingers from the railing in order to remove him from the arena.  *Id.* at 2:35–55.

The two NYPD officers who escorted and handcuffed Oakley proceeded to arrest him on site.

Ex. 5.a (Internal MSG Post-Incident Security Footage ("MSG Security Footage") Video 1) at :14–25.

They remained with him until an NYPD van arrived, *see* Am. Compl. ¶¶ 49, 51; Ex. 5.d (MSG Security

Footage Video 4) at 15:24, 16:55–17:00, 18:38, to take Oakley to the nearby precinct, where he was

charged with multiple misdemeanors and released with an appearance ticket.

Thereafter, the Manhattan District Attorney's Office ("DA") initiated a criminal action against

Oakley.  *See* Ex. 7 (Mar. 31, 2017 Crim. Compl.).  As part of discovery, the DA produced videos of the

February 8, 2017 incident to Oakley, including the internal MSG Arena Cam and MSG Security

Footage.  *See* Ex. 15 (Feb. 26, 2018 email from D. Wigdor to R. Mastro ("Wigdor Email")); Walden

Decl.  The parties ultimately entered a plea disposition and did not proceed to trial.  On August 4, 2017,

the criminal court granted a six-month adjournment in contemplation of dismissal, and the DA and

Oakley signed a trespass notice, pursuant to which Oakley voluntarily agreed not to enter MSG for one

year.  Ex. 8 (Trespass Notice).  While the six-month adjournment expired on February 2, 2018, and the

case was dismissed, the trespass notice remains in effect.

### C.    DEFENDANTS' ALLEGED DEFAMATORY STATEMENTS

Afterwards, MSG made certain statements about the very public event that had just occurred in

the arena.  Given that the incident unfolded in front of an arena full of fans and countless others watching

the broadcast on their televisions that night, Defendants were compelled to address the situation publicly

and reassure MSG fans that their security and safety is important and is taken very seriously.  First, on February 8 and 9, the Knicks' public relations department posted on its Twitter account two statements regarding Oakley's removal and arrest, noting that numerous MSG personnel had witnessed Oakley's behavior from the time he entered the arena up through his on-site arrest.  Am. Compl. ¶¶ 58, 62. Second, on February 10, Dolan was interviewed about the incident on ESPN Radio's *The Michael Kay Show*.  *Id.* ¶¶ 65–73.  That interview was videotaped, and is publicly available.  Ex. 6 (Feb. 10, 2017 Video of Dolan Interview on *The Michael Kay Show* ("Dolan Interview")).   After explaining the unfortunate incident and saying "I don't know" whether Oakley has a "problem with alcohol," Dolan went on to describe Oakley as a "great Knick" whom he "loved" to watch play and, to this day, "still admire[s]," and stated that "nothing [] would make me happier than to see . . . Oakley be[ing] on that center court, being honored along with the rest of his teammates, and my shaking his hand."  Am. Compl. ¶ 69; Ex. 6 (Dolan Interview) at 1:58–2:18, 9:48–52, 14:30–42.

### D.      OAKLEY'S POST-INCIDENT CONDUCT

Since February 8, 2017, Oakley has made numerous comments to the media about the incident. For example, the day after he was removed from the arena, arrested, and charged for his conduct at MSG, Oakley gave an interview on Fox5, during which he insisted that he had not done anything to warrant his ejection.  *See Charles Oakley Admits to Having 'A Couple Drinks' Before Scene at Garden*, NY Daily News (Feb. 10, 2017).[9]  Oakley also admitted—before Dolan's interview on *The Michael Kay Show*—that he had "had a couple drinks" before entering MSG on February 8.  *Id.*  That same day, Oakley gave an interview with Stephen A. Smith on ESPN (*available at* https://www.youtube.com/watch?v=-Baji5K1xc8).  When asked whether he said anything to Dolan or MSG personnel, Oakley first said no, then admitted to saying to at least one security guard "why y'all

---

[9]   *Available at* http://www.nydailynews.com/sports/basketball/knicks/charles-oakley-couple-drinks-scene-garden-article-1.2969283.

looking at me" and that he was thinking at the time "why all those guys up against that wall." *Id.* Oakley also admitted that an NYPD officer was involved in his removal. *Id.* ("They had no right to walk up on me. Send a NY cop and tell Oakley he has to leave. Have the respect.").

Oakley has repeatedly exploited and monetized the incident for his personal gain. In March 2017, Oakley was paid to host a party at Headquarters Gentleman's Club—a strip club just blocks from MSG—that featured a cardboard cutout of Dolan. *See Charles Oakley Greeted by James Dolan Cutout at Strip Club Party*, NY Daily News (Mar. 24, 2017).[10] Oakley has also used the incident to promote the "BIG3," a three-on-three basketball league for former professional players that he sponsors. In March 2017, Oakley and the new league put out an advertisement for an upcoming tournament, featuring a photograph of Oakley towering over MSG security at the February 8 game, above the caption: "[I]f you think he's tough off the court, wait til you see him on the court." *The Big3 Took a Subtle Shot at the Knicks Over the Charles Oakley Incident*, Dime Magazine (Mar. 17, 2017).[11]

### E.  OAKLEY'S HISTORY OF SIMILAR ACTS[12]

In his post-NBA years, Oakley has been involved in a number of other altercations with security personnel and law enforcement. *See* Ex. 9 (Answer and Counterclaim, *Oakley v. Aria Resort & Casino*, at 14-17 (Nev. D. Ct. July 13, 2011) ("Aria Counterclaim")) (describing other similar incidents in 2010, when Oakley assaulted security officers and bystanders, and 2006, when Oakley threw dice at a casino employee, causing a one-half inch laceration above the individual's eye); *Former Knicks' Player Charles Oakley Busted for DUI*, NY Daily News (Dec. 18, 2017) (discussing Oakley's DUI arrest in

---

[10]  *Available at* http://www.nydailynews.com/entertainment/gossip/confidential/charles-oakley-greeted-james-dolan-cutout-strip-club-party-article-1.3008282.

[11]  *Available at* https://uproxx.com/dimemag/charles-oakley-big3-knicks/.

[12]  Publicly available information regarding Oakley's prior similar history is directly relevant and critical to the resolution of the defamation claims in this action. During his February 10 interview, Dolan specifically referred to Oakley's post-retirement "trouble," including his "many physical [prior] altercations," as the basis, in part, for the statements that Oakley now alleges defamed him. Ex. 6 at 10:20–50.

Georgia)[13].  In 2016, long after his retirement from the NBA, Oakley initiated a nearly identical exchange at the Cleveland Cavaliers' arena when he aggressively confronted and threatened arena security guards outside the Cavaliers' locker room when they refused to let him enter to join that team's private celebration of the NBA Championship.  *See Charles Oakley Almost Gets Into Fight Outside Cavs' Locker Room*, NY Post (June 20, 2016).[14]

Instead of accepting responsibility for his behavior, Oakley has misused the court system to accuse his *victims* of unlawful conduct.  *E.g.*, Exs. 9 (Compl., *Oakley v. Aria Resort & Casino*, (Nev. D. Ct. May 12, 2011)) (alleging negligence, assault and battery, false imprisonment, and defamation against Las Vegas hotel and its security officer); 10 (Compl., *Oakley v. City of Henderson*, (Nev. D. Ct. July 13, 2011)) (alleging negligence and battery against two police officers).

## LEGAL STANDARD

### A.    OAKLEY'S PLEADING BURDEN UNDER RULE 12(B)(6)

Under Fed. R. Civ. P. 12(b)(6), a complaint must be dismissed if it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This standard requires plaintiffs to "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  In applying this standard, a court must ignore "mere conclusory statements" or legal conclusions; the Court may only consider the factual allegations in the complaint and determine whether they plausibly state a claim on which relief can be granted.  *Id.*  "[A] sheer possibility that a defendant has acted unlawfully" is not enough.  *Id.*

### B.    EXTRINSIC EVIDENCE THE COURT MAY CONSIDER ON THIS MOTION

While this Court need look no further than the face of the Amended Complaint to find that

---

[13]  *Available at* http://www.nydailynews.com/sports/basketball/knicks/knicks-player-charles-oakley-busted-dui-article-1.274812.

[14]  *Available at* https://nypost.com/2016/06/20/charles-oakley-almost-gets-into-fight-outside-cavs-locker-room/.

Oakley's claims fail as a matter of law, it also has the discretion to consider—and should consider—certain highly relevant extrinsic evidence that belies Oakley's allegations and compels dismissal here.

On a 12(b)(6) motion to dismiss, a court may consider:  (1) "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit," *Kalyanaram*, 742 F.3d at 44 n.1; (2) documents that are "integral to the complaint," even when the plaintiff "chooses not to attach [the document] to the complaint or incorporate [the document] by reference," *Condit v. Dunne*, 317 F. Supp. 2d 344, 356 (S.D.N.Y. 2004) (Leisure, J.) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir. 1991)); (3) "any statements or documents incorporated . . . by reference" in the pleading, *Kalyanaram*, 742 F.3d at 44 n.1; and (4) "matters of which judicial notice may be taken." *Id.*  Among the matters of which a court may take judicial notice are:

> **(i) a party's prior pleadings**, *see U.S. v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984) ("pleadings constitute the admissions of a party-opponent and are admissible in the case in which they were originally filed");
>
> **(ii) civil or criminal court filings in another case**, *see In re Zyprexa Prods. Liab. Litig.*, 549 F. Supp. 2d 496, 501 (E.D.N.Y. 2008) ("[j]udicial notice can be taken of prior complaints and legal proceedings"); and
>
> **(iii) public online postings, including "information publicly announced on a party's website,"** *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) (Crotty, J.); *see also Fernandez v. Zoni Language Ctrs.*, No. 15-cv-6066 (PKC), 2016 WL 2903274, at *3 (S.D.N.Y. May 18, 2016) (Castel, J.); *Hotel Emps. & Rest. Emps. Union v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 549 (2d Cir. 2002).[15]

Indeed, in general, a court may take judicial notice "at 'any stage of the proceeding,' of any fact 'that is not subject to reasonable dispute because' it 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Wells Fargo Bank*, 127 F. Supp. 3d at 166.

