**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X
CHARLES OAKLEY,                                    :
                                                   :
                              Plaintiff,           :   Civil Case No.: 17-cv-6903 (RJS)
                                                   :
              v.                                   :
                                                   :
JAMES DOLAN, in his individual and professional    :
capacities, MSG NETWORKS, INC., THE MADISON        :
SQUARE GARDEN COMPANY and MSG SPORTS &             :
ENTERTAINMENT, LLC,                                :
                                                   :
                              Defendants.          :
-----------------------------------------------------------------------X


**PLAINTIFF CHARLES OAKLEY'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**


**WIGDOR LLP**

Douglas H. Wigdor
Renan F. Varghese
Kenneth Walsh

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
rvarghese@wigdorlaw.com
kwalsh@wigdorlaw.com

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................... 1

RELEVANT FACTS AND BACKGROUND ....................................................................... 3

I.      ALLEGATIONS OF THE AMENDED COMPLAINT ............................................. 3

        A.      The February 8, 2017 Incident ..................................................................... 3

        B.      Defendants Subsequently Defame Mr. Oakley .............................................. 4

                1.      MSG's Defamatory Statements ......................................................... 4

                2.      Defendant Dolan's Defamatory Statements ....................................... 5

                3.      Mr. Oakley's Damages ...................................................................... 6

II.     PROCEDURAL BACKGROUND .......................................................................... 7

LEGAL ARGUMENT ........................................................................................................ 7

I.      MOTION TO DISMISS STANDARD ..................................................................... 7

        A.      Rule 12(b)(6) Standard ................................................................................. 7

II.     DEFENDANTS IMPROPERLY RELY ON SUBSTANTIAL EXTRINSIC
        EVIDENCE ........................................................................................................... 8

        A.      The Court Should Not Consider Video Footage of the Incident .................... 11

                1.      Defendants' Description of the Video Footage is False and Misleading ... 14

        B.      The Court Should Not Consider Video of Mr. Dolan's February 10
                Interview ..................................................................................................... 16

        C.      The Court Should Not Consider Prior Court Proceedings ............................. 16

        D.      The Court Should Not Consider Information on Public Websites .................. 18

III.    PLAINTIFF  STATES A CLAIM FOR DEFAMATION ............................................ 18

        A.      Plaintiff States a Claim for Defamation *Per Se* ........................................... 19

B.       Plaintiff States a Claim for Defamation *Per Quod* ................................................23

C.       Plaintiff Alleges Actual Malice ...........................................................................25

D.       Defendants' Statements Were Not Opinions ........................................................27

IV.    PLAINTIFF STATES A CLAIM FOR ASSAULT AND BATTERY ............................29

V.     PLAINTIFF STATES A CLAIM FOR FALSE IMPRISONMENT................................33

VI.    PLAINTIFF STATES A CLAIM FOR ABUSE OF PROCESS.....................................34

VII.   PLAINTIFF STATES A CLAIM FOR DISABILITY DISCRIMINATION....................37

CONCLUSION.....................................................................................................................40

# TABLE OF AUTHORITIES

## Cases

*Agnant v. Shakur*,
   30 F. Supp. 2d 420 (S.D.N.Y. 1998).................................................................................. 22

*Albert v. Loksen*,
   239 F.3d 256 (2d Cir. 2001)............................................................................................... 18

*Alfaro v. Labador*,
   300 F. App'x 85 (2d Cir. 2008) ......................................................................................... 24

*Allen v. CH Energy Grp., Inc.*,
   872 N.Y.S.2d 237 (3d Dep't 2009) .................................................................................... 21

*Alvarez v. Cty. of Orange, N.Y.*,
   95 F. Supp. 3d 385 (S.D.N.Y. 2015).................................................................................. 12

*Amadsau v. Bronx Lebanon Hosp. Ctr.*,
   No. 03 Civ. 6450 (LAK)(AJP), 2005 WL 121746 (S.D.N.Y. Jan. 21, 2005)................................. 27

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................................................. 8

*Ava v. NYP Holdings, Inc.*,
   64 A.D.3d 407 (1st Dep't 2009) ......................................................................................... 23

*Bass v. World Wrestling Fed. Entmt., Inc.*,
   129 F. Supp. 2d 491 (E.D.N.Y. 2001) ................................................................................ 29

*Bejaoui v. City of New York*,
   No. 13 Civ. 5667 (NGG)(RML), 2015 WL 1529633 (E.D.N.Y. Mar. 31, 2015)........................ 17

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................................................. 8

*Biro v. Conde Nast*,
   963 F. Supp. 2d 255 (S.D.N.Y. 2013)................................................................................. 26

*Bounkhoun v. Barnes*,
   No. 15 Civ. 631A, 2017 WL 1331359 (W.D.N.Y. Apr. 11, 2017) ................................. 16

*Brown v. Austin*,
   No. 05 Civ. 9443 (PKC), 2007 WL 2907313 (S.D.N.Y. Oct. 4, 2007).......................... 8

*Buckley v. Consolidated Edison Co. of New York*,
    127 F.3d 270 (2d Cir. 1997) ............................................................................................. 39

*Burdick v. Verizon Commc'ns, Inc.*,
    758 N.Y.S.2d 877 (4th Dep't 2003) ................................................................................ 20

*Cain v. Mandl Coll. of Allied Health*,
    No. 14 Civ. 1729 (ER), 2017 WL 2709743 n.1 (S.D.N.Y. June 22, 2017) ................... 38

*Camarillo v. Carrols Corp.*,
    518 F.3d 153 (2d Cir. 2008) ............................................................................................. 37

*Campoverde v. Sony Pic. Entmt.*,
    No. 01 Civ. 7775 (LAP), 2002 WL 311633804 (S.D.N.Y. 2002) ................................. 34

*Chamberlain v. City of White Plains*,
    986 F. Supp. 2d 363 (S.D.N.Y. 2013) ............................................................................. 13

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002) ............................................................................................. 10

*Charles Atlas, Ltd. v. Time-Life Books, Inc.*,
    570 F. Supp. 150 (S.D.N.Y. 1983) .................................................................................. 25

*Church of Scientology Int'l v. Behar*,
    238 F.3d 168 (2d Cir. 2001) ............................................................................................. 25

*Clark v. Schuylerville Cent. Sch. Dist.*,
    807 N.Y.S.2d 175 (3d Dep't 2005) ................................................................................. 27

*Cohen v. Davis*,
    926 F. Supp. 399 (S.D.N.Y. 1996) ........................................................................... 29, 30

*Combs v. City of New York*,
    130 A.D.3d 862 (2d Dep't 2015) ..................................................................................... 31

*Condit v. Dunne*,
    317 F. Supp. 2d 344 (S.D.N.Y. 2004) ............................................................................. 10

*Cortec Indus., Inc. v. Sum Holding L.P.*,
    949 F.2d 42 (2d Cir. 1991) ............................................................................................... 10

*D'Amico v. Corr. Med. Care, Inc.*,
    120 A.D.3d 956, 991 N.Y.S.2d 687 (2014) .................................................................... 35

*Di Gilio v. Burns Int'l Detective Agency*,
   46 A.D.2d 650 (2d Dep't 1974) ................................................................. 29

*DiFolco v. MSNBC Cable LLC*,
   831 F. Supp. 2d 634 (S.D.N.Y. 2011) ........................................................ 19

*Doe v. Deer Mountain Day Camp*,
   682 F. Supp. 2d 324 (S.D.N.Y. 2010) ........................................................ 38

*Doron Precision Sys., Inc. v. FAAC, Inc.*,
   423 F. Supp. 2d 173 (S.D.N.Y. 2006) ........................................................ 18

*Dunlop-McCullen v. Rogers*,
   No. 00 Civ. 3274 (JSR)(JCF), 2002 WL 1205029, n.3 (S.D.N.Y. Feb. 21, 2002) ...................... 27

*Elias v. Rolling Stone LLC*,
   872 F.3d 97 (2d Cir. 2017) ........................................................................ 19

*Faiaz v. Colgate Univ.*,
   64 F. Supp. 3d 336 (N.D.N.Y. 2014) ........................................................ 33

*Frangipani v. HBO*,
   No. 08 Civ. 5675 (GBD), 2010 WL 1253609 (S.D.N.Y. Mar. 16, 2010) ...................... 8

*Franklin v. Daily Holdings, Inc.*,
   135 A.D.3d 87 (1st Dep't 2015) ......................................................... 23, 28

*Fuji Photo Film U.S.A., Inc. v. McNulty*,
   669 F. Supp. 2d 405 (S.D.N.Y. 2009) ........................................................ 16

*Gersbacher v. New York*,
   134 F. Supp. 3d, 711 (S.D.N.Y. 2105) ................................................. 11, 13

*Gottlieb v. Sullivan Cty. Harness Racing Ass'n*,
   25 A.D. 798 (3d Dep't 1966) ....................................................................... 30

*Greenfield v. City of New York*,
   No. 99 Civ. 2330 (AJP), 2000 WL 124992 (S.D.N.Y. Feb. 3, 2000) ........................ 17

*Grogan v. Blooming Grove Volunteer Ambulance Corp.*,
   917 F. Supp. 2d 283 (S.D.N.Y. 2013) ........................................................ 19

*Gross v. New York Times Co.*,
   82 N.Y.2d 146 (1993) ....................................................................... 28, 29

*Hassan v. Marriott Corp.*,
   243 A.D.2d 406 (1st Dep't 1997) ................................................................. 29

*Hauser v. Bartow*,
   273 N.Y. 370 (1937) ....................................................................................... 36

*Hayes v. Sweeney*,
   961 F. Supp. 467 (W.D.N.Y. 1997) ............................................................... 21

*Hays v. City of New York*,
   No. 14 Civ. 10126 (JMF), 2017 WL 782496, n. 1 (S.D.N.Y. Feb. 28, 2017) ............................. 13

*Henry v. Daytop Vill., Inc.*,
   42 F.3d 89 (2d Cir. 1994) .............................................................................. 40

*Hobbs v. Imus*,
   698 N.Y.S.2d 25 (1st Dept. 1999) ................................................................ 28

*Huggins v. Povitch*,
   No. 131164/94, 1996 WL 515498 (N.Y. Sup. Ct. Apr. 19, 1996) ................. 28

*Idema v. Wager*,
   120 F. Supp. 2d 361 (S.D.N.Y. 2000) ......................................................... 23

*J.L. v. E. Suffolk Boces*,
   No. 14 Civ. 4565 (SIL), 2018 WL 1882847 (E.D.N.Y. Apr. 19, 2018) ......... 31

*Jones v. Maples/Trump*,
   No. 98 Civ. 7132, 2002 WL 287752 (S.D.N.Y. Feb. 26, 2002) .................... 36

*Kalimantano GmbH v. Motion in Time, Inc.*,
   939 F. Supp. 2d 392 (S.D.N.Y. 2013) ......................................................... 22

*Karedes v. Ackerley Grp., Inc.*,
   423 F.3d 107 (2d Cir. 2005) ........................................................................ 26

*Kavanagh v. Zwilling*,
   997 F. Supp. 2d 241 (S.D.N.Y. 2014) ......................................................... 19

*Lawhorn v. Algarin*,
   No. 16 Civ. 6226 (FPG), 2018 WL 1046794 (W.D.N.Y. Feb. 26, 2018) ...... 10

*Lewis v. Brown*,
   No. 15 Civ. 5084 (NRB), 2017 WL 1091986 (S.D.N.Y. Mar. 15, 2017) ....... 13

*Liberman v. Gelstein*,
   80 N.Y.2d 429 (1992) ..................................................................................... 23

*Makinen v. City of New York*,
   857 F.3d 491 (2d Cir. 2017) ........................................................................... 37

*Manno v. Hembrooke*,
   120 A.D.2d 818 (3d Dep't 1986) .................................................................... 26

*Marlin v. City of New York*,
   No. 15 Civ. 2235 (CM), 2016 WL 4939371 (S.D.N.Y. Sept. 7, 2016) ........... 13

*Mason Tenders Dist. Council of Greater New York v. W. Sur. Co.*,
   No. 15 Civ. 9600 (JPO), 2016 WL 4098568 .................................................. 10

*McKinnon v. Bell Sec.*,
   268 A.D.2d 220 (1st Dep't 2000) ................................................................... 33

*McLennon v. City of New York*,
   171 F. Supp. 3d 69 (E.D.N.Y. 2016) .............................................................. 17

*Medcalf v. Walsh*,
   938 F. Supp. 2d 478 (S.D.N.Y. 2013) ............................................................ 22

*Mitchell v. New York Univ.*,
   No. 150622/13, 2014 WL 123255 (N.Y. Sup. Ct. Jan. 8, 2014) .................... 32

*Moore v. Sam's Club*,
   55 F. Supp. 2d 177 (S.D.N.Y. 1999) .............................................................. 33

