# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

---

No. 17-cv-6903 (RJS)

---

CHARLES OAKLEY,

Plaintiff,

VERSUS

JAMES DOLAN *ET AL.*,

Defendants.

---

OPINION AND ORDER
February 19, 2020

---

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/19/20

RICHARD J. SULLIVAN, Circuit Judge:

Plaintiff Charles Oakley brings this action against MSG Networks, Inc., The Madison Square Garden Company, and MSG Sports & Entertainment, LLC (collectively, the "MSG Defendants"), and James Dolan, alleging claims for defamation, assault, battery, false imprisonment, abuse of process, and denial of a public accommodation in violation of New York state law, and denial of a public accommodation in violation of the Americans with Disabilities Act (42 U.S.C. § 12101 *et seq.*) ("ADA"). Now before the Court is Defendants' motion to dismiss the Amended Complaint for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, Defendants' motion is GRANTED.

## I. BACKGROUND

### A. Facts[1]

As any basketball fan knows, Oakley is a former NBA All-Star power forward who played for the New York Knicks from 1988 to 1998. (Am. Compl. ¶¶ 6, 14, 15.) Dolan

---

[1] The following facts are taken from the Amended Complaint, filed on February 9, 2018 (Doc. No. 36 ("Amended Complaint" or "Am. Compl.")), and the video footage of Dolan's *The Michael Kay Show* interview (Doc. No. 43 Ex. 6 ("Dolan Interview")), which was incorporated therein by reference. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). In ruling on Defendants' motion, the Court has also considered Defendants' memorandum of law (Doc. No. 42 ("Mem.")), Plaintiff's opposition (Doc. No. 50 ("Opp'n")), and Defendants' reply (Doc. No. 54 ("Reply")).

is the Executive Chairman of the MSG Defendants, which own and operate Madison Square Garden ("the Garden") and the Knicks. (*Id.* ¶¶ 2, 7–10.) Although Oakley asserts that he never met Dolan until long after his playing days had ended, he alleges that Dolan harbored animosity toward him, "constantly disrespect[ing] [him]" and "even having security harass him" "[w]ithout any justification" when he attended Knicks games. (*Id.* ¶ 2; *see also id.* ¶¶ 23, 26–28.)

Things came to a head on February 8, 2017, when Oakley attended a Knicks game at the Garden against the Los Angeles Clippers. (*Id.* ¶ 30.) Oakley insists that he was "neither intoxicated nor otherwise behaving inappropriately" when he arrived at the Garden (*id.* ¶ 31), and that he took his seat, "coincidentally" located several rows behind where Dolan was sitting, without fanfare (*id.* ¶ 32). However, a few minutes after Oakley sat down, three men identifying themselves as members of the Garden's security team approached him and asked him to leave the arena. (*Id.* ¶ 34.) Oakley claims he asked the guards why he was being asked to leave, only to have one of the guards respond: "Why are you sitting so close to Mr. Dolan?" (*Id.* ¶ 35.)

Oakley acknowledges that he did not immediately comply with the guards' request, instead attempting to explain that "he had done nothing wrong and simply wanted to watch the game in peace." (*Id.* ¶ 37.) He then "turn[ed] around" and "return[ed] to his seat." (*Id.* ¶ 40.) As he did so, two of the guards grabbed him, pushed him to the ground, and demanded that he leave the Garden "immediately." (*Id.* ¶¶ 42, 44.) Once back on his feet, Oakley continued to ask why he was being ejected from the Garden, at which point the guards again attempted to force him from the arena. (*Id.* ¶ 45.) Oakley responded by

"push[ing] their hands away," whereupon six guards grabbed him and threw him to the ground. (*Id.* ¶¶ 46–47.) The guards then restrained him, escorted him out of the Garden, and delivered him to police officers, who arrested him and charged him with assault. (*Id.* ¶¶ 49, 51, 123.)

Following the February 8 incident, Defendants made a series of statements that Oakley alleges were defamatory. First, on the night of the incident, the Knicks public relations Twitter account, @NY_KnicksPR, which is owned and operated by Defendants, tweeted that Oakley:

> behaved in a highly inappropriate and completely abusive manner. He has been ejected and is currently being arrested by the New York City Police Department. He was a great Knick and we hope he gets some help soon.

(*Id.* ¶ 58.) Second, on February 9, @NY_KnicksPR tweeted:

> There are dozens of security staff, employees and NYPD that witnessed Oakley's abusive behavior. It started when he entered the building and continued until he was arrested and left the building. Every single statement we have received is consistent in describing his actions. Everything he said since the incident is pure fiction.

(*Id.* ¶ 62.)

Third, on February 10, Dolan appeared on ESPN Radio's *The Michael Kay Show* and made a number of statements about Oakley and the February 8 incident, including the following:

- "I think the most important thing with that is that we need to keep

the Garden a place that's comfortable and safe for everybody who goes there. So anybody who comes to the Garden, whether they've been drinking too much alcohol, they're looking for a fight, they're abusive, disrespectful to the staff and the fans, they're going to be ejected and they're going to be banned."[2]

- "To me, I think that Charles has got a problem. I've said this before, we've said it before. We said it one time that he's his own worst problem.   He has a problem. People need to sort of understand that.    He has a problem with anger. He's both physically and verbally abusive. He may have a problem with alcohol, we don't know, right."

- "We know that he talked about on TV that he was drinking beforehand.      We've heard statements from some of the police and security that he appeared to be impaired, *et cetera*. Yes, they clearly, our staff . . . could see that."

- "When you have issues like this, the first step for anybody is to ask for help."

- "The No. 1 concern always has to be the safety and the comfort of the fans."

- "We'll probably hear chants tonight in support of Mr. Oakley, but I would like . . . those same people to look around and look at the people who are working at Madison Square Garden, and understand that the person that they're chanting for may have been a great Knick player, but he was terribly abusive to those same people who are there to help them."

- "There were security people there who were abused. There were service people there who were abused. The same people that the fans who come to the game tonight, who are going to help those fans find their seats, get them food, try and make them comfortable, they were abused.  And abused not – in a really horrible, angry, nasty way. With racially – with racial overtones, sexual overtones. The stuff you never ever want to hear. How do you bring your kids to a game if you think that's going to happen?"

- "It's very clear to us that Charles Oakley came to the Garden with an agenda, with a mission in mind and from the moment he stepped into the Garden, and I mean the moment he walked through the first set of doors, he began with this behavior. Abusive behavior, disrespectful behavior. Stuff that I don't think you . . . want to say on the radio. . . . And it just accelerated and accelerated and accelerated, all the way down to his seats, and then ultimately with a confrontation with security, and

---

[2] Where there are discrepancies between the Amended Complaint and the original sources on which it relies, the Court quotes the latter, which are incorporated by reference into the Amended Complaint.  The oral statements printed here have also been cleaned up to remove filler words (*e.g.*, "uh," "um," "you know").

eventually ending up with his being ejected and arrested. . . . I mean I'm not inside of Charles Oakley's mind. He did say a bunch of things along the way that looked like he was headed in my direction. I didn't hear them myself but we heard from our employees *et cetera* that he was using my name a lot. But this isn't because I'm nervous. This is because you can't do what he did and stay. We clearly did not – we weren't perfect here, and I think that Charles never should have made it to his seats. That's on us. We're doing things to remedy that. To make sure that doesn't happen again with anybody."

(*Id.* ¶¶ 68–73; Dolan Interview.)

B. Procedural History

On September 12, 2017, Oakley filed the original Complaint in this action against Dolan and the MSG Defendants, asserting New York state law claims of defamation – including defamation per se, libel, and slander – assault, battery, false imprisonment, abuse of process, and denial of a public accommodation in violation of the New York State Human Rights Law (N.Y. Exec. L. § 290 *et seq.*) ("NYSHRL") and the New York City Human Rights Law (N.Y.C. Admin. Code § 8-101 *et seq.*) ("NYCHRL"). He also alleged a federal claim of denial of public accommodation in violation of the ADA.[3] (Doc. No. 1.) The Court held a conference on January 12, 2018 to discuss Defendants' contemplated motion

to dismiss. (Doc. No. 51 Ex. 1.) In light of the discussions at that conference and Oakley's voluntary withdrawal of his NYCHRL claim, Oakley filed an Amended Complaint on February 9, 2018 that included an additional claim for defamation *per quod* but was otherwise substantially similar to the original Complaint. (Am. Compl. ¶¶ 94–148.)

