# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X
CHARLES OAKLEY,                                    :
                                                   :
                        Plaintiff,                 :   Civil Case No.: 17-cv-6903 (RJS)
                                                   :
              v.                                   :
                                                   :
JAMES DOLAN, in his individual and professional    :   SECOND AMENDED
capacities, MSG NETWORKS, INC., THE MADISON        :   COMPLAINT
SQUARE GARDEN COMPANY and MSG SPORTS &             :
ENTERTAINMENT, LLC,                                :
                                                   :   **Jury Trial Demanded**
                        Defendants.                :
                                                   :
------------------------------------------------------------------------X

Plaintiff Charles Oakley ("Plaintiff" or "Mr. Oakley"), through his lawyers, Wigdor LLP,

hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      In 1998, Charles Oakley was traded to the New York Knicks and, during the

ensuing decade on which he played for the team, he established himself as a premier player

known for his hard-nosed play, defense and rebounding.

2.      However, one person who did not appreciate Mr. Oakley's contributions to the

Knicks franchise was Defendant James Dolan, who inherited control of the Knicks from his

father a year after Mr. Oakley's career with the team came to an end.  Without any justification,

Defendant Dolan constantly disrespected Mr. Oakley, refusing to make eye contact or shake his

hand during meetings, making him purchase his own tickets to attend games at the arena he

called home for a decade, and even having security harass him when he did attend games prior to

the incident in question.

3.      Defendants' animosity came to a head on February 8, 2017, when Mr. Oakley appeared at Madison Square Garden (the "Garden") to watch a Knicks game.  Within minutes of unobtrusively taking his seat, Defendant Dolan directed security to forcibly remove Mr. Oakley from the Garden and humiliate him in front of the Knicks fans that had attended the game. Adding insult to injury, Defendants proceeded to ban Mr. Oakley from the Garden indefinitely. Despite his immense contributions to the franchise, Mr. Oakley was treated like a common criminal by Defendant Dolan and Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC (together, "MSG").

4.      As if their mistreatment of Mr. Oakley at the Garden was not embarrassing and shameful enough, over the ensuing days, Defendants Dolan and MSG launched a coordinated and defamatory public relations campaign against Mr. Oakley, baselessly accusing him of abusing fans and staff, acting inappropriately and struggling with alcoholism.  By propagating what they knew to be blatant lies, Defendants Dolan and MSG have caused irreparable harm to Mr. Oakley's name and career, and discriminated against him based on the false perception that he is an alcoholic.  However, as he did throughout his playing career, Mr. Oakley has refused to walk to the bench in shame.  Instead, holding his head up high, Mr. Oakley files this Second Amended Complaint to set the record straight and to hold Defendants responsible for their reprehensible conduct.

5.      In doing so, Mr. Oakley seeks redress for Defendants' unlawful conduct ~~in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12182, *et seq.* ("ADA") and the New York State Human Rights Law, New York Executive Law §§ 290, *et seq.* ("NYSHRL"), as well as various state tort laws~~in violation of New York's assault and battery laws.

**PARTIES**

2

6.      Plaintiff Charles Oakley is a former All-Star power forward for the New York Knicks, a 17-year veteran of the National Basketball Association ("NBA"), and a resident of the State of Ohio.

7.      Defendant James Dolan is a resident of the State of New York and at all relevant times was Executive Chairman of MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC.

8.      Defendant MSG Networks, Inc. is a publicly-traded, foreign corporation with its principal place of business located at Two Pennsylvania Plaza, New York, New York 10121.  At all relevant times, MSG Networks, Inc. owned and operated Madison Square Garden and the New York Knicks.

9.      Defendant The Madison Square Garden Company is a wholly-owned subsidiary of MSG Networks, Inc., with its principal place of business located at Two Pennsylvania Plaza, New York, New York 10121.  At all relevant times, The Madison Square Garden Company owned and operated Madison Square Garden and the New York Knicks.

10.     Defendant MSG Sports & Entertainment, LLC is a wholly-owned subsidiary of MSG Networks, Inc., with its principal place of business located at Two Pennsylvania Plaza, New York, New York 10121.  At all relevant times, MSG Sports & Entertainment, LLC owned and operated Madison Square Garden and the New York Knicks.

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as this action involves citizens of different states and the amount in controversy in this matter exceeds $75,000.

~~12.     The Court further has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under the ADA.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367(a).~~

~~13.~~     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful practices alleged herein, occurred in this district.

12.

**FACTUAL ALLEGATIONS**

**I.     MR. OAKLEY'S CAREER WITH THE NEW YORK KNICKS**

~~14.~~13.  Mr. Oakley, a third-year power forward at the time, was traded to the Knicks on June 27, 1988.

