Kcmdoakc
                              Teleconference

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   CHARLES OAKLEY,

 4                  Plaintiff,                   New York, N.Y.

 5            v.                                 17 Civ. 6903(RJS)

 6   JAMES DOLAN, et al.,

 7                  Defendants.

 8   ------------------------------x

 9                                              December 22, 2020
                                                10:00 a.m.
10
     Before:
11
                         HON. RICHARD J. SULLIVAN,
12
                                    Circuit Judge sitting by designation
13
                  APPEARANCES (via Skype video/teleconference)
14
     WIGDOR LLP
15        Attorneys for Plaintiff
     BY:  DOUGLAS H. WIGDOR
16        RENAN F. VARGHESE
                 - and -
17   PETRILLO KLEIN & BOXER LLP
          Attorney for Plaintiff
18   BY:  NELSON A. BOXER
          JOHN "JACK" ALLEN, Student Extern
19
     GIBSON, DUNN & CRUTCHER, LLP (NY)
20        Attorneys for Defendants
     BY:  RANDY M. MASTRO
21        DECLAN T. CONROY

22

23

24

25

Kcmdoakc
                        Teleconference

1              (Video/teleconference initiated at 9:00 a.m.)

2              (Discussion off the record regarding setup)

3              (Time noted at 10:16 a.m.)

4              THE CLERK:  Good morning, Judge Sullivan.

5              THE COURT:  OK.  Can you see and hear me?

6              UNIDENTIIED SPEAKER:  I can.

7              THE CLERK:  Yes.

8              THE COURT:  All right.  So I'm not sure what the

9      problem was but I'm here now after several failed attempts.

10             So let me just call the case.

11             This is Oakley v. Dolan, et al., 17 Civ. 6903.

12             Let me take appearances.  For the plaintiff?

13             MR. BOXER:  Good morning, your Honor.  Nelson Boxer,

14     Petrillo Klein & Boxer, and Doug Wigdor, from Wigdor LLP, for

15     the plaintiff.

16             THE COURT:  OK.  Mr. Boxer, Mr. Wigdor, good morning

17     to you.

18             Can you hear me and see me all right?

19             MR. BOXER:  I can.

20             MR. WIGDOR:  Good morning, Judge.

21             THE COURT:  Good morning.

22             All right.  And for the defendants?

23             MR. MASTRO:  Yes, your Honor.  Randy Mastro and Declan

24     Conroy from Gibson, Dunn & Crutcher.

25             A pleasure to see you, your Honor.

Kcmdoakc
                              Teleconference

1              THE COURT:  All right.  Mr. Mastro, Mr. Conroy, I can

2     see and hear you all right.  Can you see and hear me and

3     Mr. Wigdor and Mr. Boxer OK?

4              MR. MASTRO:  Yes, your Honor.

5              MR. CONROY:  Good morning, Judge.

6              THE COURT:  All right.  Let me just make sure we have

7     the court reporter on the line.

8              (Pause)

9              THE REPORTER:  Yes, your Honor.  I just had to come

10    off mute.

11             THE COURT:  OK.  Great.  Thank you.  Let us know if

12    you are having trouble hearing.

13             So, OK, without repeating sort of all the history in

14    this case, this case began back in 2017.  The initial complaint

15    was filed in September, I think it was, based on an incident

16    that occurred at Madison Square Garden in February of 2017.

17    The original complaint had a number of different causes of

18    action, leading with defamation.  I think there were three --

19    two or three defamation claims, a libel claim, a slander claim.

20    There was an assault claim, a battery claim.  There was a false

21    imprisonment claim.  There was also an abuse of process claim,

22    a denial of public accommodations, and violations of the

23    Americans with Disabilities Act claim.  There was a violation

24    of the New York State Human Rights Law claim.  I think that was

25    all of them or most of them.

Kcmdoakc

Teleconference

1          In any event, there was a motion to dismiss that led

2    to an amended complaint which had most of the same claims.  I

3    ultimately ruled on that motion.  I dismissed everything.

4    There was an appeal.  The Court of Appeals affirmed on

5    everything but the assault and battery.  They sent that back in

6    a short opinion.

7          And so following that, following the mandate for the

8    appeal, the defendants submitted a letter on

9    December 7th requesting a premotion conference to seek a motion

10   to -- let me start over.  They sought a premotion conference in

11   connection with a contemplated motion for summary judgment.

12         I then got a response to that letter on

13   December 11th from plaintiffs as well as a separate premotion

14   letter on December 11th from the plaintiffs seeking to amend

15   the complaint for a second time and attaching a proposed second

16   amended complaint.  On December 17th, I got a three-page letter

17   response.  All in keeping with my individual practices.

18         So not every district judge does it this way.  I

19   always did.  I thought premotion conferences were useful.  It's

20   just an attempt really to preview the arguments, see if we can

21   narrow the areas of dispute, see if there is the ability to

22   make the process more efficient.  I never tell a party they

23   can't make a motion, because parties generally have a right to

24   make a motion, but I think sometimes it is useful to be able to

25   discuss with the Court sort of what is the bases for the motion

Kcmdoakc
                              Teleconference

1    and to get a preview.

2           So with that spirit in mind, we will chat about these

3    motions today.  I think it probably makes sense to start with

4    the motion to amend first and then get to the summary judgment

5    argument.

6           So anybody disagree with that?

7           UNIDENTIIED SPEAKER:  Whatever is your preference,

8    your Honor.

9           THE COURT:  So, counsel, if you could state your name

10   each time you speak just because, you know, the court reporter

11   will not know your voices.  Maybe by the end of this he will

12   but at this point he doesn't.  So just state your name each

13   time.  That can seem a little repetitive but makes for a much

14   cleaner transcript, and that's in everyone's interest.  OK?

15          So let's then start with the motion to amend.  The

16   opposition basically talks about several bases for me to deny

17   that motion.  Maybe I'll ask -- who is carrying the ball here?

18   Mr. Boxer?

19          MR. BOXER:  I am, your Honor.

20          THE COURT:  OK.  So I guess the arguments articulated

21   in the December 17th letter from Mr. Mastro focus on law of the

22   case and res judicata, also the lack of any new evidence, and

23   then sort of a merit-based argument as to time bar and

24   failures -- you know, basically the failure to be able to prove

25   this based, I think, on the video.

Kcmdoakc
                              Teleconference

1             So, I think I'm less focused on law of the case, but I

2    guess I would like to know why it is defendant, who was named

3    in multiple counts, who was identified as the person who was

4    sort of the puppet master and directing the removal of

5    Mr. Oakley, wasn't named in the first two complaints.  It seems

6    to me there is no new evidence here.  You seem to be aware of

7    all of these facts that you are alleging in your proposed

8    amended complaint, which is where we were at a long time ago.

9             MR. BOXER:  This is Nelson Boxer.  That is precisely

10   the question I wanted to start with, your Honor.