Here, the Court should consider the pieces of extrinsic evidence listed below—all of which Plaintiff and his counsel have had in their possession and/or have otherwise been aware of and have had

---

[15]  *See, e.g.*, *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166–67 (S.D.N.Y. 2015) (Engelmayer, J.) (judicial notice of a LexisNexis database search); *Wang v. Pataki*, 396 F. Supp. 2d 446, 458 n.2 (S.D.N.Y. 2005) (Sweet, J.) (considering information on the Village Voice's website).

access to since before they filed this lawsuit.  As an initial matter, that Plaintiff and his counsel have "actual notice" of all the information referenced in and attached as Exhibits to Defendants' motion papers is "significant" and reason enough for the Court to properly consider this critical evidence.  *See, e.g., Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Despite the fact that the documents attached to defendant['s] motion to dismiss were neither public disclosure documents . . . , nor attached as exhibits to the complaint or incorporated by reference in it, the district court was entitled to consider them in deciding the motion to dismiss[, since they] were documents plaintiffs had either in its possession or had knowledge of and upon which they relied in bringing suit.  It did not lack notice of those documents; these papers were integral to its complaint.").[16]

   1. **<u>Video Footage Of The February 8 Incident.</u>**  The Court can and should consider the available video footage of the incident because it is objective, dispositive, and the best evidence of the event at issue, and Oakley's counsel has admitted that he had that evidence in his possession before filing this lawsuit.  Specifically, Oakley's counsel has admitted receiving from the DA's Office in discovery during the criminal case the internal MSG Arena Camera footage that captures the entire incident in the arena from start to finish.[17]  Therefore, there can be no genuine dispute as to its authenticity, and the Court's consideration of it poses no surprise or prejudice to Oakley.

   The internal MSG footage is corroborated by other publicly available videos with audio—

---

[16]  The Second Circuit has explained that "[a] finding that plaintiff has had notice of documents used by defendant in a 12(b)(6) motion is significant, since . . . the problem that arises when a court reviews statements extraneous to a complaint generally is the lack of notice to the plaintiff that they may be so considered; it is for that reason—requiring notice so that the party against whom the motion to dismiss is made may respond—that Rule 12(b)(6) motions are ordinarily converted into summary judgment motions. Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated."  *Cortec Indus., Inc.*, 949 F.2d at 48.

[17]  *See* Ex. 15.  The internal MSG Arena Camera footage submitted to the Court is the same footage the DA previously produced to Oakley in his criminal case.  *See* Walden Decl. (confirming that Arena Cam and other video evidence was provided to the DA); *see also* Ex. 2.a.  For the Court's convenience, Defendants have also included a "close up" of this footage, which is simply zoomed in on the relevant area where the incident unfolded.  Ex. 2.b (MSG Arena Cam Close Up ("Close Up")).  Both the actual footage and this zoomed-in version depict the incident start to finish, including Oakley striking the first blow and then repeatedly striking MSG security guards as they attempted to escort him out of the arena.

including those posted on the *New York Times*' website, YouTube, and the ESPN national television broadcast of the game, Exs. 3–5—that Oakley's counsel has admitted to viewing before this case was filed, Ex. 15.  These public videos, while limited in duration, show critical exchanges belying Oakley's allegations about the incident.  This video evidence was arguably incorporated by reference in Oakley's original pleading.[18]  But in any event, it is so integral here that this Court has every right to consider it as objective evidence of the events at the heart of this case.[19]

      **2.**  **Video Of Dolan's February 10 Interview on *The Michael Kay Show.***  Regarding Oakley's defamation claims, the Court should consider the entire video of Dolan's February 10, 2017 interview on ESPN Radio's *The Michael Kay Show*.  Ex. 6.  The defamation claims are based primarily on Dolan's statements during that interview, and Oakley relies on and quotes extensively from that interview in both his Original and Amended Complaint.  *E.g.*, Am. Compl.  ¶¶ 65–77.  Under well-settled law, the Court can and should consider the entire video of the interview, and not just the cherry-picked statements quoted in Oakley's pleadings, in analyzing Oakley's defamation claims.  *See Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 414 n.52 (S.D.N.Y. 2009) (Scheindlin, J.); *Torain v. Casey*, No. 16-cv-2682 (VEC) (JCF), 2016 WL 6780078, at *2 n.1 (S.D.N.Y. Sept. 16, 2016) (Francis, M.J.).

      **3.**  **Documents From Oakley's Criminal Case And Other Prior Court Proceedings.**  The Court should also consider documents filed in Oakley's related criminal case and pleadings from his prior civil cases.  *See Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (endorsing "judicial notice of pleadings in other lawsuits attached to defendants' motion to dismiss"); *In re Zyprexa Prods. Liab.*

---

[18]  The original Complaint explicitly referenced the national broadcast of the February 8 game.  *See* Dkt. 1 ¶¶ 4, 53  (alleging Oakley was "publicly embarrass[ed] . . . on live television" and "humiliat[ed] . . . on national television").  Oakley cannot avoid the consequences of these allegations simply by removing them in his amended pleading—they are party admissions and statements of which the Court may take judicial notice.  *See McKeon*, 738 F.2d at 31 (a party "cannot advance one version of the facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change in stories").

[19]  *See Lewis*, 2017 WL 1091986, at *8 (surveillance video); *Hays*, 2017 WL 782496, at *1 ("video of the primary incident at issue"); *Chamberlain*, 986 F. Supp. 2d at 374 n.1 ("video recordings of the incident" were "integral to the Complaint").

*Litig.*, 549 F. Supp. 2d at 501 ("[j]udicial notice can be taken of prior complaints and legal proceedings"). Specifically, the Court should consider (1) the criminal complaint, and (2) a notice of trespass Oakley and the DA signed as part of the plea disposition in Oakley's related criminal case. Exs. 7–8. Both documents are judicially noticeable, highly relevant, objective evidence that directly contradict allegations in the Amended Complaint. For example, while Oakley alleges that Defendants have banned him from MSG, the trespass notice shows that Oakley voluntarily entered into an agreement with the DA not to enter MSG for one year. The information in these documents is already in the public record and the Amended Complaint—that is, Oakley's arrest and the charges filed against him for the February 8 incident. Those matters are also integral to Oakley's assault, battery, abuse-of-process, and false imprisonment claims. *See Obilo v. City Univ. of City of N.Y.*, No. 01-cv-5118 (DGT), 2003 WL 1809471, at *4 (E.D.N.Y. Apr. 7, 2003) (taking judicial notice of incident report and police complaint where plaintiff alleged he was "arrested and prosecuted without probable cause").

Judicial notice of pleadings in prior civil cases Oakley has filed in connection with his prior physical altercations with security personnel and/or law enforcement—as well as of the underlying altercations themselves—is also warranted because they reflect Oakley's relevant recidivist history.

**4. Information Published On Public Websites.** Finally, the Court can and should take judicial notice of certain public website postings on Oakley's own website, oakleyinthekitchen.com, and the Rebound Institute's websites, reboundinstitute.com, including posts of Oakley's own tweets on his Twitter account. Under well-settled law, the Court can consider information on Oakley's personal website because it is a party admission, *see Doron*, 423 F. Supp. 2d at 179 n.8, and in any event the Court may take judicial notice of all the materials from that website and the Rebound Institute's online materials that Defendants have attached hereto as exhibits in further support of their motion. Exs. 11–13. Indeed, it is particularly appropriate for the Court to consider these materials now because they wholly discredit multiple claims forwarded in the Amended Complaint. *See infra* III.A.2.b.

15

## ARGUMENT

For the reasons below, each and every one of Oakley's ten claims is facially deficient on the pleadings alone.  Because Oakley has no viable claim, the pleading should be dismissed in its entirety.

### A.    OAKLEY'S DEFAMATION CLAIMS FAIL FOR MULTIPLE REASONS

The Amended Complaint alleges four defamation causes of action (defamation *per se*, defamation *per quod*, libel, and slander) based on two statements posted on the Knicks' PR Twitter account and statements Dolan made during his February 10, 2017 interview on *The Michael Kay Show*. Am. Compl. ¶¶ 96–121 (Counts 1–4).[20]  Under New York law, a plaintiff alleging defamation must plead five elements:  (1) a "defamatory statement of fact concerning the plaintiff; (2) publication to a third party; (3) fault [(actual malice for public figures)]; (4) falsity of the defamatory statement; and (5) special damages or per se accountability (defamatory on its face)."  *Biro*, 883 F. Supp. at 456.  A defamatory statement "must do more than cause discomfort or affront"; it must lead "reasonable minds" to "think the speech attributes odious or despicable characterizations to its subject."  *Chau*, 771 F.3d at 127.  Here, Oakley alleges that Defendants' statements defamed him because they purportedly "publicly accus[ed] him of having committed assault, [of] having subjected other individuals . . . to abusive conduct[,] and [of] being an alcoholic."  Am. Compl. ¶ 117; *see also id.* ¶¶ 97, 103–04, 111.  Oakley further alleges that Defendants defamed him because they knew "these statements were false, or were recklessly indifferent to the falsity of these statements, and made them with the specific intention of damaging Oakley's reputation and maligning him to the general public."  *Id.* ¶ 99.