*Naiman v. New York Univ.*,
   No. 95 Civ. 6469 (LMM), 1997 WL 249970 (S.D.N.Y. May 13, 1997) .......... 38

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ....................................................................................... 25

*Nolan v. State*,
   158 A.D.3d 186 (1st Dep't 2018) ................................................................... 19

*Oblio v. City Univ. of New York*,
   No. 01 Civ. 5118 (DGT), 2003 WL 1809471 (E.D.N.Y. Apr. 7, 2003) .......... 17

*Oparaji v. New York City Dep't of Educ.*,
   No. 03 Civ. 4105 (NG)(VVP), 2005 WL 1398072 (E.D.N.Y. June 14, 2005) ............ 35

*Parker v. Zugibe*,
    No. 16 Civ. 4265 (KMK), 2017 WL 4296795 (S.D.N.Y. Sept. 26, 2017) .................................... 39

*Phelps v. City of New York*,
    No. 04 Civ. 8570 (DLC), 2006 WL 1749528 (S.D.N.Y. June 27, 2006) ..................................... 35

*Radow v. Weiss*,
    733 N.Y.S.2d 488 (2001) ................................................................................................................ 36

*Rivera v. New York City Health & Hosps. Corp.*,
    191 F. Supp. 2d 412 (S.D.N.Y. Mar. 26, 2002) ............................................................................... 8

*Rivera v. Puerto Rican Home Attendants Servs., Inc.*,
    930 F. Supp. 124 (S.D.N.Y. 1996) ................................................................................................. 32

*Schaeffer v. Cavallero*,
    54 F. Supp. 2d 350 (S.D.N.Y. 1999) ......................................................................................... 30, 31

*Scheuer v. Rhodes*,
    416 U.S. 232 (1974) .......................................................................................................................... 8

*Sorvillo v. St. Francis Preparatory Sch.*,
    607 F. App'x 22 (2d Cir. 2015) ...................................................................................................... 29

*Speedmark Transp., Inc. v. Mui*,
    778 F. Supp. 2d 439 (S.D.N.Y. 2011) .............................................................................................. 9

*Sprewell v. NYP Holdings, Inc.*,
    772 N.Y.S.2d 188 (N.Y. Sup. Ct. 2003) ................................................................................... 20, 21

*Stone v. Sutton View Capital, LLC*,
    No. 17 Civ. 1574 (VEC), 2017 WL 6311692 (S.D.N.Y. Dec. 8, 2017) ......................................... 39

*Tacopina v. Kerik*,
    No. 14 Civ. 749 (LTS)(FM), 2016 WL 1268268 (S.D.N.Y. Mar. 31, 2016) ............................... 22

*Tommy Lee Handbags Mfg. Ltd. v. 1948 Corp.*,
    971 F. Supp. 2d 368 (S.D.N.Y. 2013) .............................................................................................. 8

*Van Ever v. New York State Dep't of Corr. Servs. at Sing Sing Corr. Facility*,
    No. 99 Civ. 1234 (SAS), 2009 WL 1727713 (S.D.N.Y. Nov. 21, 2000) ................................. 38, 39

*Vessa v. City of White Plains*,
    No. 12 Civ. 6989 (ER), 2014 WL 1271230 (S.D.N.Y. Mar. 27, 2014) ......................................... 36

*Walker v. Urban Compass, Inc.,*
    2017 WL 608308 (N.Y. Sup. Ct. Feb. 15, 2017) ........................................................ 22

*Wilcox v. Newark Valley Cent. Sch. Dist.,*
    74 A.D.3d 1558 (3d Dep't 2010) ......................................................................... 22, 28

*World Wrestling Fed. Entmt., Inc. v. Bozell,*
    142 F. Supp. 2d 514 (S.D.N.Y. 2001) ....................................................................... 26

*Ying Li v. City of New York,*
    246 F. Supp. 3d 578 (E.D.N.Y. 2017) ....................................................................... 35

*Zsigray v. Cty. Comm'n of Lewis Cty.,*
    No. 16 Civ. 64, 2017 WL 462011 (N.D. W.Va. Feb. 2, 2017) ............................... 32, 33

## **Other Authorities**

42 U.S.C. § 12102 (1)(C) ................................................................................................ 37

N.Y. Exec. Law § 292(21)(c) .......................................................................................... 37

Fed. R. Civ. P. 8 ................................................................................................................ 7

Plaintiff Charles Oakley ("Plaintiff" or "Mr. Oakley") submits this Memorandum of Law in opposition to Defendants James Dolan ("Mr. Dolan"), MSG Networks, Inc., the Madison Square Garden Company and MSG Sports & Entertainment, LLC's (collectively, "Defendants") motion to dismiss Plaintiff's Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons set forth herein, Defendants' motion should be denied in its entirety.

## PRELIMINARY STATEMENT

Despite having been specifically admonished by the Court to avoid arguments "tailored more to the court of public opinion than the United States District Court of the Southern District of New York," and to limit their submissions "to argument and authorities relevant to the pending motion," Defendants have disregarded the Court's explicit instructions. Rather than litigate Mr. Oakley's claims on the merits, Defendants have instead used this motion as a vehicle to further the process that they began on February 8, 2017—to publicly destroy Plaintiff's reputation by relying on false and misleading statements designed to sway the public.

Having rejected the Court's offer to allow them to convert their motion to dismiss to a motion for summary judgment, Defendants nevertheless introduce evidence outside of the four corners of the Amended Complaint, knowing that Plaintiff has no access to such evidence. Much of this evidence, including references to Plaintiff's prior lawsuits and his purported criminal record, is not even tangentially relevant to the allegations in the Amended Complaint, a fact of which Defendants are undoubtedly aware. Defendants have included this improper evidence in a transparent attempt to impugn Plaintiff's reputation and to distract from their own unlawful conduct, which gave rise to this meritorious lawsuit. Tellingly, even this extrinsic evidence alone is insufficient to support Defendants' claim that Plaintiff was behaving inappropriately as soon as he entered Madison Square Garden ("MSG," the "Garden" or the "Arena") on February 8, 2017, forcing security guards to violently confront him and publicly eject him from the place he had

called home for a decade (the "Incident").  However, Defendants' internal video footage of this very Incident from inside the Arena paints a starkly different picture.  As depicted in the video footage, from the moment he takes his seat Mr. Oakley can be seen laughing and casually interacting with fans.  Nowhere is there evidence that he was acting as belligerently as Defendants falsely claim.

In fact, most notably during a stoppage in play, Defendant Dolan can be seen summoning a security guard and speaking to him at length.  *See* Kushner Decl.[1] Ex. 2a at 8:18:41–8:18:52.  As soon as the security guard returned to his station, Defendant Dolan signaled for his attention and made a very clear gesture with his right hand, bringing it from his head and pointing it towards the ground.  *Id.* at 8:19:12.  Within seconds of Defendant Dolan's gesture, the security guard gathered other security personnel who proceeded to surround Mr. Oakley and throw him out of the Arena. *Id.* at 8:19:13–8:19:30.  When the guards were finished assaulting Mr. Oakley and violently ejecting him from MSG, Defendant Dolan can be seen giving a thumbs up to the security guards.  *Id.* at 8:22:43.  It is therefore clear that as alleged in the Amended Complaint, it was not Mr. Oakley's conduct on February 8, 2017 that led to him being violently assaulted by Defendants' personnel, but Defendant Dolan's inability to even tolerate Mr. Oakley's presence at the Garden.

It is to address this unlawful conduct, as well as Defendants' subsequent attempts to malign Plaintiff by instituting a defamatory media campaign designed to falsely portray Mr. Oakley as a violent and out of control alcoholic, that has prompted Plaintiff to institute this lawsuit.  For the reasons set forth below, Defendants' meritless motion to dismiss should be denied in its entirety and Plaintiff should be permitted to proceed to discovery where he will adduce the evidence that will conclusively prove his claims.

---

[1]     All citations to the "Kushner Decl." refer to the Declaration of Sarah L. Kushner submitted in support of Defendants' motion to dismiss and its corresponding exhibits.

## RELEVANT FACTS AND BACKGROUND

**I.      ALLEGATIONS OF THE AMENDED COMPLAINT**

### A.      The February 8, 2017 Incident

Plaintiff Charles Oakley is a former all-star power forward for the New York Knicks.  *See*
Am. Compl. ("AC"), Dkt. No. 36, ¶ 6.  At all relevant times, Defendants MSG Networks, Inc., The
Madison Square Garden Company and MSG Sports & Entertainment, LLC (collectively, the "MSG
Defendants") owned and operated Madison Square and the New York Knicks, and Defendant Dolan
was Executive Chairman of the MSG Defendants.  *Id*. ¶¶ 7-10.

Despite never having met Defendant Dolan during his playing career, Mr. Oakley constantly
found himself the target of his harassing behavior.  *Id*. ¶¶ 27-28.  This pattern of harassing behavior
reached a crescendo on February 8, 2017, when Plaintiff attended the Knicks game at MSG against
the Los Angeles Clippers.  *Id*. ¶ 30.  Mr. Oakley was neither intoxicated nor behaving
inappropriately when he arrived at the Arena, and he was allowed to enter and go to his seat without
incident.  *Id*. ¶ 31.  Although Mr. Oakley's seat was coincidentally located several rows behind Mr.
Dolan's seat, Mr. Oakley went to his seat without speaking to Mr. Dolan or otherwise
acknowledging him in any way.  *Id*. ¶¶ 32-33.

Within a few minutes of arriving at his seat, three men approached Mr. Oakley, identifying
themselves only as members of MSG's security team, and ordered him to leave the Arena without
any explanation.  *Id*. ¶ 34.  When Mr. Oakley calmly sought an explanation as to why he was being
treated with such hostility, one of the security guards publicly berated him by demanding loudly,
"Why are you sitting so close to Mr. Dolan," making it clear that Plaintiff was being ejected from
MSG on Defendant Dolan's orders.  *Id*. ¶¶ 35-36.

Despite Mr. Dolan's attempt to publicly humiliate him, Mr. Oakley attempted to defuse the
situation by patiently explaining that he had done nothing wrong and simply wanted to watch the

game in peace.  *Id*. ¶ 37.  Indeed, as he spoke with the security guards, Mr. Oakley raised his arms

in a defensive posture to clearly convey that he had no intention of engaging in any violent

behavior.  *Id*. ¶ 38.  As Mr. Oakley turned to peaceably return to his seat, two of the security guards

grabbed Mr. Oakley and forcibly pushed him to the ground.  *Id*. ¶¶ 40, 42-43.

When Mr. Oakley stood up, the security guards continued to demand that Mr. Oakley leave

the Garden immediately, despite having no basis for making such a demand.  *Id*. ¶ 44.  When Mr.

Oakley again asked for an explanation as to his removal from MSG, the security guards further

escalated the Incident by physically grabbing Mr. Oakley in an effort to forcibly compel him to

leave the Arena.  *Id*. ¶ 45.  When he attempted to defend himself, the guards turned Mr. Oakley

around, grabbed him and threw him to the ground.  *Id*. ¶ 47.  Mr. Oakley was thereafter placed in

restraints and roughly thrown out of the Garden, after which he was arrested and charged with

assault.  *Id*. ¶¶ 51, 55, 123, 127, 130.

      **B.**      **<u>Defendants Subsequently Defame Mr. Oakley</u>**

          **1.**      **MSG's Defamatory Statements**

Shortly after the Incident, the Knicks public relations Twitter account (@NY_KnicksPR),

which Defendants own and operate, tweeted:

> Charles Oakley came to the game tonight and ***behaved in a highly inappropriate
> and completely abusive manner***.  He has been ejected and is currently being arrested
> by the New York City Police Department.  He was a great Knick and ***we hope he
> gets some help soon***.

*Id*. ¶ 58 (emphasis added in Amended Complaint).  Defendants knew this statement was completely

false when they made it, as at no point while being attacked at the Garden had Mr. Oakley acted

inappropriately or abusively.  *Id*.  To the extent that Mr. Oakley ever touched anyone, it was either

to shake hands with fans, or to defend himself after he had been roughly grabbed by Defendants'

personnel.  *Id*.  The public statement made by the Knicks that the organization hoped Mr. Oakley

would "get[] some help soon" was similarly defamatory, as it blatantly insinuated that Mr. Oakley had a substance abuse problem of some kind.  *Id.*

On February 9, 2017, the Knicks organization doubled down on its defamatory statement that Mr. Oakley had somehow been "abusive" and sought to reinforce their claim that he had somehow deserved the physical abuse he had received from its security guards.  *Id.* ¶ 62. Specifically, the @NY_KnicksPR tweet read:

> Updated statement (2/9):  There are dozens of security staff, employees and NYPD that witnessed Oakley's abusive behavior.  It started when he entered the building and continued until he was arrested and left the building.  Every single statement we have received is consistent in describing his actions.  Everything he said since the Incident is pure fiction.