On March 5, 2018, the Court granted Defendants' request to stay discovery pending the disposition of Defendants' motion to dismiss the Amended Complaint. (Doc. No. 38.) Defendants filed their motion to dismiss on March 30, 2018, asserting that Oakley had failed to state a claim for which relief can be granted under Rule 12(b)(6). (Doc. No. 41.) Oakley filed his opposition brief on May 24, 2018 (Doc. No. 50), and Defendants filed their reply brief on June 11, 2018 (Doc. No. 54). Oakley thereafter submitted a series of letters to the Court – on March 13, 2019 (Doc. No. 56), July 29, 2019 (Doc. No. 58), and November 15, 2019 (Doc. No. 63) – setting forth additional authorities and facts in opposition to the motion to dismiss. Defendants responded to each letter with submissions of their own on March 13, 2019 (Doc. No. 57), July 30, 2019 (Doc. No. 59), and November 18, 2019 (Doc. No. 64). In September 2019 and January 2020, Oakley also requested that the Court lift the discovery stay in this matter (Doc. Nos. 61, 65), which the Court denied (Doc. Nos. 62, 67).

II. LEGAL STANDARD

To withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns*, 493 F.3d at 98; *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a

---

[3] The libel, assault, battery, and false imprisonment claims were brought only against the MSG Defendants, whereas the remainder of the claims were asserted against all Defendants.

short and plain statement of the claim showing that the pleader is entitled to relief . . . ."). To meet this standard, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id.* at 570.

### III. DISCUSSION

#### A. Extrinsic Evidence

As an initial matter, the Court must first address Defendants' request that it consider extrinsic evidence outside the Amended Complaint in analyzing the motion to dismiss.

A complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). "Where a document [or other extrinsic evidence] is not incorporated by

reference, the court may nevertheless consider it where the complaint 'relies heavily upon [it],' thereby rendering [it] 'integral' to the complaint." *Id.* (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)). A "necessary prerequisite" for taking into account materials extraneous to the complaint "is that the 'plaintiff *rely* on the . . . [item] in drafting the complaint; mere notice or possession is not enough.'" *Id.* at 231 (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (alterations omitted)). "[I]f material is not integral to or otherwise incorporated in the complaint, it may not be considered unless the motion to dismiss is converted to a motion for summary judgment and all parties are 'given a reasonable opportunity to present all the material that is pertinent to the motion.'" *Id.* (quoting Fed. R. Civ. P. 12(d)). The Court may also consider "matters of which judicial notice may be taken," *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993), namely, facts that are "not subject to reasonable dispute because" they "(1) [are] generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201.

Defendants urge the Court to consider "certain highly relevant extrinsic evidence" in ruling on the motion to dismiss, including (1) video footage – from a variety of sources – of the February 8 incident at the Garden, (2) video footage of Dolan's February 10 appearance on *The Michael Kay Show*, (3) documents from Oakley's New York state criminal case and other unrelated civil court proceedings commenced by Oakley against third parties, and (4) information posted on the website of the Rebound Institute (a drug and alcohol rehabilitation clinic), Oakley's website

"oakleyinthekitchen.com," and Twitter. (Am. Compl. ¶¶ 92–93; Mem. at 12–15.) For the reasons set forth below, the Court determines that, aside from the video of Dolan's February 10 appearance on *The Michael Kay Show* – which is expressly referenced in and relied upon by the Amended Complaint – the Court will not consider any of the extrinsic evidence in examining Defendants' motion to dismiss. The Court likewise declines to take judicial notice of these materials.

1. Video Footage of the February 8 Incident

Defendants contend that the Court should consider video footage of the February 8 incident "because it is objective, dispositive, and the best evidence of the event at issue." (Mem. at 13.) They maintain that Oakley had access to the internal Madison Square Garden arena camera footage and other publicly available video, so the Court's consideration of those videos would "pose[] no surprise or prejudice to Oakley." (*Id.* at 13–14.) However, Defendants fail to satisfy the necessary requirements for this Court to consider the video footage as extrinsic evidence at the motion to dismiss stage. Oakley does not incorporate the video footage by reference in his Amended Complaint, nor does he imply that the footage was integral to that complaint. *See, e.g., Marlin v. City of New York*, No. 15-cv-2235 (CM), 2016 WL 4939371, at *8 (S.D.N.Y. Sept. 7, 2016) (refusing to consider video clips at the motion to dismiss stage because they were not integral to the complaint nor did the complaint reference them); *Gersbacher v. City of New York*, 134 F. Supp. 3d 711, 719 (S.D.N.Y. 2015) (declining to consider video of arrest at the motion to dismiss stage where plaintiff "may have been aware that his arrest was filmed, but . . . nothing . . . indicate[d] that he had seen the videos prior to Defendants raising

them, much less relied upon them in drafting the complaint").

The Court further declines to take judicial notice of the video footage. The videos do not represent facts that are generally well known within this Court's territorial jurisdiction, and since the videos have not been authenticated, their accuracy cannot reasonably be assumed at this stage of the proceedings. *See, e.g., Harasz v. Katz*, 239 F. Supp. 3d 461, 474 (D. Conn. 2017).

2. Video Footage of Dolan's February 10 Interview on *The Michael Kay Show*

Defendants likewise assert that the Court may examine a video of Dolan's appearance on *The Michael Kay Show* because "Oakley relies on and quotes extensively from that interview in [his] Amended Complaint." (Mem. at 14.) The Court agrees. Dolan's statements from *The Michael Kay Show* are expressly referenced in the Amended Complaint and are the very defamatory statements on which Oakley is proceeding. In a defamation case, the Court must analyze the allegedly defamatory statements in total and in context. *See Elias v. Rolling Stone LLC*, 872 F.3d 97, 109 (2d Cir. 2017). Oakley selectively quotes from Dolan's interview in the Amended Complaint, providing snippets of Dolan's remarks but eliding the full context in which those statements were uttered. (*See* Am. Compl. ¶¶ 68–73.) That context may affect the meaning of Dolan's statements. Therefore, the Court is free to consider the video of Dolan's appearance on *The Michael Kay Show*. *See Edwards v. Raymond*, 22 F. Supp. 3d 293, 297 (S.D.N.Y. 2014) (considering recording not attached to complaint but on which plaintiff "clearly relied" in filing suit).

### 3. Documents from Oakley's New York State Criminal Case and Other Proceedings

Defendants next ask the Court to consider (1) the criminal complaint in the New York state case related to the February 8 incident, (2) a notice of trespass signed by Oakley and the District Attorney as part of the plea disposition in that case, and (3) pleadings Oakley has filed in prior civil cases "in connection with his prior physical altercations with security personnel and/or law enforcement." (Mem. at 14–15.) The Court declines this request. Oakley does not remotely reference the criminal complaint, trespass notice, or pleadings in prior civil cases in the Amended Complaint, let alone rely on those documents such that they are integral to the complaint. *See, e.g.*, *McLennon v. City of New York*, 171 F. Supp. 3d 69, 90 (E.D.N.Y. 2016) (refusing to consider "documents related to [the plaintiff's] criminal case" where they were not "incorporated by reference" into the complaint). Furthermore, although a court may take judicial notice of documents from other proceedings "to establish the fact of such litigation and related filings," it may not do so "for the truth of the matters asserted in the other litigation." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

While Oakley's pleadings in prior civil cases he commenced against unrelated third parties do "constitute the admissions of a party-opponent" and therefore may be admissible evidence in this case, *see United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984), Defendants seek to use this evidence to demonstrate Oakley's "recidivist history" (Mem. at 15) and to show that "this is not the first time Oakley has misbehaved and then resorted to litigation as cover for his own misconduct" (*id.* at 4). Defendants insist that Oakley "has repeatedly clashed with police and security . . . and then brought suits against the very police officers and security guards who were the victims of his abuse," alleging that he is "abusing the litigation process to try to deflect blame for his own actions onto others." (*Id.* at 5.) Obviously, Oakley's credibility and motivations in bringing suit are not relevant on a motion to dismiss, for which the factual allegations are presumed to be true. *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 812 (2d Cir. 2019) (holding that the district court erred in making credibility determinations on a motion to dismiss).