~~15.~~14.  Over the next ten years, coinciding with Mr. Oakley's tenure, the Knicks enjoyed their most sustained run of excellence and reassumed their place among the league's elite teams, making the second round of the playoffs every single year, except for one, while Mr. Oakley was on the team, in large part due directly to his contributions.

~~16.~~15.  By way of example, in 1994 – a season during which Mr. Oakley was instrumental in leading the Knicks to within one win of a NBA championship – he was both named to the All-Defensive First Team and appeared in the NBA All-Star Game.

~~17.~~16.  Even now, nearly two decades after he stopped playing for the Knicks, Mr. Oakley ranks among the top three players in franchise history in offensive rebounds, defensive rebounds, minutes played and steals, making him inarguably the greatest power forward in Knicks history.

4

## II.   DEFENDANT DOLAN'S HISTORY OF MISTREATING FORMER EMPLOYEES

~~18.~~17.  In 1999, Defendant Dolan inherited control of MSG, the Garden and the Knicks from his father, Charles Dolan.

~~19.~~18.  Since Defendant Dolan became chairman of the Knicks, they almost immediately relinquished their status as one of the NBA's premier teams, winning only a single playoff series since the turn of the century.

~~20.~~19.  The Knicks' reputation sunk to unfathomable new lows in 2007 when Defendants Dolan and Madison Square Garden LP were found liable for retaliating against a former employee, Anucha Browne Sanders, who had complained about having been sexually harassed by the then-coach of the Knicks.

~~21.~~20.  In fact, the jury found Defendant Dolan personally liable for retaliating against Ms. Sanders, and awarded her $3 million in punitive damages from Defendant Dolan for his unlawful conduct.

~~22.~~21.  This pattern of retaliating against Defendants' former employees who refused to accept Defendant Dolan's unlawful conduct sadly repeated itself with Mr. Oakley.

## III.   DEFENDANT DOLAN'S ANIMOSITY TOWARDS MR. OAKLEY

~~23.~~22.  Mr. Oakley had never met Defendant Dolan during his playing career, or for several years thereafter.

~~24.~~23.  Eager to bury the hatchet with the newly installed owner of the Knicks, given what the franchise meant to him and all he had done for it, Mr. Oakley approached NBA Commissioner Adam Silver to set up a meeting with Defendant Dolan.

~~25.~~24.  Despite Mr. Oakley's best efforts, even Mr. Silver was unable to convince to Defendant Dolan to agree to a meeting.

26.25.  To this day, Mr. Oakley does not know the source of Defendant Dolan's animosity toward him.  However, the ongoing nature of the animosity is obvious and well-known, as illustrated by, among other things, the fact that Mr. Oakley has repeatedly been forced to purchase tickets to Knicks games out of his own pocket, whereas Defendant Dolan has routinely treated countless other retired Knicks players to courtside seats.

27.26.  Even when attending such games, Defendant Dolan went out of his way to harass Mr. Oakley without justification.

28.27.  By way of example only, during a Knicks game that Mr. Oakley attended during the 2015-2016 season, he noticed that a team of security personnel made a point of following him everywhere he went at the Garden.  One security guard admitted to Mr. Oakley that they were only treating him in such a manner because Defendant Dolan had ordered them to do so, despite the fact that Plaintiff had done nothing to deserve to be treated like a criminal.

29.28.  Despite the abhorrent treatment that he has received at the hands of Defendant Dolan, Mr. Oakley was committed to, and continues to be committed to, returning to MSG.

IV.    **THE FEBRUARY 8, 2017 INCIDENT AT THE GARDEN**

30.29.  On February 8, 2017, Mr. Oakley attended a Knicks game at the Garden against the Los Angeles Clippers.

31.30.  Notably, Mr. Oakley was neither intoxicated nor otherwise behaving inappropriately when he arrived at the Garden and was allowed to enter the arena without incident.

32.31.  Mr. Oakley's seats coincidentally were located several rows behind where Defendant Dolan was sitting (Mr. Oakley obviously had no way of knowing whether Defendant

Dolan would even be attending this particular game, let alone where he would be seated if he did so).

32.   Nevertheless, Mr. Oakley proceeded to his seats without speaking to Defendant Dolan or acknowledging him in any way.

33.   Mr. Oakley spoke with attendees nearby and acted calmly and without incident.

34.   However, unbeknownst to Mr. Oakley, Defendant Dolan observed had seen him Mr. Oakley and called over a security guard that he employed and over to conversed with the security guard.

35.   Immediately after the security guard spoke with Defendant Dolan, he then proceeded to say something to Mr. Oakley.

36.   Shortly thereafter, Defendant Dolan signaled to the same security guard, who now was standing with several other security guards, pointing downwards with his right index finger.