11            At the time the amended complaint was filed, we did

12   not have videotape evidence of Mr. Dolan preceding and during

13   the incident with Mr. Oakley.  We had videotape evidence of

14   Mr. Oakley, and we had evidence of the security guards

15   approaching him.  I don't think it's definitive but we had

16   that.  But we did not have the videotape that was filed with

17   the defendants' motion to dismiss, which shows Mr. Oakley

18   walking down to a seat, apparently without incident, sitting,

19   no one in front of him turning around as if he's acting

20   boisterous -- I know they contend otherwise but that's our view

21   of the evidence -- and then a security officer walked over to

22   Mr. Dolan, who is sitting in the very first row, and they

23   confer, it appears, whispering for about 40 seconds.

24            THE COURT:  OK.  Wait a minute.  This is in the first

25   amended complaint.  Both the original and the first amended

Kcmdoakc
                              Teleconference

 1   complaint allege that Dolan directed the security to forcibly

 2   remove Mr. Oakley from the Garden and that the security guards

 3   were carrying out defendant Dolan's orders.  So, why does the

 4   fact of videotape alter this somehow?  This was the factual

 5   allegations in the original complaint.

 6          MR. BOXER:  There were.  But the videotape, the next

 7   thing that happens is it shows two things:  Mr. Dolan giving a

 8   hand signal, after which the security personnel approach and we

 9   allege the assault and battery took place, and after that you

10   see Mr. Dolan showing two thumbs up, pointing in out at a

11   distance after Mr. Oakley is removed and dragged out of the

12   Garden.

13          So while the prior complaint alleged that he directed

14   them and he, as Executive Chairman of Madison Square Garden,

15   oversees ultimately the security personnel, what's new is the

16   evidence I just described.  And so while we understood

17   Mr. Dolan to be involved and responsible for what happens at

18   Madison Square Garden, we did not have in our possession the

19   evidence that we think circumstantially demonstrates that

20   Mr. Dolan acted as an aider and abettor or acted in concert

21   with the security personnel.  It was not in our -- the

22   40-second consultation and then the hand signal -- it is

23   actually a 40-second consultation and then a gathering of

24   troops off to the side of the court and then the hand signal,

25   the thumbs down, and the security personnel converge on

Kcmdoakc

Teleconference

1   Mr. Oakley.  We weren't able to allege that --

2            THE COURT:  Wait a minute.  You alleged the fact that

3   Dolan directed security to forcibly remove Oakley from the

4   Garden.  That is alleged.

5            MR. BOXER:  That is.

6            THE COURT:  That allegation is enough to assert an

7   aiding and abetting assault or a battery claim, right?

8            MR. BOXER:  I don't think without the videotape we

9   really had enough to actually state the claim.  I appreciate

10  that it is alleged, and it supports some of our other claims,

11  but without actually seeing what he did in the moment and the

12  conference and then the signal, I don't know that that would

13  have been an overt act that would have survived a motion to

14  dismiss for aiding and abetting.

15           THE COURT:  Directing security to remove him would not

16  have been sufficient?  I mean, I just don't --

17           MR. BOXER:  I take your point.

18           THE COURT:  Wait.  Wait.  Wait.  It doesn't help us in

19  cases where there isn't video.  It seems to me what you're

20  saying then is that plaintiffs don't get to bring these claims

21  because they don't have video that supports allegations that

22  they've otherwise made in a complaint.

23           MR. BOXER:  I'm not saying that.

24           THE COURT:  That is a tough argument, I've got to tell

25  you.

Kcmdoakc
                        Teleconference

1          MR. BOXER:  OK.  I appreciate that.

2          There is a second element here for us, which is we

3    haven't even started discovery.  We don't know what -- I

4    appreciate that's jumping ahead to part two today.  We don't

5    know what -- who said what to whom, who spoke to Mr. Dolan, who

6    Mr. Dolan instructed.  And our concern is that if we develop

7    further evidence about Mr. Dolan's aiding and abetting or

8    acting in concert during the course of discovery and we don't

9    move to amend at this point, we do run the risk of the defense

10   arguing that our claim related back to right now, after the

11   mandate, when we had the videotape that was produced in their

12   motion to dismiss and that we sat on that evidence and that we

13   are now out of court if we discover additional evidence to

14   further support those theories.  So it --

15         THE COURT:  Wait.  I mean, there is a second argument

16   made by Mr. Mastro that you're time-barred on this because the

17   one-year statute of limitations has run and there is no

18   relation back except for a narrow band of instances where there

19   is a mistake concerning the proper identity of the party.  And

20   there is no mistake here.  You alleged in the original

21   complaint who was pulling the strings -- Mr. Dolan.

22         So, why would this relate back?

23         MR. BOXER:  Because we were mistaken in the sense that

24   we didn't have the evidence on the videotape.  We were unaware

25   of the meeting right before it happened and the instruction he

Kcmdoakc
                            Teleconference

1    then gave to remove him at that time.  I think to generally

2    allege that he directs what occurs in Madison Square Garden and

3    those entities is different from what we're able to allege now

4    and we were unaware of then.

5              THE COURT:  But that's not what was alleged in the

6    original complaint.  It wasn't alleged that he generally

7    controls Madison Square Garden.  It's that he sent the security

8    folks to do what they did.  So, all right.

9              Well, I'm making all of Mr. Mastro's arguments for

10   him.

11             MR. MASTRO:  Yes.

12             THE COURT:  Let me give him a chance to respond, and

13   then I will let you respond after that.

14             MR. BOXER:  Thank you, your Honor.

15             THE COURT:  Mr. Mastro.

16             MR. MASTRO:  Thank you, your Honor.

17             I'll cut right to the point.  I think your Honor had

18   it exactly right.  The core of what they're claiming now is,

19   you know, exactly what they alleged and then argued before your

20   Honor in both the original complaint, the amended complaint, in

21   court argument, and in their opposition papers to the motion to

22   dismiss.

23             And, your Honor, I do find it extraordinary that it

24   was alleged that Dolan, quote-unquote, directed the removal of

25   Oakley.  It was in fact alleged, your Honor, in both the

Kcmdoakc
                          Teleconference

1    complaint and the amended complaint, that the security guards

2    were then sent, quote, to carry out defendant Dolan's orders,

3    end quote, and that Dolan was clearly attempting to publicly

4    humiliate Oakley, end quote.  Those are all direct quotes from

5    their original complaint and their amend complaint.

6            Your Honor, so it is extraordinary to me to say, by

7    Mr. Boxer, whom I have great respect for, that I appreciate

8    those allegations were made but somehow that wasn't enough to

9    state a claim when the core of the claim they're stating now is

10   exactly that.

11           I have to make one correction to Mr. Boxer, because

12   Mr. Wigdor admitted in contemporaneous emails in February, you

13   know, February 18th, that he admitted in contemporaneous emails

14   that -- I mean 2019 -- that they in fact had all of the

15   videotape evidence.  What did he say?  He said, We have both

16   the public videos and, quote, whatever you gave to the District

17   Attorney, end quote.

18           And then Jim Walden swore in his declaration -- this

19   is docket entry number 44, paragraphs 7 through 11 -- swore in

20   his declaration that, in fact, all of the internal arena cam

21   footage that was submitted to this Court was in fact given to

22   the DA's Office that Mr. Wigdor said, quote, whatever he gave

23   to the District Attorney we had.  Your Honor, I don't think it

24   ultimately turns on that.  It's just a fact that we turned all

25   of that same -- all of that cam footage over to the DA's

Kcmdoakc

Teleconference

1    Office, and Mr. Wigdor admitted, in contemporaneous e-mails and

2    it is docket number 43-15, that he in fact had whatever you

3    gave to District Attorney.