As a preliminary matter, Oakley now effectively concedes that the challenged statements are not

---

[20]  While only the corporate Defendants are named in the libel claim, all four of these counts are best analyzed together because defamation "incorporates the twin torts of libel and slander," *Cortes v. Twenty-First Century Fox Am., Inc.*, No. 17-cv-5634 (RWS), 2018 WL 348862, at *8 (S.D.N.Y. Jan. 9, 2018) (Sweet, J.) (internal citation omitted)—libel being defamation "by written expression" and slander being defamation "by oral expression," *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 456 (S.D.N.Y. 2012) (Oetken, J.).  *Compare Chau v. Lewis*, 771 F.3d 118, 126-27 (2d Cir. 2014) (libel), *with Sleepy's LLC v. Select Comfort Wholesale Corp.*, 133 F. Supp. 3d 483, 498 (E.D.N.Y. 2015) (slander).

defamatory *per se* on their face—notably, the amended pleading simply alleges that these statements were defamatory *per se by implication*. *Id.* ¶ 57 (alleging that Defendants' challenged statements "*impl*[*ied*] both that he was an alcoholic and that he had committed a violent crime") (emphasis added). This amendment is not surprising given the Court's prior observation on the record that the challenged statements do not fall into any of the four narrow defamation *per se* categories recognized under New York law. *See, e.g.*, Tr. at 7:21–8:1, 8:2–4, 13:14–21, 27:11–24. A claim for implied defamation, however, is subject to a stricter standard under New York law than ordinary defamation claims. *See Armstrong v. Simon & Schuster, Inc.*, 649 N.E.2d 825, 829 (N.Y. 1995). "To survive a motion to dismiss a claim for defamation by implication . . . the plaintiff must make a rigorous showing that the language of the communication as a whole can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference." *Stepanov*, 987 N.Y.S.2d at 44. Here, the Amended Complaint merely asserts in conclusory terms that Defendants "intended or endorsed" the alleged inferences—it pleads no factual allegations in support thereof. Thus, the Court should find that Oakley has failed to state a claim for defamation by implication, and should dismiss Oakley's defamation causes of action on this basis alone.

Should the Court reach the challenged statements, however, it should still find that each of Oakley's defamation claims are legally deficient in multiple, fundamental ways: (1) none of the challenged statements constitute defamation *per se*; (2) Oakley now relies on a new, unsupported and fabricated claim of special damages; (3) the Amended Complaint fails to plead actual malice, a necessary element of any defamation claim brought by a public figure like Oakley; and (4) the challenged statements are not actionable because they are constitutionally protected opinions.

### 1.   Oakley Fails To Plead The Necessary Elements Of Defamation *Per Se*

In order to state a defamation *per se* claim under New York law, a plaintiff must allege that the relevant statements fit within one of four narrow categories: "statements (i) charging plaintiff with a

serious crime; (ii) that tend to injure another [plaintiff] in his . . . trade, business, or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman." *Liberman v. Gelstein*, 605 N.E.2d 344, 347 (N.Y. 1992).  It is for the court to determine whether the challenged statements are defamatory *per se*.  *See Ithaca Coll. v. Yale Daily News Pub. Co.*, 445 N.Y.S.2d 621, 622 (3d Dep't 1981).  Here, Oakley alleges that Defendants' statements "accus[ed] him of having committed the serious crime of assault," "accus[ed] him of suffering from the loathsome disease of alcoholism," and "defamed [him] in his trade, business or profession."  Am. Compl. ¶¶ 103–05.  Each argument fails.

### (a) The Statements Do Not Accuse Oakley Of Committing Assault— Or Any Serious Crime.

The Amended Complaint does not identify *any* statement even suggesting that Oakley committed assault, physical injury, or any other crime—let alone a serious one—in connection with the February 8, 2017 incident (or otherwise).  Instead, the pleading simply claims that certain statements Defendants allegedly made about Oakley—such as that he "behaved in a[n] . . . abusive manner" at the February 8 game, that "[h]e has a problem with anger," and that he can be generally "abusive"— constitute defamation *per se* under the serious crime category.  *Id.* ¶¶ 58, 69.  These statements, however, do not explicitly accuse or otherwise imply that Oakley committed assault or any other crime.  *Cf. Liberman*, 605 N.E.2d at 348 ("[I]t is not slanderous per se to claim that someone committed harassment.").  Even construing Defendants' statements in the light most favorable to the Plaintiff, there is no way to distort these statements into implying even third-degree assault, which is not a serious crime.[21]  *Cf. Burdick v. Verizon Commc'ns, Inc.*, 305 A.D.2d 1030, 1031 (4th Dep't 2003) (allegation that plaintiff "hit" or "took a swing at" another not defamatory *per se*).[22]

---

[21]  In New York, to be guilty of third-degree assault, an individual must "cause physical *injury* to another person," N.Y. Penal Law § 120.00(1)–(3); second-degree assault requires "*serious*" physical injury, *id.* § 120.05 (emphases added).  The challenged statements do not accuse Oakley of causing injury to anyone.

[22]  *Sprewell v. NYP Holdings, Inc.*, 772 N.Y.S.2d 188 (N.Y. Sup. Ct. 2003), is distinguishable.  There the challenged statements referred to specific physical actions taken by the plaintiff, including that he "took a swing," "busted [his] hand"

**(b)     Alcoholism Is Not A "Loathsome Disease," And—Even If It Were— The Statements Do Not Accuse Oakley Of Being An Alcoholic.**

Oakley also alleges that Defendants' statements implied that he is an alcoholic and thus constitute defamation *per se* based on a loathsome disease.  Am Compl. ¶¶ 88–90, 104.  It is well-established, however, that only "existing venereal disease[s] and other 'loathsome and communicable' disease[s]" can qualify as loathsome diseases.  *TC v. Valley Cent. Sch. Dist.*, 777 F. Supp. 2d 577, 603 (S.D.N.Y. 2011) (Eginton, J.) (quoting Restatement (Second) of Torts § 572); *see also Marino v. Jonke*, No. 11-cv-430 (VB), 2012 WL 1871623, at *11 (S.D.N.Y. Mar. 30, 2012) (Briccetti, J.).  Alcoholism fits neither category.  Accordingly, in *Ruderman v. Stern*, the court rejected this very argument, finding that "[d]efendants' statements that plaintiff was an alcoholic" simply "do not constitute slander per se." No. 39179/97, 2004 WL 3153217, at *16 (N.Y. Sup. Ct. Oct. 25, 2004).

Yet even if the law did consider alcoholism a loathsome disease—which it does not—the Amended Complaint does not identify a single statement that labels Oakley an alcoholic.  The Amended Complaint simply points to a one statement Dolan made in his lengthy February 10 interview that "[h]e [Oakley] *may* have a problem with alcohol," Am Compl. ¶ 69 (emphasis added), and the Twitter statement—which Oakley only attributes to corporate Defendants, not Dolan—expressing MSG's "hope" that "he gets some help soon," *id.* ¶ 89.  First, speculating about a potential problem someone "may" have is a far cry from calling someone an alcoholic.  Oakley also misleadingly quotes this statement:  Dolan actually stated that Oakley "*may* have a problem with alcohol, *we don't know, right*." Ex. 6 (emphases added).  As for the second statement, expressing hope that someone "gets . . . help" is not something courts consider defamatory *per se*.  *Marino*, 2012 WL 1871623, at *11.  And, as with the first statement, it is offered out of context:  the relevant tweet expressed the hope that Oakley "gets some help soon" immediately after noting that he had been "arrested by the New York City Police

---

in a "skirmish," "punch[ed] a wall," and used a "clenched fist" to "hit[] a surface."  *Id.* at 193.  That is simply not the case here.  In any event, *Sprewell* is at odds with the holding of a higher state court.  *See Burdick*, 305 A.D.2d at 1031.

Department."  Am. Compl. ¶ 58.  In context, there is simply no way to reasonably tie or otherwise

construe the "hope he gets some help soon" statement—which does not even mention alcohol, *see id.*—

to an alleged accusation that Oakley is an alcoholic.

For all these reasons, the Court should find that none of the challenged statements accuse or

imply that Oakley is an alcoholic, and even if they did, such statements would not be defamatory *per se*

as a matter of law, because alcoholism is not a "loathsome disease" in this context.

### (c)    The Challenged Statements Did Not Defame Oakley In His "Trade, Business, Or Profession."

Recognizing that his original defamation claims would not survive a Rule 12(b)(6) motion,

Oakley amended his pleading to include a new argument for defamation *per se*:  that he was injured in

his trade, business, or profession.  *Id.* ¶ 105.  That argument also fails, however, because the challenged

statements do not specifically concern Oakley's purported profession, as opposed to his general personal

qualities, and because Oakley has not and cannot allege that counseling alcoholics at rehabilitation

centers is his profession.  "Courts have consistently held that any allegedly defamatory statements that

do not affect a plaintiff's actual business profession, rather than simply qualities that are important for

business, are not defamatory *per se*."  *Kalimantano GmbH v. Motion In Time, Inc.*, 939 F. Supp. 2d 392,

420 (S.D.N.Y. 2013) (Engelmayer, J.).  To find that a statement qualifies as one that "tends to injure

another in his or her trade, business, or profession," "[t]he statement must be made with reference to a

matter of significance and importance for the [operation of the business], rather than a more general

reflection upon the plaintiff's character or qualities."  *Medcalf v. Walsh*, 938 F. Supp. 2d 478, 487

(S.D.N.Y. 2013) (Engelmayer, J.) (internal citation omitted).