*Id.*  Plaintiff alleges that in reality Defendants intentionally misrepresented the statements of their security guards and of witnesses, several of whom supported Mr. Oakley's account of the events but were silenced.  *Id.* ¶ 63.  These references to alleged statements made by security guards and other witnesses were designed to provide the impression that Defendants' prior and subsequent statements had factual underpinnings and were not mere statements of opinion.  *Id.* ¶ 64.

### 2.    Defendant Dolan's Defamatory Statements

On February 10, 2017, Defendant Dolan appeared on ESPN Radio's "The Michael Kay Show" and further disparaged Mr. Oakley in discussing the Incident.  *Id.* ¶ 65.  Mr. Dolan confirmed that Mr. Oakley had been banned from the Garden indefinitely and proceeded to defame Mr. Oakley by making untrue statements regarding his purported alcoholism and violent propensities, including the following:

- I think the most important thing with that is we need to keep the Garden safe for anybody who goes there . . .  So anybody drinking too much alcohol, looking for a fight, they're going to be ejected and they're going to be banned.

- To me, Charles has got a problem.  We've said it before; he's his own worst problem.  People have to understand that.  He has a problem with anger.  He's both physically and verbally abusive.  He may have a problem with alcohol.

- We know he said on TV that he was drinking beforehand. We heard statements from police that he appeared to be impaired. Our staff clearly could see that.

- When you have issues like this, the first step for anybody is to ask for help.

*Id.* ¶¶ 68-69. Defendant Dolan was fully aware that his comments had no basis in fact, as Mr.

Oakley has never suffered from an alcohol problem. *Id.*

Mr. Dolan further falsely stated that Mr. Oakley had put both Knicks fans and MSG security

guards at risk in stating the following:

- We'll probably hear chants [in support of Mr. Oakley] tonight. But I would like for those people to look around and look at the people working at Madison Square Garden and realize that the guy they're chanting for might have been a great Knick player, but he was terribly abusive to them.

- There were security people there who were abused. There were service people who were abused. The same people who help fans get to their seats, they were abused. With racial overtones, sexual overtones. How do you bring your kids to a game if you think that's going to happen?

- It's very clear to us that Charles Oakley came into the Garden with an agenda. From the moment he stepped into the Garden, he began with this behavior. Abusive behavior, stuff you wouldn't want to say on the radio . . . It just accelerated and accelerated and accelerated . . . I'm not inside of Charles Oakley's mind. He did say a bunch of things along the way that looked like he was headed in my direction. I didn't hear them myself but we heard from our employees that he was using my name a lot. But this isn't because I'm nervous. This is because you can't do what he did and stay. We clearly did not—we weren't perfect here, and I think Charles never should have made it to his seats. And that's on us, and we're doing things to remedy that and make sure that never happens again . . . I can't say for sure.

*Id.* ¶¶ 72-73. Mr. Dolan was aware that these statements were also untrue, and he made them with

actual malice. *Id.* ¶¶ 74-76.

### 3.    Mr. Oakley's Damages

As a result of the aforementioned defamatory statements, Mr. Oakley has suffered both

reputational harm and specifically, identifiable monetary damages. *Id.* ¶¶ 82-95. First, Defendants'

false statements concerning Mr. Oakley's abusive behavior, including that Mr. Oakley had acted

abusively toward MSG security guards and Knicks fans, leads to the inference that Mr. Oakley had

committed such a serious act of violence towards Knicks fans that it had warranted his arrest.  *Id.* ¶¶ 85-87.  Likewise, Mr. Dolan's statements regarding Mr. Oakley's purported drinking problem leads to the inference that Mr. Oakley suffers from the disease of alcoholism.  *Id.* ¶¶ 88-90.

Defendants' defamatory statements also caused Plaintiff to lose significant business opportunities, as he had previously been retained to make guest appearances at drug and alcohol rehabilitation clinics to speak with patients and provide them other services.  *Id.* ¶¶ 91-92.  However, as a direct result of Defendants' statements claiming that Mr. Oakley was an alcoholic, one such rehabilitation clinic, the Rebound Institute, no longer thought it was appropriate for someone with such a reputation to interact with their patients, and cancelled appearances from which Plaintiff was scheduled to earn.  *Id.* ¶¶ 93-95.

## II.  <u>PROCEDURAL BACKGROUND</u>

On September 12, 2017, Plaintiff commenced this action against Defendants, asserting causes of action for defamation *per se*, libel, slander, assault, battery, false imprisonment, abuse of process and denial of a public accommodation in violation of the ADA, NYSHRL and NYCHRL.  Dkt. No. 1.  Following a January 12, 2018 pre-motion conference regarding Defendants' anticipated motion to dismiss, Plaintiff filed his Amended Complaint on February 9, 2018.  Dkt. No. 36.  On March 30, 2018, Defendants filed the instant motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  Dkt. No. 42.  For the reasons set forth herein, Defendants' motion should be denied in its entirety.

## <u>LEGAL ARGUMENT</u>

## I.  <u>MOTION TO DISMISS STANDARD</u>

### A.  <u>Rule 12(b)(6) Standard</u>

Pursuant to Fed. R. Civ. P. 8, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To survive a motion to dismiss for failure to state a claim, the plaintiff must merely allege "sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In deciding a motion pursuant to Fed. R. Civ. P. 12(b)(6), the court must "liberally construe the complaint, accepting the factual allegations as true, and drawing all reasonable inferences in Plaintiff's favor." *Frangipani v. HBO*, No. 08 Civ. 5675 (GBD), 2010 WL 1253609, at *2 (S.D.N.Y. Mar. 16, 2010). The court should deny a motion to dismiss "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

## II.  DEFENDANTS IMPROPERLY RELY ON SUBSTANTIAL EXTRINSIC EVIDENCE

As a threshold matter, Defendants' attempt to cure the deficiencies in their motion to dismiss by drawing from "evidence" outside of the pleadings fails as a matter of law.  It is well settled that, in deciding a motion to dismiss, a court is limited to the four corners of the complaint.  *See Tommy Lee Handbags Mfg. Ltd. v. 1948 Corp.*, 971 F. Supp. 2d 368, 382 (S.D.N.Y. 2013) (disregarding extrinsic evidence and considering only "the complaint and any documents incorporated therein"). Where a movant submits extrinsic materials in support of a motion to dismiss, the court must disregard such improperly submitted extrinsic materials.  *See Brown v. Austin*, No. 05 Civ. 9443 (PKC), 2007 WL 2907313, at *1 (S.D.N.Y. Oct. 4, 2007) ("The Court declines to convert the motion to dismiss into a motion for summary judgment under Rule 56, Fed. R. Civ. P., and accordingly, does not consider the extrinsic evidence submitted by the moving defendants"); *Rivera v. New York City Health & Hosps. Corp.*, 191 F. Supp. 2d 412, 425 (S.D.N.Y. Mar. 26, 2002) ("I decline to convert the motion to dismiss to a summary judgment motion and thus I will not consider the extrinsic materials.").

In support of their motion to dismiss, Defendants repeatedly cite to the exact kind of extrinsic materials not properly considered at this stage, including, *inter alia*, video footage of the

Incident, video footage of Defendant Dolan's February 10, 2018 interview on "The Michael Kay Show," court documents from prior judicial proceedings, and information and tweets found online. *See* Dkt. No. 42 ("Defs. Mem.") at 13-15.  If Defendants believed that such evidence presented a full and complete picture of the relevant events, the proper course of conduct would have been to file a motion for summary judgment, as the Court expressly offered them the opportunity to do. However, the Court noted that such a decision would carry consequences—namely that Plaintiff could seek discovery to uncover the existence of other relevant evidence:

> THE COURT: If you want to make a motion for summary judgment and then we can collect all the videos and I can look at them all, then that would be fine, I suppose, and then **I guess we will hear from Mr. Wigdor whether he thinks some additional discovery is necessary including testimonial discovery. But, this is a motion to dismiss**.  Varghese Decl., Ex. 1 at 30:19-24 (emphasis added).

> THE COURT: I am inclined to stay discovery pending resolution of this motion but if it is going to be a motion for summary judgment then I guess I would be curious to hear whether the tapes are the whole story or **we need some additional limited discovery if it were converted to a summary judgment motion**. Varghese Decl., Ex. 1 at 53:2-8 (emphasis added).

It is clear that by both refusing the opportunity to convert their motion to a motion for summary judgment, while nevertheless attaching substantial extrinsic evidence in support of their "motion to dismiss," Defendants are impermissibly attempting to obtain the benefits of a summary judgment while simultaneously denying Plaintiff his right to take corresponding discovery.  Such a blatant misuse of the Federal Rules should not be countenanced by the Court.  *See Speedmark Transp., Inc. v. Mui*, 778 F. Supp. 2d 439, 440 n.1 (S.D.N.Y. 2011) ("The Court declines to consider these extraneous materials and will not convert [the] motion to dismiss into one for summary judgment, since plaintiffs have not had the opportunity to take discovery").

It is for this reason that the Court explicitly stated that it was not interested in considering extrinsic evidence, such as the video on which Defendants rely in the instant case, in deciding the instant motion, stating at the Pre-Motion Conference, *inter alia*, "I don't want to go to the video, I

want to leave it to the pleadings" (Varghese Decl., Ex. 1 at 37:6-7), "it doesn't seem to me that this is a case in which I should be broadening the pleadings to include the video" (*id.* at 16:4-5), "Mr. Mastro, you really are relying on the video and I'm not sure that I am prepared to do that" (*id.* at 28:1-2), and "[Y]ou are telling me that there is a lot of video that proves what you are claiming in your defense and I just think that's not what a motion to dismiss is about" (*id.* at 32:14-18).

Defendants' false claim that "Plaintiff and his counsel have 'actual notice' of all the information referenced in and attached as Exhibits to Defendants' motion papers," is insufficient to change the Court's analysis. As the Second Circuit has been forced to explain as a result of numerous parties misstating the law as Defendants do in the instant case,[2] "[b]ecause this standard has been misinterpreted on occasion, we reiterate here that a plaintiff's ***reliance*** on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (emphasis in original); *see also Mason Tenders Dist. Council of Greater New York v. W. Sur. Co.*, No. 15 Civ. 9600 (JPO), 2016 WL 4098568, at *3 ("For external evidence to be considered on a 12(b)(6) motion, it is not sufficient that Plaintiffs had notice or possession of that evidence; rather Plaintiffs must have *relied upon it* in drafting the complaint.") (emphasis in original).

As explained in further detail below, *none* of the extrinsic material upon which Defendants rely is integral to *any* of the allegations in the Amended Complaint. In fact, Defendants' evidence is not referenced in the Amended Complaint at all, let alone to such an extent as it could be accurately said that Plaintiff relied on this evidence in bringing his claims, and the Court should therefore

---

[2]     Defendants' reliance upon *Condit v. Dunne*, 317 F. Supp. 2d 344 (S.D.N.Y. 2004) is misplaced, as the court in *Condit* held that it may only consider an extrinsic document, "***upon which [the plaintiff] solely relies*** and which is integral to the complaint. *Id.* at 356. Similarly, in *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991), another case upon which Defendants rely, the Second Circuit specifically observed that extrinsic evidence was only properly considered because it was "integral to [the] complaint." *Id.* at 48. Here, Plaintiff clearly did not heavily rely upon the extrinsic material which Defendants cite, as the materials are neither referenced in the Amended Complaint nor part of the allegations contained therein.

refuse to consider such evidence in deciding the instant motion to dismiss.  *See Lawhorn v. Algarin*,

No. 16 Civ. 6226 (FPG), 2018 WL 1046794, at *4 (W.D.N.Y. Feb. 26, 2018) (holding that, even

where the complaint cited facts contained in extrinsic materials, they were not relied upon heavily,

and therefore were not integral to the complaint).

### A.  <u>The Court Should Not Consider Video Footage of the Incident</u>

Defendants first claim that the Court may consider video footage of the incident because

"Oakley's counsel has admitted that he had the evidence in his position before filing this lawsuit."

Defs. Mem. at 13.  This argument is simply not true, as Defendants are well aware, given that

Plaintiff has repeatedly explained that while he had *some* video footage of the Incident, he did not

have *all* of the relevant videos (indeed, it would have been impossible to know whether other videos

existed, given the stay of discovery that Defendants sought and obtained in this matter), and that

"there very well could be" other videos that would be disclosed during discovery.  *See* Kushner

Decl. at Ex. 15; *see also* Varghese Decl.[3] at ¶ 4.  The statements in these e-mails are in accord with

the representations that Plaintiff's counsel made at the Pre-Motion Conference, where he

specifically told the Court that "there are many different camera angles, some of which we have,

*some of which we don't have*."  Varghese Decl., Ex. 1 at 17:6-9 (emphasis added).  Accordingly,

Defendants' misleading claim that the Court should consider the video footage they attach to their

motion papers because Plaintiff was in possession of such footage should be rejected.  *See*

*Gersbacher v. New York*, 134 F. Supp. 3d, 711, 719 (S.D.N.Y. 2105) (finding that the mere

possession of extrinsic evidence is an insufficient basis to consider in a motion to dismiss).