The Court therefore rejects Defendants' request to consider the criminal complaint, trespass notice, and pleadings Oakley has filed in prior civil cases.

### 4. Information Published on Public Websites

Defendants finally request that the Court take judicial notice of certain postings – on Oakley's website "oakleyinthekitchen.com," on the Rebound Institute's website "reboundinstitute.com," and on Twitter – that allegedly shed light on Oakley's relationship with the Rebound Institute and pertain to the issue of special damages. (Mem. at 15.) The Court declines to take judicial notice of this information. As Oakley notes, the materials have not been properly authenticated (Opp'n at 18), and Defendants do not explain why the materials' asserted inconsistency with the Amended Complaint renders them competent evidence that must be considered at the motion to dismiss stage instead of on a motion for summary judgment or at trial (Mem. at 15). *See, e.g.*, *Moukengeschaie v. Eltman, Eltman & Cooper, P.C.*, No.14-cv-7539 (MKB), 2016 WL 1274541, at *13 n.13 (E.D.N.Y. Mar. 31, 2016); *Galley Schuler v. Rainforest All., Inc.*, No. 14-cv-

226 (CR), 2016 WL 10516026, at *2 (D. Vt. Feb. 10, 2016).

\*     \*     \*

For all these reasons, the Court will not consider the extrinsic evidence Defendants proffer, except for the video of Dolan's February 10 appearance on *The Michael Kay Show*.

### B. Motion to Dismiss

Oakley claims that he was defamed by statements Defendants made on February 8, 9, and 10. He also alleges assault, battery, false imprisonment, abuse of process, denial of a public accommodation in violation of New York state law, and denial of a public accommodation in violation of the ADA based on the February 8 incident. The Court will address each of these claims in turn.

#### 1. Defamation

"Defamation, consisting of the twin torts of libel and slander, is the invasion of the interest in a reputation and good name." *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001) (quoting *Hogan v. Herald Co.*, 84 A.D.2d 470, 474 (N.Y. App. Div. 1982)). Slander is defamation by spoken expression, and libel is defamation by written expression. *Id.* Under New York law, a defamation claim requires a plaintiff to establish (1) a "defamatory statement of fact concerning the plaintiff;" (2) "publication to a third party;" (3) "fault (either negligence or actual malice depending on the status of the [defamed] party);" (4) "falsity of the defamatory statement;" and (5) "special damages or per se actionability." *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000) (libel); *Albert*, 239 F.3d at 265–66 (slander). For slander claims, New York law also requires a plaintiff to establish that the statements in question are not shielded by a privilege. *Albert*, 239 F.3d

at 266. "Whether particular words are defamatory presents a legal question to be resolved by the court in the first instance." *Aronson v. Wiersma*, 483 N.E.2d 1138, 1139 (N.Y. 1985). If a plaintiff in a defamation suit is a public officer or public figure, the plaintiff must show actual malice on the part of the speaker or publisher. *See Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 155 (1967).

In broad strokes, Oakley alleges that Defendants defamed him by falsely accusing him of assaulting Garden workers on February 8, 2017 and of being an alcoholic. Defendants respond that Oakley has failed to sufficiently plead three necessary elements of his New York defamation claims: (1) that the statements were defamatory statements of fact, as opposed to opinion; (2) actual malice; and (3) per se actionability or special damages. (Mem. at 17–30.)

##### a. Assault Accusations

Oakley claims that Defendants made defamatory statements accusing him of having committed the "serious crime of assault" and of having been "abusive" toward others. (Am. Compl. ¶¶ 103, 111, 117.) On February 8, 2017, @NY_KnicksPR tweeted that "Charles Oakley came to the game tonight and behaved in a highly inappropriate and completely abusive manner. He has been ejected and is currently being arrested by the New York City Police Department." (*Id.* ¶ 58.) The next day, @NY_KnicksPR again tweeted about the incident, stating that "[t]here are dozens of security staff, employees and NYPD that witnessed Oakley's abusive behavior." (*Id.* ¶ 62.) Furthermore, on February 10, 2017, Dolan appeared on *The Michael Kay Show* and stated that Oakley was "physically and verbally abusive" and that he "abused" many individuals at the February 8 game.

(*Id.* ¶¶ 69, 72; *see also supra* section I.A., pp. 2–4.) The Court concludes that Oakley fails to plead defamation based on these statements because (1) they are not defamatory statements of fact concerning him, (2) he has failed to allege actual malice, and (3) he has not alleged special damages or per se actionability.

### (1) Defamatory Statements of Fact

First, the statements Oakley identifies neither explicitly accuse nor imply that Oakley committed assault. In New York, third-degree assault requires an individual to "cause physical injury to another person," N.Y. Penal Law § 120.00(1)–(3), and second-degree assault requires "serious" physical injury, *id.* § 120.05. But the allegedly defamatory statements do not accuse Oakley of causing physical injury to anyone. Oakley weaves together Defendants' statements in a misleading fashion, joining statements as connected that were originally uttered at different times and in different contexts, to maintain that "[t]aken together, the statements that [Oakley] was 'arrested' for 'engaging in physically abusive' behavior that jeopardized the safety of Knicks fans, give rise to the reasonable inference that he was arrested for physically attacking members of the public." (Opp'n at 20.) The Court disagrees. Defendants never accused Oakley of causing physical injury to anyone, and their statements that Oakley was "abusive" to individuals at the February 8 Knicks game and that he was ejected from the game and arrested by the NYPD do not give rise to the implication that Oakley committed assault.[4]

Moreover, the Court concludes that Defendants' statements accusing Oakley of subjecting other individuals to "abusive conduct" at the February 8 game are not defamatory because those statements constitute nonactionable statements of opinion. "An expression of pure opinion is not actionable" because "[i]t receives the Federal constitutional protection accorded to the expression of ideas, no matter how vituperative or unreasonable it may be." *Steinhilber v. Alphonse*, 501 N.E.2d 550, 552 (N.Y. 1986). "In New York, the determination of whether a statement is a fact or an opinion is left to the Court." *Galland v. Johnston*, No. 14-cv-4411 (RJS), 2015 WL 1290775, at *5 (S.D.N.Y. Mar. 19, 2015). The Court examines four factors in making this determination: (1) "whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous;" (2) "whether the statement is capable of being objectively characterized as true or false;" (3) "the full context of the communication in which the statement appears;" and (4) "the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which might signal to readers or listeners that what is being read or heard is likely to be opinion, not fact." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 402 n.7 (2d Cir. 2006) (internal quotation marks and citation omitted). Because context is important to the analysis, courts do not consider the words in isolation, but "construe[] [them] in the context of the

___

[4] Oakley cites *Sprewell v. NYP Holdings, Inc.*, 772 N.Y.S.2d 188 (N.Y. Sup. Ct. 2003), for its explanation that though a statement may not use the "technical words of a criminal indictment," it can still be "reasonably susceptible to a connotation of

criminality," *id.* at 193–94 (quoting *Caffee v. Arnold*, 104 A.D.2d 352, 353 (N.Y. App. Div. 1984)), and thus be defamatory. However, *Sprewell* is inapposite. In *Sprewell*, the allegedly defamatory statements referred to specific physical actions the plaintiff took, such as "punching a wall." *Id.* at 193. Here, Defendants' statements do not refer to any specific physical actions Oakley took.

entire statement or publication as a whole, tested against the understanding of the average reader." *Dillon v. City of New York*, 261 A.D.2d 34, 38 (N.Y. App. Div. 1999).