33.37.  In response to Defendant Dolan's gesture, the security guard radioed to other security personnel at MSG and a large group of security personnel they proceeded to converge on Mr. Oakley.  Given the large number of security personnel that confronted Mr. Oakley, notwithstanding his calm demeanor up to that point, it is obvious that they acted at all times with the intention of forcing Mr. Oakley to leave the GardenMSG with unreasonable force.

34.38.  Incredibly, within a few minutes of reaching his seats, Thehese Mr. Oakley was approached by three large men then identifying identified themselves as being members of Madison Square Garden's security team who and ordered him to leave the arena without explanation.

35.39.  Understandably confused, Mr. Oakley asked these purported security guards why he was being forced to leave the area when he had done nothing more than sit in publicly

available seats.  Rather than respond to Mr. Oakley's reasonable question, one of the security

guards proceeded to berate him publicly by demanding loudly, "Why are you sitting so close to

Mr. Dolan?"

36.40.  At that point, it became clear to Mr. Oakley that the sole reason that the security

guards were seeking to oust him from the Garden was Defendant Dolan's orders.

41.     Embarrassed that Defendant Dolan was clearly attempting to publicly humiliate

him in front of the same fans who spent a decade cheering for him, Mr. Oakley attempted to

defuse the situation by patiently explaining to the security personnel that he had done nothing

wrong and simply wanted to watch the game in peace.

37.42.  As he rose from his seat, the security personnel grabbed Mr. Oakleyhim and

roughly pulled him backwards as Defendant Dolan watched and refused to take action to prevent

their conduct, thereby both enabling the violent conduct against Mr. Oakley and signaling his

tacit approval of such unlawful behavior.

38.43.  Mr. Oakley raised his arms during this encounter, in a defensive posture that

clearly conveyed that he had no intention of engaging in any violent behavior.

39.44.  If security had simply asked Mr. Oakley to take his seat and watch the game, what

followed would never have happened.

40.45.  Mr. Oakley attempted to demonstrate that he was capable of watching the game

without creating an incident, by turning around and peaceably returning to his seat.

41.46.  Mr. Oakley did not, however, refuse to leave the Garden at the time and merely

sought an explanation for why he was being treated differently than every other fan who had

attended the Knicks game that night.

8

42.47.  As he did so, two of the security guards grabbed Mr. Oakley and pushed him to the ground.

43.48.  In forcibly shoving Mr. Oakley to the ground within seconds of first approaching him, and without any physical threat or provocation from Mr. Oakley, the security guards clearly exceeded the bounds of reasonable behavior and instigated a physical altercation where there otherwise was no need for such violent conduct.

44.49.  When Mr. Oakley got back to his feet, the security guards loudly reiterated their demand that he leave the Garden immediately, despite the fact that they had no legitimate basis for ejecting him.

45.50.  When Mr. Oakley continued to request an explanation for this outrageous behavior, the security guards further escalated the confrontation by physically grabbing Mr. Oakley to forcibly compel him to leave.

46.51.  Fearing for his safety as he was surrounded by several large security guards, and having already been roughly shoved to the ground once, Mr. Oakley pushed their hands away in self-defense.

47.52.  Within seconds, Mr. Oakley was forcibly turned around so his back faced security, grabbed by six officials and thrown onto the ground.

48.53.  The security guards further refused Mr. Oakley's repeated requests that he be allowed to stand up, instead crowding around him and impeding his ability to get to his feet.

49.54.  Mr. Oakley was then put into restraints and the security guards roughly threw him out of the Garden.

55.     In grabbing Mr. Oakley, restraining him, dragging him to the ground and refusing his repeated requests that he be allowed to stand up, Defendants greatly exceeded the amount of

force that was necessary in the situation, especially since Mr. Oakley had explained repeatedly that he had not done anything wrong and not instigated the violent conduct.

50.56.  After Mr. Oakley was violently removed from his seat, Defendant Dolan gave his security guards a "thumbs up" gesture, making clear that he approved of his security personnel's use of violent force and that they had complied with his instructions.

51.57.  Mr. Oakley was ultimately taken outside of the arena, arrested and charged with assault.

52.58.  The incident caused an enormous spectacle during the game and was incredibly embarrassing for Mr. Oakley.

53.59.  Mr. Oakley was also completely bewildered by the incident because, according to the security guard who first approached him, all he had done was sit too closely to Defendant Dolan.

54.60.  As a Knicks legend who had repeatedly attended games in the past, Mr. Oakley had every intention of returning to the site of his playing days, even after having been treated in such a blatantly violent and inappropriate manner.

55.61.  However, the Knicks sought to take away this source of joy and pride from Mr. Oakley as well, as they immediately announced that Mr. Oakley was banned indefinitely from Knicks games and the Garden, generally.