4              And at the end of the day, your Honor, I know your

5    Honor will recall from their motion papers what they said in

6    May of 2018.  I'm sorry, we're talking 2018 now.  He argued

7    that the video evidence showed Dolan -- this is in their

8    brief -- speaking at length to the security guards' station

9    near plaintiff, end quote, looking back at Mr. Oakley, end

10   quote, signaling the security guard's attention, quote, making

11   a very clear gesture with his right hand, end quote, and taking

12   his hands from his head and pointing down toward the ground,

13   end quote, which led to the, quote, violent confrontation, end

14   quote, that Dolan later allegedly endorsed with a, quote,

15   thumbs up gesture, end quote.  That was all their description

16   of events while we were involved in motion practice.  They

17   didn't submit an amended complaint then.  They didn't say they

18   had something to add then specifically about Dolan.  They knew

19   everything from February 2018 on.  They had the video footage.

20   They had the arena cam.  They made these arguments in court.

21   Some of these words mirror what's in their so-called amended

22   pleading now.

23             I just -- your Honor, I don't want to belabor the

24   point because I think it is so crystal clear.  At the end of

25   the day, whether they have the footage or not -- and they did

Kcmdoakc
Teleconference

 1 | have the footage and admitted it back in February 2018 -- they

 2 | had enough to make these accusations against Dolan, to make

 3 | him, as you put it, the puppet master or, as we put it, the

 4 | centerpiece of this, but they didn't include him in the assault

 5 | and battery and both because there is no new evidence here,

 6 | because they knew enough to make these outrageous allegations,

 7 | which are untrue, but nevertheless allegations that they made

 8 | going back to February 2018 and in the motion practice in

 9 | May 2018, they had all of that information.

10 |         They are time-barred.  They don't have any claim on

11 | the merits.  And they can't claim they made a mistake or

12 | shouldn't have realized that they could have made an allegation

13 | like this.  And it goes even deeper than that, your Honor.  I

14 | know you said you didn't really want to start with law of the

15 | case or res judicata.  But when it comes to res judicata -- and

16 | this is what the Second Circuit has counseled in the L-Tec

17 | Elecs. case -- you have a defendant who is dismissed from the

18 | case.  Even if other claims are continuing, unless there was

19 | some fraud or affirmative covering up, game over on Mr. Dolan,

20 | who has already been dismissed.  You can't go back later and

21 | say, oh, Mr. Dolan got dismissed, now I want to assert

22 | something new that was basically part of the core case to begin

23 | with.

24 |         So, your Honor, I think that this is -- I'm not going

25 | to use basketball analogies like slam dunks, but the fact of

Kcmdoakc
                        Teleconference

1   the matter is that there really is no basis for an amendment.

2   There are multiple independent reasons why your Honor should

3   reject it, as your Honor did before.

4           So, we respect your Honor's rulings.  We respect the

5   Second Circuit's ruling, which expressly affirmed the denial of

6   leave to amend.  And so, for all those reasons, your Honor, I

7   think it is, you know, game over on amending the complaint at

8   this point.

9           THE COURT:  OK.  I will give Mr. Boxer a chance to

10  respond to that.

11          MR. BOXER:  Thank you, your Honor.  This is Mr. Boxer.

12          Three points, your Honor.  To repeat what I was

13  arguing initially, directing the removal, that allegation is

14  not, in our view, enough to support an assault and battery

15  claim.  It is directing the removal.  What we now have from the

16  videotape is the 40-second meeting, the gathering of troops, so

17  to speak, the thumbs-down gesture, and then all those people

18  conferring on Mr. Oakley, so --

19          THE COURT:  You do not allege --

20          MR. BOXER:  I'm sorry.

21          THE COURT:  No, that is all right.

22          MR. BOXER:  No, you go ahead.

23          THE COURT:  You had that in February of 2018, right?

24          MR. BOXER:  I was getting to that.

25          We had that when -- and what Mr. Mastro was just

Kcmdoakc
                    Teleconference

1    describing, I believe, was Mr. Wigdor's response to the brief

2    and motion they filed to dismiss, where the videotape was

3    produced for the first time to Mr. Wigdor, and I'll get to that

4    last point in a second.

5              I went back and looked at all the court transcripts,

6    and Mr. Mastro just referred to it.  There was quite a colloquy

7    on whether or not and when the plaintiff should file an amended

8    complaint as of right.  And there was discussion as to whether

9    that should occur after the motion to dismiss was filed or

10   before.  And Mr. Wigdor certainly expressed a preference to do

11   it after, and there was back and forth with the Court as to the

12   advisability of doing it that way.

13             He chose to do it before, and then landed the motion

14   to dismiss with the video tape.  And precisely the dilemma that

15   Mr. Wigdor articulated at that conference in fact occurred,

16   because arguments were made and evidence was shown that we did

17   not have a chance as of right to incorporate into our

18   complaint.

19             THE COURT:  Right.  But in the opposition briefing,

20   there was a perfunctory throw-away line that, "And if we are

21   going to lose on this motion, we ask for an opportunity to

22   amend," with no amended complaint and no discussion as to what

23   the amendment would consist of.  Certainly by the time of the

24   opposition brief, you had the video, you had the ability to

25   make this argument, and you didn't make it, right?

Kcmdoakc
                        Teleconference

1          MR. BOXER:  At that point we did.  At that point we

2     did.  But now they're moving on the pleadings.  We've exercised

3     our amendment as of right, and we're litigating the motion to

4     dismiss.  And so when we lose, now we're out of court and we

5     don't have the ability to make a motion to amend.

6          THE COURT:  But you had an ability to make a motion --

7     you can make a motion to amend basically at any time.  And the

8     motion to amend, to file a second amended complaint, didn't

9     include any specific allegations, didn't say anything about,

10    ah, we now have this video so we've got to include Dolan in the

11    assault and battery causes of action.  There is nothing like

12    that.

13         MR. BOXER:  That's correct.  And I think that decision

14    was informed by the premotion conference on the motion to

15    dismiss and, for better or worse, that's what we did, but

16    that's the basis for why we argue it's new today.

17             Lastly, as far as Mr. Wigdor and things he wrote and

18    said, whatever he received in this case, he did not receive the

19    video that accompanied the motion to dismiss that showed

20    Mr. Dolan, as opposed to Mr. Oakley, until the motion to

21    dismiss.  And so we don't -- we understand what mistake, it

22    requires you to show, and we wouldn't have made the motion, or

23    we wouldn't have submitted a letter, I should say, unless we

24    were sure about that.  So I just wanted to correct those two

25    points, and with that I have nothing further to add, your

Kcmdoakc
                              Teleconference

 1   Honor.

 2             THE COURT:  OK.  All right.  So let's pause there and

 3   I think pivot towards the defendants' contemplated motion for

 4   summary judgment, because I guess what Mr. Mastro is saying is

 5   that if I were to grant his motion for summary judgment, it

 6   doesn't much matter whether Dolan is in this thing because that

 7   would end the case on the sole remaining claims for assault

 8   against any and all defendants.  Right, Mr. Mastro?