Here, even grossly misconstruing the challenged statements to Oakley's benefit, they are at most

general reflections on Oakley's character—not targeted comments regarding his purported profession

or business persona.  Notably, the allegation that the statements caused injury to his "professional [or]

personal reputation," Am. Compl. ¶ 106, is "not sufficient" to support a defamation claim because the

statements "must have been spoken of [the plaintiff] in his business." *Tacopina v. Kerik*, No. 14-cv-749 (LTS) (FM), 2016 WL 1268268, at *4 (S.D.N.Y. Mar. 31, 2016) (Swain, J.). Oakley merely alleges that Defendants said he was "abusive" and acted "inappropriate[ly]" at the February 8 game, and speculated that he "*may* have a problem with alcohol." Am. Compl. ¶¶ 58, 69; *see also id.* ¶¶ 72–73. Such general comments are insufficient to state a cognizable defamation *per se* claim based on alleged injury to one's profession. *See Walker v. Urban Compass, Inc.*, No. 652554/2016, 2017 WL 608308, at *3, *6 (N.Y. Sup. Ct. Feb. 15, 2017) (accusations that one abuses alcohol not defamatory *per se* under trade/business category); *see also Wilson v. Tarricone*, No. 12-cv-5337 (LTS), 2013 WL 12084504, at *5 (S.D.N.Y. Sept. 26, 2013) (Swain, J.) ("Defamatory statements must touch [plaintiff] in his business or office. It is not sufficient that they tend to injure [him] in his business, they must have been spoken of him in his business.") (internal citation and brackets omitted); *e.g.*, *id.* (not defamatory *per se* to allege that plaintiff was "incompetent" and "incapable of serving as a[n] officer").

Finally, this claim fails for the additional reason that it relies on extrinsic facts. Under New York law, "statements cannot be slanderous per se if reference to extrinsic facts is necessary to give them a defamatory import." *Aronson v. Wiersma*, 483 N.E.2d 1138, 1140 (N.Y. 1985). The Amended Complaint does not identify a trade, business, or profession in which Oakley is currently engaged, let alone allege that his current trade, business, or profession is delivering autobiographical speeches at alcohol rehabilitation clinics.[23] Even if it did, this claim would still fail because one would need to know multiple extrinsic facts to connect the statements at issue to Oakley's this alleged business. At a minimum, one would need to know that (1) Oakley's profession consists of working with alcoholics at rehabilitation clinics and (2) in a capacity whereby he represents that he is sober and that his sobriety is

---

[23] Oakley does not allege that appearing at alcohol rehabilitation centers is his trade or business, nor could he. Oakley's own website features a three-part biography, including a section entitled "Life After Basketball." Ex. 11 (Oakley's Public Website). Though the biography mentions such disparate endeavors as hosting a cooking show, opening a restaurant, and founding a sweepstakes app, at no point does it even *mention* appearances at alcohol rehabilitation centers, let alone suggest that Oakley has dedicated his post-retirement life to counseling alcoholics at the Rebound Institute or elsewhere.

beyond question (as opposed to, for example, speakers who provide inspiration based on their own past struggles with alcohol).  Because no reasonable listener would know these extrinsic facts—which Oakley does not even bother to allege—the relevant statements cannot be defamatory *per se*.  *See*, *e.g.*, *Agnant v. Shakur*, 30 F. Supp. 2d 420, 426 (S.D.N.Y. 1998) (Mukasey, J.) (rejecting defamation *per se* claim because "no reasonable jury could interpret the disputed lyrics in the manner urged by plaintiff" without knowing multiple extrinsic facts); *Franklin v. Daily Holdings, Inc.*, 21 N.Y.S.3d 6, 11 (1st Dep't 2015).

## 2.  The Amended Complaint Fails To Plead Special Damages

To avoid dismissal of his defamation claims, Oakley now alleges that Defendants' statements are also actionable under a defamation theory based on special damages.  "Special damages consist of the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation."  *Kalimantano GmbH*, 939 F. Supp. 2d at 420–21 (internal citation omitted).  Oakley did not plead special damages in his original Complaint, *see* Dkt. 1, and Oakley's counsel repeatedly informed the Court that he was not and had no intention of alleging defamation based on special damages.  Tr. at 7:3–13, 7:21–8:1, 8:2–4, 13:14–22, 27:11–24.  Nevertheless, in his Amended Complaint, Oakley now alleges special damages—specifically, that he "was scheduled to earn appearance fees totaling precisely $40,000 from the Rebound Institute," but "once Defendants falsely claimed that he was an alcoholic who needed to get 'help,'" he "was not able to receive the $40,000 he would have otherwise been paid."  Am. Compl. ¶¶ 94–95.  Yet even with this belated addition, the Amended Complaint fails to properly link this alleged lost fee to the alleged defamation.

### (a)  The Amended Complaint Fails To Establish That Defendants' Statements Caused The Alleged Damages.

For special damages to be found, "actual losses must be identified and *causally related* to the alleged tortious act."  *L.W.C. Agency, Inc. v. St. Paul Fire and Marine Ins. Co.*, 509 N.Y.S.2d 97, 100 (2d Dep't 1986) (emphasis added).  When a plaintiff fails to causally link the allegedly defamatory

statement to the alleged damage, courts routinely dismiss the defamation claim as facially deficient. *See*, *e.g.*, *id.* at 99–100 (allegation that defendants' statements caused prospective employers to refuse to employ plaintiff insufficient to plead special damages).  While the Amended Complaint tries to causally connect the challenged statements to Oakley's alleged damage, the link is conclusory and inadequate.

The Amended Complaint merely alleges that, "as a direct result" of Defendants' statements, the Rebound Institute "conclu[ded] that it was not appropriate for someone with [] a reputation [for alcoholism] to interact with their patients," and thus "Oakley was not able to receive [a] $40,000" appearance fee from the Rebound Institute.  Am. Compl. ¶¶ 93, 95.  Oakley's special damages claim thus assumes that Defendants' statements generated Oakley's reputation for alcoholism.  This, however, is impossible, as the statements never labeled Oakley as an alcoholic. *See id.* ¶¶ 58, 69.  Moreover, the Amended Complaint ignores the numerous other factors that could have caused an organization to dissociate with Oakley after February 8, including the fact that he was taken into police custody on national television, that he was arrested, that he was charged with multiple crimes, that he agreed to the contents of the Trespass Notice, and/or that he promotes strip clubs, *see supra* I.B, D.  Oakley thus cannot plausibly plead that certain cherry-picked statements Defendants made—and not numerous other actions for which Oakley alone was responsible—allegedly made Oakley "not able to receive" an appearance fee from the Rebound Institute, Am. Compl. ¶ 95.

### (b)      The Special Damages Claim Is Fabricated.

The special damages claim can be dismissed on its face for the reasons discussed above.  But the implausibility of that claim is further underscored by judicially noticeable public materials.  Indeed, the Rebound Institute's public website and Twitter account reveal not only that there is no causal connection between the challenged statements and Oakley's purported appearance fee, but that the special damages claim itself is false.  Those public postings reveal that in the months after the incident, Oakley was—and still is today—actively involved with and a featured face of the Rebound Institute:

- Oakley hosted the Rebound Institute basketball camp on March 18, 2017 (less than six weeks after the incident) and helped host the organization's celebrity golf tournament on May 4, 2017; at the former, a Rebound Institute press release stated that Oakley "explain[ed] the importance of living a healthy lifestyle";

- Rebound Institute's owner and founder Jayson Williams appeared with Oakley on a radio show in April 2017 to promote the Rebound Institute;

- Rebound Institute's website's "About Us" section features links to three positive news articles regarding Oakley's involvement with the organization;

- On March 23, 2017, the Rebound Institute shared a tweet by Oakley that included a link to an article which stated that the Knicks and Dolan should be "embarrassed" with themselves; and

- On April 11, 2017, the Rebound Institute posted an image of Oakley on its Twitter page with a caption that read "DolanSucks."

Exs. 12–13 (Rebound Institute Website; Rebound Institute Twitter).  This public information proves that this new allegation of special damages is plainly false.  Indeed, Oakley has used the February 8 incident for personal financial gain and to enhance his public profile.  *See supra* I.D.  The Amended Complaint's special damages claim is thus both unsupported and implausible, and should be dismissed.

### 3.     The Amended Complaint Does Not Plead Actual Malice

A public figure cannot recover damages for defamation unless he proves that the relevant statements were made with actual malice at the time of publication.  *See Dunlop-McCullen v. Rogers*, No. 00-cv-3274 (JSR) (JCF), 2002 WL 1205029, at *7 (S.D.N.Y. Feb. 21, 2002) (Rakoff, J.).  "Whether a plaintiff is a public or private figure is a question of law to be determined by the court."  *Id.* at *8. Those who have "assum[ed] roles of especial prominence in the affairs of society" and "invite[d] attention and comment" are generally considered public figures.  *Id* (internal citation omitted).  The Amended Complaint itself characterizes Oakley as a "Knicks legend," a "premier" "17-year veteran of the NBA" who was "inarguably the greatest power forward in Knicks history."  Am. Compl. ¶¶ 1, 6, 17, 54.  Moreover, Oakley alleges he has spent significant time since his retirement making "guest appearances," from which he can earn tens of thousands of dollars in fees for a single appearance.  *Id.* ¶¶ 92, 94.  Unsurprisingly, courts regularly have found that plaintiffs with similar backgrounds are

24

public figures. *See*, *e.g.*, *Pippen v. NBC Universal Media, LLC*, No. 11-cv-8834, 2012 WL 12903167, at *2 (N.D. Ill. Aug. 2, 2012); *Time, Inc. v. Johnston*, 448 F.2d 378, 381–82 (4th Cir. 1971). Oakley must therefore "show that the statements were made with 'actual malice'—that is, with knowledge that the statements were false or with reckless disregard as to their falsity." *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015). Oakley has not.