Second, Defendants claim that the video footage in question should be considered by the

Court here "because it is objective, dispositive, and the best evidence of the event at issue."  Defs.

Mem. at 13.  This, too, is a blatant misstatement of the facts as well as of the relevant law.  There is

---

[3] All references to the "Varghese Decl." refer to the Declaration of Renan F. Varghese in Opposition to Defendants'
Motion to Dismiss Plaintiff's Amended Complaint, dated May 24, 2018.

no evidence that Defendants' self-selected video footage is *all* of the relevant and available footage of the incident.  Indeed, the only internal video that Defendants provided showing the events leading up to Plaintiff being ousted from MSG consists of a single camera angle.  There is no video of (A) Plaintiff walking into MSG, (B) Plaintiff interacting with MSG employees as he walked to his seat, or (C) the hallways and elevators showing Plaintiff walking to his seat.  It defies belief that there would be no videos of the time from when Plaintiff entered MSG to when he got to his seat, especially considering that Defendants have provided ample video of the time when Plaintiff left the MSG floor and was forced out of the Garden by security.  *See* Kushner Dec. Ex. 5a-5d.  More importantly, none of the internal surveillance videos provided by Defendants contain *any* audio indicating that Plaintiff made any inappropriate statements prior to being violently accosted by the security guards.  Instead, Defendants blatantly attempt to poison the Court's view of Plaintiff's actions by providing unverified and unsourced "quotes" of what Plaintiff purportedly said.  Such conclusory and self-serving claims are not evidence at all, let alone the "best evidence" that Defendants claim to have.

Moreover, while the videos contain some footage of the Incident, this does not end the inquiry as to whether they are admissible at the motion to dismiss stage.  Rather, in order for such video evidence to be considered, Defendants must demonstrate that Plaintiff *relied* on the video itself in drafting the Amended Complaint, such that it can be fairly found to be integral to Plaintiff's allegations.  Here, the video footage upon which Defendants rely is neither incorporated by reference nor integral to the Amended Complaint.[4]  While the Amended Complaint describes the

---

[4]  Defendants' attempt to introduce the video evidence by claiming that the original Complaint referenced the national broadcast of the February 8, 2017 Knicks game is futile.  First, Defendants have utterly failed to explain how merely mentioning the obvious fact that an NBA game was televised means that any video footage taken anywhere in the Arena is therefore also incorporated into the allegations.  Such a result would utterly pervert the motion to dismiss evidentiary standard so as to render it meaningless.  Second, as the case law makes clear, in order for a court to consider extrinsic evidence, it is not enough for the plaintiff to merely make a passing reference to it in the Complaint.  *Alvarez v. Cty. of Orange, N.Y.*, 95 F. Supp. 3d 385, 396 (S.D.N.Y. 2015) ("[T]he documents that Defendants ask the Court to consider . . . are not integral to the Amended Complaint merely because Plaintiff mentions and arguably relies on [them]").  In this

incident, it makes absolutely no reference to any video footage capturing the Incident such that the footage would be "heavily relied upon."[5]  Accordingly, it would be an error for this Court to consider these videos in deciding Defendants' motion to dismiss.  *See Gersbacher*, 134 F. Supp. 3d at 718 (declining to consider video of arrest where the plaintiff "may have been aware that his arrest was filmed, but there is nothing that indicates that he had seen the videos prior to Defendants raising them, much less relied upon them in drafting the complaint"); *Marlin v. City of New York*, No. 15 Civ. 2235 (CM), 2016 WL 4939371, at *8 (S.D.N.Y. Sept. 7, 2016) (observing that video clips "that purport to show in real time what was happening . . . on the night [the plaintiff] was arrested" were not integral to the complaint because the complaint "makes no reference to them").

Defendants cite readily distinguishable cases where the plaintiffs had specifically referenced (or heavily relied on) the video in their complaints.  *See, e.g., Lewis v. Brown*, No. 15 Civ. 5084 (NRB), 2017 WL 1091986, at *2 (S.D.N.Y. Mar. 15, 2017) (finding that the "video [was] *referenced in the complaint*") (emphasis added); *Hays v. City of New York*, No. 14 Civ. 10126 (JMF), 2017 WL 782496, at *1, n. 1 (S.D.N.Y. Feb. 28, 2017) (a "video of the primary incident at issue" had been incorporated into the Complaint by reference); *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 374, n.1 (S.D.N.Y. 2013) (the videos were "relied on heavily in drafting" the complaint).  As discussed above–and in contrast to *Lewis*, *Hays* and *Chamberlain*–the videos of the Incident were neither incorporated by reference nor relied upon at all in drafting the Amended Complaint.

---

case, that Plaintiff was able to excise any reference to the television broadcast from his Amended Complaint without changing the substance of his allegations, is fatal to Defendants' argument that this broadcast was a central component of Plaintiff's allegations.

[5]  Similarly, despite Defendants' claims in their May 10, 2018 letter to the Court, the fact that Plaintiff believed that the Court may see the video before ruling on the motion to dismiss does not warrant a different result.  Mr. Oakley's off the cuff comments are not evidence that the video footage was heavily relied upon in drafting the Amended Complaint, especially considering Plaintiff did not even have the internal security footage at the time.  Further, as will be explained below, Mr. Oakley was correct in stating that the video footage does not support Defendants' arguments in the instant case.

1.      **Defendants' Description of the Video Footage is False and Misleading**

While the law is clear that the Court should not consider the video footage provided by Defendants for the reasons discussed above, Defendants' reliance on this material is particularly disingenuous insofar as it does not support the arguments they put forth.  Instead, the internal video footage clearly shows that Defendants' violent and abusive behavior was unjustified and that additional discovery is necessary to resolve Plaintiff's claims.

Though Defendants devote substantial effort to characterizing the sequence of events which transpired after security descended upon Mr. Oakley, they conveniently fail to address what transpired immediately prior to such events.  A portion of the aforementioned video footage clearly depicts Defendant Dolan summoning security to violently confront Plaintiff without any legitimate justification.

Contrary to Defendants' claims that Plaintiff was behaving in a belligerent manner, warranting his ejection, it is apparent from the MSG internal security footage that nothing could be further from the truth.  From the moment he took his seat until the moment security personnel approach him, Mr. Oakley never leaves his seat.  Moreover, while Defendants now baselessly claim that Mr. Oakley was yelling obscenities at Defendant Dolan and various security guards stationed several yards away from him, nothing in the video supports this representation.  None of the people seated near Mr. Oakley stare at him as one would expect them to had he been loudly cursing at security guards, no security guards approach him to ask him to cease his alleged conduct, and no one sitting near Defendant Dolan turns in Mr. Oakley's direction to see who was purportedly screaming at him.  Quite the contrary, Mr. Oakley is seen shaking hands with fans, laughing with people sitting next to him, and speaking with MSG's service employees, without any objection.

However, immediately before MSG security approaches Mr. Oakley, Defendant Dolan can be seen speaking at length to a security guard stationed near Plaintiff.  *See* Kushner Decl. Ex. 2a at

8:18:41–8:18:52.  Once the security guard returns to his station, Defendant Dolan looks back at Mr. Oakley, signals the security guard's attention and makes a very clear gesture with his right hand, taking it from his head and pointing down toward the ground.  *Id*. at 8:19:12.  It is only then, a mere eight seconds after Defendant Dolan's gesture, that the security guard gathers a group of personnel, approaches Plaintiff who has remained in his seat during the entirety of this interaction, and proceeds to violently confront him.  Kushner Decl. Ex. 2a at 8:19:13–8:19:30.  This video footage makes clear that, consistent with what Plaintiff has alleged in his Amended Complaint, it was Defendant Dolan's unlawful animus towards him, rather than anything Mr. Oakley himself did, that led to Plaintiff being forcibly and violently confronted by MSG personnel.

After Defendant Dolan instructed MSG security guards to approach Mr. Oakley, while they stood around him, Mr. Oakley rose to his feet to speak to the guards.  *Id*. at 8:19:45.  Contrary to Defendants' representation that, when Mr. Oakley stood up, he "reached out with his right hand and violently lunged at the security guard," in reality, the video shows that upon standing up Mr. Oakley was immediately violently pulled backwards by several security guards.  *Id*. at 8:19:47.  The footage ends with Defendant Dolan giving the security guard a thumbs-up gesture after Mr. Oakley is dragged out of the Garden, making clear that the guard had successfully complied with his instructions.  *Id*. at 8:22:43.  Thus, the security footage is devoid of any evidence that Mr. Oakley's behavior warranted the violent assault committed by Defendants' personnel.  At the very least, although the Court should not consider the video footage in deciding the instant motion to dismiss, the differing descriptions of what transpired during the course of the Incident demonstrate why discovery on these issues is absolutely necessary, including testimony from witnesses who were seated in Plaintiff's vicinity, other camera angles from within Madison Square Garden, as well as any available audio.  Indeed, by citing to purported testimony by their security guards in support of their motion to dismiss, *see* Defs. Mem. at 6, n. 5, Defendants are conceding the relevance of such

testimony and to the fact that their motion cannot be sustained without such statements, which can only be adduced during discovery in this matter where Plaintiff will have the opportunity to cross examine these alleged witnesses.

### B.      The Court Should Not Consider Video of Mr. Dolan's February 10 Interview

Defendants likewise claim that the Court should consider the entirety of Mr. Dolan's February 10, 2018 interview on "The Michael Kay Show" because Plaintiff "relies on and quotes extensively from that interview."  Defs. Mem. at 14.  While Plaintiff quotes excerpts of the interview, it is a distortion to claim that Plaintiff *relied on* the entirety of the interview such that it can be considered at this stage.  Instead, as the Amended Complaint makes clear, the only portions of the interview on which Plaintiff relies are those specifically quoted and identified as being defamatory.  AC ¶¶ 68-73.  *See also Bounkhoun v. Barnes*, No. 15 Civ. 631A, 2017 WL 1331359, at *4 (W.D.N.Y. Apr. 11, 2017) ("Although allegations in the amended complaint refer to events that purportedly are explained in greater detail within the documents, the documents themselves are not integral to the basic assertion of any party's claim").  Thus, Defendants' reliance upon *Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405 (S.D.N.Y. 2009) is misplaced, as the court in *Fuji* only considered a document in its entirety where the plaintiff alleged that "all of the statements" contained therein were defamatory.  *Id.* at 414.  In contrast, Plaintiff has not alleged that the entirety of Mr. Dolan's interview on "The Michael Kay Show" was defamatory, and has specifically identified those portions that were defamatory.

### C.      The Court Should Not Consider Prior Court Proceedings

Defendants' proffer of documents "filed in Oakley's related criminal case and pleadings from his prior civil cases," Defs. Mem. at 14, fares no better.  The mere fact that Defendants caused Plaintiff to be arrested does not make his entire criminal record relevant to the instant case, let alone relevant at the pleading stage on a motion to dismiss.  Nothing in the Amended Complaint

specifically references the criminal complaint or the trespass notice[6] and courts have held that such documents are not properly considered in deciding a motion to dismiss.[7]  *See McLennon v. City of New York*, 171 F. Supp. 3d 69, 90 (E.D.N.Y. 2016) (declining to consider "documents related to [the plaintiff's] criminal case" where they were not "incorporated by reference"); *Bejaoui v. City of New York*, No. 13 Civ. 5667 (NGG)(RML), 2015 WL 1529633, at *6 (E.D.N.Y. Mar. 31, 2015) ("Where, as here, Plaintiff does not mention [complaint reports and arrest reports] and does not appear to rely on them, the court cannot deem such extrinsic materials to be integral to the Complaint").

Similarly, Defendants have not even attempted to argue how the Amended Complaint incorporates or otherwise heavily relies on the other civil litigations in which Plaintiff was a party, such that they would be relevant at the motion to dismiss stage, when such litigations are not mentioned anywhere in the Amended Complaint in the first instance.  It is clear, therefore, that Defendants have only included such evidence in a transparent attempt to malign Plaintiff's reputation to the Court (or, more likely, to the general public), by improperly portraying him as a violent, litigious individual.[8]  *Greenfield v. City of New York*, No. 99 Civ. 2330 (AJP), 2000 WL 124992, at *12 (S.D.N.Y. Feb. 3, 2000) ("[T]he Second Circuit is clear that . . . evidence of prior litigation cannot be admitted solely for the purpose of proving that a plaintiff has a character trait for litigiousness and acted in conformity with that trait in the present lawsuit").  Defendants admit

---

[6]  To the extent that Defendants cite to the trespass notice for the proposition that Plaintiff voluntarily agreed not to enter the Garden, this argument willfully conflates two different issues.  Irrespective of whatever agreement Oakley made with the District Attorney's office, this does not change the fact that, as alleged in the Amended Complaint, *Defendants* have separately banned him from entering MSG.  *See* AC ¶¶ 67-68.