According to the Amended Complaint, Defendants' statements referred to Oakley's behavior as being "inappropriate" and "abusive," with Dolan stating that Oakley was "physically and verbally abusive" and that he "abused" many individuals at the February 8 game. However, "abusive" is a subjective term that the New York courts have held to constitute a "nonactionable statement[] of opinion." *See Rotondi v. The Madison Square Garden Co.*, No. 150097/2015, 2017 WL 4083093, at *3 (N.Y. Sup. Ct. Sept. 12, 2017) (finding that statements "mostly consist[ing] of assertions that the plaintiff was abusive and interfered with [a basketball] game" were "nonactionable statements of opinion"); *see also Colantonio v. Mercy Med. Ctr.*, 73 A.D.3d 966, 968 (N.Y. App. Div. 2010) (determining that statements that plaintiff "has poor judgment," "is belligerent and very unreasonable," is "not stable," and is "inappropriate" were "nonactionable expressions of opinion"); *Farrow v. O'Connor, Redd, Gollihue & Sklarin, LLP*, 51 A.D.3d 626, 627 (N.Y. App. Div. 2008) (holding that a "subjective characterization of the plaintiff's behavior . . . constituted a nonactionable expression of opinion").

Accordingly, Oakley has failed to allege that Defendants' statements are defamatory statements of fact concerning him.

(2) Actual Malice

Oakley's defamation claim based on Defendants' allegedly false accusation that he committed the crime of assault also fails to allege that Defendants harbored actual malice toward Oakley. Actual malice is a necessary requirement of Oakley's defamation claim because Oakley is a public

figure.   (Am. Compl. ¶¶ 1, 6, 14–17.) Individuals who have "assumed roles of especial prominence in the affairs of society" and "invite[d] attention and comment" are generally considered public figures. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974); *see also, e.g.*, *Time, Inc. v. Johnston*, 448 F.2d 378, 380 (4th Cir. 1971) (holding that a former professional basketball player was a public figure); *Pippen v. NBC Universal Media, LLC*, No. 11-cv-8834 (SJC), 2012 WL 12903167, at *2 (N.D. Ill. Aug. 2, 2012) (holding that Scottie Pippen, a former professional basketball player, was a public figure); *Wilsey v. Saratoga Harness Racing, Inc.*, 140 A.D.2d 857, 858 (N.Y. App. Div. 1988) (explaining that "professional athletes . . . are often public figures"). Oakley describes himself as a "Knicks legend," a "premier" "17-year veteran of the NBA" who was "inarguably the greatest power forward in Knicks history" and who appeared in the NBA All-Star Game in 1994. (Am. Compl. ¶¶ 1, 6, 16–17, 54.) He also states that he has spent significant time since his retirement making "guest appearances" from which he earns tens of thousands of dollars. (*Id.* ¶¶ 92, 94.) Based on the pleadings alone, there can be no doubt that Oakley is a public figure.

A public figure cannot recover damages for defamation unless he proves, by clear and convincing evidence, that the relevant statements were made with actual malice at the time they were spoken or written. *See Palin*, 940 F.3d at 817; *see also Dunlop-McCullen v. Rogers*, No. 00-cv-3274 (JSR), 2002 WL 1205029, at *7 (S.D.N.Y. Feb. 21, 2002). A statement is made with "actual malice" where it is made "with knowledge that the statement[] [is] false or with reckless disregard as to [its] falsity." *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015). Actual malice concerns "the speaker's subjective doubts about the truth

of the publication." *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001). "[A] public-figure plaintiff must plead 'plausible grounds' to infer actual malice by alleging 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' actual malice." *Biro*, 807 F.3d at 546 (quoting *Twombly*, 550 U.S. at 556). "Conclusory allegations are insufficient . . . ." *Amadasu v. Bronx Lebanon Hosp. Ctr.*, No. 03-cv-6450 (AJP), 2005 WL 121746, at *13 (S.D.N.Y. Jan. 21, 2005) (citations omitted), *report and recommendation adopted by Amadasu v. Rosenberg*, No. 03-cv-6450 (LAK), 2005 WL 954916 (S.D.N.Y. Apr. 26, 2005).

Oakley fails to satisfy this requirement. Indeed, he does not offer any facts beyond conclusory allegations that the MSG Defendants or Dolan acted with actual malice. The Amended Complaint asserts repeatedly that the MSG Defendants and Dolan were "fully aware that [their] comments were and are entirely without basis in fact and/or" that their comments were made with "a reckless disregard for their truth." (Am. Compl. ¶¶ 59, 70.) But the Amended Complaint does not provide any factual grounds to support those conclusory allegations. These are the type of "labels and conclusions" and "formulaic recitation[s] of the elements of a cause of action" that must be disregarded under *Iqbal* and *Twombly*. *Twombly*, 550 U.S. at 555; *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 281 (S.D.N.Y. 2013).

In fact, the only assertion that the Amended Complaint makes regarding actual malice is that Dolan harbored a general animosity toward Oakley. (Am. Compl. ¶¶ 26, 28.) But evidence of ill will alone, without more, cannot establish actual malice. *See Dunlop-McCullen*, 2002 WL 1205029, at *16 n.3 (explaining that "past disputes between the parties and grudges . . .

[s]tanding alone . . . [are] not sufficient to establish actual malice" (quoting *Celle*, 209 F.3d at 183)). And the mere repetition of the assertion that the MSG Defendants and Dolan made their statements either knowing they were false or with reckless disregard for their truth is simply not enough to eke out a cause of action. (Am. Compl. ¶¶ 59, 70.)

Oakley thus fails to satisfy his burden "to plead facts giving rise to the plausible inference that [Defendants] [made] the allegedly defamatory [statements] with actual malice." *Palin*, 940 F.3d at 815; *see also Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 453 (S.D.N.Y. 2018) (dismissing "conclusory" allegations regarding actual malice that "provide[d] no detail" as to the defendants' "knowledge or mental state").

### (3) Special Damages and Per Se Actionability

Oakley also fails to plead that Defendants' allegedly false accusations of assault and/or abusive conduct caused him to suffer special damages or were per se actionable. "Special damages are specific and measurable losses which must be alleged with sufficient particularity to identify actual losses and are related causally to the alleged tortious acts." *Kanciper v. Lato*, 989 F. Supp. 2d 216, 237 (E.D.N.Y. 2013) (citation omitted). Oakley has not alleged that he suffered special damages as a result of Defendants' purportedly false accusations that he committed the crime of assault and was abusive toward the Garden staff. In fact, the only damages alleged in the Amended Complaint relate to Oakley's asserted loss of $40,000 from the Rebound Institute, but that loss was expressly tethered to Defendants' statements claiming that Oakley was an alcoholic, not to the assault accusation. (Am. Compl. ¶ 93.)

The Amended Complaint is equally deficient with respect to per se actionability. To plead per se actionability in lieu of pleading special damages, a plaintiff must allege that the purportedly defamatory statements fit into one of four categories: statements (1) "charging plaintiff with a serious crime;" (2) "that tend to injure another in his or her trade, business or profession;" (3) "that plaintiff has a loathsome disease;" or (4) "imputing unchastity to a woman." *Liberman v. Gelstein*, 605 N.E.2d 344, 347 (N.Y. 1992). For those categories of statements, damages may be presumed, and a defendant need not plead specific damages. *Id.* But "whether the contested statements are reasonably susceptible of a defamatory connotation" are matters for the Court to decide. *Armstrong v. Simon & Schuster, Inc.*, 649 N.E.2d 825, 829 (N.Y. 1995).