**V.      ~~DEFAMATORY~~ STATEMENTS BY DEFENDANTS**

56.62.  Recognizing that there was no legitimate basis for their horrendous treatment of Mr. Oakley, Defendants were left scrambling for an explanation to provide to Knicks fans as to why they would violently throw out a Knicks legend from the Garden.

57.63.  It became apparent over the next approximately 48 hours that Defendants had attempted to solve the problem that they had created by making a series of outrageous and patently false statements to the national media with the sole intent of defaming Mr. Oakley, implying both that he was an alcoholic and that he had committed a violent crime against Knicks fans while at the Garden that night.

A.    **Statements by MSG**

58.64.  On February 8, 2017, shortly after the incident, the Knicks public relations Twitter account (@NY_KnicksPR), which is owned and operated by Defendants, tweeted:

> Charles Oakley came to the game tonight and ***behaved in a highly inappropriate and completely abusive manner***.  He has been ejected and is currently being arrested by the New York City Police Department.  He was a great Knick and ***we hope he gets some help soon***.

(emphasis added).

59.65.  This statement is completely false, and Defendants knew it was false at the time it was made and/or recklessly disregarded their truth at the time they were made.  At no point while being attacked at the Garden had Mr. Oakley acted inappropriately or abusively.  To the extent that Mr. Oakley ever touched anyone, it was only after he had been roughly grabbed by Defendants' personnel, in a clear act of self-defense.  However, Mr. Oakley neither initiated contact nor attempted to physically engage in an altercation with any of Defendants' employees.

60.66.  The statement by the Knicks that the organization hoped Mr. Oakley would "get[] some help soon" was similarly defamatory, as it blatantly insinuated that Mr. Oakley had a substance abuse problem of some kind.

11

61.67.  It would later become apparent that this statement by the Knicks was part of a coordinated media strategy by Defendants, designed to propagate the lie that Mr. Oakley is an alcoholic.

62.68.  The next day, on February 9, 2017, the Knicks organization doubled down on its defamatory statement that Mr. Oakley had somehow been "abusive" and sought to reinforce their claim that Mr. Oakley had somehow deserved the physical abuse he had received from their security guards.  Specifically, the @NY_KnicksPR tweet read:

> Updated statement (2/9):  There are dozens of security staff, employees and NYPD that witnessed ***Oakley's abusive behavior***.  It started when he entered the building and continued until he was arrested and left the building.  ***Every single statement we have received is consistent in describing his actions***.  ***Everything he said since the incident is pure fiction***.

(emphasis added).

63.69.  Upon information and belief, Defendants intentionally misrepresented the statements of their security guards and witnesses, several of whom supported Mr. Oakley's account of events and were silenced.

64.70.  These references to alleged statements made by security guards and other witnesses were designed to provide the impression that Defendants' prior and subsequent statements had factual underpinnings and were not mere statements of opinion.

**B.    Statements by Defendant Dolan**

65.71.  On February 10, 2017, Defendant Dolan appeared on ESPN Radio's, "The Michael Kay Show" and spoke about the dispute with Mr. Oakley.

66.72.  Defendant Dolan arrived at the show with a binder labeled, "Preparation."

67.73.  Once the show began, Defendant Dolan confirmed that Mr. Oakley was banned from the Garden indefinitely, and unleashed a litany of defamatory statements.

12

68.74.  In attempting to explain his decision, Defendant Dolan said:  "I think the most

important thing with that is we need to keep the Garden safe for anybody who goes there . . .  So

***anybody drinking too much alcohol, looking for a fight, they're going to be ejected and they're***

***going to be banned***."

69.75.  Defendant Dolan went on to accuse Mr. Oakley several more times of being an

alcoholic and/or having been overly impaired during the game:

> ***To me, Charles has got a problem. We've said it before; he's his***
> ***own worst problem. People have to understand that. He has a***
> ***problem with anger. He's both physically and verbally abusive. He***
> ***may have a problem with alcohol.***
>
> . . .
>
> ***We know he said on TV that he was drinking beforehand. We***
> ***heard statements from police that he appeared to be impaired. Our***
> ***staff clearly could see that***.
>
> . . .
>
> ***When you have issues like this, the first step for anybody is to ask***
> ***for help***.

70.76.  In making these statements, Defendant Dolan was acting with actual malice

towards Ms. Oakley, as he was fully aware that his comments were and are entirely without basis

in fact and/or made the comments with a reckless disregard for their truth.  Defendant Dolan

further attempted to provide a basis for his false statements by referencing statements made by

others purporting to support his allegations about Mr. Oakley.  However, Mr. Oakley has never

had a problem with excessive anger nor has he ever abused alcohol or any other drug.