 9             MR. MASTRO:  Yes, that's completely correct, your

10   Honor.

11             THE COURT:  Let's talk about your contemplated motion.

12             So I remember vividly, as you do, too, I'm sure, that

13   you wanted me to consider the video as part of the motion to

14   dismiss.

15             MR. MASTRO:  Yes.

16             THE COURT:  And I declined to do that.

17             Now, of course we're in a different posture.  So,

18   certainly I can consider a motion for summary judgment at any

19   time.  I expect -- and in fact I know that Mr. Boxer and

20   Mr. Wigdor are going to say, well, they need discovery to nail

21   down various things.

22             I guess one question I have is is there any dispute as

23   to the authenticity of the videos on which Mr. Mastro is

24   relying?  So Mr. Boxer or Mr. Wigdor, I want --

25             MR. BOXER:  There is in the sense that I don't think

Kcmdoakc
                    Teleconference

1   we have evidence of its authenticity, and there certainly is in

2   a sense of completeness, since we didn't receive a videotape of

3   Mr. Oakley prior to him sitting down.  But in the sense that I

4   am confident that Mr. Mastro would not present something to the

5   Court that wasn't what it purported to be, I think in practice,

6   I'm assuming it is what he says it is, but I don't think

7   they've proven it.  And I think there are bigger issues on the

8   discovery, but I don't want to jump ahead unless your Honor

9   wants me to go first.

10          THE COURT:  Well, it is Mr. Mastro's contemplated

11  motion so I will let him go first.  I mean, I think I

12  understand the argument.  I've known it was coming for awhile

13  because in the context of the motion to dismiss, I basically

14  said that sounds like a motion for summary judgment, so it's

15  not shocking to me that he's making that motion now.  He's

16  relying on the video.

17          I think the video, it seems to me, does contradict a

18  fair amount of what's in the complaint.  And, you know, I think

19  I made this point earlier, that to the extent that what's

20  alleged in the complaint turns out to be patently false and

21  contradicted by video, that would potentially be a basis for

22  sanctions.

23          So, anyway, Mr. Mastro, I'll give you the floor, and

24  then I'll give Mr. Wigdor or Mr. Boxer a chance to respond.

25          MR. MASTRO:  Thank you, your Honor.  I appreciate it.

Kcmdoakc
                          Teleconference

1            To answer you your Honor's first question, obviously

2       we produced all of the in-the-arena footage and then leading

3       Oakley out of the arena through the tunnels to where the police

4       took him away.  We obviously produced all of that.

5            THE COURT:  I guess the question is is there some

6       dispute that this is doctored or is there some dispute that

7       this is not everything, that there are angles that were

8       obscured, that there is stuff that happened before and after

9       that we need to know in order to resolve a summary judgment

10      motion?

11           MR. MASTRO:  Right.  And I am, as an officer of the

12      court, representing to the Court that we produced the arena cam

13      footage.  It's not -- it's a series of snaps, stills, in

14      succession; it is not video like some of the other video

15      evidence.  We produced all of that from Oakley's time in the

16      arena, sitting down, approached, taken out of the arena,

17      through the tunnels, out of Madison Square Garden.  And I don't

18      think there is any question that that's the case.  It was all

19      turned over to the DA's Office, and then it was turned over to

20      Oakley's counsel by both the DA's Office and by us.

21           Now, your Honor -- and I don't think they're really

22      contesting that, your Honor, at all.  Mr. Wigdor, in fact, at

23      the Second Circuit said the same thing that I did.  He said,

24      you should look at the video, in response to Judge Newman.  He

25      said, I'm happy for you to look at the video.  Those are his

Kcmdoakc
                       Teleconference

1   quotes.  There is no question that it's the authentic arena cam

2   footage.

3               There is also footage, publicly-available footage,

4   that Mr. Wigdor has also acknowledged exists and that they have

5   possession of.  One long clip posted on the New York Times,

6   another on YouTube.  ESPN was covering the game, you know, live

7   nationally at the time and caught part of the incident.  That

8   footage, there is no question that it is authentic footage, and

9   Mr. Wigdor has acknowledged having that public footage.  That

10  is straight video.  And, therefore, I think the Court now has

11  from several angles of, in terms of the arena cam and in terms

12  of The New York Times, the ESPN and the YouTube footage, the

13  Court has, you know, everything that, you know, you -- that

14  they should need, and they've never had an issue or expressed

15  an issue about the video footage.  In fact, they've encouraged

16  the courts to look at it after they left your courtroom, your

17  Honor, they encouraged the appellate court to look at the

18  footage.

19              Now having said that, your Honor, let's cut to the

20  heart of the matter.  All right?  And I think your Honor

21  already hit on it.  I said this when we made our motion to

22  dismiss, while we thought we had a valid motion, a meritorious

23  motion regardless.  The video footage proves that Oakley's

24  allegations are demonstrably false.  It belies them.  They are,

25  as we have said -- and I don't like to have to say this, we

Kcmdoakc
                              Teleconference

 1   hoped it would never come to this, your Honor, but they're

 2   fabrications.  Mr. Oakley has not told the truth about what

 3   happened that night in his pleading and his many public

 4   statements.

 5           The fact of the matter is that the video footage puts

 6   the lie to his assault and battery case.  It shows him to have

 7   been the aggressor.  It shows him to have slipped to the

 8   ground, not being thrown to the ground, ever.  It shows him --

 9   unfortunately I have to say this -- using profanity, being

10   physically aggressive -- not defensive posture -- pushing,

11   shoving, hand, fist in face of a security guard so that he

12   literally reels backwards.  Another security guard, you know,

13   chopping down on his arms and then violently shoving him twice.

14           This is not a man in a defensive posture.  This is not

15   a man who is saying, you know, trying their words, peaceably

16   behave, not a man who was complying with a request to leave.

17   It shows him refusing to leave and then getting violent,

18   aggressive, and, frankly, offensive in the language he used.

19   And guess what, your Honor.  The video footage shows an NYPD

20   police officer, being the person closest to him immediately in

21   proximity to him, as he is refusing to leave, because this was

22   security guards and NYPD.

23           Now, your Honor, I think it's -- I think it's game

24   over when the videos are considered.  And Mr. Boxer's comment

25   that, oh, the discovery they need, your Honor knows what he's

Kcmdoakc
                        Teleconference

 1    talking about.  It's the same kind of discovery that was

 2    irrelevant on a motion to dismiss.  They want to show -- and

 3    it's a false narrative but, nevertheless, it is their

 4    narrative -- they want to show why it was that the security

 5    guards approached Mr. Oakley.  What Mr. Dolan said, what

 6    happened before he was approached, all of those things.

 7              But as your Honor has held, and as the Second Circuit

 8    made crystal clear, we're down to the short strokes.  It is a

 9    revocable license.  It could be removed for any reason.  And

10    when he was told to leave, and refused to leave -- in his own

11    pleading, he says he turned to go back to his seat after being

12    asked to leave, in his own pleading -- they had the right to

13    remove him, use, you know, physical acts to remove him.  The

14    short stroke we're down to, your Honor, is whether the physical

15    force used to remove him was objectively unreasonable.  It's

16    his burden to prove that.  The videos totally belie any such

17    notion.