Actual malice concerns "the speaker's [actual,] subjective doubts about the truth of the publication." *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001). It is irrelevant "whether a reasonably prudent man would have published [the challenged statement], or would have investigated [it] before publishing." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 276–78 (S.D.N.Y. 2013) (Oetken, J.) (internal citation omitted). Indeed, actual malice requires that the speaker himself demonstrate "deliberate or reckless falsification." *Id.* at 276 (internal citation omitted). At the motion to dismiss stage, a "public-figure plaintiff must plead 'plausible grounds' to infer actual malice by alleging 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' actual malice." *Biro*, 807 F.3d at 546 (quoting *Twombly*, 550 U.S. at 556). "Conclusory allegations are insufficient." *Amadsau v. Bronx Lebanon Hosp. Ctr.*, No. 03-cv-6450 (LAK) (AJP), 2005 WL 121746, at *13 (S.D.N.Y. Jan. 21, 2005) (Peck, M.J.) (internal citation omitted). Finally, "the actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989).

Here, Oakley fails to offer any proof of actual malice beyond conclusory legal allegations and insufficient accusations of ill will. The Amended Complaint repeatedly asserts in conclusory terms that Defendants "knew [the statements at issue were] false at the time [they] w[ere] made and/or recklessly disregarded their truth at the time they were made." Am. Compl. ¶ 59, *see id.* ¶¶ 63, 70, 74, 76, 99, 108, 113, 119. Each such allegation, however, is exactly the kind of legal allegation and mere formulaic recitation of the relevant element that "must be discarded at the outset" in the *Iqbal*/*Twombly* analysis.

*Biro*, 963 F. Supp. 2d at 281; *see id.* at 282–83 (dismissing defamation claim where the only support for the claim were conclusory allegations that the defendant "acted with actual malice" and "knew or should have known that the statement of fact in the [allegedly defamatory] article was false"). Similarly, Oakley's naked assertion that Defendants "act[ed] with actual malice," *e.g.*, Am. Compl. ¶¶ 70, 74, 108, is unavailing and should be afforded no weight, *see Iqbal*, 556 U.S. at 678. Pleading "actual-malice buzzwords is simply not enough to nudge a case into discovery." *Biro*, 963 F. Supp. 2d at 279–80 (internal citation omitted).[24]

The Amended Complaint's only remaining factual allegations regarding actual malice are that Dolan harbored ill will towards Oakley. These allegations are implausible and unavailing. As ostensible evidence of this ill will, Oakley alleges that he has had to purchase his own tickets to Knicks games, and that he was once trailed by security guards while at the Garden. Am. Compl. ¶¶ 26, 28. Even if credited, however, these claims do not plausibly establish that Defendants harbored animosity toward Plaintiff, nor do they show that the challenged statements were knowingly or recklessly false. In any event, the Court should find that Oakley has not pled actual malice because evidence of ill will cannot, without more, establish actual malice. *See, e.g., Dunlop-McCullen*, 2002 WL 1205029, at *16 n.3 (descriptions of "past disputes between the parties and grudges held by the defendants" are insufficient, standing alone, to establish actual malice). Finally, Oakley's entire factual argument regarding actual malice is inconsistent with his allegations that Defendants actually perceived him to be an alcoholic. *Compare* Am. Compl. ¶ 70, *with id.* ¶¶ 139–148. Because facts are judicial admissions, "[p]laintiffs may not plead facts in the alternative." *Almazan v. Almazan*, No. 14-cv-311 (AJN), 2015 WL 500176, at *13 n.4 (S.D.N.Y. Feb. 4, 2015) (Nathan, J.). If Oakley wishes to plead that Defendants "[b]elieved [t]hat [he] was an [a]lcoholic," Am. Compl. at 23, he cannot simultaneously plead malice.

---

[24]   That Dolan specifically explained that certain statements of his were premised on Oakley's "trouble[d]" post-retirement history including "many physical altercations," underscores that his statements were not deliberately or recklessly false.

Since Oakley has failed to allege malice, the Court should dismiss all of his defamation claims.

### 4. The Statements Are Not Actionable Because They Are Opinions

Oakley's defamation claims must also be dismissed because they are based on statements of opinion. It is well-settled that "[a]n expression of pure opinion is not actionable" as it "receives the Federal constitutional protection accorded to the expression of ideas, no matter how vituperative or unreasonable it may be." *Steinhilber v. Alphonse*, 501 N.E.2d 550, 552 (N.Y. 1986). "In New York, the determination of whether a statement is a fact or an opinion is left to the Court," and is ripe for consideration at this stage. *Galland v. Johnston*, No. 14-cv-4411 (RJS), 2015 WL 1290775, at *5 (S.D.N.Y. Mar. 19, 2015) (Sullivan, J.). Four factors are relevant to this determination: (1) "whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous;" (2) "whether the statement is capable of being objectively characterized as true of false;" (3) "the full context of the communication in which the statement appears;" and (4) "the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which might signal to readers or listeners that what is being read or heard is likely to be opinion, not fact." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 402 n.7 (2d Cir. 2006) (internal citations omitted). Context is key to this analysis. Thus, when looking at allegedly defamatory statements, courts do not consider the words in isolation, but "construe[ them] in the context of the entire statement or publication as a whole, tested against the understanding of the average reader." *Dillon v. City of New York*, 704 N.Y.S.2d 1, 5 (1st Dep't 1999) (internal citation omitted). "[E]ven apparent statements of fact may assume the character of statements of opinion, and thus be privileged, when made in public debate, . . . or other circumstances in which an audience may anticipate" the use of "fiery rhetoric or hyperbole." *Steinhilber*, 501 N.E.2d at 556 (internal citation omitted).

Here, as a preliminary matter, even if Defendants' alleged defamatory statements were assessed in a vacuum, devoid of any context, they are, on their face, statements of opinion:

- Oakley challenges certain tweets posted by the Knicks' public relations department stating that Oakley "behaved in a highly inappropriate" and "abusive" "manner" at the February 8 game. Am. Compl. ¶¶ 58, 62; *see also id.* ¶¶ 69, 72–73. The words "inappropriate" and "abusive," however, are inherently subjective, ambiguous terms that are not defamatory on their face. *See, e.g., Abbitt v. Carrube*, No. 101678/15, 2018 WL 1094157, at *1–2 (1st Dep't Mar. 1, 2018) (words like "unethical," "detrimental," "inappropriate," "disrespect," and "intimidation" are expressions of pure opinion, and not defamatory); *Rotondi v. The Madison Square Garden Co.*, No. 150097/2015, 2017 WL 4083093, at *3 (N.Y. Sup. Ct. Sept. 12, 2017) (statements "that the plaintiff was abusive and interfered with [a basketball] game" at MSG were "nonactionable statements of opinion").

- Oakley also challenges the statement in the first tweet, "*we hope* he gets some help soon," Am. Compl. ¶ 58 (emphasis added), but that is simply a statement of opinion. "[W]e hope" signals that what follows is not a fact but rather a subjective, nonactionable wish that Oakley takes some action in the future. *See, e.g., Silverman v. Clark*, 822 N.Y.S.2d 9, 20 (1st Dep't 2006) (statement about "potential future conduct" was protected opinion).

- Dolan's statements were also opinion. They were explicitly presented as his and/or his organization's views. For example, Dolan prefaced his statements by stating "[i]t's very clear *to us*" or "[*t*]*o me*, Charles has [] a problem." Am. Compl. ¶¶ 69, 73 (emphases added). This Court has previously found that statements were "opinion[s] on their face" when preceded by synonymous phrases such as "in my mind" and "I found." *Galland*, 2015 WL 1290775, at *6.

- Oakley claims that Dolan accused him of being an alcoholic, but all Dolan ever said was that Oakley "*may* have a problem with alcohol." Am. Compl. ¶ 69 (emphasis added). The word "may" necessarily signals that this statement is not an assertion of fact but merely subjective speculation. *See Ratajack v. Brewster Fire Dep't, Inc.*, 178 F. Supp. 3d 118, 165 (S.D.N.Y. 2016) (Karas, J.) (statement that an individual "may be a future harm" was opinion).

- Dolan's other statements are not actionable because they were not specifically about Oakley — rather, they were general statements about how MSG handles situations of disruptive behavior. *E.g.*, Am. Compl. ¶¶ 68 ("*anybody* . . . looking for a fight, they're going to be ejected") (emphasis added); 71 ("[t]he No. 1 concern has to be the safety of and comfort of the fans"). Such blanket, generalized statements are simply not actionable as a matter of law. *See Galland*, 2015 WL 1290775, at *6 (stressing that, in order to be actionable, "the statement at issue . . . must be . . . about the plaintiff, not just a general statement") (internal citation omitted).

In context, it is even more clear that Defendants' statements are not actionable. Regarding the statements on Twitter, *see* Am. Compl. ¶¶ 58–64, New York courts have "consistently protected statements made in online forums as statements of opinion rather than fact," *Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*, 151 F. Supp. 3d 287, 295 (E.D.N.Y. 2015), particularly with respect to statements on Twitter, a platform that restricts the number of characters per comment and allows users to interact freely and informally. *See, e.g., Jacobus v. Trump*, 51 N.Y.S.3d 330, 341–44 (N.Y. Sup. Ct. 2017) (finding that statements made on Twitter by then-presidential candidate Donald Trump were

28

nonactionable opinions, even though, when "viewed in isolation, [they] could be found to convey facts"). Likewise, New York courts have repeatedly found that remarks delivered on radio or television entertainment talk shows like *The Michael Kay Show* are non-actionable opinions. *See*, *e.g.*, *Hobbs v. Imus*, 698 N.Y.S.2d 25, 26 (1st Dep't 1999); *Huggins v. Povitch*, No. 131164/94, 1996 WL 515498, *7–9 (N.Y. Sup. Ct. 1996). Because Dolan's statements were part of the "spirited" "give and take" of a show aimed at entertainment, they are best understood as opinion. *Huggins*, 1996 WL 515498, at *7.