[7]  *Oblio v. City Univ. of New York*, No. 01 Civ. 5118 (DGT), 2003 WL 1809471 (E.D.N.Y. Apr. 7, 2003) is distinguishable, as the court observed that it could rely on extrinsic evidence where "plaintiff's counsel conceded [at oral argument] that the exhibits were incorporated in plaintiff's complaint by reference."  *Id.* at 4 n.11. Here, Plaintiff has never made any such concession.

[8]      Contrary to what Defendants now claim, Plaintiff certainly challenges both the accuracy and relevance of Defendant Dolan's claim that Plaintiff has a "troubled" history with various physical altercations.  Defs. Mem. At 29, n. 26.  Not only is this statement untrue, it further underscores the fact that Defendants are simply trying to further malign Plaintiff and continue their defamatory campaign.

that this is the sole intention for which they seek to introduce this material, conceding that the only relevance of such documents is to demonstrate Mr. Oakley's purported "recidivist history." Defs. Mem. at 15. Sadly, this is yet another example of the vindictive and defamatory conduct that has marked Defendants' actions towards Mr. Oakley, in their misguided efforts to explain their violent and inexcusable behavior which gave rise to this lawsuit.

        **D.**      **The Court Should Not Consider Information on Public Websites**

Finally, Defendants falsely claim that the Court should consider information on various websites to support their motion. Defs. Mem. at 15. First, and contrary to what Defendants argue, the materials on http://oakleyinthekitchen.com do not qualify as "a party admission" of which the Court may take judicial notice, as such a position is undercut by the very case they cite, *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173 (S.D.N.Y. 2006). The court in *Doron* observed that a plaintiff's website may be considered "as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination," and the plaintiff "admitted to this [information at issue] during . . . oral argument." 423 F. Supp. 2d at 179, n. 7. As the materials upon which Defendants rely have not been properly authenticated, they should be disregarded. Second, there is absolutely no support for the proposition that the Court can consider the information on the third-party Rebound Institute website, and Defendants do not even attempt to offer a persuasive argument, instead stating, without explanation, that the Court "may take judicial notice" of such material simply because they claim it supports their motion to dismiss. As this argument blatantly misstates the evidentiary standard in deciding a motion to dismiss, Defendants' argument lacks merit.

**III.**      **PLAINTIFF STATES A CLAIM FOR DEFAMATION**

Under New York law, defamation "consist[s] of the twin torts of libel and slander, [and] is the invasion of the interest in a reputation and good name." *Albert v. Loksen*, 239 F.3d 256, 265 (2d

Cir. 2001).  To state a claim for defamation, the plaintiff must allege "(i) a defamatory statement of

fact, (ii) that is false, (iii) published to a third party, (iv) of and concerning the plaintiff, (v) made

with the applicable level of fault on the part of the speaker, (vi) either causing special harm or

constituting slander per se, and (vii) not protected by privilege."  *Grogan v. Blooming Grove*

*Volunteer Ambulance Corp.*, 917 F. Supp. 2d 283, 290 (S.D.N.Y. 2013).  Where a statement is

defamatory *per se*, courts "presume[] that damages result from those specifically enumerated

categories of statements," and the plaintiff need not "plead and prove special damages."  *DiFolco v.*

*MSNBC Cable LLC*, 831 F. Supp. 2d 634, 648 (S.D.N.Y. 2011).  In contrast, a statement is

defamatory *per quod* if it results in actual damages and "the false statement is contained ***not in the***

***statement's literal wording but rather its innuendo***."  *Kavanagh v. Zwilling*, 997 F. Supp. 2d 241,

248 (S.D.N.Y. 2014) (emphasis added).

> ### A.   <u>Plaintiff States a Claim for Defamation *Per Se*</u>

Relevant here, a statement is defamatory *per se* if it falls into one of the following three

categories: "(1) statements charging the plaintiff with a serious crime; (2) statements that tend to

injure the plaintiff in her trade, business or profession; [or] (3) statements that impute to the plaintiff

a 'loathsome disease.'"  *Nolan v. State*, 158 A.D.3d 186, 195 (1st Dep't 2018).  In light of the fact

that Defendants' statements satisfy all three categories, it is beyond dispute that Defendants'

defamatory statements were defamatory *per se*.  AC ¶¶ 65-77.

As a threshold matter, Defendants attempt to escape liability by carefully parsing their

various statements and arguing that none of the statements, standing alone, meet the standards of

defamatory conduct.  In taking this position, Defendants completely ignore the body of case law

which makes clear that, in the context of a defamation case, a court must look at the statements *in*

*total* and *in context*.  *See Elias v. Rolling Stone LLC*, 872 F.3d 97, 109 (2d Cir. 2017) ("The District

Court erred by evaluating the Article's various allegations . . . in isolation, rather than considering

them in the context of the article as a whole"). When seen through this prism, there is no question that Defendants' statements, taken together, defamed Plaintiff.

First, Defendants' statements unquestionably accused Mr. Oakley of a serious crime— assault, and Defendants' claim to the contrary rings hollow. Specifically, Defendants stated that Mr. Oakley was "arrested" because he "behaved in a highly inappropriate and completely abusive manner" and was "looking for a fight." AC ¶¶ 58, 68-69. Likewise, Defendant Dolan stated that Mr. Oakley was "both physically and verbally abusive," that security people and fans "were abused" and that Mr. Oakley's purported "abusive behavior" began "the moment he stepped into the Garden." *Id.* ¶¶ 72-73. He then clarified his meaning, stating that Defendants ejected Plaintiff because his conduct endangered the "**safety** . . . of [the] fans" and that the fans needed to understand that "he was ***terribly abusive*** to them." *Id.* ¶¶ 71-72 (emphasis added).

Taken together, the statements that Plaintiff was "arrested" for "engaging in physically abusive" behavior that jeopardized the safety of Knicks fans, give rise to the reasonable inference that he was arrested for physically attacking members of the public. No reasonable reader would believe that Plaintiff had been arrested for simply yelling (or even cursing) loudly at a basketball game. In choosing their words as carefully as they did, Defendants clearly wanted to convey the impression that Plaintiff had violently assaulted fans that had attended the game, and was arrested as a result.[9] Having been successful in doing so, it would fundamentally pervert the law to claim, as Defendants now do, that they can escape liability merely by omitting the specific crime of which they accuse Mr. Oakley, and the case law on the subject is in accord. *See Sprewell v. NYP Holdings, Inc.*, 772 N.Y.S.2d 188, 192–93 (N.Y. Sup. Ct. 2003) (an article which said that the plaintiff threw a punch at someone and "*missed*" was defamatory per se because "defamatory

---

[9]     Defendants' explicit linking of Mr. Oakley's alleged "physically abusive" behavior with his subsequent "arrest" differentiates the instant case from the sole case cited by Defendants, *Burdick v. Verizon Commc'ns, Inc.*, 758 N.Y.S.2d 877 (4th Dep't 2003), in which there was no mention of the plaintiff having been charged with, or even committed, criminal conduct.

language need not consist of the technical words of a criminal indictment provided that it is reasonably susceptible to a connotation of criminality").

Likewise, Defendant Dolan's comments imputed that Plaintiff suffered from the loathsome disease of alcoholism. Specifically, while speaking about Mr. Oakley, Mr. Dolan stated that "anybody drinking too much alcohol . . . [is] going to be ejected and [is] going to be banned." AC ¶ 68. Mr. Dolan further stated that "Charles has a problem," that "[h]e may have a problem with alcohol," that he "was drinking beforehand," and that there were "statements from police that he appeared to be impaired." *Id.* ¶ 69. These allegations are sufficient to support an inference that Mr. Dolan's statements were *per se* defamatory. *See Hayes v. Sweeney*, 961 F. Supp. 467, 481 (W.D.N.Y. 1997) ("[A]n imputation of alcohol consumption is defamatory when accompanied by some aggravating factor, such as the suggestion that conduct is habitual or that the person is 'a drunk'").

Finally, Defendants' statements clearly disparaged Mr. Oakley in his trade or business. In order to allege such a claim, a plaintiff must demonstrate that the statements "reflect on [his] performance or [are] incompatible with the proper conduct of [his] business." *Sprewell*, 772 N.Y.S.2d at 195. Here, as alleged in the Complaint, Plaintiff derived significant income opportunities from making appearances at drug and alcohol rehabilitation centers to give speeches and to interact with patients. AC ¶¶ 92, 105-106. By falsely claiming that Mr. Oakley was an alcoholic, Defendants' statements clearly disparaged his ability to perform in that capacity, as there can be no question that treatment centers cannot retain the services of an individual who is alleged to be suffering from the same substance abuse problems as their patients. *See Allen v. CH Energy Grp., Inc.*, 872 N.Y.S.2d 237, 239 (3d Dep't 2009) (finding that a statement defamed the plaintiff's business reputation where "a person who engaged in the conduct described by [the defendant] would not be qualified to continue in [the plaintiff's] position").

Despite the fact that their statements clearly impugned Plaintiff's ability to provide services to people suffering from substance abuse issues, Defendants nevertheless attempt to avoid liability by citing to case law standing for the unremarkable proposition that statements *generally* reflecting negatively on a plaintiff's reputation are not actionable. *See Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 420 (S.D.N.Y. 2013) (finding that a statement that the plaintiff stole a watch was not related to his business as food wholesaler); *Medcalf v. Walsh*, 938 F. Supp. 2d 478, 488 (S.D.N.Y. 2013) (a statement about the plaintiff's post-partum depression being irrelevant to her job as a legal secretary); *Tacopina v. Kerik*, No. 14 Civ. 749 (LTS)(FM), 2016 WL 1268268, at *4 (S.D.N.Y. Mar. 31, 2016) (a statement that the plaintiff was untrustworthy did not impugn his ability to perform as an author or consultant).

However, Defendants' argument elides the fact that Plaintiff is not claiming that their statements merely damaged his general professional reputation.[10] Rather, by falsely claiming that Plaintiff himself was an alcoholic, Defendants' statements damaged Plaintiff's specific business reputation as someone who worked with alcoholics, making them actionable. *See Wilcox v. Newark Valley Cent. Sch. Dist.*, 74 A.D.3d 1558, 1561 (3d Dep't 2010) (statement that the plaintiff's action endangered the safety of students injured her business reputation as a teacher).

Finally, Defendants claim that Plaintiff's defamation *per se* claim fails because it relies on extrinsic facts. However, Defendants' definition of extrinsic facts does not comport with that established under the law. While New York courts have held that they cannot consider extrinsic evidence in determining whether a statement is defamatory, this only applies when the statements themselves are not clear on their face. *See Agnant v. Shakur*, 30 F. Supp. 2d 420, 426 (S.D.N.Y.

---

[10]    It is for this reason that Defendants rely on *Walker v. Urban Compass, Inc.*, 2017 WL 608308 (N.Y. Sup. Ct. Feb. 15, 2017). In *Walker,* the court merely held that a claim that the plaintiff abused drugs and alcohol did not damage his professional reputation as a real estate agent, as the two were unrelated matters. *Id.* at *3. In contrast, in the instant case, accusing Mr. Oakley of being an alcoholic directly impacted his ability to provide services to alcohol treatment centers.

1998) (finding that song lyrics making veiled references to the plaintiff were not sufficiently clear as to be defamatory); *Franklin v. Daily Holdings, Inc.*, 135 A.D.3d 87, 94 (1st Dep't 2015) (same). Here, there is no question that Defendants are both speaking about Plaintiff and referring to him as an alcoholic.  Moreover, contrary to Defendants' claims, Plaintiff does allege that it was a matter of public knowledge that he worked with alcohol rehabilitation centers.  *See* AC ¶105.  Thus, there is no need to rely on any extrinsic facts to impute a defamatory meaning as to Defendants' comments.[11]

### B.   Plaintiff States a Claim for Defamation *Per Quod*

Even putting aside the fact that Defendants' statements were defamatory *per se*, Defendants' motion to dismiss Plaintiff's defamation claims would nevertheless be futile because Plaintiff has also adequately alleged a cause of action for defamation *per quod*.  Statements are defamatory *per quod* "[w]hen the common usage of the challenged language can be [defamatory] due to extrinsic circumstances."  *Idema v. Wager*, 120 F. Supp. 2d 361, 368 (S.D.N.Y. 2000).  As a claim for defamation *per quod* requires special damages, *see Ava v. NYP Holdings, Inc.*, 64 A.D.3d 407, 412 n.3 (1st Dep't 2009), where Plaintiff addresses his claims of defamation *per se* and defamation *per quod* simultaneously.  It is well established under New York law that "[s]pecial damages contemplate the loss of something having economic or pecuniary value."  *Sprewell*, 772 N.Y.S.2d at 196 (Sup. Ct. 2003) (quoting *Liberman v. Gelstein*, 80 N.Y.2d 429, 434-35 (1992)).[12]

---

[11]   Even if Plaintiff hadn't alleged that his work with alcohol treatment centers was commonly known, this would be irrelevant to the Court's analysis.  The law does not mandate that the general public be aware of a plaintiff's profession in order for a statement to defame his or her business reputation, as this would act as a *de facto* bar to any private individual from bringing such a defamation claim given that such an individual's occupation would likely not be widely known.