Here, Oakley asserts that Defendants' statements "accus[ed] him of having committed the serious crime of assault against members of the public, warranting his arrest." (Am. Compl. ¶ 103.) But as explained above, Defendants' statements neither explicitly nor implicitly accused Oakley of committing assault. They merely alleged that he was "abusive," which is too vague a term to support a claim of per se defamation. *See Colantonio*, 73 A.D.3d at 968; *Farrow*, 51 A.D.3d at 627; *Rotondi*, 2017 WL 4083093, at *3.

Accordingly, Oakley does not sufficiently plead special damages or per se actionability.

\*    \*    \*

For the reasons stated above, Oakley's defamation claim based on Defendants' purported accusations that Oakley committed the crime of assault and/or engaged in abusive behavior toward Garden staff fails to sufficiently plead three

necessary elements and consequently fails on those three independent grounds.

### b. Alcoholism Statements

Oakley next contends that Defendants defamed him by accusing him of being an alcoholic. He maintains that Defendants' statements "were inarguably spreading the false rumor that [he] was an alcoholic who had a habitual problem that required 'help.'" (Am. Compl. ¶ 90.) Specifically, Oakley alleges that the MSG Defendants stated on February 8, 2017 that they "hope[d] [Oakley] gets some help soon." (*Id.* ¶ 58.) During his appearance on *The Michael Kay Show*, Dolan made further comments about Oakley "drinking before[]" the game, that police and security had said "he appeared to be impaired," that Oakley "may have a problem with alcohol, we don't know," and that "[w]hen you have issues like this, the first step for anybody is to ask for help." (*Id.* ¶ 69; Dolan Interview.) Once again, Oakley has failed to plead defamation because (1) he has failed to allege actual malice, and (2) he has not sufficiently alleged special damages or per se actionability.

### (1) Actual Malice

As noted above, Oakley is a public figure who must demonstrate that the allegedly defamatory statements were made with actual malice at the time they were uttered. *Palin*, 940 F.3d at 809–10. But once again, Oakley does not offer any proof beyond conclusory allegations of Defendants acting with actual malice. Though he pleads that he has never abused alcohol (Am. Compl. ¶ 70), Oakley never pleads that the MSG Defendants or Dolan knew that purported fact. He merely pleads conclusory statements that reflect the elements of actual malice and a generalized assertion that the MSG Defendants and Dolan knew – somehow – that he was not, in

fact, an alcoholic.  Consequently, Oakley fails to sufficiently plead actual malice.

### (2)  Special Damages and Per Se Actionability

Oakley also fails to plead special damages caused by Defendants' statements or per se actionability.  First, the Amended Complaint does not plausibly allege that Defendants' statements caused the purported damages.   To plead special damages, a plaintiff must identify actual losses that are "causally related to the alleged tortious act." *L.W.C. Agency, Inc. v. St. Paul Fire & Marine Ins. Co.*, 125 A.D.2d 371, 373 (N.Y. App. Div. 1986).  The Amended Complaint, however, merely states in a conclusory manner that "as a direct result" of Defendants' statements, the Rebound Institute "conclu[ded] that it was not appropriate for someone with . . . a reputation [for alcoholism] to interact with their patients" and that "Oakley was [therefore] not able to receive $40,000" in appearance fees from the Rebound Institute. (Am. Compl. ¶¶ 93, 95.)  He does not explain on what basis he reached this conclusion or proffer any facts to support a direct causal connection between Defendants' statements and the Rebound Institute's alleged decision not to pay Oakley $40,000 in appearance fees.  Simply assuming that Defendants' statements "directly" caused the Rebound Institute to withhold appearance requests is not enough to support an allegation of special damages.

Second, the Amended Complaint does not plausibly allege per se actionability based on either of the grounds Oakley proffers:  that Defendants' purported statements that he is an alcoholic (1) tended to injure him in his trade, business, or profession (*id.* ¶ 105); or (2) accused him of suffering from a loathsome disease (*id.* ¶ 104).  The first ground fails because the challenged statements speak only to Oakley's general personal qualities, and Oakley has not alleged any connection between the allegedly defamatory statements and his trade, business, or profession.  The second ground fails because New York law does not consider alcoholism to be a loathsome disease.

"Courts have consistently held that any allegedly defamatory statements that do not affect a plaintiff's actual business profession, rather than simply qualities that are important for business, are not defamatory *per se*." *Kalimantano GMBH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 420 (S.D.N.Y. 2013).  A statement that tends to injure another in his or her trade, business, or profession is one that "must be made with reference to a matter of significance and importance for [the proper conduct of the business, trade, profession, or office itself], rather than a more general reflection upon the plaintiff's character or qualities." *Medcalf v. Walsh*, 938 F. Supp. 2d 478, 487 (S.D.N.Y. 2013) (quoting *Liberman*, 605 N.E.2d at 348).

Defendants' statements can only be construed as general reflections upon Oakley's character or qualities, not as specific comments regarding his purported trade, business, or profession.  Here, the allegedly defamatory statements include no reference to Oakley's business or profession, and merely reference Oakley himself.  But as Judge Swain recently observed, "[i]t is not sufficient that [statements] tend to injure plaintiff in his business, they must have been spoken of him in his business." *Tacopina v. Kerik*, No. 14-cv-749 (LTS), 2016 WL 1268268, at *4 (S.D.N.Y. Mar. 31, 2016) (emphasis omitted) (quoting *Gurtler v. Union Parts Mfg. Co.*, 285 A.D. 643, 646 (N.Y. App. Div. 1955)); *see also Walker v. Urban Compass, Inc.*, No. 652554/2016, 2017 WL 608308, at *6 (N.Y. Sup. Ct. Feb.

15, 2017) (determining that accusations that plaintiff abused alcohol did "not specifically relate to plaintiff's ability to" perform his job, "but rather reflect[ed] more generally upon his character," and thus were not defamatory per se under the injury to trade, business, or profession category).

Significantly, the Amended Complaint does not even specify what Oakley's trade, business, or profession is. Instead, the complaint merely asserts that Oakley has "made guest appearances at drug and alcohol rehabilitation clinics to speak with patients and provide other services, including cooking them meals" (Am. Compl. ¶ 92), and that he "works with individuals who suffer from substance issues" (*id.* ¶ 105). Though Oakley's brief contends that he "derived significant income opportunities" from appearances at drug and alcohol rehabilitation centers (Opp'n at 21), the Amended Complaint is silent on that point and merely alleges that "it is a matter of common knowledge that [Oakley] works with individuals who suffer from substance abuse issues" (Am. Compl. ¶ 105). Since Oakley does not plead that working with individuals who suffer from substance abuse issues is his trade, business, or profession, he has not established per se actionability on this basis.

Oakley next alleges that Defendants' purported statements accused him of "suffering from the loathsome disease of alcoholism." (*Id.* ¶ 104.) This contention also fails because New York law does not consider alcoholism to be a loathsome disease, and therefore Oakley does not plead per se actionability on this basis. Under New York law, loathsome diseases "include only existing venereal disease[s] and other 'loathsome and communicable' disease[s]." *TC & KC v. Valley Cent. Sch. Dist.*, 777 F. Supp. 2d 577, 603 (S.D.N.Y. 2011) (quoting Restatement (Second) of Torts § 572); *see*

*also Marino v. Jonke*, Nos. 11-cv-430, 11-cv-4425 (VB), 2012 WL 1871623, at *11 (S.D.N.Y. Mar. 30, 2012). Alcoholism is neither a venereal disease nor communicable. Consequently, alcoholism does not qualify as a loathsome disease for purposes of per se actionability under New York law.