71.77.  During the interview, Defendant Dolan also repeatedly accused Mr. Oakley of

putting the safety of Knicks fans at risk, and somehow having abused them:  "***The No. 1 concern***

***has to be the safety and comfort of the fans***."

13

72. 78.  Defendant Dolan elaborated, again stating that Mr. Oakley somehow put others at risk and treated them abusively, when in reality he had done nothing but attempt to attend the game:

> We'll probably hear chants [in support of Mr. Oakley] tonight.  But I would like for those people to look around and look at the people working at Madison Square Garden and *realize that the guy they're chanting for might have been a great Knick player, but he was terribly abusive to them*.
>
> . . .
>
> *There were security people there who were abused. There were service people who were abused. The same people who help fans get to their seats, they were abused. With racial overtones, sexual overtones.* How do you bring your kids to a game if you think that's going to happen?

73. 79.  Perhaps feeling he needed to justify his decision to have Mr. Oakley removed and banned indefinitely from the Garden, Defendant Dolan further defamed Mr. Oakley by stating that Mr. Oakley had come to the game with an "agenda" to take some unspecified action against him:

> *It's very clear to us that Charles Oakley came into the Garden with an agenda. From the moment he stepped into the Garden, he began with this behavior. Abusive behavior, stuff you wouldn't want to say on the radio . . . It just accelerated and accelerated and accelerated* . . . I'm not inside of Charles Oakley's mind. *He did say a bunch of things along the way that looked like he was headed in my direction. I didn't hear them myself but we heard from our employees that he was using my name a lot.* But this isn't because I'm nervous. This is because you can't do what he did and stay. We clearly did not — we weren't perfect here, and I think Charles never should have made it to his seats. And that's on us, and we're doing things to remedy that and make sure that never happens again. … I can't say for sure.

74. 80.  As with virtually all of Defendant Dolan's statements about Mr. Oakley during this show, he was fully aware that these too were complete fabrications and acted with actual

14

malice in making them.  Mr. Oakley had made no effort to confront Defendant Dolan and did

nothing to otherwise incite Defendants to forcibly remove him from the Garden.

75.81.  Defendants were aware that at no point was Mr. Oakley abusive towards any of

Defendants' employees or staff, nor was he abusive to any Knicks fans, as evinced by the fact

that he was allowed to proceed to his seat without interruption, despite being in full view of the

public.

76.82.  Thus, Defendants were also aware that their statements accusing Mr. Oakley of

instigating the confrontation or otherwise provoking the security personnel at the Garden were

false at the time they made these statements, and/or Defendants were recklessly indifferent to

this fact.

83.    It was only when Defendant Dolan first caught sight of Mr. Oakley that issues

arose.

**C.    Defendant Dolan's History of Baselessly Accusing Critics of Alcoholism**

77.84.  Tellingly, this was not the first time that Defendant Dolan has attempted to malign

individuals who upset him with unsupported accusations that they were alcoholics.

78.85.  In February 2015, Defendant Dolan accused a fan of being an alcoholic merely

based on the fan's sending an angry e-mail to him, writing:

> Why would anybody write such a hateful letter. I am just guessing
> but ill bet your life is a mess and you are a hateful mess. What have
> you done that anyone would consider positive or nice. I am betting
> nothing. In fact ill bet you are negative force in everyone who comes
> in contact with you. You most likely have made your family
> miserable. **Alcoholic maybe. I just celebrated my 21 year
> anniversary of sobriety. You should try it**.

(emphasis added).

15

79.86.  In fact, less than two months after the incident with Mr. Oakley, Defendant Dolan accused another fan of purportedly drunkenly heckling him, telling the press "he had an open bottle of beer and smelled of alcohol," an accusation that the fan vehemently denied.

80.87.  Indeed, it is clear that Defendant Dolan's knee jerk response when confronted by anyone that he does not like is to level unsupported accusations that his critics suffer from alcoholism, a particularly sad pattern in light of his own struggles with alcohol that he referenced in the February 2015 e-mail.

**D.**     **The Effect of Defendants' Statements on Mr. Oakley**

81.88.  When read together, it is clear that Defendants engaged in a coordinated and intentional effort to malign Mr. Oakley's reputation in two separate ways.

82.89.  First, Defendants repeatedly claimed that Mr. Oakley was "***abusive***," and "***looking for a fight***."

83.90.  Defendant Dolan expounded on these spurious claims when he knowingly and falsely claimed that Mr. Oakley was "terribly abusive to [the fans]" and that Mr. Oakley's behavior purportedly threatened "***the safety and comfort of the fans***."