18              And as your Honor knows from your own cases, the

19    seminal Supreme Court case that your Honor has cited on

20    multiple occasions, Scott v. Harris, when you've got the video

21    evidence, let's go to the video.  In the words of the immortal,

22    you know, Scott v. Harris, when the video blatantly

23    contradicts, end quote, the allegations that have been made,

24    OK, when it is a visible fiction, as it is here, OK, it should

25    be reviewed and viewed in the facts in light of what's depicted

Kcmdoakc
                         Teleconference

1    on the video.  End of story.

2            And, your Honor, there have not only been multiple

3    case in the Second Circuit and the Southern District where

4    courts have granted summary judgment at the prediscovery stage

5    based on clear, dispositive evidence like this, there is even a

6    recent case in the Western District of Virginia based on video

7    evidence, a summary judgment motion at the outset of discovery,

8    and the court there dismissed based on the video evidence, and

9    that was the end of the case.

10           I respectfully suggest to your Honor that under these

11   circumstances, you should look at the video.  It is irrelevant

12   why -- they shouldn't be allowed to amend.  Mr. Dolan is out of

13   the case.  This is part of, unfortunately, your Honor, that

14   public relations game that your Honor told all parties to

15   please avoid.  OK?  They want Dolan back in the case.  And then

16   they want to try to depose him and find out what he said to the

17   security guards and what the security guards said to him and

18   what were the real reasons.  Your Honor knows, you've already

19   ruled, that doesn't matter.  The Second Circuit has ruled that

20   doesn't matter.

21           The Second Circuit couldn't have been clearer.  The

22   Second Circuit gave an exceedingly narrow path to what little

23   is left of this case, and expressly rejected Oakley's

24   contention that, quote, the act of removal was unreasonable,

25   end quote, and it said that the only question that remains

Kcmdoakc
                        Teleconference

1    here, the only question that remains here, is whether, quote,

2    the security guards used excessive force in accomplishing the

3    removal.

4           The videos, from multiple angles, show that this was

5    not objectively unreasonable force, and they show that Oakley's

6    behavior exacerbated the situation, that he was the aggressor,

7    that he was the one who compelled the need to use even more

8    physical force because he refused to leave.  And, again, in any

9    version of their pleading, including proposed, they never

10   alleged that Mr. Oakley suffered any injury whatsoever from the

11   removal -- ever.

12          But, your Honor, I would like to go to the videotape.

13   I have two short clips that will show you the core of the

14   incident from different angles and I would -- each are about a

15   minute, maybe one is a little over a minute -- I would like to

16   show them to the Court now, because I don't ever ask you to

17   just take my word for it, I present evidence.  And the videos

18   are the evidence.

19          THE COURT:  All right.  I don't mind -- well, I

20   wouldn't mind seeing them.  They've already been introduced, as

21   it were, in connection with the motion to dismiss.  I didn't

22   consider it for that purpose.

23          But I think it is useful, Mr. Boxer, for you to

24   respond to them.  OK?

25          MR. BOXER:  I actually object to him showing them at

Kcmdoakc
                              Teleconference

1    this point because I think your rules preclude showing exhibits

2    during these conferences, and we got notice of it about 20

3    minutes ago without sending them to us.  But I would like to

4    first respond to Mr. Mastro's presentation, and then I defer to

5    your Honor's judgment as to whether these two-minute videos are

6    worth seeing.  But there were two --

7              THE COURT:  Wait.  Wait a second.

8              You've seen these videos, you know what they are;

9    right.

10             MR. BOXER:  I don't know which portions he has cut and

11   pasted.

12             MR. MASTRO:  Your Honor, I'm not cutting and pasting.

13   I'm showing a complete segment for each about a minute, one

14   from the New York Times video and one from the YouTube video.

15             And, your Honor, I'll just say this.  OK?  There's

16   nothing left in the complaint to support unreasonableness.

17   When you look at these videos and see how they belie the

18   allegations in the complaint and proven them to be demonstrably

19   false, there is nothing left in this complaint, amended

20   complaint, that could possibly support a finding that Oakley

21   could meet his burden of objective unreasonableness in the

22   force that was used.  So, I think it would be helpful to the

23   Court to just see these short videos.

24             THE COURT:  All right.  So, Mr. Boxer, you think it

25   would be better to hear from you before the videos are shown or

Kcmdoakc
                            Teleconference

1   after?

2              MR. BOXER:  I would appreciate that, your Honor, if I

3   could.

4              THE COURT:  OK.

5              MR. BOXER:  There were two glaring omissions in

6   Mr. Mastro's presentation.  The first is what the Second

7   Circuit actually held, and it described the issue remaining

8   regarding the assault and battery claims as whether the use of

9   force was reasonable under the circumstances, which the Court

10  stated is generally best left for a jury to decide.

11             THE COURT:  Well, they seemed to be very impressed

12  with your complaint, which insisted that Mr. Oakley was thrown

13  onto the ground by six officials.  So, are you aware of any

14  video that shows that?

15             MR. BOXER:  Your Honor, the video shows what it shows.

16  I see him thrown to the ground on the video.

17             THE COURT:  Uh-uh-uh-uh.  Answer my question.

18             Are you aware of any video, anyplace, that showed

19  Mr. Oakley being grabbed by six officials and thrown to the

20  ground?

21             MR. BOXER:  I see him being grabbed and I see him

22  being thrown to the ground.  I can't say I have read it, I've

23  looked at it recently to count the number of people who were

24  doing the throwing.

25             THE COURT:  I think what's going to be very important

Kcmdoakc
                              Teleconference

1    in this motion for summary judgment is whether or not there is

2    any evidence that supports that characterization in paragraph

3    47 of the complaint, of the amended complaint.

4              MR. BOXER:  OK.

5              THE COURT:  So there is another point you wanted to

6    make, I think?

7              MR. BOXER:  Yes.  The Court even said in the criminal

8    context whether an arrest and a force used in an arrest is

9    reasonable depends on the severity of the crime that's charged.

10   So what happens before, what's known before, what's known when

11   an officer, a security personnel approaches a person to make an

12   arrest or in this case to remove somebody is all part of the

13   circumstances of whether or not their conduct was reasonable.

14   And in this case -- so, Mr. Mastro doesn't mention that.

15             But more telling is he keeps saying that he's produced

16   all of the footage in the arena so all that you need to look at

17   is what happened in those moments after Mr. Dolan gave the

18   signal to remove Mr. Oakley.  But in fact, the defendants have

19   already put in issue what happened before Mr. Oakley even got

20   to his seat on the question of whether the force they used was

21   reasonable under the circumstances.  And we haven't seen a

22   single video of him walking that the Garden, walking through

23   the hallways, and getting to his seat.

24             But two days after the incident, Mr. Dolan, on Michael

25   Kay's Show, said from the moment he stepped into the Garden, I

Kcmdoakc
Teleconference

1    mean the moment he walked through the first set of doors, he

2    began with this abusive and disrespectful behavior, and it

3    accelerated and accelerated all the way down to his seat.

4    According to what the Second Circuit held, those are

5    circumstances that are relevant to whether the use of force and

6    the number of security personnel was reasonable.  And maybe

7    they'll prove that.  Maybe in discovery they will show that he

8    was acting, Mr. Oakley, abusive behavior all the way down to

9    his seat so that when he gives the signal, Mr. Dolan, and six

10   or seven or however many people surround Mr. Oakley, that was

11   reasonable under the circumstances.