Finally, the challenged statements are not mixed opinion because Defendants disclosed the facts on which they were based. *See Brian v. Richardson*, 621 N.Y.S.2d 48, 49 (1st Dep't 1995) ("A statement of opinion that is accompanied by a recitation of the facts on which it is based or one that does not imply the existence of undisclosed underlying facts is not actionable."). With respect to the two tweets, both disclose that their statements regarding Oakley's behavior are based on first-hand eye-witness reports of Oakley's conduct at MSG on February 8: the first tweet states that "Charles Oakley came to the game tonight," while the second reveals that Defendants received reports about what Oakley did from the time "he entered the building" until he "left the building." Am. Compl. ¶¶ 58, 62. Dolan similarly divulged that he formed his opinion from what Oakley had "said on TV"—which included Oakley's own statement that he had "had a couple of drinks" before arriving at the Garden[25]—from "statements from police," from first-hand accounts of Oakley's behavior that night that Dolan learned from "his employees," and from Oakley's post-retirement history of "trouble," including his "many physical [prior] altercations" with security personnel and law enforcement,[26] Ex. 6 at 10:20–10:50; *see also* Am. Compl. ¶¶ 69, 73. *Sorvillo v. St. Francis Prepatory Sch.*, 607 F. App'x 22 (2d Cir. 2015), is

---

[25]   *See Charles Oakley Admits to Having 'a couple drinks' Before Scene at Garden*, NY Daily News (Feb. 10, 2017), *available at* http://www.nydailynews.com/sports/basketball/knicks/charles-oakley-couple-drinks-scene-garden-article-1.2969283.

[26]   Notably, Oakley has not challenged the basis of Dolan's contemporaneous statements that Oakley has a "trouble[d]" past littered with "many physical altercations," making it all the more appropriate for the Court to consider that history and Dolan's consideration of it at the motion to dismiss stage.

particularly instructive.  There, the Second Circuit affirmed the dismissal of a defamation claim because the statement at issue "shared with the reader the basis of [the defendant's] opinion, namely that he received several disturbing emails" concerning the content of the plaintiff's website.  *Id.* at 25.  (internal quotation marks omitted).  Indeed, in this case, those who read/heard Defendants' statements ultimately had *more* access to the underlying information than the readers/listeners in *Sorvillo*, because the incident was on "live television," broadcast "national[ly]," Dkt. 1 ¶¶ 4, 53, and widely reported on the media. *Cf. Gisel v. Clear Channel Commc'ns, Inc.*, 942 N.Y.S.2d 751, 752 (4th Dep't 2012) ("Because [defendant's] statements were based on facts that were widely reported by . . . media outlets and were known to his listeners, it cannot be said that [they] were based on undisclosed facts.").

Accordingly, the Court should find that, especially when examined in context, all of the allegedly defamatory statements are non-actionable statements of protected opinion.[27]

## B.      OAKLEY FAILS TO STATE A CLAIM FOR ASSAULT OR BATTERY

Oakley's claims against the corporate Defendants for assault and battery, Am. Compl. ¶¶ 122– 128, fail because Oakley's own pleadings reflect that any alleged physical contact he had with MSG security officers was privileged.  A civil battery claim requires Oakley to prove "an intentional wrongful physical contact with [his] person without consent."  *Green v. City of New York*, 465 F.3d 65, 86 (2d Cir. 2006) (internal citation omitted).  Assault is the "intentional placing of another person in fear of imminent harmful or offensive contact."  *Id.* (internal citation omitted).  Oakley alleges that Defendants, via MSG security personnel, assaulted and battered him "when . . . they physically and forcibly removed [him] from [MSG] and subsequently detained him until police could arrive."  Am. Compl. ¶¶ 123, 127. Defendants, however, cannot be subject to tort liability for removing Oakley from the arena—a place

---

[27]    Even if some statements were not opinion, the Court should still conclude that they are not actionable because they are "substantially true," and thus any "claim of libel is legally insufficient."  *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 242 (2d Cir. 2017).  There is no dispute that Oakley refused to comply with multiple verbal requests to leave the arena on February 8, or that he was arrested and charged with crimes (including misdemeanor assault) that very night, immediately after the incident.  *See* Am Compl. ¶¶ 34–40, 51.

where he was not entitled to be once he was peacefully asked to leave.[28]

New York law protects property owners, like the corporate Defendants here, from liability when they use reasonable force to eject an individual who has been asked to leave their property. *Mitchell*, 2014 WL 123255, at *1 (dismissing assault and battery claims premised on security guards' "forceful[] remov[al]" of expelled student from campus for failure to state a claim because defendants were privileged to remove plaintiff). Even taken as true, Oakley's own allegations admit this privilege applied: MSG security guards and an NYPD officer approached him and instructed him "to leave the arena" before they ever touched him or attempted to physically remove him from the arena.[29] Am. Compl. ¶ 34; *see id.* ¶ 44. Oakley refused to comply with that lawful, peaceful request. *Id.* ¶¶ 37, 40–41.[30] It was only after Oakley willfully disobeyed that directive multiple times and refused to leave, that security guards and NYPD officers who witnessed Oakley's conduct were entitled to and did decide to physically remove him. *See Mitchell*, 2014 WL 123255, at *1 (dismissing battery claim because "property owner[s] ha[ve] the right to use reasonable force to eject a trespasser from [their] premises").[31]

---

[28]  As an initial matter, Oakley's assault claim fails because he has not alleged Defendants "intentional[ly]" placed him in "reasonable apprehension" of imminent harmful contact. Oakley alleges only that the security guards who approached him were "three large men" "attempting to publicly humiliate him in front of the [] fans." Am. Compl. ¶¶ 34, 37. That, however, is insufficient. *See Mitchell v. New York Univ.*, No. 150622/13, 2014 WL 123255, at *1 (N.Y. Sup. Ct. Jan. 8, 2014) (dismissing assault claim because "[i]ntent is an essential element of an assault claim," yet "there [was] no allegation that the public safety officers intended to place plaintiff in apprehension of harmful contact"; "that plaintiff was removed from the premises in front of other people and was subject to embarrassment is not a basis for a viable assault claim").

[29]  It is irrelevant that Oakley "purchase[d]" his own ticket to attend the February 8 game and claims "he had done nothing wrong" and there was "no legitimate basis for ejecting him." Am. Compl. ¶¶ 2, 26, 37, 44. It is well-settled that "[a] ticket to a place of public amusement is a license and revocable" at the owner's sole discretion. *Gottlieb v. Sullivan Cty. Harness Racing Ass'n*, 25 A.D.2d 798, 798 (3d Dep't 1966). Moreover, the back of all tickets purchased to watch Knicks games explicitly state that the ticket is a "license revocable in MSG's sole discretion." Ex. 14 (Ticket).

[30]  Oakley now alleges that he "did not . . . refuse to leave [MSG] at the time and merely sought an explanation." Am. Compl. ¶ 41. That new allegation, however, is flatly contradicted by Oakley's other allegations and thus is not entitled to any weight. *See id.* ¶¶ 37, 40 (alleging that after being asked to leave, Oakley "explain[ed] to . . . security" that he "wanted to watch the game in peace" and "turn[ed] around and [] return[ed] to his seat").

[31]  *Gottlieb*, 25 A.D.2d at 798 (affirming grant of motion for directed verdict on assault claim where plaintiff was ejected after he was asked to leave the race track and refused to comply); *Schaeffer v. Cavallero*, 54 F. Supp. 2d 350, 352 (S.D.N.Y. 1999) (Rakoff, J.) (dismissing battery and false imprisonment claims against airline on Rule 50 motion because plaintiff was asked to leave the airplane but refused to comply and thereby "brought upon himself the 'battery'"); *see also* N.Y. Pattern Jury Instr. Civil 3:3 ("Defense of real property . . . by the use of such force as is necessary to eject a trespasser is justified, but unless the trespasser has entered with the use of force, the trespasser must first be requested to depart.").

Oakley does not and cannot dispute that his refusal to comply with the security guards' and police officers' directives can foreclose his assault and battery claims. Instead, he tries to sidestep that fatal flaw, for now, by hiding behind the pleading standard. *See* Dkt. 24 (Pl. Ltr.) at 2 (arguing that whether or not he "refused to leave the arena after a legitimate request . . . can only be tested after discovery"). But discovery on these tort claims is unnecessary—and, in fact, would be improper—given that Oakley admits in his own pleadings that he was asked to leave the property and did not comply with that request. *See Mitchell*, 2014 WL 123255, at *1. Oakley may similarly argue—based on a new allegation in his amended pleading—that the property owner's justification cannot be determined at this stage in light of his allegation that "the security guards clearly exceeded the bounds of reasonable behavior" and "greatly exceeded the amount of force that was necessary in the situation." Am. Compl. ¶¶ 43, 50, 124. But even if this were true, which it is not, unreasonable force alone does not defeat a property owner's privilege to remove a trespasser. Rather, Oakley must also have alleged and would have to eventually prove that security personnel were "motivated by an intent to [inflict] injur[y on him]." *Mitchell*, 2014 WL 123255, at *1 (collecting authorities). Oakley has not alleged that he suffered any injury at all—much less that security personnel had a malicious and willful intent to injure him. Accordingly, the claim should be dismissed. *See id.* (dismissing assault and battery claims where plaintiff did not allege that he "sustained any injuries").