[12]   Defendants' contention that "Oakley's counsel repeatedly informed the Court that he was not and had no intention of alleging defamation based on special damages" is inaccurate. Defs. Mem. at 22.  In reality, Plaintiff's counsel represented that at the time of the pre-motion conference, he was not aware that Plaintiff had suffered from any special damages sufficient to support a claim for defamation *per quod*.  Upon further investigation, Plaintiff's counsel learned that as a direct result of Defendants' defamatory statements, Mr. Oakley did suffer actual pecuniary harm, supporting his subsequent cause of action for defamation *per quod*.

Plaintiff's allegations support an inference that, when considered with additional factors, Defendants' statements are susceptible to a defamatory meaning which resulted in special damages. Defendants' statements that they "hope [Mr. Oakley] gets some help soon," that "Charles has got a problem," that  he was "drinking too much alcohol," that "he appeared to be impaired" and that "the first step for anybody is to ask for help" all suggest that Mr. Oakley is an alcoholic.  AC ¶¶ 58, 60, 69.  Plaintiff further alleges that as a result of these defamatory statements, he has suffered special damages in the amount of $40,000, in appearance fees that he had previously been scheduled to earn.  *Id.* ¶¶ 91-95.

In moving to dismiss, Defendants first argue that Plaintiff fails to allege the requisite causal link between their defamatory statements and Mr. Oakley's damages, claiming that there were "other factors" from which an organization could choose to disassociate from Mr. Oakley.  Defs. Mem. at 22-23.  This argument fails for two reasons.  First, these "other factors" are not included in the Amended Complaint and are therefore not the proper basis to sustain a motion to dismiss. *Alfaro v. Labador*, 300 F. App'x 85, 86 (2d Cir. 2008) (holding that, "[i]n ruling on a motion to dismiss under Rule 12(b)(6), the District Court was required to accept as true the allegations in the complaint, and apart from those allegations, there was no factual basis upon which the District Court could have" granted the motion to dismiss).  Second, Defendants concede that Plaintiff alleges the necessary causal link by stating that his loss in compensation from the Rebound Institute was "a direct result" of their statements.  Defs. Mem. at 23.  Specifically, prior to Defendants' defamatory statements, Plaintiff had been retained to make appearances at treatment facilities and the Rebound Institute only "came to the conclusion that it was not appropriate for someone with such a reputation to interact with their patients," *after* Defendants defamed Mr. Oakley.  *Id.* ¶¶ 92-93.  Thus, as a result of Defendants' defamatory statements, Plaintiff was denied $40,000 in appearance fees that he had been scheduled to receive from the Rebound Institute.  *Id*. ¶¶ 94-95.

Defendants further argue that, based upon certain websites and tweets, Mr. Oakley's special damages are "fabricated," as Mr. Oakley is "actively involved with and a featured face of the Rebound Institute."  Defs. Mem. at 23.  As an initial matter, as discussed above, the Court should disregard the materials upon which Defendants rely, as they are extrinsic to the Amended Complaint.  *See supra* at pp. 8-10, 18.  In any event, while Defendants may use this extrinsic evidence during the course of discovery to test the credibility of the claims of Mr. Oakley and the Rebound Institute, they do not conclusively prove that Plaintiff did not lose the business opportunities alleged in the Amended Complaint.  At worst, they merely show that at some point the Rebound Institute was comfortable being associated with Mr. Oakley again.  However, a plaintiff need not allege a total and complete loss of *every single potential* business opportunity as a result of the defendant's defamatory conduct.  *See Charles Atlas, Ltd. v. Time-Life Books, Inc.*, 570 F. Supp. 150, 155 (S.D.N.Y. 1983) (holding that the plaintiff adequately alleged special damages where it alleged that the defendant's defamatory statements "caused it to lose $30,323 in sales and revenues and to expend $14,000 in 'special advertising expenses'").  As Plaintiff alleges that Defendants' defamatory statements resulted in a specific and identifiable pecuniary harm, his allegations support an inference that he has sustained special damages.

### C.    Plaintiff Alleges Actual Malice

A defendant acts with actual malice when he acts "with knowledge that [the defamatory statement] was false or with reckless disregard of whether it was false or not."  *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964).  The actual malice standard "does not measure malice in the sense of ill will or animosity, but instead the speaker's subjective doubts about the truth of publication."  *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001).  Given the fact-intensive nature of the inquiry as to whether a defendant knew its statements were false, courts have held that "resolution of the . . . actual malice inquir[y] typically requires discovery."  *Id*. at

173; *see also Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 118-19 (2d Cir. 2005) (observing that, "[g]iven th[e] opportunity [for discovery], [the plaintiff] may be able to adduce facts establishing the speaker's subjective doubts about the truth of the publication").

Plaintiff's allegations in this case support an inference that Defendants acted with actual malice.  Plaintiff alleges that Defendants knew their statements about his supposedly violent and abusive conduct were false, as he never engaged in any such conduct while at the Garden or otherwise behaved inappropriately, and Defendants had to fabricate witness statements to support their false depiction of the events.  AC ¶¶ 59, 63-64, 70, 74, 75.  To the contrary, Mr. Oakley never initiated contact and, at all times, was acting in self-defense.  *Id.* ¶59.  As Plaintiff alleges that Defendants were aware that their statements that Mr. Oakley had instigated the Incident and acted abusively were false, he thus adequately alleges that Defendants acted with actual malice in defaming him.  Similarly, given that Plaintiff alleges that Defendants were at all times aware that he was never an alcoholic (*id.* ¶70), it is clear that the Amended Complaint contains specific allegations sufficient to demonstrate actual malice.  *See World Wrestling Fed. Entmt., Inc. v. Bozell*, 142 F. Supp. 2d 514, 528 (S.D.N.Y. 2001) (holding that the plaintiff alleged actual malice where "[a] reasonable fact-finder could certainly infer reckless disregard for the truth and/or spite, ill will, and an intent to harm"); *Manno v. Hembrooke*, 120 A.D.2d 818, 819 (3d Dep't 1986) (finding that actual malice was alleged where statements "were made with knowledge that they were false or with reckless disregard as to whether they were false").

The case law cited by Defendants for the proposition that Plaintiff purportedly failed to allege actual malice is inapposite, as in all of those cases the respective plaintiffs merely relied on the ill will on the part of the defendant, rather than demonstrating they had any knowledge that the statement was incorrect.  *See Biro v. Conde Nast*, 963 F. Supp. 2d 255, 281 (S.D.N.Y. 2013) (dismissing a complaint where the plaintiff failed to allege any facts demonstrating that the

defendant knew the article was false); *Amadsau v. Bronx Lebanon Hosp. Ctr.*, No. 03 Civ. 6450

(LAK)(AJP), 2005 WL 121746, at \*13 (S.D.N.Y. Jan. 21, 2005) (where the plaintiff solely relied on

a claim that the defendant was motivated by "malice, ill will, personal spite, or in the alternative, by

defendants' culpable recklessness or gross negligence"); *Dunlop-McCullen v. Rogers*, No. 00 Civ.

3274 (JSR)(JCF), 2002 WL 1205029, at \*16, n.3 (S.D.N.Y. Feb. 21, 2002) (one cannot prove actual

malice merely by describing past disputes between the parties).  Here, not only has Plaintiff alleged

that Defendants were aware that their statements were false, but he has also demonstrated that

Defendant Dolan has a history of engaging in the same type of reckless conduct as in the instant

case, by claiming twice without justification that two other people who upset him were drunk and/or

alcoholics.  AC ¶¶78-81.

### D.   Defendants' Statements Were Not Opinions

Finally, contrary to Defendants' argument, their defamatory statements are not non-

actionable statements of opinion.  Despite ultimately acknowledging that the statements must be

viewed as a whole and in context, Defendants once again attempt to parse each statement

individually to support the claim that their statements were non-actionable opinions.  Under New

York law, "a statement of opinion accompanied by a full recitation of the facts on which it is

based will be deemed a pure opinion, while a statement of opinion that implies a basis in

undisclosed facts is actionable 'mixed opinion.'"  *Clark v. Schuylerville Cent. Sch. Dist.*, 807

N.Y.S.2d 175, 176–77 (3d Dep't 2005).

Here, when viewed in their totality, it is clear that Defendants were indisputably attempting

to communicate factual statements about Plaintiff.  As a threshold matter, Defendants left no doubt

as to their intentions when they specifically said of Mr. Oakley, "**everything he has said since the**

**Incident is pure fiction**."  AC ¶62.  Any reasonable reader would interpret this claim to mean that

Defendants were claiming that, in contrast, their statements were *factual.*  Defendants cannot escape

this conclusion merely by making half-hearted efforts to couch their statements with purported qualifying words such as "hope" or "may," especially where, as here, they repeatedly seek to bolster their claims with unspecified references to Plaintiff's purported history of "problems," as well as witness statements that they claim corroborate their version of the events.  AC ¶¶59-69.  By using this language, Defendants have "impl[ied] a basis in undisclosed facts [which] is actionable mixed opinion."  *Wilcox v. Newark Valley Cent. Sch. Dist.*, 904 N.Y.S.2d 523, 526 (3d Dep't 2010) (collecting cases).

In moving to dismiss the Amended Complaint, Defendants further argue that "courts have consistently protected statements made in online forums as statements of opinion rather than fact." Defs. Mem. at 28.  However, the mere fact that statements are made online does not preclude a finding that a statement is actionable as defamation.  *See Franklin*, 135 A.D.3d at 94 (holding that a statement published on Twitter was actionable defamation).  Likewise, Defendants' argument that Defendant Dolan's statements on a television program are *per se* not actionable is not supported by the case law.  Unlike in *Huggins v. Povich*, No. 131164/94, 1996 WL 515498 (N.Y. Sup. Ct. Apr. 19, 1996), Defendant Dolan did not repeatedly state that he was merely expressing his personal opinions.  *Id.* at *7.  Nor are Defendant Dolan's comments the kind of off-the-cuff "shock talk" from radio hosts with a history of "crude and hyperbolic" statements such as was the case in *Hobbs v. Imus*, 698 N.Y.S.2d 25, 26 (1st Dept. 1999).  Rather, these were carefully-thought-out statements made by Defendants to convince the general public that Mr. Oakley was a violent, out-of-control alcoholic.  *See* AC ¶¶58-75.

Similarly unavailing is Defendants' argument that "the challenged statements are not mixed opinion because Defendants disclosed the facts on which they were based."  Defs. Mem. at 29.  The decision by the Court of Appeals in *Gross v. New York Times Co.,* 82 N.Y.2d 146 (1993) is dispositive.  In *Gross*, the court found that statements are not actionable "if the facts on which they

are based are fully and accurately set forth and it is clear to the reasonable reader or listener that the accusation is merely a personal surmise built upon those facts." *Id.* at 155. However, the court found that a newspaper article which claimed its allegations were supported by unspecified "documents" and that "interviews conducted with several pathologists" gave rise to the inference that they were provable facts.[13] *Id.* at 149-50, 155.

Based upon the foregoing, Defendants' motion to dismiss Plaintiff's claims for defamation *per quod*, defamation *per se*, libel and slander should be denied.

## IV.   **PLAINTIFF STATES A CLAIM FOR ASSAULT AND BATTERY**

To state a claim for assault under New York law, "a plaintiff must plead an intentional placing of another person in fear of imminent harmful or offensive contact."[14] *Bass v. World Wrestling Fed. Entmt., Inc.*, 129 F. Supp. 2d 491, 508 (E.D.N.Y. 2001). An action for assault "need not involve physical injury." *Di Gilio v. Burns Int'l Detective Agency*, 46 A.D.2d 650, 650 (2d Dep't 1974). To state a claim for battery, the plaintiff "must prove bodily contact, with intent that was offensive in nature." *Hassan v. Marriott Corp.*, 243 A.D.2d 406, 407 (1st Dep't 1997). It is well established that whether an individual would find conduct to be offensive "or would be in apprehension of harmful or offensive conduct are issues of fact that cannot be resolved on [a] motion to dismiss." *Cohen v. Davis*, 926 F. Supp. 399, 402 (S.D.N.Y. 1996).