Precedent supports this conclusion. In *Ruderman v. Stern*, No. 39179/97, 2004 WL 3153217, at *16 (N.Y. Sup. Ct. Oct. 25, 2004), the court held that "[d]efendants' statements that plaintiff was an alcoholic" did "not constitute [defamation] per se" because they did not "fit into the [per se actionability] categories." Oakley cites *Hayes v. Sweeney*, 961 F. Supp. 467, 481 (W.D.N.Y. 1997), for the proposition that "an imputation of alcohol consumption is defamatory when accompanied by some aggravating factor, such as the suggestion that [such] conduct is habitual or that the person is 'a drunk.'" (Opp'n at 21.) *Hayes* is inapplicable, however, because it involved a claim of per se actionability based on injury to trade, business, or profession – not an assertion that alcoholism was a loathsome disease. 961 F. Supp. at 479–81. In that context, the court determined that defendants' statement accusing plaintiff of having "an alcohol problem that affected her ability to perform her job" as a New York State Department of Labor regional director was per se actionable. *Id.* at 481. The court noted, however, that "[i]t is not actionable *per se* to charge a man orally with being drunk or in the habit of getting drunk, unless" the statements qualified under a different category of per se actionability. *Id.* (quoting *Morrison v. News Syndicate Co.*, 247 A.D. 397, 399 (N.Y. App. Div. 1936)).

Accordingly, Oakley has neither sufficiently pleaded special damages nor per se actionability for Defendants' statements

allegedly accusing him of being an alcoholic.

* * *

Because Oakley has failed to allege actual malice or special damages, his defamation claim based on Defendants' statements purportedly accusing him of being an alcoholic must be dismissed.

### 2. Assault and Battery

In addition to his defamation claims, Oakley contends that the MSG Defendants committed assault and battery against *him* when they "physically and forcibly removed [him] from the Garden and subsequently detained him until police could arrive to unjustifiably arrest him." (Am. Compl. ¶ 127.)

Assault is the "intentional placing of another person in fear of imminent harmful or offensive contact." *Green v. City of New York*, 465 F.3d 65, 86 (2d Cir. 2006) (citation omitted). Civil battery is "an intentional wrongful physical contact with another person without consent." *Id.* (citation omitted). The law is clear that "a property owner has the right to use reasonable force to eject a trespasser from its premises," but "the use of unnecessary force or evidence of intent to injure as opposed to an intent to guard the owner's property removes the privilege." *Mitchell v. N.Y. Univ.*, No. 150622/2013, 2014 N.Y. Misc. LEXIS 105, at *17 (N.Y. Sup. Ct. Jan. 8, 2014) (citing *Noonan v. Luther*, 99 N.E. 178, 179 (N.Y. 1912); *McGovern v. Weis*, 265 A.D. 367, 370 (N.Y. App. Div. 1943); *Hill v. Greeley Square Hotel Co.*, 175 A.D. 421, 422–23 (N.Y. App. Div. 1916)).

According to the Amended Complaint, three Madison Square Garden security guards approached Oakley at his seat and ordered him to leave the Garden "without explanation." (Am. Compl. ¶ 34.) Oakley alleges that he "attempted to defuse the situation by . . . explaining to the security personnel that he had done nothing wrong and simply wanted to watch the game in peace." (*Id.* ¶ 37.) He maintains that he then "turn[ed] around and . . . return[ed] to his seat" (*id.* ¶ 40), in an unspoken, but explicit, refusal to comply with the MSG Defendants' lawful directive as property owners of the Garden. After this refusal to comply, Oakley alleges that "two of the security guards grabbed [him] and pushed him to the ground." (*Id.* ¶ 42.) Oakley asserts that this conduct "clearly exceeded the bounds of reasonable behavior" because there had been no "physical threat or provocation from [him]." (*Id.* ¶ 43.)

Oakley further alleges that after he got up and once more tried to request an explanation for the security guards' behavior, the guards reiterated their demand that he leave the Garden and grabbed him again to compel his removal. (*Id.* ¶¶ 44–45.) "Fearing for his safety," Oakley claims he then "pushed their hands away in self-defense." (*Id.* ¶ 46.) At this point, Oakley alleges that "six [security] officials" grabbed him and "thr[ew]" him to the ground, "crowding around him and impeding his ability to" stand up. (*Id.* ¶¶ 47–48.) Oakley maintains that he was then "put into restraints" and that the "security guards roughly threw him out of the Garden." (*Id.* ¶ 49.) Oakley asserts that by "grabbing [him], restraining him, dragging him to the ground and refusing his repeated requests that he be allowed to stand up, Defendants greatly exceeded the amount of force that was necessary in the situation." (*Id.* ¶ 50.)

As an initial matter, Oakley grossly misunderstands the law concerning a landlord's right to remove a trespasser from its property. The law is clear that the MSG Defendants had the right to expel Oakley

from the Garden and that his refusal to leave justified their use of reasonable force to remove him – a licensee who became a trespasser by refusing to leave their property after being directed to do so.[5]  *See, e.g., Noonan*, 99 N.E. at 179; *McGovern*, 265 A.D. at 370; *Hill*, 175 A.D. at 422–23; *see also Impastato v. Hellman Enters., Inc.*, 147 A.D.2d 788, 789 (N.Y. App. Div. 1989) (explaining that "[a]n admission ticket to a place of public amusement is merely a license which is revocable, without cause, at the will of the proprietor"); *Gottlieb v. Sullivan Cty. Harness Racing Ass'n*, 25 A.D.2d 798, 798 (N.Y. App. Div. 1966); *Madden v. Queens Cty. Jockey Club, Inc.*, 72 N.E.2d 697, 698 (N.Y. 1947); *Aaron v. Ward*, 96 N.E. 736, 737 (N.Y. 1911); *People ex rel. Burnham v. Flynn*, 82 N.E. 169, 185–86 (N.Y. 1907) (explaining that a concert ticket is a revocable license and that a ticketholder, if he remains on the premises after that license has been revoked, "becomes a trespasser, and may be removed by the use of force necessary for the purpose").  Oakley's pleadings and brief reveal a mistaken belief that he could "negotiate" with security personnel to avoid being ejected, and that the MSG Defendants had to justify his ejection to his satisfaction before he was required to comply with their directive to leave. (*See, e.g.*, Am. Compl. ¶¶ 34–53; Opp'n at 29–32.)  Equally unfounded is Oakley's assertion that reasonable force to remove a trespasser cannot be employed unless the trespasser first engages in physical threats or provocation, even if that trespasser steadfastly refuses to leave after being

---

[5] *See Rosenstiel v. Rosenstiel*, 20 A.D.2d 71, 76 (N.Y. App. Div. 1963) ("[A] licensee is one who enters upon or occupies lands by permission, express or implied, of the owner . . . without possessing any interest in the property, and who becomes a trespasser thereon upon revocation of the permission or privilege.").

requested to do so.  (*See* Am. Compl. ¶ 43.) Were Oakley's version of property rights accurate, property owners would be powerless to remove trespassers, who would be free to ignore the entreaties of property owners to an inevitable stalemate.  The law is not so anemic.  To the contrary, it permits property owners to use reasonable force to eject trespassers from their premises.  This is true even for venues like theaters and sports arenas.  *See, e.g., Mathews v. N.Y. Racing Ass'n, Inc.*, 193 F. Supp. 293, 295 (S.D.N.Y. 1961) (horse racing track); *cf. People ex rel. Burnham v. Flynn*, 114 A.D. 578, 581 (N.Y. App. Div. 1906) (explaining that theater owners had right to prevent individual from entering theater "by such reasonable force as was necessary").  Therefore, the only issue with respect to Oakley's assault and battery claim is whether Defendants used unnecessary force or intended to injure him, in which case the privilege to use force would be forfeited.

In his Amended Complaint, Oakley alleges that Defendants grabbed him and forced him to the ground, but he does not claim that this unwanted touching occurred *before* he refused to comply with the security guards' directive that he leave the Garden.  Indeed, Oakley never alleges that he attempted to comply with the security guards' directive.  In his view, the guards' use of force was unreasonable because he did "nothing wrong and simply wanted to watch the game in peace." (Am. Compl. ¶ 37.)  But the guards were not required to justify their request, and Oakley's admitted refusal to comply is what justified their use of force.  Of course, the force used by the guards had to be reasonable, but the mere allegation that the guards subsequently "grabbed [him] and pushed him to the ground" (*id.* ¶ 42) is not enough to demonstrate unreasonable force, *see, e.g., Kalfus v. N.Y. & Presbyterian Hosp.*, 476 F. App'x 877, 880–81 (2d Cir. 2012)

(explaining that police officers' pushing trespasser onto the ground while arresting him to remove him from the premises after he refused to leave was reasonable force).