84.91.  The only implication that could have been drawn from these statements, in conjunction with Defendants' references to the fact that Mr. Oakley was "arrested" for his conduct, notably without explaining the nature of the charges brought against Mr. Oakley, and by their references to selected statements allegedly made by witnesses, was that that Mr. Oakley had committed such a serious act of violence towards Knicks fans that it had warranted his arrest, a claim that Defendants propagated despite knowing full well that nothing of the sort had occurred.

16

85.92.  Thus, Defendants claimed, without basis, that Mr. Oakley, a former power forward for the Knicks, was arrested as a result of his behavior in "looking for a fight" that jeopardized "the safety" of the team's fans.

86.93.  These statements were clearly designed to create the belief that Mr. Oakley had committed a serious crime, which Defendants knew not to be the case.

87.94.  Second, Defendants repeatedly referred to the fact that Mr. Oakley was purportedly "drinking too much alcohol" on February 8, 2017, and that he was "clearly" "impaired" as a result of his drinking, neither of which were true, as Defendants were fully aware.

88.95.  However, Defendants were not satisfied with falsely claiming that Mr. Oakley was intoxicated while at the Garden.  Instead, they compounded their malicious statements by further stating, without any support, that Mr. Oakley had a possible "problem" with alcohol, requiring him to "ask for help," and leading Defendants to "***hope he gets some help soon***."

89.96.  Such statements, coupled with the references to statements from unidentified individuals purportedly supporting the false claim that Mr. Oakley was impaired, were inarguably spreading the false rumor that Mr. Oakley was an alcoholic who had a habitual problem that required "help."

90.97.  Defendants' statements concerning Mr. Oakley not only caused him to suffer reputational harm, but also directly caused him to lose significant business opportunities.

91.98.  Specifically, prior to February 8, 2017, Mr. Oakley made guest appearances at a drug and alcohol rehabilitation clinics to speak with patients and provide other services, including cooking them meals.

17

92.99.  However, as a direct result of Defendants' statements claiming that Mr. Oakley was an alcoholic, one such rehabilitation clinic, the Rebound Institute, came to the conclusion that it was not appropriate for someone with such a reputation to interact with their patients.

93.100.       Prior to Defendants' statements, Mr. Oakley was scheduled to earn appearance fees totaling precisely $40,000 from the Rebound Institute.

94.101.       However, once Defendants falsely claimed that he was an alcoholic who needed to get "help," Mr. Oakley was not able to receive the $40,000 he would have otherwise been paid for his appearance at the Rebound Institute.

<del>FIRST CAUSE OF ACTION</del>
<del>(Defamation *Per Quod*)</del>

<del>95.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.</del>

<del>Defendants defamed Plaintiff by falsely accusing him of being an alcoholic who required treatment.</del>

<del>96.    The statements made by Defendants were false.</del>

<del>96.    Defendants were at all times aware that these statements were false, or were recklessly indifferent to the falsity of these statements, and made them with the specific intention of damaging Oakley's reputation and maligning him to the general public.</del>

<del>96.    As a direct and proximate result of Defendants' defamatory conduct, Plaintiff lost exactly $40,000 in appearance fees that he was otherwise scheduled to be paid, for which he is entitled to an award of damages.</del>

<del>96.    As a direct and proximate result of Defendants' defamatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.</del>

## ~~SECOND CAUSE OF ACTION~~
~~(Defamation *Per Se*)~~
~~*Against All Defendants*~~

~~96.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.~~

~~96.    Defendants defamed Plaintiff by publicly accusing him of having committed the serious crime of assault against members of the public, warranting his arrest.~~

~~96.    Defendants further defamed Plaintiff by accusing him of suffering from the loathsome disease of alcoholism.~~

~~96.    Defendants' accusation that Plaintiff is an alcoholic further defamed Plaintiff in his trade, business or profession, as it is a matter of common knowledge that Plaintiff works with individuals who suffer from substance abuse issues, and substance abuse treatment centers cannot associate with alleged alcoholics.~~

~~96.    Defendants made defamatory statements that caused serious injury to Plaintiff's professional and personal reputation.~~

~~96.    None of these assertions by Defendants had any factual basis.~~

~~96.    In making these statements, Defendants were acting with actual malice, as they were at all times aware that none of the statements were true, or were acting with reckless indifference to the falsity of these statements.~~

~~96.    As a direct and proximate result of Defendants' defamatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.~~

## ~~THIRD CAUSE OF ACTION~~
~~(Libel)~~
~~*Against Defendants MSG Networks, Inc.,*~~
~~*The Madison Square Garden Company*~~

19

*and MSG Sports & Entertainment, LLC*

96.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

96.    Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC defamed Plaintiff by, *inter alia*, publicly accusing him on Twitter of having committed assault, having subjected other individuals to abusive conduct and being an alcoholic.

96.    None of these assertions by Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC have any factual basis.

96.    Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC were aware at all times that the statements were false and made the statements in reckless disregard of their falsity.