12             THE COURT:  Wait.  Wait.  Wait.

13             So your position now is that surrounding Mr. Oakley

14   constituted excessive force?

15             MR. BOXER:  No.  I'm saying that the whole

16   circumstance of how he was removed from his seat is all part of

17   the circumstances as to whether the conduct was reasonable.

18   And what we're left with here are some handpicked videos by the

19   defense to try to prove as a matter of law that under these

20   circumstances it was reasonable.  But even the videos, they

21   don't -- they sort of start after they already claim the

22   problem existed.

23             If it's true that Mr. Oakley was abusive and

24   disrespectful all the way down to his seat, and let's just say

25   arguably they knew that, then that heightens the amount of

Kcmdoakc
                                Teleconference

 1   force that would be reasonable to remove him.  We have no sense

 2   of that.

 3              THE COURT:  Stop.  Stop.

 4              The first inquiry I have is whether there was really

 5   any kind of force used to remove him and what that consisted

 6   of.  So to the extent that there is evidence that shows him

 7   being thrown to the ground, I think that that needs to be

 8   produced.  But it doesn't sound to me like there is any such

 9   evidence.

10              To the extent that the guards refused Mr. Oakley's

11   repeated requests that he be allowed to stand up -- that's

12   paragraph 48 -- again, I'm not sure that there is video that

13   supports that.  Mr. Mastro says not, and what I've seen

14   suggests that that is not accurate either, that he wouldn't get

15   up and then he wouldn't leave.  He basically grabbed onto the

16   railing so that he wouldn't be removed from the Garden.

17              MR. BOXER:  I saw video when he was off to the side

18   where he was trying to stand up and they wouldn't allow it.

19   But even who said what to whom, even what any bystanders heard

20   Mr. Oakley said or didn't say, what the security personnel said

21   or didn't say, all of those are facts that are relevant to

22   whether the use of force was reasonable, and we're in a

23   situation where --

24              THE COURT:  It may or may not be.

25              MR. BOXER:  We're entitled to discovery on that.

Kcmdoakc

Teleconference

1      THE COURT:  No, you're not, even not necessarily.  If

2  it is discovery that wouldn't make a difference, you are not

3  entitled to it.

4      Now, look, it seems to me the way this goes is they

5  make their motion, you respond to it, and you respond to their

6  56.1 statement as to what facts you're disputing and the bases

7  for it.  And under 56(b), if you need additional discovery, you

8  articulate what it is you need and why it is you're not able to

9  respond to certain factual allegation or legal arguments.  And

10  I think that's a lot easier to do after you see what their

11  motion is.

12      But it is not the case that you're just entitled to

13  any discovery that you want at this point.  It has to be

14  discovery that is relevant to the lone standing cause of

15  action.  And if the video shows that there was no force, then

16  it doesn't much matter what conversations they had or didn't

17  have before that happened, it seems to me.

18      MR. BOXER:  Well, I think the video shows force.  But,

19  for example, when they're claiming that their justification --

20  of course they can remove him for any reason, he is a licensee,

21  but they haven't said that.  And they didn't say we sent two

22  people over to say can you please leave because we feel like

23  it.  What they've said, and they've said publicly, is that from

24  the moment he entered the gates, he was boisterous, he was

25  abusive, he was abusive with the support personnel, with the

Kcmdoakc
                    Teleconference

1   waitress, and that informed the reasonableness of what they

2   did.  And we should be able to test that, to see whether in

3   fact they did -- that's the whole essence of the claim that the

4   Second Circuit found, that the jury should decide whether under

5   all the circumstances the use of force, the alleged assault and

6   battery, was reasonable.  And what we're faced with now is

7   after all this time they're going to produce only video that

8   they have in the arena, even though they said everything before

9   that is relevant, and asking the Court to enter judgment

10  summarily without giving us a chance to even support our case.

11  And I don't think that's what is fair, and I don't think that's

12  what the Second Circuit was suggesting in its decision.

13          THE COURT:  Well, I mean, I'm not sure what they were

14  suggesting.  The decision is what it is.  But it is back here

15  now.  There is a motion for summary judgment being

16  contemplated.  And, you know, if there is no disputed issue of

17  fact that requires discovery, then there is no need for

18  additional discovery.

19          So, all right.  I mean, look, I think that's certainly

20  the law in this circuit.  It is the law of the land.

21          So, Mr. Mastro, you wanted to show your video?

22          MR. MASTRO:  Yes, your Honor.  Would you like me to

23  respond briefly to Mr. Boxer first before we show the videos?

24  Whatever you prefer.

25          THE COURT:  Whatever you want to do.

Kcmdoakc
                           Teleconference

1            MR. MASTRO:  Thank you, your Honor.  I really

2     appreciate it.

3            You know, Mr. Boxer said they can remove him for any

4     reason.  That's right.  What the Second Circuit actually held,

5     because I like to use their exact language, was that, Although

6     Oakley did contend incorrectly that the act of removal was

7     unreasonable, his additional and actionable claim was that the

8     security guards used excessive force in accomplishing the

9     removal, end quote.  That's on page 3.  And it's his burden to

10    show it was objectively unreasonable force.

11           I also heard Mr. Boxer say he thinks he saw Mr. Oakley

12    thrown to the ground.  OK?  Two points in the videos to focus

13    on -- the first one where he clearly trips and falls; the

14    second one where he slides to the floor and then he goes on to

15    resist.  You will see both.  The Times footage picks up as he's

16    first getting up but then shows clearly what happened as he's

17    being taken out of the arena and goes to the ground a second

18    time.  The YouTube video shows both and has a very clear view

19    of the fact that he trips and falls himself.  Nobody throws him

20    to the ground at any point.

21           I heard Mr. Boxer say, well, in a criminal case, the

22    police, they have more latitude, da-da-da-da.  You will see the

23    NYPD is there every step of the way, including right in front

24    of Mr. Oakley as he is yelling profanities at the NYPD officer

25    and the security guards, as he towers over them.

Kcmdoakc

Teleconference

1    And, your Honor, I would just, you know, conclude with

2    this before we show the videos.  It's totally irrelevant, now

3    that the Second Circuit has ruled and affirmed your Honor in

4    this regard, you know, the act of removal, they had the right

5    to remove him.  I heard Mr. Boxer say they could remove him for

6    any reason, and that's exactly what the Second Circuit said.

7    So all those preliminaries where he wants to go on fishing

8    expeditions and try and drag Mr. Dolan back in and who said

9    what to whom and how did Oakley act when he was out on the

10   street before he came into the Garden, totally irrelevant.  The

11   only issue now is was the force used not objectively -- was the

12   force used objectively unreasonable.  Oakley's burden.

13   It was not.  The video proves that.  That is the

14   definitive evidence.  And that's what court after court has

15   said, you know, and we can cite half a dozen more cases to your

16   Honor but we only had a three-page letter.  But from the

17   Supreme Court on down, that's the definitive word, when you

18   have conclusive video or audio evidence, and your Honor has

19   ruled that in other cases.