The videos of the incident further confirm that Defendants did not assault or batter Oakley. *First*, the video evidence corroborates Oakley's allegations that he was asked to leave but refused to do so. Ex. 4 at :09–:11 (showing Oakley yelling "let me sit in my seat," "no I'm gonna sit right here," "I'm not talking to you," and "that's some bullshit" in response to security's request that he "please walk . . . can you please walk"). *Second*, the videos confirm not only that MSG security used reasonable force in ejecting Oakley, but that Oakley's allegations regarding the incident are simply wrong. Indeed, the entire sequence of events as depicted in the pleading is directly contradicted by the undisputed video

evidence that Plaintiff has had in his possession since the outset of this case:

- The Amended Complaint asserts that, after being approached and asked to leave, Oakley "attempted to defuse the situation by patiently explaining to the security personnel that he had done nothing wrong," and "raised his arms . . . clearly convey[ing] that he had no intention of engaging in any violent behavior." Am. Compl. ¶¶ 37–38.

    The video evidence, however, clearly shows that as soon as MSG security and an NYPD police officer approached him and asked him to leave, Oakley immediately became hostile and physically aggressive. Ex. 2.a at 8:00–16. Any suggestion that the security guards or NYPD officer were the ones to initiate any physical altercation is false. The videos show that the first MSG security guard who approached Oakley calmly spoke to him without touching him. *Id.* The objective video evidence shows that Oakley was the initial aggressor and attacker, not the other way around. *Id.* at 8:14–37; *see supra* at I.B.

- Oakley also alleges that "two of the security guards grabbed [him] and pushed him to the ground." Am. Compl. ¶ 42. Public video evidence, however, demonstrates that the only time Oakley was on the ground during this time was when he, completely on his own, tripped and fell. Ex. 4 at :12–14. Video footage plainly shows that no one pushed Oakley; in fact, the only security guard who made contact with Oakley around that time was a security guard who was actively trying to catch Oakley as he fell. *Id.* at :13–15.

- The Amended Complaint asserts that "[w]hen [] Oakley got back to his feet" "the security guards further escalated the confrontation by physically grabbing [] Oakley to forcibly compel him to leave," causing Oakley to "push[] their hands away in self-defense." Am. Compl. ¶¶ 44–46.

    This is also not true. The video evidence leaves no doubt that, after he tripped and fell, Oakley jumped right back up and proceeded, unprovoked, to threaten and engage in physically aggressive behavior towards MSG security personnel, in plain view of the police officer, culminating in Oakley violently striking two more security guards, and requiring security and the police officer to physically escort Oakley out of the arena. *See supra* at I.B.

- The allegation that Oakley was "thrown onto the ground," Am. Compl. ¶ 47, during his removal from MSG is also unequivocally false. Multiple video sources plainly show that Oakley, in resisting the now two NYPD officers' and the security guards' efforts to escort him out of the Arena, purposely pulled himself down towards the ground. Exs. 3 at :49–54; 1 at :20–25.

Based on Oakley's own allegations, further corroborated by the video evidence, the only plausible inference that can be drawn is that Oakley was asked to leave MSG, refused to comply with that request, and ultimately had to be physically removed from the arena given his non-cooperation. Thus, he "brought upon himself the [alleged] 'battery'" and assault. *Schaeffer*, 54 F. Supp. 2d at 352. Any physical contact that MSG security guards or NYPD officers made with Oakley was necessary to defend themselves and others and therefore not actionable. *See Sachs v. Musa*, No. 10-cv-1663 (JPO), 2014

33

WL 1855615, at *2 (S.D.N.Y. May 8, 2014) (Oetken, J.).

In sum, the Court should dismiss Counts 5 and 6 for failure to state a claim, a conclusion that is fully supported by the video evidence the Court can and should consider.  *See*, *e.g.*, *Zsigray v. Cty. Comm'n of Lewis Cty.*, No. 16-cv-64, 2017 WL 462011, at *4 (N.D. W.Va. Feb. 2, 2017) (considering video evidence of alleged altercation and dismissing plaintiff's assault and battery claim under West Virginia law because "[t]he video simply does not show that" plaintiff's allegations were accurate).

### C.      OAKLEY'S FALSE IMPRISONMENT CLAIM ALSO FAILS

To state a claim for false imprisonment, Oakley must allege and show that "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged."  *McGowan v. United States*, 825 F.3d 118, 126 (2d Cir. 2016).  Oakley has failed to meet his burden of pleading a viable claim.  In short, the Amended Complaint simply does not provide sufficient factual allegations— as opposed to conclusory formulaic recitations that "Defendants . . . intentionally confined [him]"—to establish the requisite elements, namely that Defendants were responsible for restraining and detaining him.  In fact, the Complaint is conspicuously silent altogether on both who restrained him and who detained him.  *See* Am. Compl. ¶¶ 49 ("Oakley was then put into restraints and the security guards roughly threw him out of [MSG]."); 51 ("Oakley was ultimately taken outside of the arena, arrested and charged with assault.").   On these vague pleadings, the Court cannot plausibly infer that it was Defendants who imprisoned Oakley and therefore the claim should be dismissed.  *See, e.g.*, *Radin v. Tun*, No. 12-cv-1393 (ARR) (VMS), 2015 WL 4645255, at *8 (E.D.N.Y. Aug. 4, 2015) (bare allegation that plaintiff was "falsely imprisoned" insufficient to state a claim because it was "devoid of information concerning the circumstances of her detention, including who detained her").

While it is not necessary for the Court to look past the allegations to dismiss this claim, other evidence that the Court can consider fully explains the gamesmanship behind Oakley's artful pleading:

34

it was the NYPD—not Defendants' employees—who restrained and detained him.  There is no dispute that NYPD officers were present and involved in the incident from start to finish.  Dkt. 25 (Dec. 13, 2017 Jnt. Ltr.) at 1 ("During the game, [] Oakley was asked to leave and was ultimately removed from MSG . . . by MSG security guards *and NYPD police officers*.") (emphasis added).  This is further corroborated by the video evidence, which plainly shows that it was necessarily the NYPD who arrested Oakley.  Specifically, the video confirms (i) that at least one uniformed NYPD officer was present throughout the entire course of the incident, Ex. 2.a at 7:50–8:20, (ii) that he and another uniformed NYPD officer were involved in leading Oakley out of MSG, *id.*; (iii) that those two NYPD officers—*not* MSG security guards—handcuffed Oakley after directly observing his violent, physical conduct, *see* Ex. 4 at 2:19–34, and (iv) that those same two police officers—not MSG security guards—remained with Oakley thereafter outside of the arena until the NYPD police van arrived, *see* Ex. 5 (MSG Security Videos).  In other words, Oakley's assertion that *Defendants* "detained him until police could arrive" is a bald-faced lie.  Am. Compl. ¶ 123.  As a matter of law, Defendants cannot be held liable for *the NYPD's* detention or arrest of Oakley.  *See Levy v. Grandone*, 14 A.D.3d 660, 661 (2d Dep't 2005) ("[A] civilian complainant, by merely seeking police assistance or furnishing information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made and criminal charges filed, will not be held liable for false arrest.").[32]

### D.   OAKLEY'S ABUSE OF PROCESS CLAIM FAILS BECAUSE IT IS CONCLUSORY AND LEGALLY INSUFFICIENT

Oakley claims that all Defendants are liable under state law for abuse of process based on

---

[32]  To the extent Oakley claims he was imprisoned prior to being handcuffed, that argument also fails because at least one uniformed NYPD officer was present from the outset.  That officer restrained Oakley himself and otherwise participated in the entire altercation with MSG security.  As a result, any alleged confinement or imprisonment would constitute a police arrest, *see Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir. 1991), and was privileged by probable cause—the officer witnessing Oakley's actions, *see, e.g.*, *Hays*, 2017 WL 782496, at *3.  Even without reference to any extrinsic evidence, any purported "imprisonment" prior to Oakley being handcuffed was privileged by virtue of his refusal to comply with MSG's request to leave its property.  *See Schaeffer*, 54 F. Supp. 2d at 350 (dismissing battery and false imprisonment claims against airline on Rule 50 motion because plaintiff was asked to leave the airplane but refused to comply).

Oakley's "criminal charge."  Am. Compl. ¶¶ 133–138.  To establish an abuse of process claim under New York law, a plaintiff must allege and demonstrate that the defendant "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act (2) with [an] intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003).  The plaintiff must also allege and prove actual or special damages as a result of the abuse of process.  *Kahn v. Friedlander*, 456 N.Y.S.2d 482, 484 (3d Dep't 1982).  Here, however, as set forth below, Oakley has fallen woefully short of adequately alleging an abuse of process claim for multiple reasons, each of which independently requires that this claim be dismissed under Rule 12(b)(6).

### 1.    Oakley Does Not Allege Defendants "Caused" His Criminal Process

Oakley was criminally charged for his conduct on February 8.  Am. Compl. ¶ 51.  But *Defendants* did not *cause* that criminal process.  Indeed, Oakley's *only* allegation regarding the cause of his charge is the conclusory assertion that "Defendants caused process to be issued to Plaintiff in the form of a criminal charge."  *Id.* ¶ 134.  This is exactly the kind of legal conclusion and formulaic recitation of the causation element that the Court must disregard under the *Twombly/Iqbal* standard.  *See Gearren v. McGraw-Hill Cos., Inc.*, 690 F. Supp. 2d 254, 260–61 (S.D.N.Y. 2010) (Sullivan, J.).  Meanwhile, the Amended Complaint does not contain *a single factual allegation* that supports an inference that any one of the Defendants (much less all of them) caused his criminal charge or arrest.  Nor could Oakley make such an allegation given that NYPD officers decided to handcuff and arrest him on site during the course of the incident.[33]  Ex. 4 at 2:19–34.  This deficiency requires dismissal of Oakley's abuse of process action for failure to state a claim for which relief can be granted.  *See Oparaji*

---

[33]  Nor would any such inference be plausible given that at least one NYPD officer was involved in the February 8 incident from the outset through Oakley's subsequent arrest.  Because NYPD officers were first-hand witnesses to Oakley's hostile and aggressive behavior—which included physically striking MSG security personnel—the NYPD had ample cause for arresting and charging Oakley with third-degree assault, aggravated harassment, and other crimes.  *See supra* I.B.