Plaintiff states a claim for both assault and battery. Within minutes of taking his seat at the Garden, and with no basis or justification, three large men approached Mr. Oakley and demanded,

---

[13] As Defendants did not actually fully disclose what the witness statements and Plaintiff's purported "history" indicated in their statements, *Sorvillo v. St. Francis Preparatory Sch.*, 607 F. App'x 22 (2d Cir. 2015), a summary order with no precedential effect, does not support Defendants' argument that the defamatory statements are non-actionable. Instead, given the fact that Plaintiff challenges the very existence of the witness statements to which Defendants cite, there is no question that Defendants' motion to dismiss should be denied. *See* AC ¶¶ 62-63.

[14] To the extent that Defendants attempt to procure dismissal of Plaintiff's assault and battery claims by arguing that he failed to plead that Defendants' security officers acted with the requisite intent, this is flatly contradicted by the allegations in the Amended Complaint, wherein Plaintiff alleges that Defendants "intentionally placed Plaintiff in imminent fear of harmful and/or offensive conduct" and that they "intentionally and wrongfully physically contacted Plaintiff without his consent." AC ¶¶ 123, 127.

without explanation, that he leave the Arena.  AC ¶ 34.  When Mr. Oakley explained that he had

done nothing wrong and turned around to peaceably return to his seat, two security guards grabbed

Mr. Oakley and pushed him to the ground.  *Id.* ¶¶ 37-42.  The security guards then physically

grabbed Mr. Oakley to forcibly compel him to leave the Arena, placing him in fear for his safety.

*Id.* ¶¶ 44-46.  These allegations are sufficient to survive Defendants' motion to dismiss Plaintiff's

claims for assault and battery.  *See Cohen*, 926 F. Supp. at 402 (holding that the plaintiff stated a

claim for battery where she alleged that "someone grabbed her arm to prevent her from leaving a

room").

Defendants argue that they were allowed to use force when Plaintiff refused to leave the

Garden, citing to the language used on the back of the ticket.  Defs. Mem. at 30-31.  Once again, the

terms on the ticket itself are extrinsic evidence not integral to the allegations in the Amended

Complaint and should therefore be rejected by the Court.  *See supra* at pp. 8-11.  Even putting this

fact aside, the terms of the ticket state that MSG is only entitled to eject "any person whose conduct

MSG deems disorderly, who uses vulgar or abusive language or who fails to comply with these

terms," and Plaintiff's allegations do not support an inference that he was behaving in such a

manner.  *See* Kushner Decl. Ex. 14; *see also* AC ¶¶ 35, 40, 43-45, 50.  Accordingly, Plaintiff's

allegations do not support an inference that Defendants were entitled to baselessly eject Mr. Oakley

in the first instance, and the terms of the ticket are therefore irrelevant.

Defendants' reliance upon *Gottlieb v. Sullivan Cty. Harness Racing Ass'n*, 25 A.D. 798 (3d

Dep't 1966) is clearly misplaced.  In *Gottlieb*, the plaintiff was forcibly removed from a racetrack

for bringing a convicted bookmaker, and relevant rules and regulations provided that "[a]ny person .

. . whose conduct is deemed detrimental to the best interest of harness racing or who is deemed an

undesirable person may be expelled from the track."  *Gottlieb*, 25 A.D.2d at 798.  Likewise,

*Schaeffer v. Cavallero*, 54 F. Supp. 2d 350 (S.D.N.Y. 1999) is similarly unpersuasive, as the

plaintiff had a statutory duty to obey "an authorized airline representative['s] [instruction] to leave the plane," was asked to leave a plane because he was yelling and being "quarrelsome," and refused a "polit[e]" request that he disembark. *Id.* at 352. In contrast to a convicted bookmaker at a racetrack and an individual instructed to leave an airplane – situations that are both expressly addressed in relevant rules and regulations – Mr. Oakley engaged in no behavior that warranted his expulsion from the Garden at all, let alone in a violent and abusive manner.

Irrespective of Defendants' purported right to throw Plaintiff out of Madison Square Garden without any justification, their motion to dismiss should nevertheless be denied because Plaintiff sufficiently alleges that the amount of force used against him was legally unreasonable. Plaintiff alleges that he was peacefully watching the game, that he never acted violently, that he never refused to leave the Garden[15] and that he merely sought an explanation as to why he was being baselessly ejected. AC ¶¶ 35, 40-45, 50. Despite his non-confrontational demeanor and reasonable inquiries, MSG security guards repeatedly grabbed Mr. Oakley and threw him to the ground. *Id.* ¶¶ 42, 47. In light of the foregoing, it would be entirely premature to conclude that the security guards' use of force in doing so was reasonable as a matter of law, and Defendants' argument that "discovery on these tort claims is unnecessary" is patently false. *See J.L. v. E. Suffolk Boces*, No. 14 Civ. 4565 (SIL), 2018 WL 1882847, at *13 (E.D.N.Y. Apr. 19, 2018) (a question of the defendant's state of mind in assaulting the plaintiffs and whether the type of force used against the plaintiffs was appropriate given the circumstances was a factual issue for the jury to resolve); *Combs v. City of New York*, 130 A.D.3d 862, 864-65 (2d Dep't 2015) ("Because of its intensely

---

[15]     Despite Defendants' transparent efforts to impugn Plaintiff's honesty by claiming that his allegations in the Amended Complaint — to the effect that he never refused a request to leave — contradicted those in his original Complaint, a comparison of the language exposes the lie in Defendants' arguments. Nowhere in the original Complaint did Plaintiff state the he affirmatively refused to leave. Rather, Mr. Oakley simply asked for an explanation as to what he had purportedly done to warrant being thrown out of the Garden, and attempted to show that he was capable of watching the game in a peaceful manner by returning to his seat. Comp. ¶¶ 39-42; AC ¶¶ 35-46. Thus, his Amended Complaint makes explicit what was implicit in the original Complaint—that Mr. Oakley never refused any direction to leave the Garden and that Defendants therefore had no right to violently remove him from his seat.

factual nature, the question of whether the use of force was reasonable under the circumstances is generally best left for a jury to decide.")

Defendants' reliance on *Mitchell v. New York Univ.*, No. 150622/13, 2014 WL 123255 (N.Y. Sup. Ct. Jan. 8, 2014) does not warrant a different result.  In *Mitchell*, the plaintiff was explicitly barred from entering the defendants' premises absent express permission.  *Id.* at *1. When the plaintiff attempted to enter the defendants' property without such clearance, the defendants' officers "forcibly removed" him.  *Id.*  In dismissing the plaintiff's assault and battery claims, the *Mitchell* court noted that the complaint did not describe the force used on the plaintiff, and tellingly, the court also explained that while a property owner can "use *reasonable* force" to eject a trespasser, that privilege disappears with "the use of unnecessary force."  *Id.*  However, because the plaintiff did not allege the force was unnecessary, the complaint was dismissed.  *Id.* Here, Mr. Oakley never refused to comply with a request to leave the Garden, and was certainly not barred from Defendants' facilities beforehand such that they could automatically eject him without prior notice.  AC ¶¶ 30-33.  Moreover, the Amended Complaint is replete with allegations both describing the offensive physical contact and making it clear that such contact was unreasonable given the circumstances.[16]  *Id.* ¶¶ 42, 45, 47-49.

Finally, Defendants argue that "videos of the Incident further confirm that Defendants did not assault or batter Oakley."  *See* Defs. Mem. at 32.  As an initial matter, for the reasons discussed above, the Court should decline to consider video of the Incident, and Defendants' reliance upon *Zsigray v. Cty. Comm'n of Lewis Cty.*, No. 16 Civ. 64, 2017 WL 462011, at *4 (N.D. W.Va. Feb. 2,

---

[16]    Defendants also rely on *Mitchell* in support of their argument that "unreasonable force alone does not defeat a property owner's privilege to remove a trespasser," because a plaintiff **_must_** establish "that security personnel were motivated by an intent to inflict injury."  Defs. Mem. at 32 (emphasis added).  However, in *Mitchell*, the court observed that "the use of unnecessary force **_or_** evidence of an intent to injury as opposed to guard the owner's property removes the privilege."  *Mitchell*, 2014 WL 123255, at *1 (emphasis added).  Accordingly, Defendants' arguments that a property owner is entitled to use unreasonable or excessive force and that Plaintiff would be required to establish an intent to injure are both incorrect.  *See also Rivera v. Puerto Rican Home Attendants Servs., Inc.*, 930 F. Supp. 124, 133 (S.D.N.Y. 1996) ("New York law does not make intent to cause physical injury an element of the torts of assault and battery").

2017) is unavailing.  *See* Defs. Mem. at 34.  Unlike *Zsigray*, in which the court considered an extrinsic video tape because the "Complaint [made] multiple references to video footage of the Incident and, in effect, [made] the video part of the Complaint" (*Zsigray*, 2017 WL 462011, at *3), Mr. Oakley has not made any references to the video footage, and it is therefore not integral to the Amended Complaint.  Further, in *Zsigray*, the court's observation regarding the accuracy of the plaintiff's allegations had nothing to do with the court's ability to consider the video tape in the first instance.  *Id.*  In any event, even if the Court were to consider Defendants' video footage, their description of the contents of such footage is inaccurate and, at the very least, warrants further discovery, as Mr. Oakley did not initiate any contact with the security guards, and the security guards violently throw Mr. Oakley to the ground on multiple occasions.  *See supra* at pp. 14-16; AC ¶¶ 42, 45, 47-4; *see also McKinnon v. Bell Sec.*, 268 A.D.2d 220, 221-22 (1st Dep't 2000) ("The trier of fact must determine whether plaintiff's demeanor and behavior aggressively precipitated the confrontation, to the extent of relieving defendant of responsibility").

## V.      PLAINTIFF STATES A CLAIM FOR FALSE IMPRISONMENT

A claim of false imprisonment "consists of the unlawful detention of the person of another, for any length of time, whereby he is deprived of his personal liberty."  *Moore v. Sam's Club,* 55 F. Supp. 2d 177, 187 (S.D.N.Y. 1999).  To state a claim for false imprisonment, the plaintiff must allege that:  "(1) he was confined, (2) the defendant intended to confine him, (3) the plaintiff was aware of his confinement, (4) the plaintiff did not consent to the confinement, and (5) the defendant's actions were not otherwise privileged."  *Faiaz v. Colgate Univ.*, 64 F. Supp. 3d 336, 356 (N.D.N.Y. 2014).

Plaintiff states a claim for false imprisonment, as he alleges that the MSG Defendants "grabbed [him] and pushed him to the ground," and that when he got back to his feet, he was "forcibly turned around so his back faced security, grabbed by six officials and thrown onto the

ground." AC ¶¶ 42, 47.  The MSG Defendants then "physically and forcibly removed Plaintiff from the Garden and subsequently detained him until police could arrive to unjustifiably arrest him."  *Id.* ¶ 130.  As Plaintiff alleges that the MSG Defendants unlawfully detained him, his allegations are sufficient to state a claim for false imprisonment.  *See Campoverde v. Sony Pic. Entmt.*, No. 01 Civ. 7775 (LAP), 2002 WL 311633804, at *8 (S.D.N.Y. 2002) (denying a motion to dismiss where the court was unable to "find that plaintiffs can prove no set of facts in support of their false imprisonment claim").

In moving to dismiss, Defendants first argue that Plaintiff did not allege that they played a role in his false imprisonment.  Defs. Mem. at 34.  However, as discussed above, there are multiple allegations identifying MSG security guards as being directly involved in Mr. Oakley's confinement and detention.  *See* AC ¶¶ 42, 47-48, 123, 127, 130.  As Plaintiff identifies MSG security guards as being responsible for his unlawful detention, the Court need not engage in any speculation to conclude that the MSG Defendants are liable for false imprisonment.

Defendants further argue that the presence of NYPD officers on the scene absolves them of any liability.  *See* Defs. Mem. at 35.  However, the mere fact that NYPD officers were present is irrelevant, as Defendants concede that MSG security guards were involved in physically escorting Mr. Oakley out of the Arena, and Plaintiff's allegations support an inference that MSG security unlawfully detained Mr. Oakley.  *See* Defs. Mem. at 35; *see also* AC ¶¶ 42, 47-48, 123, 127, 130. The extent to which the NYPD were actually responsible for Plaintiff's imprisonment is not an issue that can be resolved on the face of the pleadings, and discovery is necessary.

## VI.  PLAINTIFF STATES A CLAIM FOR ABUSE OF PROCESS

A claim for abuse of process "lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with the intent to do harm without excuse or justification and (3) in order to obtain a collateral objective that is outside the

legitimate ends of the process." *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 616 (E.D.N.Y. 2017).