Nowhere does Oakley allege that the guards intended to injure him, and his description of the events as they unfolded does not support an inference of excessive or unreasonable force. Oakley does not allege that the guards gratuitously punched or kicked him or that any of the physical contact was unnecessary or malicious. *See, e.g., Walsh v. Hyde & Behman Amusement Co.*, 113 A.D. 42, 44 (N.Y. App. Div. 1906) (upholding jury's verdict of compensatory damages for plaintiff where, in being ejected from a theater, "he was thrown down three flights of stairs and badly beaten and bruised, such force being wholly unnecessary in ejecting him"); *Kelmenson v. Metro. Opera Co.*, 152 N.Y.S. 1002, 1003 (N.Y. App. Term 1915) (explaining that "wanton" or "malicious" force could not be used to eject plaintiff from a theater). It was only after Oakley slapped the guards' hands away "in self-defense" that three more security guards arrived on the scene and forced him to the ground and "imped[ed] his ability to" stand up. (Am. Compl. ¶¶ 46–48.) But even then, Oakley does not allege that the guards did anything more than restrain him. The fact that they "refused [his] repeated requests that he be allowed to stand up" could hardly be described as unreasonable given that Oakley never suggested that he was prepared to comply with the guards' request that he leave the arena. (*Id.* ¶ 48.) Eventually he was allowed to stand up, "put into restraints," removed from the Garden, and "detained . . . until police . . . arrive[d]." (*Id.* ¶¶ 49, 127.) Other than the facts of being restrained and removed – all of which took place *after* Oakley's refusal to comply with the guards' oral request that he leave the Garden – Oakley alleges no facts that

support an inference that the guards used unnecessary force or intended to injure him. Notably, the Amended Complaint nowhere alleges that Oakley was in fact injured – merely "embarrass[ed]" and "emotional[ly] distress[ed]." (*Id.* at 9, 25.)

Ultimately, Oakley makes no allegation that the force used by Garden officials was unreasonable. He argues instead that *any* use of force was unreasonable, because it was unreasonable to ask him to leave in the first place. In Oakley's telling, the security guards had only one choice when he declined their request that he leave the Garden: to let him return to his seat to watch the game. That is not the law, which gives property owners the right to exclude people and the right to use reasonable force to eject them when they refuse to comply. Having refused to comply with Defendants' lawful directive that he leave the premises, Oakley cannot cry foul merely because Garden security guards exercised the lawful right to remove him from the arena. Since Oakley has not alleged any facts to suggest that the guards' use of force was excessive or beyond what was necessary to remove him from the premises, his assault and battery claims must be dismissed.

### 3. False Imprisonment

Oakley further charges that the MSG Defendants committed false imprisonment by "intentionally confin[ing] [him], with [his] knowledge and awareness and without his consent, when . . . they physically and forcibly removed [him] from the Garden and subsequently detained him until police could arrive to unjustifiably arrest him." (*Id.* ¶ 130.) To state a claim for false imprisonment, a plaintiff must demonstrate that "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the

confinement was not otherwise privileged." *McGowan v. United States*, 825 F.3d 118, 126 (2d Cir. 2016) (quoting *Broughton v. State*, 335 N.E.2d 310, 314 (N.Y. 1975)).

Oakley fails to sufficiently plead a claim of false imprisonment against the MSG Defendants because their confinement of him "until police could arrive" was privileged. (Am. Compl. ¶ 130.) As the owners and operators of the Garden, the MSG Defendants were within their rights to revoke Oakley's license to be on the premises and eject him. *See Aaron*, 96 N.E. at 737; *Burnham*, 82 N.E. at 185–86; *Gottlieb*, 25 A.D.2d at 798. In removing Oakley from the premises after he refused to comply with their directive to leave, the MSG Defendants were permitted to restrain him as they led him out of the Garden. *See, e.g., Schaeffer v. Cavallero*, 54 F. Supp. 2d 350, 352 (S.D.N.Y. 1999) (dismissing false imprisonment claim against airline on Rule 50 motion because plaintiff was asked to leave airplane but refused to comply). Once outside the Garden, Oakley concedes that he was arrested (Am. Compl. ¶ 51), which necessarily implies that the New York Police Department made that arrest, not the MSG Defendants. The Court thus grants Defendants' motion to dismiss Oakley's false imprisonment claim.

### 4. Abuse of Process

Oakley next claims that Defendants committed abuse of process when they (1) "caused process to be issued to [him] in the form of a criminal charge;" (2) "caused [him] to be charged with an intent to do harm and without excuse or justification;" and (3) "caused [him] to be charged in a perverted manner with the intent to accomplish the collateral objective of publicly embarrassing [him] and destroying his reputation." (*Id.* ¶¶ 134–136.) As a result of Defendants' conduct, Oakley

claims that he lost $40,000 in appearance fees and "has suffered and continues to suffer harm for which he is entitled to an award of damages." (*Id.* ¶¶ 137–138.)

To establish an abuse of process claim under New York law, a plaintiff must demonstrate that the defendant "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse o[r] justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003) (quoting *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)). The plaintiff must also establish that the abuse of process caused "actual or special damages." *Kahn v. Friedlander*, 90 A.D.2d 868, 869 (N.Y. App. Div. 1982).

Oakley's abuse of process claim must be dismissed because he does not sufficiently plead special damages caused by the Defendants' alleged abuse of process. The Amended Complaint asserts that "as a direct result of Defendants' statements claiming that Mr. Oakley was an alcoholic, . . . the Rebound Institute[] came to the conclusion that it was not appropriate for someone with such a reputation to interact with their patients." (Am. Compl. ¶ 93.) Thus, even assuming that Oakley sufficiently pleads special damages – a contention that the Court rejected above (*see supra* section III.B.1.b.(3), pp. 13–13) – Oakley's concession that these damages were caused by Defendants' statements accusing him of being an alcoholic, not from any abuse of process, are fatal to his claim.

Accordingly, the Court grants Defendants' motion to dismiss Oakley's abuse of process claim.

5.  Denial of a Public Accommodation

Oakley last claims, in the alternative, that Defendants discriminated against him under the ADA and the NYSHRL by "denying him access to the Garden based on their perception that he suffers from alcoholism, a disability." (Am. Compl. ¶¶ 141, 146.) To state a claim under the ADA and the NYSHRL, a plaintiff must allege "(1) that she is a 'qualified individual' with a disability; (2) that defendants are a public accommodation as defined under Title III; and (3) that she was denied the opportunity to participate in or benefit from defendants' services, programs or activities, or was otherwise discriminated against by defendants on the basis of her disability." *Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 368 (S.D.N.Y. 2007); *see also Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 117 n.1 (2d Cir. 2004) ("New York State disability discrimination claims are governed by the same legal standards as federal ADA claims."). An individual is "disabled" within the meaning of the ADA and the NYSHRL if he is "regarded as" having a disability. *See* 42 U.S.C. § 12102(1)(C) (defining "disability" to include "being regarded as having such an impairment"); N.Y. Exec. Law § 292(21)(c) (defining "disability" to include "a condition regarded by others as such an impairment").

Although alcoholism qualifies as a disability under the ADA and the NYSHRL, *Makinen v. City of New York*, 857 F.3d 491, 495 (2d Cir. 2017), the Amended Complaint does not plead any fact that supports a plausible inference that Defendants discriminated against Oakley on the basis of his purported alcoholism. To the contrary, Oakley merely pleads in a conclusory manner that he was removed from the Garden "based on the Defendants' alleged perception that he suffers from alcoholism." (Am. Compl. ¶ 141; *see also id.* ¶¶ 23–24

(stating in a conclusory manner that Defendants "[b]elieved [t]hat [p]laintiff was an [a]lcoholic").)