96.    As a direct and proximate result of Defendants' tortious conduct, Plaintiff lost exactly $40,000 in appearance fees that he was otherwise scheduled to be paid, for which he is entitled to an award of damages.

96.    As a direct and proximate result of Defendants MSG Networks, Inc.'s, The Madison Square Garden Company's and MSG Sports & Entertainment, LLC's libelous conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

**FOURTH CAUSE OF ACTION**
**(Slander)**
*Against All Defendants*

96.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

20

~~97.     Defendants defamed Plaintiff by, *inter alia*, publicly accusing him of having committed assault, having subjected other individuals, including members of the public, to abusive conduct and being an alcoholic.~~

~~97.     None of these assertions by Defendants had any factual basis.~~

~~97.     Defendants made the statements despite being fully aware that they were not true and for the sole purpose of attacking Mr. Oakley's reputation.~~

~~97.     As a direct and proximate result of Defendants' tortious conduct, Plaintiff lost exactly $40,000 in appearance fees that he was otherwise scheduled to be paid, for which he is entitled to an award of damages.~~

~~97.     As a direct and proximate result of Defendants' slanderous conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.~~

~~FIFTH~~ **FIRST CAUSE OF ACTION**
**(Assault)**

*Against ~~Defendants MSG Networks, Inc.,~~*
*~~The Madison Square Garden Company~~*
*~~and MSG Sports & Entertainment, LL~~All Defendants~~C~~*

~~98.~~102.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

103.     Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC intentionally placed Plaintiff in imminent fear of harmful and/or offensive conduct when, *inter alia*, they physically and forcibly removed Plaintiff from the Garden and subsequently detained him until police could arrive to unjustifiably arrest him.

~~99.~~104.     Defendant Dolan, who owns MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC and employs the security guards who

21

assaulted Plaintiff, worked in concert with and aided and abetted them to perpetrate the assault by conspiring with the security personnel to use unreasonable force in ejecting Plaintiff from the Garden, ordering the use of unreasonable force, enabling the use of unreasonable force by failing to exercise his control over the security personnel to prevent the assault -and by subsequently approving, ratifying and adopting the assault, and each of these allegations will likely have further evidentiary support after Plaintiff has a reasonable opportunity to conduct discovery.

100.105.     Defendants had no reasonable basis for their conduct and their conduct was unwarranted given that Plaintiff had refused to engage in aggressive and/or offensive conduct until provoked, and then only in self-defense.

101.106.     As a direct and proximate result of Defendants'  -MSG Networks, Inc.'s, The Madison Square Garden Company's and MSG Sports & Entertainment, LLC's tortious conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

### SIXTH SECOND CAUSE OF ACTION
**(Battery)**
***Against*** *Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC* *All Defendants*

102.107.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

108.    Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC intentionally and wrongfully physically contacted Plaintiff without his consent when, *inter alia*, they physically and forcibly removed Plaintiff from the Garden and subsequently detained him until police could arrive to unjustifiably arrest him.

22

103.109.     Defendant Dolan, who owns MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC and employs the security guards who intentionally and wrongfully physically contacted Plaintiff without his consent, worked in concert with them to perpetrate the battery by conspiring with the security personnel to physically contact Plaintiff without his consent in ejecting Plaintiff from the Garden, ordering the unwanted physical contact, enabling the use of unreasonable force by failing to exercise his control over the security personnel to prevent the battery, and by subsequently approving, ratifying and adopting the battery, and each of these allegations will likely have further evidentiary support after Plaintiff has a reasonable opportunity to conduct discovery.

104.110.     As a direct and proximate result of Defendants'  MSG Networks, Inc.'s, The Madison Square Garden Company's and MSG Sports & Entertainment, LLC's tortious conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

SEVENTH THIRD **CAUSE OF ACTION**
(False Imprisonment Aiding and Abetting Assault)
***Against Defendant s MSG Networks, Inc.,
The Madison Square Garden Company
and MSG Sports & Entertainment, LLCDolan***

105.111.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

112.     Defendant Dolan, who owns MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC and employs the security guards who assaulted Plaintiff, aided and abetted the assault against Plaintiff by conspiring with the security personnel to use unreasonable force in ejecting Plaintiff from the Garden, ordering the use of unreasonable force, enabling the use of unreasonable force by failing to exercise his control over

23

the security personnel to prevent the assault and by subsequently approving the assault, and each of these allegations will likely have further evidentiary support after Plaintiff has a reasonable opportunity to conduct discovery.~~.~~

113.    As a direct and proximate result of Defendant Dolan's tortious conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

**FOURTH CAUSE OF ACTION**
**(Aiding and Abetting Battery)**
***Against Defendant Dolan***

114.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

~~——~~Defendant Dolan, who owns MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC and employs the security guards who intentionally and wrongfully physically contacted Plaintiff without his consent, aided and abetted the battery by conspiring with the security personnel to physically contact Plaintiff without his consent in ejecting Plaintiff from the Garden, ordering the unwanted physical contact, enabling the use of unreasonable force by failing to exercise his control over the security personnel to prevent the battery and by subsequently approving the battery, and each of these allegations will likely have further evidentiary support after Plaintiff has a reasonable opportunity to conduct discovery.