20   So, let's go to the videotape.  Let's start with the

21   New York Times and then we'll go to YouTube, and they're going

22   to show from different angles the two incidents.  The Times

23   picking up as Oakley is getting up the first time and what

24   happens from there and as he's being taken out, the second

25   video showing both how he trips and falls initially and then

Kcmdoakc
                              Teleconference

 1   what happens on the second incident when he goes to the ground.

 2            Declan, take it away.

 3            (Pause)

 4            THE COURT:  I don't hear you, Mr. Conroy.  I think

 5   you're muted.

 6            MR. CONROY:  Hi.  Can you hear me now?

 7            THE COURT:  Yes.

 8            MR. CONROY:  I think I am going to need Ms. Miller to

 9   be a presenter on the settings so I can show the video.

10            THE COURT:  OK.  Can we do that?

11            MR. CONROY:  I think I just got it right now.

12            (Pause)

13            THE COURT:  Is there a glitch or how are we doing?

14            MR. CONROY:  It's loading currently.  The first video

15   is being posted.

16            THE COURT:  OK.

17            (Pause)

18            MR. CONROY:  We are done with the first video.

19            MR. MASTRO:  That was The New York Times, your Honor.

20   The next one is YouTube.

21            THE COURT:  OK.

22            MR. CONROY:  Just give me one second to load it.

23            THE COURT:  All right.  So when you say The New York

24   Times and YouTube, of course that's not who prepared the video,

25   that's just where it was loaded, right?

Kcmdoakc
                              Teleconference

 1            MR. MASTRO:  Correct, your Honor.

 2            THE COURT:  Mr. Boxer, while we're waiting, are you

 3    disputing the authenticity of this video?

 4            MR. BOXER:  The authenticity, no.  I trust that what

 5    Mr. Mastro is presenting is what he says it is.  But I think

 6    it's a snapshot.  And as I said, when the Circuit says whether

 7    the use of force was reasonable under the circumstances and the

 8    defendants are saying the reason for they did what they did is

 9    what happened when he first walked into the Garden, I think

10    those are all relevant circumstances to whether the use of

11    force was reasonable.  So I'm sure that's an accurate --

12            THE COURT:  I really --

13            MR. BOXER:  I have no doubt it is what was on the New

14    York Times or the YouTube on that.

15            THE COURT:  I just worry that --

16            MR. BOXER:  As I said before --

17            THE COURT:  Can you hear me, Mr. Boxer?

18            MR. BOXER:  Yes.

19            THE COURT:  OK.  I just worry that the goal here is to

20    make this about the reasons as opposed to the force.

21            MR. BOXER:  Well --

22            THE COURT:  And I'm not doing this for the back page

23    of the papers and I'm not doing this for Page 6.  This is a

24    motion for summary judgment on the lone remaining causes of

25    action in this complaint, so --

Kcmdoakc
                        Teleconference

1              MR. BOXER:  Understood.  Understood.

2              And to be clear, we're not doing it for that purpose

3    either.  I brought up the police context because the Circuit

4    brought it up and said for the point that what an arresting

5    officer knows he's walking into based on what he's arresting

6    the defendant for bears on the reasonableness of the force they

7    can use.

8              THE COURT:  OK.  The reasonableness of this is that

9    the owner can remove anybody, any licensee, from the arena,

10   so --

11             MR. BOXER:  He can, but he can't use unreasonable

12   force.

13             THE COURT:  Yes.

14             MR. BOXER:  So on that question, it's not designed for

15   the back page or for any of those things.  By their own words

16   in public media, the circumstances that they reacted and then

17   used force included everything Mr. Oakley did as he walked into

18   the arena, and that's relevant.  And I'm not suggesting how

19   your Honor, hearing all that evidence and watching all the

20   videotapes, watching the videotape when he walks in the arena,

21   you know, what a jury would do with all of that, but we're out

22   of court if we don't even get a chance to explore those things.

23             THE COURT:  Well, I'm not sure that that's true.  If I

24   walk into Madison Square Garden and I just had a hat that the

25   owner objects to, I can be asked to leave.

Kcmdoakc
                              Teleconference

1          MR. BOXER:  Correct.

2          THE COURT:  But the fact that I orderly bought a

3    hotdog and a coke before then strikes me as irrelevant.  So --

4    and it seems to me also irrelevant to know why the owner took

5    such umbrage at my hat.  It seems to me that the focus has got

6    to be on the force.  And if the force is reasonable, then I

7    don't really need much to care about what happened at the

8    concession stand.

9          Anyway, back to the video.  I'm not deciding anything

10   today.

11         MR. BOXER:  OK.  I have a response to that but I will

12   keep it to myself.

13         THE COURT:  OK.  So let's go to the second video.

14   This is the so-called YouTube video.

15         MR. CONROY:  Yes.  This is docket 43-4.

16         THE COURT:  OK.  Thanks.

17         (Pause)

18         MR. MASTRO:  Thank you.

19         THE COURT:  OK.  All right.  I assume that will be

20   part of any submission on the motion for summary judgment.

21         MR. MASTRO:  Yes, your Honor.

22         THE COURT:  I will tell you, candidly, I didn't see

23   anything there that would support a characterization of

24   Mr. Oakley being thrown to the ground.

25         Mr. Boxer, did you think that reflected him being

Kcmdoakc
                        Teleconference

 1   thrown to the ground?

 2              (Pause)

 3              Mr. Boxer, are you there?

 4              (Pause)

 5              Mr. Boxer, you are getting -- wait.  That's better.

 6   Go ahead.  I can't see you but I can hear you.

 7              MR. BOXER:  I'm sorry, I didn't -- (inaudible)

 8              THE COURT:  Can you hear me, Mr. Boxer?

 9              (Pause)

10              MR. BOXER:  Yes, but I must admit it is freezing a

11   little.  I don't know if that video impacted it at all.

12              Let me try one other thing.

13              Can you hear me now?

14              THE COURT:  Yeah, I can hear you.

15              MR. BOXER:  That's better.  I can hear you fine now.

16              I'm sorry.  I didn't hear what you said before.  I

17   apologize.

18              THE COURT:  I'm just asking, are you suggesting that

19   anything we saw in those two videos constituted Mr. Oakley

20   being thrown onto the ground?

21              MR. BOXER:  Well, at the end of the second video, it

22   appears -- I still couldn't count how many were around him,

23   whether it was six, but it didn't appear to me like he slipped,

24   and they were holding him and he fell.

25              THE COURT:  You think he was thrown to the ground.

Kcmdoakc

Teleconference

1        MR. BOXER:  Yeah, then he ends up on the ground.

2        THE COURT:  That's not what I asked, not what I asked.

3        MR. BOXER:  OK.

4        THE COURT:  I'll read you the statement:  "Mr. Oakley

5   was forcibly turned around so his back faced security, grabbed

6   by six officials and thrown onto the ground."

7        So is something that we just saw in your mind him

8   being thrown onto the ground, as reflected in paragraph 47 of

9   the complaint?

10       MR. BOXER:  I thought what we saw at the end of the

11  second video showed him being thrown to the ground.