*v. N.Y.C. Dep't of Educ.*, No. 03-cv-4105 (NGVVP), 2005 WL 1398072, at *13 (E.D.N.Y. June 14, 2005) ("Since . . . [d]efendants have not caused any process to issue against plaintiff, plaintiff cannot state a claim against them for abuse of process."), *aff'd*, 172 Fed. App'x 352 (2d Cir. 2006).

> ### 2.   The Amended Complaint Does Not Allege That Defendants Perverted The Criminal Process To Accomplish A "Collateral Objective"

Oakley has also failed to allege the "crux" of a malicious abuse of process claim:  the "collateral objective" element.  "To state a claim for abuse of criminal process . . . [a plaintiff] must claim that [defendants] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Savino*, 331 F.3d  at 77.  The "collateral objective" element requires that the defendant perverted the process by using or leveraging the process with the goal of having "an effect outside the intended scope of operation of the process employed," *Jones v. Maples/Trump*, No. 98-cv-7132 (SHS), 2002 WL 287752, at *7 (S.D.N.Y. Feb. 26, 2002) (Stein, J.), such as misusing process for purposes of "extortion," "blackmail," or "coerc[ing] [another] to give up a [legal] claim." *Reisner v. Stoller*, 51 F. Supp. 2d 430, 455–56 (S.D.N.Y. 1999) (Conner, J.) (collateral objective element pled where defendant used process to coerce plaintiff to pay off his mortgage early).  Oakley has alleged nothing of the sort.

Oakley alleges in conclusory terms that Defendants' collateral objective was to "publicly embarrass[] [him] and destroy[] his reputation."  Am. Compl. ¶ 136.  But—even assuming Defendants caused Oakley's arrest and charges, which they did not—this allegation is insufficient.  Indeed, "the New York Court of Appeals has made clear that '[a] malicious motive alone . . . does not give rise to a cause of action for abuse of process.'"  *Savino*, 331 F.3d at 77; *see also Hauser v. Bartow*, 273 N.Y. 370, 374 (1937) (affirming dismissal of abuse of process claim because "whatever may have been respondent's motives, she used the process of the court for the purpose for which the law created it").  Courts have thus routinely dismissed claims based on allegations similar to Oakley's.  *See, e.g.*, *Vessa v. City of White Plains*, No. 12-cv-6989 (ER), 2014 WL 1271230, at *7–8 (S.D.N.Y. Mar. 27, 2014) (Ramos, J.) (allegation defendant had obtained a search warrant "in order to harass/embarrass plaintiff"

was "utterly insufficient to state a claim for . . . abuse of process").[34]  This Court should do the same.[35]

### 3. Oakley Has Alleged No Special Damages From The Alleged Abusive Process

"A cause of action for abuse of process" "may survive only if actual or special damages are alleged." *Kahn*, 456 N.Y.S.2d at 484.  Special damages "are specific and measurable losses which must be alleged with sufficient particularity to identify actual losses and be related causally to the alleged tortious acts."  *Kanciper v. Lato*, 989 F. Supp. 2d 216, 237 (E.D.N.Y. 2013) (internal citation omitted).

Oakley has not alleged that he suffered special damages as a result of the alleged unlawful process.  While Oakley now claims, for the first time, that he "lost" $40,000 in an "appearance fee[]" he was "scheduled to be paid" before the February 8 incident occurred, Am Compl. ¶ 100, he further claims that he lost that fee *not as a result of his criminal charges*, but as "a direct result of Defendants' statements claiming that [] Oakley was an alcoholic," *id.* ¶ 93.  Nowhere does the Amended Complaint state or imply that Oakley's purported loss was "related causally" in any way to the alleged abuse of process; thus, this claim must be dismissed.  *See Jacques v. DiMarzio, Inc.*, 216 F. Supp. 2d 139, 142 (E.D.N.Y. 2002); *Ann-Margret v. High Soc'y Magazine, Inc.*, 498 F. Supp. 401, 408 (S.D.N.Y. 1980) (Goettel, J.).

### E. OAKLEY'S DISABILITY CLAIMS FAIL BECAUSE HE ALLEGES NO FACTS SUPPORTING UNLAWFUL DISCRIMINATION

Oakley alleges in the alternative that Defendants unlawfully "den[ied] him access to [MSG] based on their perception that he suffers from alcoholism, a disability," Am. Compl. ¶¶ 141, 146, in

---

[34]  *See also Jones*, 2002 WL 287752, at *8 (allegations that process was issued "to settle a personal vendetta . . . to undermine [plaintiff's] credibility, to harm his business, reputation and person" failed to state a claim); *Chrysler Corp. v. Fedders Corp.*, 540 F. Supp. 706, 726 (S.D.N.Y. 1982) (Tenney, J.) (alleged purpose of "attempt[ing] to harass and defame [plaintiff]" insufficient to state a claim).

[35]  Oakley also has not alleged that Defendants improperly used the process "after the process [was] issued."  *Gilman v. Marsh & McLennan Cos.*, 868 F. Supp. 2d 118, 131 (S.D.N.Y. 2012) (Oetken, J.).  That is yet another reason to dismiss this claim.  *See Curiano v. Suozzi*, 480 N.Y.S.2d 466, 468 (N.Y. 1984) ("[Plaintiffs] do not contend that the summons issued by defendants was improperly used after it was issued but only that defendants acted maliciously in bringing the action."); *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 212-13 (S.D.N.Y. 2014) (Karas, J.).

violation of the Americans with Disabilities Act ("ADA"), and the New York State Human Rights Law ("NYSHRL").  To state such a claim, a plaintiff must allege (1) "[]he is a 'qualified individual' with a disability;" (2) "[the] defendants are a public accommodation;" and (3) "[]he was denied the opportunity to participate in or benefit from the defendants' services, programs or activities."  *Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 368 (S.D.N.Y. 2007) (Conner, J.).

Both of these claims fail because the Amended Complaint does not plead any fact that would support a plausible inference of discrimination.  In order to state a claim under either statute, a plaintiff must show that he was discriminated against by defendants "on the basis of" or "because of" his disability.  42 U.S.C. § 12182(a); N.Y. Exec. Law § 296(2)(a).  The Amended Complaint, however, offers no support for its conclusory assertion that Oakley was removed from MSG "based on the [Defendants' alleged] perception that [Oakley] suffers from alcoholism," Am Compl. ¶ 141.  As discussed above, Oakley does not identify a single statement labeling him an alcoholic, let alone one suggesting that this was the cause for his removal.  Arguing in the alternative that Defendants might have "[b]elieved [t]hat [p]laintiff was an [a]lcoholic" does not relieve Oakley of his duty under *Iqbal* to allege facts suggesting as much.  *See Stinnett v. Delta Air Lines, Inc.*, 278 F. Supp. 3d 599, 614 (E.D.N.Y. 2017).  Moreover, this allegation is entirely at odds with Oakley's claim that Defendants knew there was no "basis" for alleged comments that he "may have a problem with alcohol," Am. Compl. ¶¶ 69–70.  Such inconsistent factual pleading is impermissible.  *See Almazan*, 2015 WL 500176, at *13 n.4.

Furthermore, Oakley self-defeatingly pleads that there were *non-discriminatory* reasons for his removal.  Oakley alleges that Defendants' request that he leave the arena was irrational, Am. Compl. ¶¶ 34, 56, motivated by Oakley's physical proximity to Dolan, *id.* ¶ 53, or motivated by Oakley's abusive behavior, *id.* ¶¶ 58, 62, 68–69, 71–73.  None of these reasons connect to a discriminatory animus, and therefore none are actionable.  While abusive behavior might be a *symptom* of alcoholism,

that fact does not permit individuals to act abusively in public accommodations and then seek relief when an owner takes action to remove the individual and ensure the safety of other patrons. *Cf. Van Ever v. N.Y. State Dep't of Corr. Servs. At Sing Corr. Facility*, No. 99-cv-12348 (SAS), 2000 WL 1727713, at *4 (S.D.N.Y. Nov. 21, 2000) (Scheindlin, J.) ("the ADA . . . does not protect an alcoholic from the consequences of his behavior").   And while the Court need not examine it to reach this conclusion, the video evidence corroborates that Oakley's behavior was inappropriate and dangerous, warranting his removal.   The Court should therefore dismiss these claims because the pleading affirmatively disproves that Defendants removed Oakley based on a belief that he was an alcoholic.

## **CONCLUSION**

For all of the reasons explained here, Oakley's Amended Complaint does not state any viable claim.  Thus, Defendants respectfully request that the Court grant this Motion to Dismiss the Amended Complaint in its entirety and dismiss this action, with prejudice.[36]


Dated:  New York, New York
          March 30, 2018

                                        GIBSON, DUNN & CRUTCHER LLP

                                        By: /s/ Randy M. Mastro
                                             Randy M. Mastro
                                             Sarah L. Kushner
                                             200 Park Avenue
                                             New York, NY  10166-0193
                                             Telephone:  212.351.4000
                                             rmastro@gibsondunn.com
                                             skushner@gibsondunn.com

                                             *Attorneys for Defendants*

---

[36] Nor should Oakley be afforded any further opportunity to amend his pleading.  In repleading already, Oakley failed to cure the deficiencies in his original pleadings, and there is nothing he can allege that will cure the deficiencies in his Amended Complaint. *See Dluhos v. Floating & Abandoned Vessel*, 162 F.3d 63, 69 (2d Cir. 1998).