The Amended Complaint states a claim for abuse of process, as it alleges that Defendants baselessly and unjustifiably instigated his arrest and criminal charge to accomplish the collateral objective of publicly embarrassing him and destroying his reputation. *See* AC ¶¶ 134-36.  As Plaintiff was behaving appropriately and only attempted to defend himself after being violently confronted without basis, Defendants' actions in procuring his arrest were without justification, and their subsequent defamatory media campaign was intended to harm Mr. Oakley. *Id.* ¶¶ 58-62, 67-77.  Plaintiff further alleges that he lost $40,000 as a result. *Id.* ¶ 137.  These allegations are sufficient to state a claim for abuse of process. *See D'Amico v. Corr. Med. Care, Inc.*, 120 A.D.3d 956, 960, 991 N.Y.S.2d 687, 692 (2014) (denying a motion to dismiss where the defendants gave false statements with the intent of "demeaning, humiliating, and defaming [the plaintiff]").

In moving to dismiss Plaintiff's abuse of process claim, Defendants first argue that Plaintiff does not allege that Defendants caused the issuance of the criminal process.  However, a defendant who "promote[s] or facilitate[s] an arrest and prosecution may be liable for abuse of process." *Phelps v. City of New York*, No. 04 Civ. 8570 (DLC), 2006 WL 1749528, at *5 (S.D.N.Y. June 27, 2006).[17]  As discussed above with respect to Plaintiff's false imprisonment claim, Defendants actively participated in Mr. Oakley's arrest and prosecution by detaining him at MSG and assisting the NYPD upon his arrest and charge of assault.[18]  AC ¶¶ 42, 47-48.

---

[17]     *Oparaji v. New York City Dep't of Educ.*, No. 03 Civ. 4105 (NG)(VVP), 2005 WL 1398072 (E.D.N.Y. June 14, 2005) is distinguishable as, unlike Mr. Oakley, the plaintiff in *Oparaji* was neither arrested nor charged with a crime, but instead alleged that he had been discriminatorily terminated. *Id.* at *3.

[18]     Defendants' argument is particularly disingenuous in light of the fact that the extrinsic evidence they themselves have submitted to the Court fatally undermines their claim. The Misdemeanor Charge provided by Defendants reflects that MSG officials provided information that facilitated Mr. Oakley's arrest, and the Trespass Notice issued to Mr. Oakley further demonstrates that Defendants played a key role in his prosecution, as the Trespass Notice states that he is subject to arrest should he return to the Garden, and is signed by a "venue representative." *See* Kushner Decl. Exs. 7, 8.

Defendants further argue that Plaintiff fails to allege that Defendants sought to achieve a collateral objective.  *See* Defs. Mem. at 37.  However, Plaintiff alleges that Defendants caused the issuance of process for the purpose of humiliating him and damaging his reputation, which they were able to accomplish with the subsequent defamatory statements specifically referencing the arrest.  *See also Radow v. Weiss*, 733 N.Y.S.2d 488, 489 (2001) (denying summary judgment on an abuse of process claim because of factual issues about the defendants' motivations).

Defendants' argument that "Courts have thus routinely dismissed claims based on allegations similar to Oakley's" is simply not true and not supported by the case law to which they cite.  *See* Defs. Mem. at 37.  In *Vessa v. City of White Plains*, No. 12 Civ. 6989 (ER), 2014 WL 1271230 (S.D.N.Y. Mar. 27, 2014), the court dismissed the plaintiff's abuse of process claims because the plaintiff had failed to demonstrate that any legal process was issued in the first instance, and the plaintiff could not challenge the validity of the warrant.  *Id.* at *8.  Likewise, in both *Hauser v. Bartow*, 273 N.Y. 370 (1937) and *Jones v. Maples/Trump*, No. 98 Civ. 7132, 2002 WL 287752, at *7 (S.D.N.Y. Feb. 26, 2002), the courts rejected abuse of process claims where the plaintiffs did not demonstrate that the defendant used the process after it was issued.  *Hauser* at 374, *Jones* at *7. In contrast, here, Defendants specifically referred to the arrest that they procured through false pretenses in subsequent public statements, all in a clear attempt to further humiliate Mr. Oakley, thereby abusing the previously-obtained criminal process.  *See* AC ¶¶ 58, 62, 69.

Finally, Defendants argue that Plaintiff has not alleged special damages from their abuse of process.  *See* Defs. Mem. at 38.  However, as discussed above, Defendants' unlawful conduct has resulted in Plaintiff losing exactly $40,000 in appearance fees to which he otherwise would have been entitled.  *See* AC ¶¶ 94-95, 137.  Defendants' argument that this loss was incurred as a result of Defendants' defamatory statements misses the point.  The defamatory statements, which

36

explicitly reference the arrest, are the very abuse of process for which Plaintiff now seeks recovery. Therefore, Defendants' motion to dismiss Plaintiff's claim for abuse of process should be denied.

## VII.   PLAINTIFF STATES A CLAIM FOR DISABILITY DISCRIMINATION

To state a claim for discrimination based on a perceived disability arising under the ADA or NYSHRL, the plaintiff "must allege (1) that she is disabled within the meaning of the ADA; (2) that defendants own, lease, or operate a place of public accommodation; and (3) that defendants discriminated against her by denying her a full and equal opportunity to enjoy the services defendants provide." *Camarillo v. Carrols Corp.*, 518 F.3d 153, 156, 158 (2d Cir. 2008).  An individual is "disabled" within the meaning of the ADA and NYSHRL even if he or she is merely "regarded as" having a disability.  *See* 42 U.S.C. § 12102 (1)(C) (defining an individual as having a "disability" under the ADA if he or she is "regarded as having such an impairment"); N.Y. Exec. Law § 292(21)(c) (defining "disability" under the NYSHRL as "a condition regarded by others as such an impairment").  Relevant here, the Second Circuit has observed that alcoholism qualifies as a disability under the ADA and the NYSHRL.  *Makinen v. City of New York*, 857 F.3d 491, 495 (2d Cir. 2017).

In moving to dismiss Plaintiff's disability discrimination claims, Defendants first argue that Plaintiff has not alleged that he was forcibly removed from Madison Square Garden because they perceived him to be an alcoholic.  Defs. Mem. at 39.  However, Defendants made multiple comments supporting an inference that Plaintiff was ejected because of Defendants' belief that he was an alcoholic, including, *inter alia*, Dolan's statements that "anybody drinking too much alcohol, looking for a fight, they're going to be ejected and they're going to be banned," that Mr. Oakley "may have a problem with alcohol" and that he had "heard statements from police that [Plaintiff] appeared to be impaired."  AC ¶¶ 67-69, 146, 149.  Plaintiff further alleges that, but for Defendants discriminatorily banning him from the Garden, he would have routinely returned.  *Id.* ¶

37

54. These allegations support an inference that Defendants denied Mr. Oakley access to MSG based on their perception that he suffered from alcoholism. *See Naiman v. New York Univ.*, No. 95 Civ. 6469 (LMM), 1997 WL 249970, at *2 (S.D.N.Y. May 13, 1997) (holding that the defendant violated the ADA where the plaintiff was excluded from a public accommodation).

Defendants' argument that Plaintiff "self-defeatingly pleads that there were non-discriminatory reasons for his removal" (*see* Defs. Mem. at 39) is similarly meritless. As an initial matter, and contrary to Defendants' argument, Plaintiff does not allege that his ejection from the Garden was actually motivated by his physical proximity to Mr. Dolan or his purported abusive behavior, but rather, that Defendants fabricated those reasons to cover for their discriminatory behavior. *See* AC ¶¶ 35, 53, 58, 62. Indeed, Plaintiff specifically alleges that he was not acting inappropriately in any way such as to warrant his ejection. *Id.* ¶¶ 35, 37, 40-41, 45, 48, 50. Furthermore, even assuming other bases for Defendants' discriminatory conduct existed, "under the ADA, it is enough if the plaintiff's disability was a motivating factor in the discrimination." *Cain v. Mandl Coll. of Allied Health*, No. 14 Civ. 1729 (ER), 2017 WL 2709743, at *3 n.1 (S.D.N.Y. June 22, 2017). Accordingly, Plaintiff need not allege that his disability was a "but-for" cause of his discrimination. *See also Doe v. Deer Mountain Day Camp*, 682 F. Supp. 2d 324, 343 (S.D.N.Y. 2010) ("The existence of additional factors causing an injury does not necessarily negate the fact that the defendant's wrong is also the legal cause of the injury."). As Plaintiff alleges that Defendants' perception of his disability was a motivating factor in his denial of access to a public accommodation, his allegations are sufficient to state a claim arising under the ADA and NYSHRL.

As Plaintiff's allegations do not support an inference that he was acting abusively, Defendants' argument that they were merely "tak[ing] action to remove the individual and ensure the safety of other patrons" lacks merit. Defs. Mem. at 10. To that end, Defendants' reliance upon *Van Ever v. New York State Dep't of Corr. Servs. at Sing Sing Corr. Facility*, No. 99 Civ. 1234

38

(SAS), 2009 WL 1727713 (S.D.N.Y. Nov. 21, 2000) is misplaced, as the *Van Ever* court examined whether the plaintiff stated a claim for employment discrimination where his employer failed to provide a reasonable accommodation for his disability.  In contrast, Plaintiff alleges that Defendants denied him access to a public accommodation based upon their perception of Plaintiff as an alcoholic, which the Second Circuit has observed "may qualify as a disability for purposes of the ADA."  *Buckley v. Consolidated Edison Co. of New York*, 127 F.3d 270, 273 (2d Cir. 1997).  Moreover, as Plaintiff was not acting abusively or in an unsafe manner, there was clearly no need to remove him to ensure the safety of other patrons.  *See* AC ¶¶ 31, 36-38, 75-76.

Finally, Defendants claim that Plaintiff's perceived disability discrimination claim cannot proceed given his allegation that they knew or were recklessly indifferent to the fact that Plaintiff was not an alcoholic.  Defs. Mem. at 39.  However, while Defendants claim that Plaintiff cannot plead such inconsistent facts, the case law compels a different result.  Under the law, a party is permitted to "assert contradictory statements of fact" where there is legitimate "doubt about the facts in question."  *Stone v. Sutton View Capital, LLC*, No. 17 Civ. 1574 (VEC), 2017 WL 6311692, at *5 (S.D.N.Y. Dec. 8, 2017) (internal citations and quotations omitted); *see also Parker v. Zugibe*, No. 16 Civ. 4265 (KMK), 2017 WL 4296795, at *5 (S.D.N.Y. Sept. 26, 2017) (allowing the plaintiff to proceed with allegations that a search warrant was forged while also alleging that the search warrant was signed by a judge).  This is a case where such doubt exists.  Unlike an objectively provable fact such as whether a contract was executed, in the instant case, the "facts" which Defendants claim are inconsistent involve Defendant Dolan's state of mind, and whether or not he believed Mr. Oakley was an alcoholic.  Without having the opportunity to take his deposition, it is impossible for Mr. Oakley to state with certainty what Defendant Dolan believed in the moment.  And, indeed, to follow Defendants' reasoning would provide Defendants an easy end-run around legal liability.  If Plaintiff were forced to only proceed with his defamation claim,

Defendant Dolan could claim that he at all times believed Mr. Oakley to be an alcoholic, and ejected him for that reason.  On the other hand, if Plaintiff were required to solely assert a disability discrimination claim, Defendant Dolan could admit that his subsequent statements were a lie and that he never believed that Plaintiff suffered from alcoholism.  This kind of Hobson's choice is precisely what the alternative pleading provision of Fed. R. Civ. P. 8 was designed to avoid.  *See Henry v. Daytop Vill., Inc.*, 42 F.3d 89, 95 (2d Cir. 1994) (explaining that inconsistent pleadings "may lie either in the statement of the facts or the legal theories" and, pursuant to the Federal Rules of Civil Procedure, "we may not construe [the plaintiff's] first claim as an admission against another alternative or inconsistent claim") (internal citations omitted).

## CONCLUSION

For the reasons set forth herein, Defendants' motion to dismiss Plaintiff's Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) should be denied in its entirety.[19]

Dated: May 24, 2018
     New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
     Douglas H. Wigdor
     Renan F. Varghese
     Kenneth Walsh

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
rvarghese@wigdorlaw.com
kwalsh@wigdorlaw.com

*Attorneys for Plaintiff*

---

[19]    To the extent that the Court finds deficiencies in any of Plaintiff's claims, Plaintiff respectfully requests the right to amend his pleadings to address any such deficiencies.  Contrary to what Defendants claim, there is no basis to find that such an amendment would be futile given that neither party knows the basis of the Court's eventual decision.