Beyond these conclusory assertions, Oakley relies on three statements allegedly uttered by Dolan to establish Defendants' perception that Oakley suffers from alcoholism. These include (1) Dolan's representation that "anybody who comes to the Garden [after] drinking too much alcohol [is] going to be ejected and . . . banned;" (2) Dolan's musings that Oakley "may have a problem with alcohol, we don't know;" and (3) Dolan's repeating of "statements from some of the police and security that [Oakley] appeared to be impaired, *et cetera*" at the February 8 game. (Opp'n at 37; Dolan Interview.) None of these, either in isolation or collectively, suffices to support an inference that Defendants had a perception that Oakley suffers from alcoholism or that they discriminated against him on that basis.

Courts have long distinguished between "being a chronic alcoholic" and "being in public while drunk on a particular occasion." *Powell v. Texas*, 392 U.S. 514, 530–32 (1968) (plurality op.); *see also Clifford v. County of Rockland*, 528 F. App'x 6, 8–9 (2d Cir. 2013) (distinguishing alcoholism from drinking or being intoxicated in the ADA context); *Baptista v. Hartford Bd. of Educ.*, 427 F. App'x 39, 42 (2d Cir. 2011) (same); *Macshane v. City of New York*, No. 06-cv-6024 (RRM), 2015 WL 1298423, at *15 n.18 (E.D.N.Y. Mar. 23, 2015) (collecting cases in the ADA context distinguishing alcoholism from actions taken under the influence of alcohol). The plain meaning of Dolan's first statement is that people who drink too much at the Garden will be ejected, and the third statement clearly references Oakley's demeanor on the night of the February 8 game, not his purported alcoholism. As for

the second statement, Dolan in no way connected that comment to Oakley's ejection from the Garden on February 8. Therefore, though Oakley contends that these statements "support an inference that Defendants denied [him] access to [the Garden] based on their perception that he suffered from alcoholism" (Opp'n at 38), the obvious reading is that Oakley was denied access for his conduct on the night of February 8, 2017, not for being an alcoholic. Indeed, as noted above, most of the Amended Complaint asserts – albeit in a conclusory manner – that Dolan knew that Oakley was *not* an alcoholic. Without additional facts, such as similar instances of discriminatory treatment toward perceived alcoholics or other statements reflecting Defendants' discriminatory animus toward alcoholics at the Garden, the Amended Complaint abjectly fails to allege a claim for discrimination under the ADA or NYSHRL. *Cf. Macshane*, 2015 WL 1298423, at *17 (dismissing disability discrimination claims on summary judgment in part because plaintiffs "failed to identify any proof suggesting . . . that defendants exhibited hostility toward them based on their perceived disability, treated them differently than similarly-situated [individuals], or applied different procedures or standards to them").

Accordingly, the Court grants Defendants' motion to dismiss as to Oakley's ADA and NYSHRL claims.

## C. Leave to Amend

Finally, the Court considers Oakley's request for leave to amend. (Opp'n at 40 n.19.) "Although Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given when justice so requires,' it is within the sound discretion of the [Court] to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet*

*Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (quoting Fed. R. Civ. P. 15(a)). In addition, the Second Circuit has consistently stated that district courts may deny leave to amend when plaintiffs request such leave in a cursory sentence on the last page of an opposition to a motion to dismiss, without any justification or an accompanying proposed amended pleading. *See, e.g., City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014) (affirming denial of leave to amend where plaintiffs already had one opportunity to amend their complaint and had "identified no additional facts or legal theories" to support their request to amend); *Food Holdings Ltd. v. Bank of Am. Corp.*, 423 F. App'x 73, 76 (2d Cir. 2011) (affirming district court's denial of leave to amend where plaintiffs requested leave to amend "on the final page of their brief in opposition to defendants' motion to dismiss, in boilerplate language and without any explanation as to why leave to amend was warranted"); *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 275–76 (2d Cir. 2006).

Here, in a footnote to the final sentence of his opposition to Defendants' motion to dismiss, Oakley, without any legal or other support, states: "To the extent that the Court finds deficiencies in any of [Oakley's] claims, [Oakley] respectfully requests the right to amend his pleadings to address any such deficiencies." (Opp'n at 40 n.19.) Significantly, Oakley offers no basis for his request for leave to amend nor does he attach a proposed amended complaint. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (noting that a court may deny leave to amend, on notice grounds, "where the request gives no clue as to 'how the complaint's defects would be cured'" (quoting *Porat*, 464 F.3d at 276)). Moreover, this is not Oakley's first attempt at repleading in this action. To the contrary,

on January 19, 2018, after the parties had exchanged pre-motion letters (Doc. Nos. 19, 24) and the Court had held a pre-motion conference concerning Defendants' contemplated motion to dismiss (Doc. No. 51 Ex. 1), Oakley sought and received leave to amend for the purpose of addressing deficiencies in the complaint that the Court and Defendants addressed at some length (Doc. Nos. 29, 30).  Notwithstanding the benefit of Defendants' pre-motion letter and an extensive colloquy with the Court at the pre-motion conference, Oakley's amended pleading still fails to allege facts sufficient to withstand a motion to dismiss.

As Judge Lynch aptly noted when he was on the district court, "[w]hile pleading is not a game of skill in which one misstep may be decisive to the outcome, neither is it an interactive game in which plaintiffs file a complaint, and then bat it back and forth with the Court over a rhetorical net until a viable complaint emerges."  *In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*, Nos. 06-cv-643, 07-cv-8686, 07-cv-8688 (GEL), 2008 WL 4962985, at *2 (S.D.N.Y. Nov. 20, 2008) (internal quotation marks and citations omitted); *see also Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (noting that courts can deny leave to amend where there has been "repeated failure to cure deficiencies by amendments previously allowed" (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962))); *NRW, Inc. v. Bindra*, No. 12-cv-8555 (RJS), 2015 WL 3763852, at *1 (S.D.N.Y. June 16, 2015) ("To grant leave to amend after a plaintiff has had ample opportunity to amend would be condoning a strategy whereby plaintiffs hedge their bets . . . in the hopes of having another bite at the proverbial apple." (internal quotation marks and citation omitted)).

Accordingly, because Oakley has not attached a proposed amended complaint or even attempted to explain why an additional opportunity to amend would cure the Amended Complaint's deficiencies, the Court denies Oakley's request for leave to amend.

## IV. CONCLUSION

From its inception, this case has had the feel of a public relations campaign, with the parties seemingly more interested in the court of public opinion than the merits of their legal arguments.   That is perhaps understandable, given the personal and public nature of the dispute.   But while basketball fans in general, and Knicks fans in particular, are free to form their own opinions about who was in the right and whether Oakley's ejection was motivated by something more than the whims of the team's owner, the fact remains that Oakley has failed to allege a plausible legal claim that can meet federal pleading standards. Accordingly, for the reasons stated above, IT IS HEREBY ORDERED THAT Defendants' motion to dismiss is GRANTED.  IT IS FURTHER ORDERED THAT Oakley's request for leave to file another amended complaint is DENIED. The Clerk of Court is respectfully directed to terminate the motion pending at document number 41 and to close this case.

SO ORDERED.

_____

RICHARD J. SULLIVAN
United States Circuit Judge
Sitting by Designation

Dated: February 19, 2020
      New York, New York

                   *    *    *

21

Plaintiff Charles Oakley is represented by Douglas H. Wigdor, Renan F. Varghese, and Kenneth Walsh of Wigdor LLP, 85 Fifth Ave., 5th Fl., New York, New York 10003; and Nelson A. Boxer of Petrillo Klein & Boxer LLP, 655 Third Ave., 22nd Fl., New York, New York 10017.

Defendants James Dolan, MSG Networks, Inc., The Madison Square Garden Company, and MSG Sports & Entertainment, LLC are represented by Randy M. Mastro of Gibson, Dunn & Crutcher LLP, 200 Park Ave., New York, New York 10166; and James Walden and Milton L. Williams of Walden Macht & Haran LLP, 1 Battery Park Plaza, 34th Fl., New York, New York 10004.