115.    ~~.~~

As a direct and proximate result of Defendant Dolan's tortious conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.~~Defendants MSG Networks, Inc., The Madison Square Garden Company and MSG Sports & Entertainment, LLC intentionally confined Plaintiff, with Plaintiff's knowledge and awareness and without his consent,~~

24

when, *inter alia*, they physically and forcibly removed Plaintiff from the Garden and subsequently detained him until police could arrive to unjustifiably arrest him.

Defendants MSG Networks, Inc.'s, The Madison Square Garden Company's and MSG Sports & Entertainment, LLC's confinement of Plaintiff was not privileged in any way.

As a direct and proximate result of Defendants MSG Networks, Inc.'s, The Madison Square Garden Company's and MSG Sports & Entertainment, LLC's slanderous conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

**EIGHTH CAUSE OF ACTION**
**(Abuse of Process)**
*Against All Defendants*

Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

Defendants caused process to be issued to Plaintiff in the form of a criminal charge.

Defendants caused Plaintiff to be charged with an intent to do harm and without excuse or justification.

Defendants caused Plaintiff to be charged in a perverted manner with the intent to accomplish the collateral objective of publicly embarrassing Plaintiff and destroying his reputation.

As a direct and proximate result of Defendants' tortious conduct, Plaintiff lost exactly $40,000 in appearance fees that he was otherwise scheduled to be paid, for which he is entitled to an award of damages.

As a direct and proximate result of Defendants' tortious conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

**NINTH CAUSE OF ACTION**
**(As an Alternative Claim to Claims One through Four in the Event that Defendants Believed That Plaintiff was an Alcoholic and Did Not Act in Reckless Disregard of the Truth of Such a Belief)**
**(Denial of a Public Accommodation in Violation of the ADA)**
*Against All Defendants*

Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

Defendants own and operate the Garden, a place of public accommodation.

Defendants discriminated against Plaintiff by denying him access to the Garden based on their perception that he suffers from alcoholism, a disability.

As a former Knicks great, Plaintiff intended to return to the Garden had Defendants not denied him access, and intends to return to the Garden if he is permitted access.

As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an injunction prohibiting Defendants from further discriminating against him.

**TENTH CAUSE OF ACTION**
**(As an Alternative Claim to Claims One through Four in the Event that Defendants Believed That Plaintiff was an Alcoholic and Did Not Act in Reckless Disregard of the Truth of Such a Belief)**
**(Denial of a Public Accommodation in Violation of the NYSHRL)**
*Against All Defendants*

Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

Defendants own and operate the Garden, a place of public accommodation.

Defendants discriminated against Plaintiff by denying him access to the Garden based on their perception that he suffers from alcoholism, a disability.

As a former Knicks great, Plaintiff intended to return to the Garden had Defendants not denied him access, and intends to return to the Garden if he is permitted access.

116.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted under the law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants for the following relief:

A.     A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of ~~the United States, and~~ the State of New York;

B.     An injunction and order permanently restraining Defendants from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.     An award of damages, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages incurred as a result of Defendants' unlawful actions;

D.     An award of damages to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputation;

E.D.    An award of damages to be determined at trial, to compensate Plaintiff for emotional distress and/or mental anguish incurred as a result of Defendants' unlawful actions;

F.E.    An award of punitive damages to be determined at trial, to deter Defendants from engaging in any such further unlawful conduct, including the policies and practices complained of herein; and

G.    An award of Plaintiff's reasonable attorneys' fees and costs; and

F.    Such other and further relief as the Court may deem just and proper.

> **Formatted:** Font: Bold, Underline

**JURY DEMAND**

27

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: ~~February 9, 2018~~December 11, 2020          Respectfully submitted,
New York, New York

**WIGDOR LLP**

By: _____
     Douglas H. Wigdor
     Renan F. Varghese
     ~~Kenneth Walsh~~

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
rvarghese@wigdorlaw.com
~~kwalsh@wigdorlaw.com~~

**PETRILLO KLEIN & BOXER LLP**

By: _____/s/_____
     Nelson A. Boxer

655 Third Avenue
New York, NY 10017
Telephone: (212) 370-0330
Facsimile: (212) 370-0391
nboxer@pkbllp.com

*Attorneys for Plaintiff*

28