12       THE COURT:  OK.

13       MR. BOXER:  I -- it went by fast.  I couldn't count

14  the people.  And it sort of highlights the point.  It is one

15  angle of what happened.  All those people there, what they say

16  happened, what they observed, I appreciate there is video, but

17  I don't think it settles the question of what happened.

18       THE COURT:  All right.  So let's now then talk about a

19  briefing schedule.

20       What I have in mind is parallel briefing on the two

21  motions.  So, each of you would file your motions and then the

22  other side would respond on the same date and replies on the

23  same date.  That's what I'm inclined to do.

24       So, how long do you think you need to file -- I think

25  probably a summary judgment motion requires a little more than

Kcmdoakc
                              Teleconference

1   a motion to amend.  So, Mr. Mastro, how long do you think you

2   need to file your motion for summary judgment?

3            MR. MASTRO:  Your Honor, I'd appreciate three to four

4   weeks.  It is the holidays.

5            THE COURT:  Sure.  That's fine with me.  What do

6   you -- you pick a date.  You tell me.

7            MR. MASTRO:  OK.  Perhaps I should ask Declan, the

8   brains of the operation.  How long do we need?

9            MR. CONROY:  I think four weeks.

10           MR. MASTRO:  OK.

11           THE COURT:  So four weeks puts us at -- what is today,

12   the 22nd -- one, two, three, four, the 19th of January; is that

13   OK?

14           MR. MASTRO:  That will be great, your Honor.  Thank

15   you very much.

16           THE COURT:  Do you want the Friday, the 22nd of

17   January?

18           MR. MASTRO:  Sure, your Honor.  That will be

19   fantastic.  Thank you.  I appreciate it.

20           THE COURT:  Mr. Boxer, Mr. Wigdor, that's OK for you

21   to do your opening brief on your motion to amend?

22           MR. BOXER:  That's fine, your Honor.

23           THE COURT:  OK.  So the 22nd.

24           And then, Mr. Boxer, I'll ask you, how long do you

25   think you need to respond to the motion for summary judgment?

Kcmdoakc
                        Teleconference

Look, candidly, I don't know that I need much more briefing on

the motion to amend.  That is pretty straightforward.  It's a

legal issue.  I've got the proposed complaint.  You're

certainly welcome to brief it but don't feel compelled.  I

mean, you know, only submit what you think will help.

            MR. BOXER:  OK.  Understood.

            THE COURT:  But in terms of responding to the summary

judgment, that is probably going to require a little more

effort on your part.  How long do you think you need to do

that.

            MR. BOXER:  I was thinking three to four weeks to

respond, so let's say four weeks.  And if there is no reply,

then it would be fully submitted at that time.

            THE COURT:  OK.  So the 19th of February?

            MR. BOXER:  Thank you, your Honor.

            MR. MASTRO:  Your Honor.

            THE COURT:  Yes.

            MR. MASTRO:  If I might?  I think it would be an aid

to the Court in a summary judgment motion in a major case if we

had the opportunity to put in a brief reply to their --

            THE COURT:  I want a reply.  That's fine.  I think a

reply would be useful.  But I'm asking a different question

first.

            I think four weeks is probably more than enough time

for you to respond to the motion to amend.

Kcmdoakc
                        Teleconference

1            Do you agree with that?

2            MR. MASTRO:  I do, your Honor.

3            THE COURT:  OK.

4            MR. MASTRO:  If you want us to respond, you know, in

5     two weeks, that's fine.

6            THE COURT:  Let's keep it on the same track.  I just

7     think it's easier.

8            MR. MASTRO:  No problem.

9            THE COURT:  OK.  So, OK.  So your opposition brief on

10    the motion to amend, by the 19th of February.  And then reply

11    briefs on the two motions -- nobody has to do a reply brief,

12    but if you want to, you can do it.

13           So, Mr. Mastro, how long do you think you need for a

14    reply?

15           MR. MASTRO:  If we could have another ten days, your

16    Honor?

17           THE COURT:  OK.  That puts us at March 1st or 2nd.

18           MR. MASTRO:  I think that's right, your Honor.  Could

19    we have Monday?

20           THE COURT:  Do you want Monday?  Tuesday?  I don't

21    care, Tuesday --

22           MR. MASTRO:  Tuesday is good.  Thank you, your Honor.

23           THE COURT:  Mr. Boxer, if you want to do a reply for

24    the motion to amend, you can also then get something in by

25    Tuesday, March 2nd.  OK?

Kcmdoakc
                                    Teleconference

1          MR. BOXER:  Thank you, your Honor.

2          THE COURT:  All right.  So I'll issue an order that

3    just memorializes those dates.

4          I'm not prejudging this.  I think a preview like this

5    is helpful.  That's why I do it.  But, obviously, I'm going to

6    read the briefs, I am going to look at the attachments, I'm

7    going to consider all the arguments.

8          Mr. Mastro.

9          MR. MASTRO:  Your Honor, we had also requested in the

10   interim, pending disposition of the motion, a stay of

11   discovery.

12         THE COURT:  Yes, I am going to stay discovery, and

13   then that can be addressed in the opposition to your motion for

14   summary judgment.  That is built into the rule.  If Mr. Boxer

15   and Mr. Wigdor are arguing that they can't possibly respond to

16   your summary judgment motion without additional discovery, they

17   then will articulate that consistent with Rule 56(d).  OK?

18         MR. MASTRO:  Thank you very much, your Honor.  I

19   really appreciate it.

20         THE COURT:  That is all right.  That's why I do this.

21         So, I don't know, some people like these premotion

22   conferences, some people don't.  I find them helpful.  I think

23   it lets me hit the ground running once the motion is filed.

24         So with that, I will -- I'm prepared to adjourn unless

25   there is anything else we need to cover today.

Kcmdoakc
                              Teleconference

 1          MR. BOXER:  Just briefly, your Honor.  If your Honor

 2   is going to schedule an appearance before your Honor, I do have

 3   some court commitments the week of March 8th and, in theory, a

 4   trial the week of March 16th.  Who knows if that will happen.

 5          THE COURT:  OK.

 6          MR. BOXER:  So if that is going to happen later, I can

 7   always consult with your deputy clerk.

 8          THE COURT:  I'll tell you, what I would typically do

 9   is see the briefs and then decide whether I need additional

10   argument beyond what we had today.

11          MR. BOXER:  Thank you.

12          THE COURT:  And if I think we do, then I will schedule

13   something, but I will probably have my judicial assistant,

14   Ms. Miller, contact you to see when you are available and then

15   I will issue an order setting forth that date.  OK?

16          MR. BOXER:  I appreciate that, your Honor.  Thank you.

17          THE COURT:  All right.  Good.

18          OK.  So, thank you all.  This was very, very helpful

19   to me.  Let me thank the court reporter.

20          If anyone needs a copy of this transcript, you can

21   take that up with the court reporter either now or later

22   through the website.

23          Let me wish everybody the happiest of holidays and the

24   healthiest of holidays.  And, who knows, someday maybe we'll be

25   in the same room again.  But in the interim, I thought this

Kcmdoakc
                      Teleconference

1   worked reasonably well, with a couple of little glitches, but

2   overall this was pretty good.  So, thanks.

3              MR. MASTRO:  Thank you, your Honor.  Happy holidays.

4              MR. BOXER:  You too, your Honor.  Happy and healthy

5   new year.

6              (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25