**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X
CHARLES OAKLEY,                                                   :
                                                                 :
                                    Plaintiff,                   :      Civil Case No.: 17-cv-6903 (RJS)
                                                                 :
                v.                                               :
                                                                 :
JAMES DOLAN, in his individual and professional                  :
capacities, MSG NETWORKS, INC., THE MADISON                      :
SQUARE GARDEN COMPANY and MSG SPORTS &                           :
ENTERTAINMENT, LLC,                                              :
                                                                 :
                                    Defendants.                  :
-----------------------------------------------------------------------X

## PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL CIVIL RULE 56.1

Pursuant to Local Civil Rule 56.1(b) and the individual rules of this Court, Plaintiff

Charles Oakley ("Plaintiff" or "Mr. Oakley") submits the following response to the Statement of

Undisputed Facts annexed to the Motion for Summary Judgment of Defendants James Dolan

("Dolan"), MSG Networks, Inc., The Madison Square Garden Company, and MSG Sport &

Entertainment, LLC (together, "MSG").  All statements admitted herein are admitted without

prejudice and solely for the purpose of responding to Defendants' Statement of Undisputed Facts

pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the

Southern District of New York ("Local Civil Rules"), and responding to Defendants' Motion for

Summary Judgement.  All citations to exhibits ("Ex. __") are to the documents attached to the

Declaration of Renan F. Varghese in opposition to the instant motion ("Varghese Decl.")

submitted herewith, unless otherwise noted, or to Defendants' papers, exhibits or declarations

attached thereto.

## PLAINTIFF CHARLES OAKLEY'S RESPONSES

Defendants MSG Networks Inc., The Madison Square Garden Company, and MSG Sports & Entertainment, LLC (collectively, "Defendants"),[1] pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1(a) of the Local Civil Rules of the United States District Court for the Southern District of New York, submit the following statement of material facts as to which there can be no genuine dispute.[1]

## I. MATERIAL FACTS AS TO WHICH THERE CAN BE NO GENUINE DISPUTE BASED ON ADMISSIONS FROM OAKLEY'S AMENDED COMPLAINT

1. Plaintiff Charles Oakley ("Oakley") is a former All-Star power forward with the New York Knicks (the "Knicks"). Am. Compl. ¶ 6.[2]

    **Response to Paragraph 1**

    Dispute in part.  Admitted for the purposes of this motion that Mr. Oakley is a former All-Star power forward with the Knicks.  Dispute the footnote to ¶ 1 as it is a legal conclusion disguised as a statement of fact.

2. Defendant The Madison Square Garden Company—now named Madison Square Garden Sports Corp.—is a publicly traded corporation which, at all relevant times, indirectly owned and operated both MSG arena and the Knicks. Dkt. No. 101 (Supp. Corporate Disclosure); Am. Compl. ¶ 9.[3]

---

[1]    Because all claims against James Dolan have been dismissed, he is no longer a defendant in this action and, therefore, not mentioned here in connection with Oakley's sole remaining claims against the Defendants.

[2]    The allegations in Oakley's Amended Complaint are "judicial admission[s]" by which Oakley is "bound throughout the course of the proceeding." *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985). Defendants are entitled to rely on those judicial admissions as a basis for their Rule 56.1 Statement and summary judgment motion. *See, e.g.*, *Brown v. Gen. Instrument Corp.*, 2000 WL 1855134, at *1–2 (S.D.N.Y. Dec. 19, 2000) (Mukasey, C.J.) (noting that "[w]hen making a motion for summary judgment, a party may 'take advantage of any admissions' in the opposing party's complaint," and that a plaintiff may not "create a genuine issue of material fact by contradicting herself" in later allegations inconsistent with the complaint (quoting *Ratner v. Young*, 465 F. Supp. 386, 389 n.5 (D.V.I. 1979))).

[3]    Defendant MSG Networks Inc., which is a publicly traded corporation, had no role in operating MSG arena or the Knicks and was thus improperly named as a defendant in this action. Dkt. No. 101 (Supp. Corporate Disclosure).

**Response to Paragraph 2**

Admit for the purposes of this motion.

3.   Defendant MSG Sports & Entertainment, LLC—now named MSG Entertainment Group, LLC—was at all relevant times a wholly owned subsidiary of The Madison Square Garden Company. At all relevant times, a subsidiary of MSG Sports & Entertainment, LLC owned and operated MSG arena. Dkt. No. 101 (Supp. Corporate Disclosure).

**Response to Paragraph 3**

Admit for the purposes of this motion.

4.   On the night of February 8, 2017, Oakley attended a Knicks basketball game at MSG. Am. Compl. ¶ 30.[4]

**Response to Paragraph 4**

Admit for the purposes of this motion.

5.   During the course of the game, "members of Madison Square Garden's security team" "ordered [Oakley] to leave the arena." Am. Compl. ¶ 34.

**Response to Paragraph 5**

Admit for the purposes of this motion.

6.   Oakley did not leave as directed. Instead, Oakley "turn[ed] around" to "return to his seat," refusing to leave. *See* Am. Compl. ¶¶ 35, 37, 40.

**Response to Paragraph 6**

Admit for the purposes of this motion.

---

[4]   Printed on the back of Oakley's ticket to attend the game—like all other Knicks tickets—was the explicit statement that the ticket is a "license revocable in MSG's sole discretion." Declaration of Randy M. Mastro in Support of Defendants' Motion for Summary Judgment, dated January 22, 2021 ("Mastro Declaration") ¶ 8 (quoting Mastro Declaration, Exhibit 6).

## II. MATERIAL FACTS AS TO WHICH THERE CAN BE NO GENUINE DISPUTE BASED ON THE DISPOSITIVE VIDEOEVIDENCE

### A. Upon Being Directed to Leave, Oakley Violently Confronts MSG Security Guards

7. The group that approached Oakley and asked him to leave MSG included MSG security guards and a uniformed NYPD officer. Ex. 2.b ("Arena Cam Close-Up") at 7:55–8:15 (uniformed NYPD officer follows MSG security guards and positions himself near Oakley).[5]

**Response to Paragraph 7**

Dispute in part. Admit that an individual in a uniform was part of the group that approached Mr. Oakley. Dispute that the individual was an NYPD police officer as the individual is not identified in the video cited to by Defendants. Further dispute that the individual who Defendants claim is an NYPD police officer "asked [Mr. Oakley] to leave MSG" as the cited material or evidence does not support this proffered factual proposition, in violation of Local Rule 56.1(d). Rather, Plaintiff requires discovery as to what, if anything, he was told by the police prior to and/or during the assault. See Declaration of Douglas H. Wigdor ("Wigdor Decl.") at ¶ 13.

8. Oakley towered over each of the MSG security guards who approached him. *See, e.g.*, Arena Cam Close-Up at 8:16; Ex. 3 ("NYT Video") at 0:24–34.[6]

**Response to Paragraph 8**

Admit that Mr. Oakley was taller than the MSG security guards that approached him. Dispute any factual or legal relevance as the height of the victim or perpetrators are not relevant to an assault and battery claim.

9. In addition, Oakley was much taller than the NYPD officer accompanying MSG security personnel. *See, e.g.*, NYT Video at 0:24–34.

---

[5]   As used herein, "Ex. _" refers to the Exhibits attached to the Mastro Declaration.
[6]   Oakley's pleading alleges that the MSG security guards who approached him were "three large men." Am. Compl. ¶ 34.

4

**Response to Paragraph 9**

Admit that Mr. Oakley was taller than the individual who Defendants claim is an NYPD

police officer.  But see Responses to ¶¶ 7-8.  Dispute any factual or legal relevance as Mr.

Oakley is not claiming that he was assaulted by the NYPD.

10. After exchanging words with the MSG security guard who initially approached him and asked him to leave ("Guard 1") (see Arena Cam Close-Up at 7:55–8:14), Oakley rose out of his seat and lunged at Guard 1 (id. at 8:14).

**Response to Paragraph 10**

Dispute.  The cited material or evidence does not support the proffered factual

proposition, in violation of Local Rule 56.1(d).  Because the cited evidence does not include

audio, there is no admissible evidence that Mr. Oakley "exchanged words" with the MSG

security guards.  Rather, Plaintiff requires additional discovery concerning what Defendants'

security personnel said to him when they approached him and what, if anything, Mr. Oakley said

in response.  See Wigdor Decl. at ¶ 13.  Further, Mr. Oakley did not lunge at the security guards.

See Oakley Decl. at ¶ 10.  Rather, Mr. Oakley stood up and was immediately and violently

pulled backwards by members of Defendants' security personnel without any provocation on Mr.

Oakley's part.  See Dkt. No. 104-2b at 8:17-19.

11. Guard 1 responded by leaning away from Oakley and raising two open hands in an effort to de-escalate the situation. Id. at 8:14–16.

**Response to Paragraph 11**

Dispute.  After Mr. Oakley stood up, the initial security guard who approached him

pointed aggressively at Mr. Oakley on two separate occasions and pushed Mr. Oakley backward,

despite the fact that Mr. Oakley was being held, and forcefully pulled backwards, by other

security guards.  See Dkt. No. 104-2b at 8:17-20.  Further dispute the characterization that the

security guard was attempting to "de-escalate the situation."  Because the cited evidence does not

include any audio, there is no admissible evidence supporting Defendants' characterization of the

motivations of the individuals depicted in the video footage. Rather, Plaintiff requires additional

discovery concerning what Defendants' security personnel said to him when they approached

him and what, if anything, Mr. Oakley said in response. See Wigdor Decl. at ¶ 13.

12. Simultaneously, the NYPD officer and a separate MSG security guard ("Guard 2") moved toward Oakley to try to keep him away from Guard 1. *Id.* at 8:16–18.

**Response to Paragraph 12**

Dispute. The cited material or evidence does not support the proffered factual

proposition, in violation of Local Rule 56.1(d). Because the cited evidence does not include any

audio, there is no admissible evidence supporting Defendants' characterization of the

motivations of the individuals depicted in the video footage. Rather, Plaintiff requires additional

discovery concerning what Defendants' security personnel knew at the time they approached and

confronted Plaintiff, what they said to him and what, if anything, Mr. Oakley said in response.

See Wigdor Decl. at ¶ 13.

13. However, Oakley nevertheless extended his right arm in the direction of Guard 1. *Id.* at 8:18.

**Response to Paragraph 13**

Dispute. After Mr. Oakley was violently grabbed by Defendants' security personnel without

provocation and pulled backwards, he moved his arm in an attempt to escape their grip. See Oakley

Decl. at ¶ 11. However, Mr. Oakley visibly did not attempt to make contact with any of

Defendants' security personnel nor did he gesture in their direction. See id.

14. In response, Guard 2 stepped between Oakley and Guard 1, effectively separating them. *Id.* at 8:18–19.

**Response to Paragraph 14**

Dispute.  The individual who Defendants identify as Guard 2 pushed Mr. Oakley's waist as he stepped in front of Mr. Oakley.  See Dkt. No. 104-2b at 8:18-19.  However, because the cited evidence does not include any audio, there is no admissible evidence supporting Defendants' characterization of the motivations of the individuals depicted in the video footage. Rather, Plaintiff requires additional discovery concerning what Defendants' security personnel knew at the time they approached and confronted Plaintiff, what they said or did to him and what, if anything, Mr. Oakley said and/or did in response.  See Wigdor Decl. at ¶ 11.

15.  Oakley responded by extending his right arm toward the neck of Guard 2, causing Guard 2's head to snap backwards. *Id.* at 8:19–22.

**Response to Paragraph 15**

Dispute.  After Mr. Oakley was violently grabbed and pulled backwards by Defendants' security personnel without provocation, he moved his arm in an attempt to escape their grip.  See Oakley Decl. at ¶ 11.  However, Mr. Oakley was not attempting to make contact with any of Defendants' security personnel nor was he gesturing in their direction.  See id.

16.  In response, the NYPD officer and a third MSG security guard attempted to restrain Oakley from behind, preventing him from striking others. *Id.* at 8:22–27.

**Response to Paragraph 16**

Dispute.  The cited material or evidence does not support the proffered factual proposition, in violation of Local Rule 56.1(d).  Because the cited evidence does not include any audio, there is no admissible evidence supporting Defendants' characterization of the motivations of the individuals depicted in the video footage.  Rather, Plaintiff requires additional discovery concerning what Defendants' security personnel knew at the time they approached and confronted Plaintiff, what they said to him and what, if anything, Mr. Oakley said in response. See Wigdor Decl. at ¶ 13.

### B. Oakley Trips and Falls While Resisting Leaving

17.     After only a few seconds, Oakley was permitted to readjust his jacket. *Id.* at 8:26–28. After doing so, Oakley put up his hands and attempted to separate himself from the NYPD officer and MSG security guards. *Id.* at 8:36–40.

### Response to Paragraph 17

Dispute.  Mr. Oakley was not readjusting his jacket and did not attempt to separate himself from Defendants' security personnel as Defendants now claim.  Instead, Mr. Oakley was held by security guards throughout the time period in the video footage cited by Defendants.  See Dkt. No. 104-2b at 8:26-28.  He thereafter raised his hands upwards in a defensive gesture to make it clear to Defendants' security guards that he was not attacking them or using force.  Id. at 8:29-40.  Further dispute Defendants' characterization that Defendants' security guards "permitted" Mr. Oakley to readjust his jacket.  Because the cited evidence does not include any audio, there is no admissible evidence supporting Defendants' characterization of the motivations of the individuals depicted in the video footage.  Rather, Plaintiff requires additional discovery concerning what Defendants' security personnel knew at the time they approached and confronted Plaintiff, what they said to him and what, if anything, Mr. Oakley said in response. See Wigdor Decl. at ¶¶ 11-13.

18.     Thereafter, one security guard alternatively placed an open hand on Oakley's back and then a hand on his arm. Ex. 4 ("YouTube Video") at 0:06–14. Another security guard also briefly placed an open hand on Oakley. *Id.* at 0:12–14. Neither action was hostile nor did the guards impede Oakley's ability to move. *Id.*

### Response to Paragraph 18

Dispute in part.  Admit for the purposes of this motion that two security guards placed open hands on Mr. Oakley and that one of the security guards can be seen grabbing his arm.  Dispute Defendants' characterization that neither of the security guards were being "hostile" or that they did not "impede Oakley's ability to move."  The security guard with his hand on Mr.

Oakley's back pushed Mr. Oakley, forcing him to fall. Oakley Decl. at ¶ 13; Dkt. No. 104-2b at 8:39-41; Dkt. No. 104-4 at 0:14-16. Further dispute Defendants' characterization that Defendants' security guards were not "hostile" or that they did not impede his ability to move because there is no admissible evidence supporting Defendants' characterization of the motivations of the individuals depicted in the video footage. Rather, Plaintiff requires additional discovery concerning what Defendants' security personnel knew at the time they approached and confronted Plaintiff, what they said to him and what, if anything, Mr. Oakley said in response. See Wigdor Decl. at ¶¶ 11-13.

19. At that point, Oakley started to move away from those who had directed him to leave, but tripped and fell in the process. *Id.* at 0:10–16; Arena Cam Close-Up at 8:35–42.

   **Response to Paragraph 19**

   Dispute. Mr. Oakley did not trip and fall. Rather, he was pushed from behind, forcing

him to fall. Oakley Decl. at ¶¶ 13-14; Dkt. No. 104-2b at 8:39-41; Dkt. No. 104-4 at 0:14-16.

20. Notably, neither the NYPD officer nor any MSG security guards pushed Oakley or otherwise forcibly shoved him to the ground. Indeed, one security guard tried to *prevent* Oakley from falling by attempting to grab Oakley's arm as he began to fall. YouTube Video at 0:13– 14.[7]

   **Response to Paragraph 20**

   Dispute. See Responses to ¶¶ 18-19.

21. Oakley's trip and fall occurred nearly a full minute after MSG security personnel first arrived. Arena Cam Close-Up at 7:54–8:42.[8]

---

[7]   This dispositive video evidence belies Oakley's pleading allegation that MSG security guards "pushed" and "forcibly shov[ed] Mr. Oakley to the ground," which is blatantly false. Am.Compl. ¶¶ 42–43.
[8]   This dispositive video evidence belies Oakley's pleading allegation that "two of the security guards grabbed Mr. Oakley and pushed him to the ground . . . within seconds of first approaching him," which is blatantly false. Am. Compl. ¶¶ 42–43.

**Response to Paragraph 21**

Admit but dispute any relevance. Contrary to what Defendants now claim, the fact that Mr. Oakley was pushed to the ground approximately 50 seconds after he was approached by Defendants' security personnel is completely consistent with his allegation that he was pushed to the ground "within seconds" of being approached by Defendants' security personnel.

**C. Oakley Returns to His Feet, Screams Profane Language at MSG Security Personnel and an NYPD Officer, and Resists an Additional Request to Leave**

22. When Oakley returned to his feet, he immediately yelled at the NYPD officer, twice, "that's some bullsh\*t." NYT Video at 0:03–06.

**Response to Paragraph 22**

Dispute. Mr. Oakley did not "immediately" yell "that's some bullsh\*t" at an NYPD police officer. What Mr. Oakley told the person Defendants identify as being an NYPD police officer immediately after standing up is inaudible. Dkt. No. 104-3 at 0:02-05. After initially speaking to the supposed NYPD police officer, Mr. Oakley then turned towards his seat, gestured towards his seat and appeared to reference "my seat." It is only in response to something that was thereafter said by one of Defendants' security guards that Mr. Oakley says, "that's some bullsh\*t," in response to what the security guard had told him. Id. at 0:13-20. Plaintiff requires additional discovery concerning what Defendants' security personnel said to Mr. Oakley and what, if anything, Mr. Oakley said in response. See Wigdor Decl. at ¶ 13.

Further to the extent that Defendants are claiming that Mr. Oakley's behavior after he got back to his feet justified their earlier use of force dispute any relevance. Mr. Oakley had already been assaulted by Defendants' security personnel who violently grabbed him, pulled him backwards and then pushed him to the ground, all without any provocation. See Response to ¶¶ 10-11, 18-19. Mr. Oakley was understandably upset after having just been violently assaulted

despite not having engaged in any behavior warranting Defendants' use of unreasonable force. Oakley Decl. at ¶ 15. That he was subsequently angry does not justify the previous use of force.

Finally, dispute any relevance to the reasonableness of Defendants' subsequent use of force in pushing/dragging Mr. Oakley to the ground. At the time Mr. Oakley was pushed/dragged to the ground, he had stopped resisting and had submitted to Defendants' attempts to take him out of MSG. Dkt No. 104-1 at 0:22-28; Dkt. No. 104-2b at 9:28-36; Dkt. No. 104-3 at 0:44-51; Dkt. No. 104-4 at 1:04-11. Instead, he had his arms raised at shoulder height and was passively allowing himself to be taken out of MSG. Dkt. No. 104-4 at 1:07-11. Thus, Defendants' subsequent use of force in pushing/dragging Mr. Oakley to the ground was unreasonable. At a minimum, whether pushing/dragging Mr. Oakley to the ground was reasonable in light of all of the circumstances is a jury question and not ripe for adjudication at the summary judgement stage.

23. An MSG security guard ("Guard 3") responded by asking Oakley to "please walk." *Id.* at 0:06–14.

**Response to Paragraph 23**

Dispute in part. Admit that an MSG security guard told Mr. Oakley to "please walk" at one point in the video footage cited by Defendants. Dispute that the MSG security guard told Mr. Oakley to please walk in response to Mr. Oakley stating "that's some bullsh*t." Rather, Mr. Oakley responded to what the security guard told him by saying, "that's some bullsh*t." Dkt. No. 104-3 at 12:15. Further dispute Defendants' characterization that all the security guard said to Mr. Oakley was "please walk," as the security guard can be seen turning his head away from the camera and anything he says at that point is inaudible on the video footage cited by Defendants. Id. at 0:08-15. It is also impossible to tell from the video footage cited by Defendants whether any of Defendants' other security personnel said anything to Mr. Oakley

during this interaction.  As a result, Plaintiff requires additional discovery concerning what

Defendants' security personnel said to Mr. Oakley when they approached him.  <u>See</u> Wigdor

Decl. at ¶ 15.

24. The request that Oakley "please walk" was made at a significantly lower volume than Oakley's shouts of "that's some bullsh*t." *Compare id.* at 0:04–08, *with id.* at 0:06–12.[9]

**<u>Response to Paragraph 24</u>**

Admit but dispute any relevance.  The cited evidence does not support Defendants'

contention that the *only* thing said to Mr. Oakley was "please walk," or that other members of

Defendants' security team did not also demand that he leave MSG.  <u>See</u> Response to ¶ 23. As a

result, Plaintiff requires additional discovery concerning what Defendants' security personnel

said to Mr. Oakley when they approached him.  <u>See</u> Wigdor Decl. at ¶ 15.

25. Oakley did not comply with the request to "please walk." Instead, Oakley responded by stating, "let me sit in my seat," "no, I'm good right here," and "I'm not talking to you." *Id.* at 0:08–12.

**<u>Response to Paragraph 25</u>**

Dispute in part.  Admit that Mr. Oakley mentioned his "seat" and told a security guard

that he was not talking to him.  Dkt. No. 104-3 at 0:10-:16.  Dispute that this is all Mr. Oakley

says or that Defendants have accurately quoted Mr. Oakley as the audio of Mr. Oakley's

comments is largely unintelligible and cannot be discerned from the noise in the crowd.  Dkt.

No. 104-3 at 0:04-16.  As a result, Plaintiff requires additional discovery concerning what

Defendants' security personnel said to Mr. Oakley when they approached him and what Mr.

Oakley said in return.  <u>See</u> Wigdor Decl. at ¶ 15.

---

[9] Oakley's pleading alleges that, when he "got back to his feet, the security guards loudly reiterated their demand that he leave the Garden immediately." Am. Compl. ¶ 44.

26. Oakley then proceeded to repeatedly yell, again, "that's some bullsh*t" at both the crowd and the NYPD officer. *Id.* at 0:12–17.

**Response to Paragraph 26**

Dispute in part. Admit that Mr. Oakley yelled "that's some bullsh*t." Dispute that Mr. Oakley yelled at either the crowd or any police officers. Rather, the video footage clearly shows Mr. Oakley responding to something said to him by Defendants' security personnel. Dkt. No. 104-3 at 0:12-18.

Further dispute any relevance to the extent that Defendants are claiming that Mr. Oakley's behavior after he was pushed to the ground justifies their decision to push him to the ground near his seat or their subsequent decision to push, pull and/or throw him to the ground near the exit ramp leading out of MSG. See Response to ¶ 22.

27. During that exchange, Oakley at no point requested an explanation for why he was being asked to leave MSG. *See id.* at 0:04–17.[10]

**Response to Paragraph 27**

Dispute. Large portions of what Mr. Oakley said after getting to his feet are inaudible in the video footage cited by Defendants. The mere fact that a single video camera does not clearly show Mr. Oakley asking for an explanation as to why he was being asked to leave MSG does not mean that he did not ask for such an explanation. As a result, Plaintiff requires additional discovery concerning what Defendants' security personnel said to Mr. Oakley when they approached him and what Mr. Oakley said in return. See Wigdor Decl. at ¶ 15.

---

[10] This dispositive video evidence belies Oakley's pleading allegation that, during this time, he "continued to request an explanation for this outrageous behavior." Am. Compl. ¶ 45.

### D. Oakley Escalates the Situation and Assaults an MSG Security Guard

28.     After repeatedly shouting profanities, Oakley turned to Guard 3 and yelled at him to "get the f**k out of my face." *Id.* at 0:17–20.

**Response to Paragraph 28**

Dispute in part. The cited material or evidence does not support Defendants' proposition that Mr. Oakley was "repeatedly shouting profanities" as much of what Mr. Oakley says is inaudible in the video footage cited in Paragraph 28. Dkt. No. 104-3 at 0:17-20. Admit the remainder of statements in Paragraph 28 except dispute any relevance to the extent that Defendants are claiming that Mr. Oakley's behavior after he was pushed to the ground justifies their decision to push him to the ground near his seat or their subsequent decision to push, pull and/or throw him to the ground near the exit ramp leading out of MSG. See Response to ¶ 22.

29.     Guard 3 responded by backing away from Oakley and stating "no problem." *Id.* at 0:18–20. Guard 3 then attempted to walk around Oakley and away from the confrontation. *Id.* at 0:18–22.

**Response to Paragraph 29**

Dispute in part. Admit that one of Defendants' security guards stated, "no problem." Dispute that the security guard was attempting to walk "away from the confrontation." The security guard stepped to the right of Mr. Oakley and gestured with his right hand at a security guard standing behind Mr. Oakley. Dkt. No. 104-3. at 0:20-0:24. This second security guard then grabbed Mr. Oakley's right arm. Id. See also Dkt. No. 104-4 at 0:38-42. The first security guard then returned to his position in front of Mr. Oakley. Id. Thus, the security guard did not attempt to walk "away" from Mr. Oakley, but instead signaled to other security guards to get involved in the altercation.

30.     Instead of stepping aside to let Guard 3 leave, Oakley remained in place and stuck a finger in the face of Guard 3. *Id.* at 0:19–22. In so doing, Oakley twice repeated "get the f**k out of my face." *Id.*[11]

**Response to Paragraph 30**

Dispute in part. Admit that Mr. Oakley remained in place but dispute the characterization that the security guard was attempting to leave and that Mr. Oakley prevented him from doing so. See Response to ¶ 29. Further dispute any relevance to the extent that Defendants are claiming that Mr. Oakley's behavior after he was pushed to the ground justifies their decision to push him to the ground near his seat or their subsequent decision to push, pull and/or throw him to the ground near the exit ramp leading out of MSG. See Response to ¶ 22.

31.     At that point, Guard 3 again tried to back away from Oakley. *Id.* at 0:21–23.

**Response to Paragraph 31**

Dispute. Defendant's security guard did not "back away" from Mr. Oakley. Instead, after signaling to another security guard, this security guard resumed his position in front of Mr. Oakley. Dkt. No. 104-3 at 0:20-24. Further dispute any relevance to the extent that Defendants are claiming that Mr. Oakley's behavior after he was pushed to the ground justifies their decision to push him to the ground near his seat or their subsequent decision to push, pull and/or throw him to the ground near the exit ramp leading out of MSG. See Response to ¶ 22.

32.     Oakley reacted by stepping into the retreating security guard and bumping him in the chest. *Id.* at 0:23–27. While so doing, Oakley shouted "I said it to your motherf**king face, motherf**ker!" *Id.* at 0:23–27.

---

[11]     This dispositive video evidence belies Oakley's pleading allegation that "the security guards further escalated the confrontation by physically grabbing Mr. Oakley to forcibly compel him to leave." Am. Compl. ¶ 45.

**Response to Paragraph 32**

Admit, in part, for the purposes of this motion but dispute that the security guard was "retreating." See Response to ¶ 29.

Further dispute any relevance to the extent that Defendants are claiming that Mr. Oakley's behavior after he was pushed to the ground justifies their decision to push him to the ground near his seat or their subsequent decision to push, pull and/or throw him to the ground near the exit ramp leading out of MSG. See Response to ¶ 22.

33. Oakley then struck Guard 3 in the forehead. *Id.* at 0:29–31; YouTube Video at 0:48–50.

**Response to Paragraph 33**

Dispute the characterization that Mr. Oakley "struck" the security guard in the forehead. Rather, he pushed the security guard's forehead with his right index finger. Dkt. No. 104-3 at 0:29-31.

Further dispute any relevance to the extent that Defendants are claiming that Mr. Oakley's behavior after he was pushed to the ground justifies their decision to push him to the ground near his seat or their subsequent decision to push, pull and/or throw him to the ground near the exit ramp leading out of MSG. See Response to ¶ 22.

34. The force with which Oakley struck Guard 3's forehead forced the security guard's head backwards and evoked audible gasps of "no!" from the crowd. NYT Video at 0:30–34.

**Response to Paragraph 34**

Dispute in part. Admitted for the purposes of this motion that Defendants' security guard's head moved backwards but dispute the characterization that the "no" heard on the video is a result of Mr. Oakley's conduct. Given the fact it is impossible to see who said the word "no," there is no basis to determine whether the word was uttered as a result of Mr. Oakley or as a result of other events entirely. See Dkt. No. 104-3 at 0:30-33.

Further dispute any relevance to the extent that Defendants are claiming that Mr.

Oakley's behavior after he was pushed to the ground justifies their decision to push him to

the ground near his seat or their subsequent decision to push, pull and/or throw him to the

ground near the exit ramp leading out of MSG.  See Response to ¶ 22.

35. No MSG security guard grabbed or otherwise restrained Oakley as he yelled at, and then assaulted, Guard 3. *Id.* at 0:18–30. One MSG security guard briefly placed an open hand on Oakley's back, but to no avail, as Oakley proceeded to assault Guard 3 anyway. *Id.* at 0:24–30.

**Response to Paragraph 35**

Admitted for the purposes of this motion that no MSG security guard is restraining Mr.

Oakley during the cited portion of the video footage.  Dispute the characterization that Mr.

Oakley "assaulted" the security guard.  See Response to ¶¶ 23, 25, 29.

E. **Oakley Assaults a Second MSG Security Guard, Prompting Pleas to the NYPD Officer to "Do Something"**

36. After Oakley's assault on Guard 3, a different MSG security guard ("Guard 4")non-aggressively placed one hand on Oakley's arm, and then an open hand on his back. *Id.* at 0:30– 34.

**Response to Paragraph 36**

Dispute.  Dispute the characterization that the security guard "non-aggressively placed

one hand on Oakley's arm."  Instead, the security guard can be seen grabbing Mr. Oakley's arm

and attempting to pull Mr. Oakley in his direction.  Dkt. No. 104-3 at 0:31-34.

37. Oakley responded by chopping down on Guard 4's arm and screaming "get off of me." *Id.* at 0:34–36; *see also* YouTube Video at 0:52–54.

**Response to Paragraph 37**

Dispute in part.  Admit for the purposes of this motion that Mr. Oakley used his right arm

to push down on the security guard's arm after the security guard attempted to pull Mr. Oakley

towards him.  Dispute the characterization that Mr. Oakley screamed "get off me" as Mr. Oakley

is not screaming in the video cited by Defendants and what he says is inaudible. Dkt. No. 104-3 at 0:34-36. To the extent that what Plaintiff said to Defendants' security personnel during this time period is relevant, Plaintiff requires additional discovery concerning what Defendants' security personnel said to him and what, if anything, he said in response, during this time period. See Wigdor Decl. at ¶ 15.

38.   Oakley then further escalated the situation by twice shoving Guard 4 into a row of seats while again yelling "get off of me." NYT Video at 0:36–40; Ex. 1 ("ESPN Broadcast") at 0:09–11.

**Response to Paragraph 38**

Dispute the characterization that Mr. Oakley "escalated" the situation. Mr. Oakley only pushed the second security guard after he put both his hands on Mr. Oakley and then grabbed Mr. Oakley's arm with his right hand. Dkt. No. 104-3 at 0:36-40. Further dispute the characterization that Mr. Oakley yelled "get off me" as Mr. Oakley is not yelling in the video cited by Defendants and what he says is inaudible. Id. To the extent that what Plaintiff said to Defendants' security personnel during this time period is relevant, Plaintiff requires additional discovery concerning what Defendants' security personnel said to him and what, if anything, he said in response, during this time period. See Wigdor Decl. at ¶ 15.

39.   This assault, like Oakley's prior assault on Guard 3, occurred in plain view of the NYPD officer, who was standing in front of Oakley at the time. NYT Video at 0:29–31, 0:34–40; YouTube Video at 0:48–50, 0:52–58.[12]

**Response to Paragraph 39**

Dispute the characterization that Mr. Oakley assaulted anyone. After Mr. Oakley had already been assaulted by Defendants' security personnel, who violently grabbed him, pulled

---

[12]    This dispositive video evidence belies Oakley's pleading allegation that he "pushed" the security guards' "hands away in self-defense." Am. Compl. ¶ 46. In fact, Oakley, as the aggressor, *repeatedly* "pushed" the security guards, and was not in any way acting in self- defense.

him backwards and then pushed him to the ground, all without any provocation, <u>see</u> Response to ¶¶ 10-11, 18-19, he was understandably upset. Oakley Decl. at ¶ 15. After Mr. Oakley got to his feet, he was then confronted by a group of security officers who surrounded him. However, because portions of the video footage immediately following Mr. Oakley getting to his feet are inaudible, it is impossible to determine what Defendants' security personnel said to Mr. Oakley prompting his reaction. Plaintiff requires additional discovery concerning what Defendants' security personnel said to him during this time period. <u>See</u> Wigdor Decl. at ¶ 15. Additionally, Plaintiff only pushed the second security guard after Plaintiff had already been assaulted and after the second security guard grabbed Plaintiff on two separate occasions. <u>See</u> Response to ¶¶ 36, 39. Thus, contrary to what Defendants' contend in their footnote, the video evidence supports the allegations in the Amended Complaint that Mr. Oakley pushed the security guard away in an act of self-defense. <u>Id.</u>

40. Oakley's attacks on Guard 4 prompted an MSG security guard, who had been standing immediately behind the on-looking NYPD officer, to tap the NYPD officer's right shoulder and plead with him to "do something." NYT Video at 0:38–41.

**<u>Response to Paragraph 40</u>**

Dispute. The cited material or evidence does not support the proffered factual proposition, in violation of Local Rule 56.1(d). The alleged NYPD officer is not visible in the video footage cited by Defendants after Mr. Oakley pushes the security guard away. <u>See</u> Dkt. No. 104-3 at 0:38-0:31. Further, the video footage to which Defendants cite does not contain any audible statements made to or by the alleged NYPD officer. <u>Id.</u> To the extent that Defendants' security personnel said anything to the NYPD officer, Plaintiff requires additional discovery concerning what Defendants' security personnel said to him and what, if anything, he said in response, during this time period. <u>See</u> Wigdor Decl. at ¶ 15.

**F.    The NYPD Officer and MSG Security Guards Use Force That Is Not Objectively Unreasonable to Remove Oakley from the Seating Area**

41.    Up until this point, MSG security personnel had not used *any* force to try to effect Oakley's removal from MSG. All any security guard had done up to that point was alternatively non-aggressively place a hand on Oakley's arm, back, or side. *See, e.g.*, YouTube Video at 0:40–56.

**Response to Paragraph 41**

Dispute.  Contrary to Defendants' self-serving characterizations, the video footage submitted in this case demonstrates that Defendants used substantial and unreasonable force in attempting to remove Mr. Oakley from MSG up to this point.  First, a large group of Defendants' security personnel approach Mr. Oakley without justification and proceed to immediately and violently pull him backwards as soon as he stands up.  See Dkt. No. 104-2b at 8:17-19; Response to ¶¶ 10, 11.  Defendants' security guards then proceed to unreasonably push Mr. Oakley to the ground near his seat.  Dkt. No. 104-2b at 8:39-41; Dkt. No. 104-4 at 0:14-16; Response to ¶¶ 18-19.  After Mr. Oakley gets to his feet, another security guard grabs him and attempts to pull him in the security guard's direction.  Dkt. No. 104-3 at 0:31-34.  The same security guard then put both his hands on Mr. Oakley and grabbed Mr. Oakley's arm with his right hand.  Dkt. No. 104-3 at 0:36-40.

42.    After Oakley's second attack on an MSG security guard, MSG security personnel, together with the uniformed NYPD officer, began to attempt to remove Oakley from the seating area. NYT Video at 0:40–50.

**Response to Paragraph 42**

Admit that Defendants' security personnel and the alleged NYPD officer grabbed Mr. Oakley and began dragging him out of MSG.  Dispute the characterization that Mr. Oakley "attacked" Defendants' security personnel.  See Response to ¶ 39.

43.    To effectuate Oakley's removal and stop his attacks on the guard, an MSG security guard held Oakley's right arm (NYT Video at 0:40–44), an NYPD officer and a separate MSG

security guard held Oakley's left arm (*id.* at 0:42–47), and a third MSG security guard held Oakley's torso (*id.* at 0:45–49). *See also* ESPN Broadcast at 0:15–21; YouTube Video at 0:58– 1:07.

**<u>Response to Paragraph 43</u>**

Dispute in part. Admit that an MSG security officer grabbed Mr. Oakley's right arm, another placed Mr. Oakley's left arm in an arm bar and one grabbed his torso. Dkt. No. 104-3 at 0:40-46. Dispute the implication that these are the only one of Defendants' security personnel that dragged Mr. Oakley out of MSG. The video shows at least five, and potentially six, security guards participating in dragging Mr. Oakley out of MSG. A fourth security guard first attempts to grab Mr. Oakley by the neck before also grabbing at least his arm. Dkt. No. 104-3 at 0:42-44. A fifth security guard grabs Mr. Oakley from behind. Dkt. No. 104-4 at 1:01-06. A sixth security guard can be seen pushing the security guard who has Mr. Oakley's left arm in an arm bar, adding to the force being exerted on Mr. Oakley. Dkt. No. 104-1 at 0:23-26. However, because of the number of people surrounding Mr. Oakley at this point, is impossible to tell where each security guard's arms and hands are located. As a result, Plaintiff requires additional discovery to determine what role each member of Defendants' security personnel played in violently ejecting Mr. Oakley from MSG. Wigdor Decl. at ¶ 16. Further dispute the characterization that Defendants were attempting to "stop [Plaintiff's] attacks" on a security guard. Defendants' security guards' motivations cannot be determined based on the video, particularly considering what, if anything, the security guards said to Mr. Oakley during this period is inaudible. Thus, Plaintiff requires additional discovery concerning what Defendants' security guards said to Mr. Oakley and their motivations in dragging and/or pushing him out of MSG. <u>Id.</u>

44. After restraining Oakley, the group led Oakley toward the exit. NYT Video at 0:45– 50; ESPN Broadcast at 0:15–21; YouTube Video at 1:02–07.

**Response to Paragraph 44**

Dispute the characterization that MSG security personnel "led" Oakley towards the exit

or that they merely "restrained" him. Rather, the video evidence clearly shows that MSG

security personnel dragged, pushed and/or pulled Mr. Oakley towards the exit ramp despite the

fact that Mr. Oakley was not resisting their efforts in any manner. Dkt. No. 104-2b at 9:28-36;

Ex B at 1:04-11; Dkt. No. 104-3 at 0:44-51; Dkt. No. 104-1 at 0:22-28.

45. While Oakley was being led toward the exit, a fourth MSG security guard also held
Oakley's right arm. YouTube Video at 1:06–08.

**Response to Paragraph 45**

Dispute the characterization that the security guard "held" Mr. Oakley's right arm.

Further dispute the characterization that all this security guard did was grab Mr. Oakley's right

arm. The security grabs Mr. Oakley's right arm and proceeds to forcibly drag him to the exit.

Dkt. No. 104-4 at 1:02-08. However, the security guard's left arm is not visible, and it is unclear

where it is on Mr. Oakley's body. As a result, Plaintiff requires additional discovery concerning

what role each member of Defendants' security personnel played in violently ejecting Mr.

Oakley from MSG. Wigdor Decl. at ¶ 16.

46. For a few seconds, Oakley remained on his feet and walked alongside the NYPD officer
and MSG security guards who were leading him out of MSG at a steady pace. NYT
Video at 0:45–50; ESPN Broadcast at 0:15–21; YouTube Video at 1:02–07.

**Response to Paragraph 46**

Dispute. Plaintiff did not "walk alongside" the MSG security guards as Defendants now

claim. Rather, five to six members of Defendants' security personnel violently drag and/or push

Mr. Oakley out of MSG after they had already used a barrage of force against him. See

Response to ¶¶ 43-45.

### G. Oakley Falls Again and Refuses to Return to His Feet

47.    Then, while being escorted out of the arena, Oakley attempted to turn himself around to face the opposite direction from the exit to which he was being led. ESPN Broadcast at 0:18– 22; NYT Video at 0:48–51; YouTube Video at 1:06–09.

**Response to Paragraph 47**

Dispute. Mr. Oakley did not attempt to "turn himself." Mr. Oakley was being pushed/dragged by at least five large members of Defendants' security personnel, who had grabbed both his arms, his torso and his back. See Response to ¶ 43. Mr. Oakley could not move in any direction of his own volition because he was being pushed/dragged by Defendants' security guards. Oakley Decl. at ¶ 17-18. When Defendants' security guards attempt to turn a corner leading from the row where Mr. Oakley's seat was located to the ramp exiting MSG, it was *they* that abruptly changed Mr. Oakley's direction. See Dkt. No. 104-2b at 9:31-36; Dkt. No. 104-4 at 1:06-11; Dkt. No. 104-3 at 0:48-51; Dkt. No. 104-1 at 0:21-24.

48.    Neither the MSG security guards nor the NYPD officer turned around at that time; it was Oakley alone who elected to turn around. ESPN Broadcast at 0:18–22; NYT Video at 0:48– 51; YouTube Video at 1:06–09.

**Response to Paragraph 48**

Dispute. The video footage makes clear that Defendants' security guards change direction as they approach and round the corner leading to the exit ramp at MSG. Dkt. No. 104-1 at 0:21-24. By way of example only, only of the security guards who dragged Mr. Oakley out of MSG by pulling on his right arm turned around 360 degrees as he approached the corner, all while maintaining his hold on Mr. Oakley's right arm. Id.

49.    After turning himself around, Oakley fell to the ground and then refused to get up. ESPN Broadcast at 0:21–25; NYT Video at 0:50–54; YouTube Video at 1:07–24.

**Response to Paragraph 49**

Dispute. Mr. Oakley did not fall to the ground. Oakley Decl. at ¶¶ 18-20. Rather, Defendants' security personnel caused him to fall by both pushing and pulling him as they forcibly dragged him towards the exit. Id. At that point, Mr. Oakley's arms were up at the level of his shoulders and he was not resisting Defendants' security guard's efforts to eject him from MSG. Dkt. No. 104-4 at 1:07-11.

50.     Indicative of the fact that Oakley fell to the ground instead of being thrown to the ground is the fact that the NYPD officer escorting Oakley out of the arena stumbled and nearly fell to the ground in the wake of Oakley's fall. ESPN Broadcast at 0:22–26; NYT Video at 0:50–56; YouTube Video at 1:08–12.[13]

**Response to Paragraph 50**

Dispute. Mr. Oakley is not claiming that he was assaulted by any NYPD officers or that any NYPD officers acted in concert with Defendants' security personnel. In pushing and/or pulling Mr. Oakley to the ground, it is entirely consistent that an NYPD officer holding Mr. Oakley would also fall. See Response to ¶ 49. Further dispute Defendants' contention that the alleged NYPD officer lost his balance is inconsistent with Plaintiff's claim that he was pushed to the ground by the other six individuals. See Response to ¶¶ 43-48.

51.     Once on the ground, Oakley repeatedly refused to get up. See, e.g., YouTube Video at 1:33–34 (Oakley stating "I don't want to stand up").

**Response to Paragraph 51**

Admit that Mr. Oakley said at one point that he did not want to stand up. Dispute that he made this statement "repeatedly" as the cited material or evidence does not support the proffered factual proposition, in violation of Local Rule 56.1(d). Furthermore, dispute any relevance as what the Defendants' security personnel said to Mr. Oakley is not audible on the video footage

---

[13]     This dispositive video evidence belies Oakley's pleading allegation that he "was forcibly turned around so his back faced security, grabbed by six officials and thrown onto the ground." Am. Compl. ¶ 47.

provided by Defendants. By this point in time, Mr. Oakley had been pulled backwards, pushed to the ground, dragged towards the exit of MSG and pushed/dragged to the ground a second time. Mr. Oakley was therefore visibly concerned for his safety and what Defendants would do to him if he got to his feet. Oakley Decl. at ¶ 20. Plaintiff is entitled to further discovery concerning what Defendants' security personnel said to Mr. Oakley while he was on the ground and what Mr. Oakley said in response. Wigdor Decl. at ¶ 16.

52. Specifically, after falling, Oakley told the NYPD officer and security guards to "get the f**k off of me." YouTube Video at 1:13–15. At that point, only one NYPD officer and one MSG security guard were in physical contact with Oakley. *Id.*

**Response to Paragraph 52**

Dispute. Mr. Oakley did not tell the NYPD officer to "get the f*ck off me." Oakley Decl. at ¶ 22. Additionally, the footage to which Defendants cite does not support their contention that the only individuals in contact with Mr. Oakley were an NYPD officer and one MSG security guard. Because the video footage does not show Mr. Oakley's body below his torso, it is impossible to tell who else is holding onto Mr. Oakley at that point in time. See Ex B. at 1:13-15. Further, much of what Mr. Oakley said while on the ground and what was said to him is inaudible. Id. As a result, Plaintiff is entitled to further discovery concerning what Defendants' security personnel said to Mr. Oakley while he was on the ground and what Mr. Oakley said in response. Wigdor Decl. at ¶ 16.

53. Multiple individuals responded to Oakley by asking him to "get up" and "stand up." YouTube Video at 1:15–25.

**Response to Paragraph 53**

Dispute. The cited material or evidence does not support the proffered factual proposition, in violation of Local Rule 56.1(d). It is impossible to tell based on the video footage cited who spoke to Mr. Oakley and what precisely they said. As a result, Plaintiff is entitled to

further discovery concerning what Defendants' security personnel said to Mr. Oakley while he

was on the ground and what Mr. Oakley said in response. Wigdor Decl. at ¶ 16.

54. Oakley did not comply. Instead, Oakley repeatedly told the NYPD officer and MSG
security guards to "get off of me" (*id.* at 1:23–28), and then told the NYPD officer "I
don't want to stand up" (*id.* at 1:33–34).[14]

**Response to Paragraph 54**

Dispute. It is impossible to tell based on the video footage cited who spoke to Mr.

Oakley and what precisely they said. It is likewise impossible to hear everything that Mr.

Oakley said. Mr. Oakley did ask to be allowed to stand up of his own volition, but Defendants'

security personnel continued to hold his arms and legs, preventing him from doing so. Dkt. No.

104-4 at 2:05-20. In any event, Plaintiff is entitled to further discovery concerning what

Defendants' security personnel said to Mr. Oakley while he was on the ground and what Mr.

Oakley said in response. Wigdor Decl. at ¶ 16.

55. Oakley remained on the ground for approximately 80 seconds. *Id.* at 1:09–2:29.

**Response to Paragraph 55**

Admitted for the purposes of this motion.

56. During that time, a second uniformed NYPD officer joined the group attempting to
remove Oakley from MSG. ESPN Broadcast at 0:30–32; NYT Video at 1:06–10;
YouTube Video at 1:28–32.

**Response to Paragraph 56**

Admitted for the purposes of this motion.

57. While on the ground, Oakley told the two NYPD officers to "take me to jail," but still did
not get up. YouTube Video at 1:35–38.

---

[14]     This dispositive video evidence belies Oakley's pleading allegation that "[t]he security guards . . .
refused Mr. Oakley's repeated requests that he be allowed to stand up." Am. Compl. ¶ 48.

**Response to Paragraph 57**

Dispute in part. The audio in the cited video footage is muffled in parts by the crowd

noise and the sounds of other people speaking. Admit that Plaintiff said "take me…" but the

remainder of his statement is inaudible. Dkt. No. 104-4 at 1:35-38.

58. After additional requests to "stand up" (*id.* at 1:45–48), one of those in the group
attempting to remove Oakley emphasized to Oakley that he was "not cooperating" (*id.* at
2:09– 13). However, Oakley remained on the ground for approximately 15 more seconds
before finally returning to his feet. *See id.* at 2:13–29.

**Response to Paragraph 58**

Dispute in part. Admit that someone (but it is not clear who) is heard telling Mr. Oakley

that he was not cooperating. However, Mr. Oakley told the security guards surrounding him on

several occasions that "I'm getting up," and "give me a chance" to get up. Dkt. No. 104-4 at

2:10-19. Despite this fact, Defendants security guards continued to stand over him with their

arms all over him, preventing him from getting up. Id. Mr. Oakley is forced to pull himself up

by grabbing onto the guardrail. Id. at 2:20-30.

**H.      Oakley Returns to His Feet and Is Handcuffed by an NYPD Officer, Yet
         Continues to Resist Removal**

59. As Oakley rose to his feet, an NYPD officer handcuffed Oakley's right wrist. YouTube
Video at 2:23–30.[15]

**Response to Paragraph 59**

Admit for the purposes of this motion. Dispute Defendants' characterization in

footnote 15, characterizing Mr. Oakley's allegations that he was "put into restraints" as

"blatantly false." A handcuff is a form of restraint.

---

[15]      This dispositive video evidence belies Oakley's pleading allegations indicating that he was "put into
restraints" by an MSG security guard, which is blatantly false. *See* Am. Compl. ¶ 49.

60.     Oakley responded to the NYPD officer handcuffing his right wrist by telling him "you ain't tough." *Id.* at 2:29–31. Oakley then attempted to strike the NYPD officer with his left fist. *Id.* at 2:29–31.

**Response to Paragraph 60**

Dispute in part.  Mr. Oakley told the security guards behind the NYPD officer (who had previously surrounded him and were among those who made comments to him while he was on the ground) that they were not "tough."  Dkt. No. 104-4 at 2:28-31; Oakley Decl. at ¶ 23. Further dispute that Mr. Oakley attempted to "strike" the NYPD officer.  Rather, he pulled his left arm free after it had been grabbed by one of Defendants' security personnel.  Dkt. No. 104-4 at 2:29-33; Oakley Decl. at ¶ 24.

61.     Oakley again said, "that's some bullsh*t." *Id.* at 2:32–37.

**Response to Paragraph 61**

Admit for the purposes of this motion but dispute any relevance.  At this point, Mr. Oakley had been assaulted by Defendants' security personnel on multiple occasions without justification.  As a result, he was understandably upset.  Oakley Decl. at ¶ 15.  However, his after the fact anger does not have any bearing on whether the force used on him was reasonable.

62.     At that point, the two NYPD officers, together with three MSG security guards, attempted to walk Oakley out of the arena. *Id.* at 2:32–36.

**Response to Paragraph 62**

Admit for the purposes of this motion that at least three MSG security guards dragged Mr. Oakley out of MSG.  Dispute the characterization that they attempted to "walk" Mr. Oakley out of MSG.  Rather, they grabbed his right arm and forcibly dragged him out of MSG.  Dkt. No. 104-4 at 2:41-50.

63.     Oakley, however, once again resisted his removal by grabbing a railing with both hands. YouTube Video at 2:35–54.

**Response to Paragraph 63**

Admit that Mr. Oakley grabbed a guardrail with both hands. Dispute the characterization

that he "once again resisted his removal" as the cited material or evidence does not support the

proffered factual proposition, in violation of Local Rule 56.1(d). Further, Plaintiff never

previously attempted to resist removal. <u>See</u> Response to ¶¶ 43-47.

64.  Oakley refused to let go of the railing even after being repeatedly asked to "walk." *Id.* at 2:40–42.

**Response to Paragraph 64**

Admit for the purposes of this motion.

65.  At that time, Oakley put pressure on the fingers of an MSG security guard who was attempting to remove him, causing that security guard to yell out in pain. *Id.* at 2:42–45; *see also* NYT Video at 2:24–27.

**Response to Paragraph 65**

Dispute. Mr. Oakley did not touch any of the security guards. Rather both his hands

were at all times gripping the handrails. Dkt. No. 104-4 at 2:40-45. Thus, Mr. Oakley did

nothing to cause the security guard to yell out in pain.

66.  After that same MSG security guard successfully removed Oakley's left hand from the railing, Oakley attempted to strike that guard in the face. YouTube Video at 2:50–52.

**Response to Paragraph 66**

Dispute. After the security guard violently chopped Mr. Oakley's left arm, Mr. Oakley

attempted to push him away. Dkt. No. 104-4 at 2:50-55. However, at no point did Mr. Oakley

attempt to "strike" the security guard in the face. Oakley Decl. at ¶ 25.

67.  An NYPD officer then removed Oakley's right hand from the railing. *Id.* at 2:52–54.

**Response to Paragraph 67**

Admitted for the purposes of this motion.

68. Oakley responded by once again grabbing the railing with his right hand. *Id.* at 2:54–56. The same NYPD officer again removed Oakley's right hand from the railing for a second time. *Id.* at 2:55–57.

**Response to Paragraph 68**

Admitted for the purposes of this motion.

69. With Oakley finally separated from the railing to which he had been clinging, two NYPD officers and three MSG security guards walked Oakley out of MSG. *Id.* at 2:57–3:00.[16]

**Response to Paragraph 69**

Admit for the purposes of this motion that at least three MSG security guards attempted to drag Mr. Oakley out of MSG. Dispute the characterization that they attempted to "walk" Mr. Oakley out of MSG. Rather, they grabbed his right arm and forcibly drag him out of MSG. Dkt. No. 104-4 at 2:55-59. Dispute Defendants' characterization in footnote 16 that this contradicts Plaintiff's allegation that Defendants' "roughly threw him out of the Garden."

70. After Oakley was walked off the arena floor, two NYPD officers in the Zamboni Gate area completed handcuffing and arrested Oakley, away from the view of fans. Ex. 5.a at 0:14– 25.

**Response to Paragraph 70**

Admit for the purposes of this motion.

71. After handcuffing Oakley, the two NYPD officers walked Oakley within the back-of-house area toward the vehicle ramp exit. *Id.* at 0:28–36; Ex. 5.b at 0:05–12.

**Response to Paragraph 71**

Admit for the purposes of this motion.

72. The two NYPD officers and Oakley waited for a period of time at the top of the vehicle ramp. Ex. 5.b at 0:12–3:50. During that time, two other NYPD officers arrived on the scene. *Id.* at 1:23–32.

---

[16] This dispositive video evidence belies Oakley's pleading allegation that "security guards roughly threw him out of the Garden." Am. Compl. ¶ 49.

**Response to Paragraph 72**

Admit for the purposes of this motion.

73.     Ultimately, it was the two NYPD officers involved in Oakley's removal who escorted him down the ramp. *Id.* at 3:50–4:08; Ex. 5.c at 0:10–50. The group was accompanied by MSG security personnel and the two other NYPD officers. *Id.* at 3:50–4:08; Ex. 5.c at 0:10–50.

**Response to Paragraph 73**

Admit for the purposes of this motion.

74.     More NYPD officers met the group when they reached the bottom of the ramp. Ex. 5.d at 0:15–30.

**Response to Paragraph 74**

Admit for the purposes of this motion.

75.     The group then waited at the bottom of the ramp until the arrival of an NYPD van. *Id.* at 0:30–15:30.

**Response to Paragraph 75**

Admit for the purposes of this motion.

76.     After the NYPD van arrived, NYPD officers directed Oakley into the van. *Id.* at 16:28–58.

**Response to Paragraph 76**

Admit for the purposes of this motion.

77.     The NYPD van then drove Oakley away from MSG. *Id.* at 18:32–43.

**Response to Paragraph 77**

Admit for the purposes of this motion.

78.     From the time he left the seating area of the arena, Oakley remained on his feet, was in the custody of NYPD officers, and was being directed by them, not MSG security personnel. *See generally* Ex. 5.a, 5.b, 5.c, 5.d. In addition, during that time, no MSG employee was subjecting Oakley to any physical force whatsoever. *See generally* Ex. 5.a, 5.b, 5.c, 5.d.

**Response to Paragraph 78**

Dispute.  <u>See</u> Responses to ¶¶ 10-11, 18-19, 39, 41, 43-48.

79.    Oakley's Amended Complaint does not allege that Oakley sustained any physical injuries whatsoever from the entire event.

**Response to Paragraph 79**

Dispute.  Pursuant to Local Rule 56.1, "each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  Defendants' Paragraph 79 is therefore in violation of Local Rule 56.1 as their assertion is not followed by a citation to evidence.  Furthermore, the Amended Complaint clearly alleges that Mr. Oakley "has suffered and continues to suffer harm" as a result of Defendants' tortious conduct.  <u>See</u> Dkt. No. 36 at ¶¶ 125, 128.

## ADDITIONAL MATERIAL AND DISPUTED ISSUES OF FACT

In addition to the disputed facts set forth above, Plaintiff Charles Oakley further sets forth the additional material facts to which it is contended that there exists a genuine issue of fact to be tried.  Although Plaintiff has set forth these disputed facts in the accompanying memorandum of law with citations to evidentiary support, these disputed facts are set forth herein out of an abundance of caution.  However, for the sake of ease and brevity, the citations listed as to each material fact that is in dispute track the citations in the memorandum of law and given that descriptions of each citation are set forth in the memorandum of law, those descriptions are not repeated herein.

I.    **Plaintiff Attends the New York Knicks Game on February 8, 2017**

80.    On February 8, 2017, Mr. Oakley attended a Knicks game at MSG against the Los Angeles Clippers.  <u>See</u> Oakley Decl. at ¶ 2.

81.     Defendants' video footage does not contain any evidence of Plaintiff's behavior from when he entered MSG to when he initially took his seat prior to the Knicks game.  See Wigdor Decl. at ¶ 11.

82.     Plaintiff was not intoxicated or behaving inappropriately in any way when he arrived at MSG and was permitted to enter the arena and proceed to his seat without incident.  See Oakley Decl. at ¶ 3.

83.     Plaintiff did not make inappropriate sexual or racial comments or yell at any employees or spectators at MSG.  See Oakley Decl. at ¶ 4.

84.     Plaintiff made his way to his seat, descending the arena stairs.  Dkt. No. 104-2b at 0:06-12.

85.     As Plaintiff descended the stairs, Defendant Dolan turned his head, looking in Plaintiff's direction.  Dkt. No. 104-2b at 0:12-14.

86.     Mr. Oakley took his seat, which was an aisle seat, one row diagonally behind where Dolan was seated.  Dkt. No. 104-2b at 0:18-26.

87.     Plaintiff remained seated to the right of one individual, when a second individual took a seat two seats to the left of Plaintiff.  Dkt. No. 104-2b at 0:26-34.

88.     A female Garden employee approached the row where Plaintiff was seated and interacted cordially with Plaintiff as well as the two individuals seated to Plaintiff's left.  Dkt. No. 104-2b at 0:38-1:17.

89.     Two men and a boy approached Plaintiff along with another Garden official.  Dkt. No. 104-2b at 1:21-50.

90.     The men, boy and Garden official all interacted cordially with Plaintiff and then the men and boy took their seats in Plaintiff's row.  Dkt. No. 104-2b at 1:50-55.

91.     Plaintiff and the two individuals seated to his left continued to watch the game and speak cordially.  Dkt. No. 104-2b at 1:55-2:05.

92.     Plaintiff then acknowledged fans to his left, waving to them.  Dkt. No. 104-2b at 2:08-10.

93.     Plaintiff and the two individuals seated to his left then continued to watch the game without incident.  Dkt. No. 104-2b at 2:09-42.

94.     Plaintiff then leaned forward and tapped former tennis star John McEnroe, who was seated one row in front of Plaintiff (and two seats to Dolan's left) on the back.  Dkt. No. 104-2b at 2:44-46.

95.     McEnroe turned around, at which point Plaintiff and McEnroe greeted each other and shook hands.  Dkt. No. 104-2b at 2:46-49.

96.     Plaintiff also shook hands with the individual seated to McEnroe's left.  Dkt. No. 104-2b at 2:54-56.

97.     Plaintiff and the two individuals seated to his left went back to watching the game, interacting cordially with each other.  Dkt. No. 104-2b at 2:57-3:44.

98.     The female Garden employee returned and again interacted cordially with Plaintiff and the individual seated to Plaintiff's left, shaking hands with that individual, before the female Garden employee again left.  Dkt. No. 104-2b at 3:52-4:17.

99.     Plaintiff and the two individuals seated to his left went back to watching the game.  Dkt. No. 104-2b at 4:19-26.

100.     At no point while he was seated watching the Knicks game did Plaintiff scream at any of Defendants' employees or make any other inappropriate or derogatory comments.  See Oakley Decl. at ¶ 4.

101.     After a stoppage in play, one of Defendants' security guards stationed himself at the bottom of the stairwell, to Plaintiff's right.  Dkt. No. 104-2b at 4:26-36.

102.     Dolan turned his head and again looked in Plaintiff's direction with his arms crossed.  Dkt. No. 104-2b at 4:40-46.

103.     Mr. Oakley continued to interact cordially with the fans all around him.  Dkt. No. 104-2b at 4:55-5:26.

104.     Plaintiff then cordially interacted with a different security guard stationed just diagonally in front of Plaintiff, at the bottom of the stairwell.  Dkt. No. 104-2b at 5:26-40.

105.     A security guard was stationed near the end of the row where Dolan was seated when Dolan motioned him over.  Dkt. No. 104-2b at 6:18-19.

106.     The security guard then approached Dolan, and the two spoke for approximately 17 seconds.  Dkt. No. 104-2b at 6:19-40

107.     The individual seated directly to Dolan's left actively listened in on the conversation between the security guard and Dolan.  Dkt. No. 104-2b at 6:27-40.

108.     The security guard then moved as though he was about to leave at which point Dolan called him back and spoke for approximately 30 additional seconds.  Dkt. No. 104-2b at 6:42-7:10.

109.     The individual seated directly to Dolan's left again actively listened in on the conversation between the security guard and Dolan.  Dkt. No. 104-2b at 6:42-7:10.

110.     The security guard then walked away from Dolan and immediately made his way toward Plaintiff, who had been behaving unobtrusively throughout this entire time.  Dkt. No. 104-2b at 7:10-14.

111.    As the security guard reached the row where Plaintiff was seated, he stopped for a moment and touched his ear in a way that made it seem as though he was communicating through an earpiece.  Dkt. No. 104-2b at 7:14-16.

112.    A group of additional security guards then emerged from the tunnel and assembled diagonally behind the Knicks' bench.  Dkt. No. 104-2b at 7:17-25.

113.    During this time, Dolan turned his head and looked towards Plaintiff before Dolan placed the cup, which was still in his hand, on the floor.  Dkt. No. 104-2b at 7:36-42.

114.    Dolan then looked to his left at the security guards and emphatically pointed with his right index finger towards the ground.  Dkt. No. 104-2b at 7:42-44.

115.    At that point, the security guards (approximately eight of them) marched directly towards Plaintiff.  Dkt. No. 104-2b at 7:44-59.

116.    The security guards surrounded Plaintiff.  Dkt. No. 104-2b at 7:59-8:01; see Oakley Decl. at ¶ 6.

117.    The security guards who surrounded Mr. Oakley demanded that he leave MSG without further explanation.  Dkt. No. 104-2b at 8:02-11; see Oakley Decl. at ¶ 7.

118.    Plaintiff never refused to leave MSG.  Rather, Plaintiff responded by asking why he was being forced to leave when he had done nothing wrong.  See Oakley Decl. at ¶ 8.

119.    The security guard who had initially approached Mr. Oakley signaled towards the other security guards.  Dkt. No. 104-2b at 8:11-14

120.    Less than 25 seconds after approaching Plaintiff initially, the security guard who had initially approached Mr. Oakley responded to Mr. Oakley standing up by immediately pushing Plaintiff, who was forced backward by the guard's push.  Dkt. No. 104-2b at 8:02-18; see Oakley Decl. at ¶ 11.

121.     Guards on Plaintiff's other side immediately – without provocation – grabbed Plaintiff from behind and pulled him backwards, including by grabbing and tugging Plaintiff's arms, causing him to lose his balance.  Dkt. No. 104-2b at 8:15-28; see Oakley Decl. at ¶ 11.

122.     After the guards let go of Mr. Oakley, he raised his hands in a defensive position and moved steadily backwards, visibly indicating that he was peaceably complying with the security guards and that he did not want matters to escalate.  Dkt. No. 104-2b at 8:30; Dkt. No. 104-4 at 0:06-09; see Oakley Decl. at ¶ 12.

123.     A guard nevertheless continued to place his hands all over Plaintiff's back and arm.  Dkt. No. 104-2b at 8:30; Dkt. No. 104-4 at 0:06-09.

124.     As Mr. Oakley was walking away from the security guards and towards the stairs, in an attempt to deescalate the situation, a security guard with his hands on Plaintiff's back and arm pushed Mr. Oakley, causing Plaintiff to fall to the ground near the stairs and feel pain.  Dkt. No. 104-4 at 0:10-14; see Oakley Decl. at ¶¶ 13-14.

125.     Plaintiff did not trip and fall.  See id. ¶ 14.

126.     Plaintiff was understandably upset after having been pushed to the ground without provocation.  Oakley Decl. at ¶ 15.

127.     As security guards surrounded Plaintiff and began laying their hands on him again, Plaintiff was worried that he would be assaulted again.  He therefore attempted to defend himself by slapping one security guard's arm off of his back.  See Oakley Decl. at ¶ 16; Dkt. No. 104-4 at 0:26-1:05.

128.     Dolan stood up and looked on but did nothing to prevent his security guards from violently ejecting Oakley from the arena before sitting back down and sipping his beverage. Dkt. No. 104-2b at 9:19-45.

129. Six security guards then dragged Plaintiff, who was still on his feet, from where he was sitting toward a ramp that led to an exit from MSG. Dkt. No. 104-4 at 1:02-10.

130. During this time, a MSG security officer grabbed Mr. Oakley's right arm, another placed Mr. Oakley's left arm in an arm bar and one grabbed his torso. Dkt. No. 104-3 at 0:40-46.

131. A fourth guard first attempted to grab Mr. Oakley by the neck before also grabbing at least his arm. Dkt. No. 104-3 at 0:42-44.

132. A fifth security guard grabbed Mr. Oakley from behind. Dkt. No. 104-4 at 1:01-06.

133. A sixth security guard can be seen pushing the security guard who has Mr. Oakley's left arm in an arm bar, which served to exert greater force on Plaintiff. Dkt. No. 104-1 at 0:23-26; Dkt. No. 104-4 at 1:02-10.

134. Plaintiff did not resist Defendants' efforts to drag him out of MSG. Dkt. No. 104-4, 1:02-10; see Oakley Decl. at ¶ 17.

135. As the security guards dragged/pushed Mr. Oakley out of MSG, they maintained a strong grip on Plaintiff's upper body and he was unable to move of his own volition, nor was he attempting to do so. Dkt. No. 104-4 at 1:04-12; see Oakley Decl. at ¶ 18.

136. When the security guards turned a corner leading to an exit ramp out of MSG, the security guards behind Plaintiff pushed him hard while the security guards in front of him dragged him forcefully forward. Their combined exertion forced Plaintiff to fall to the ground and feel pain. Dkt. No. 104-4 at 1:04-12; see Oakley Decl. at ¶¶ 19-20.

137. Plaintiff did not trip or otherwise fall of his own volition. Rather, it was the unreasonable force used Defendants' security guards in pushing and/or dragging Mr. Oakley –

who was not resisting at all – from MSG that caused him to fall to the ground.  See Oakley Decl. at ¶¶ 18-20.

138.    As Plaintiff lay supine on the ground, he did not resist.  Dkt. No. 104-4 at 1:12-25; see Oakley Decl. at ¶ 22.

139.    With guards piled all around Plaintiff, the guards continued to try and grab Plaintiff's hand.  Dkt. No. 104-4 at 1:46-53.

140.    Even as Plaintiff repeatedly told the guards that he would "give [his hand] up," they continued to use force against him.  Dkt. No. 104-4 at 2:01-05.

141.    Plaintiff then also repeatedly explained, consistent with the guards' instruction, that he would "get up" if they would just "give [Plaintiff] a chance" to do so.  Dkt. No. 104-4 at 2:10-21.

142.    The fear and panic in Plaintiff's voice at this point was readily apparent, as he was surrounded by numerous guards who had already assaulted him on numerous occasions were not permitting him even a moment to stand up on his own volition.  See Oakley Decl. at ¶ 21; Dkt. No. 104-4 at 2:09-21.

143.    Plaintiff continued to hold on to a gate in the walkway as he protested that he had done nothing wrong, as multiple guards attempted to force his other arm violently behind Plaintiff's back, which again caused Plaintiff excruciating pain.  Dkt. No. 104-4 at 2:35-57.

144.    The guards then escorted Plaintiff along the Garden walkway.  Dkt. No. 104-4 at 2:35-57.

## II.    False Statements by Dolan and the Knicks After the February 8, 2017 Altercation

145.    Shortly after the incident on February 8, 2017, the Knicks public relations Twitter account tweeted: "Charles Oakley came to the game tonight and behaved in a highly

inappropriate and completely abusive manner. He has been ejected and is currently being arrested by the New York City Police Department. He was a great Knick and we hope he gets some help soon." See Ex. A.

146. The next day, February 9, 2017, the Knicks public relations Twitter account tweeted: "There are dozens of security staff, employees and NYPD that witnessed Oakley's abusive behavior. It started when he entered the building and continued until he was arrested and left the building. Every single statement we have received is consistent in describing his actions. Everything he said since the incident is pure fiction." See Ex. A.

147. These Tweets were false: Plaintiff had peaceably entered the Garden to watch the Knicks game, treated security staff and employees respectfully and did not use any abusive language or otherwise exhibit inappropriate behavior, only making contact with a security guard after one guard had forcefully shoved him and numerous other guards held him and violently tugged him from behind. See Oakley Decl. at ¶¶ 3-5, 10-12; Dkt. No. 104-2b at 8:13-38.

148. On February 10, 2017, Dolan appeared on the Michael Kay Show. See generally Dkt. No. 43-6.

149. At the outset of the interview, Dolan immediately stated that "We need to keep the Garden a place that's comfortable and safe for everybody who goes there" and that "anybody who comes to the Garden, whether they've been drinking too much alcohol, they're looking for a fight, they're abusive, disrespectful to the staff and the fans, they're gonna be ejected and they're gonna be banned" "because everybody has a right to come to those games and enjoy them and no one has the right to take that away from everybody else, and in this case that's what happened," referring to the incident with Plaintiff. See Dkt. No. 43-6 at 1:00-36.

150.     Oakley was not intoxicated while he was at MSG on February 8, 2017.  See Oakley Decl. at ¶ 3.

151.     Dolan stated, again referring to Plaintiff, that when you "come to the Garden and you behave that way and you abuse people that way . . . and subject people to that kind of behavior, you will be ejected and banned."  See Dkt. No. 43-6 at 3:00-13.

152.     Michael Kay then asked Dolan "what happened" that evening.  See Dkt. No. 43-6 at 3:23-30.

153.     Dolan stated that "it's very clear to us that [Plaintiff] came to the Garden with an agenda, with a mission in mind and from the moment he stepped into the Garden, I mean the moment he walked through the first set of doors, he began with this behavior, abusive behavior, disrespectful behavior" and this behavior "accelerated and accelerated and accelerated all the way down to his seats and then ultimately with the confrontation with security and eventually ending up with his being ejected and arrested."  See Dkt. No. 43-6 at 3:36-4:24.

154.     This statement was untrue: Plaintiff had peaceably entered MSG to watch the Knicks game, treated security staff and employees respectfully and did not use any abusive language or otherwise exhibit inappropriate behavior, only making contact with the security guards after one guard had forcefully shoved him and numerous other guards held him and violently tugged him from behind.  See Oakley Decl. at ¶¶ 3-5, 10-12; Dkt. No. 104-2b at 0:06-12, 8:13-38.

155.     When pressed by Kay as to what Plaintiff's "agenda" was, Dolan conceded that he "did not really know for sure" and that he was "not inside of Charles Oakley's mind" and that Oakley did "say a bunch of things along the way that looked like he was headed in [Dolan's] direction," although Dolan admitted that he "did not hear" remarks to this effect himself but that

he "heard from [his] employees" that Plaintiff was "using [Dolan's] name a lot." See Dkt. No. 43-6 at 4:25-52.

156.    This statement was also untrue; Plaintiff never made any effort to approach Dolan. See Oakley Decl. at ¶¶ 4-7; Dkt. No. 104-2b at 0:04-7:48. Further, it was Defendants' security guards, and not Mr. Oakley, who used Dolan's name when they told him that they were forcing him to leave MSG based on Dolan's instructions. See Oakley Decl. at ¶¶ 7, 9.

157.    Dolan further stated that "you can't do what [Oakley] did and stay" at the Garden. See Dkt. No. 43-6 at 5:00-03.

158.    Dolan further stated that Plaintiff had been "drinking beforehand" and that there were statements from some of the police and security that Plaintiff "appeared to be impaired, etc." and that "clearly [the Garden] staff could see that. Were they intimidated and that's why they didn't do anything? I don't know" but "the right thing, if everything had gone well, is he never would have made it to his seats." See Dkt. No. 43-6 at 5:41-6:10.

159.    This statement was also false; Plaintiff was not intoxicated or otherwise impaired on February 8. 2017. See Oakley Decl. at ¶ 3.

160.    Dolan stated that he was not aware, when the events unfolded, of "all the stuff that happened beforehand, obviously" and that he "wasn't aware that [Plaintiff] was behind" Dolan and that it wasn't until it was "pointed out to [Dolan] that [Plaintiff] was behind us" and that then Dolan "opened [his] ear and started to hear" Plaintiff and that "what he heard was terrible." See Dkt. No. 43-6 at 8:10-27.

161.    This statement was untrue, however, as Dolan saw Plaintiff proceed to his seat. See *supra* at ¶ 85; Dkt. No. 104-2b at 0:12-14.

162.     When confronted by Kay with the fact that Plaintiff has denied any wrongdoing, including that Plaintiff was not using foul language, Dolan responded, "It's unbelievable" and that Dolan "can't explain why" because they "have videotape" and "dozens of statements, etc." and that Dolan is "quite sure that everything we've given the press, etc." is "very, very accurate" and that maybe Plaintiff "doesn't remember it, I mean, to me Charles [Oakley] has got a problem, I've said this before . . . he's his own worst problem, he has a problem" and that people need to "sort of understand that" and that, reading from his notes, that Plaintiff has a "problem with anger, he's both physically and verbally abusive" and that he "may have a problem with alcohol." See Dkt. No. 43-6 at 8:50-9:59.

163.     Later in the interview, Dolan stated that "it's certainly not just about me," "there were security people there who were abused, there were service people there who were abused" and that those staff members were "abused in a really horrible, angry, nasty way, racially, with racial overtones, sexual overtones, the stuff you never ever wanna hear." See Dkt. No. 43-6 at 26:10-51.

164.     This statement was untrue; Plaintiff made no abusive remarks to any of Defendants' employees or to any spectator at MSG on February 8, 2017. See Oakley Decl. at ¶¶ 4-5.

165.     Dolan again stated later in the interview that fans at the Garden should "look around and look at the people who are working at Madison Square Garden and understand that [Plaintiff] may have been a great Knick player but he was terribly abusive to those same [staff members] who are there to help" the fans during games. See Dkt. No. 43-6 at 27:49-28:14.

166.     This statement was untrue; Plaintiff made no abusive remarks to any Garden employee or attendee that evening, including to Dolan. See Oakley Decl. at ¶¶ 4-5.

167.     Dolan concluded the interview by stating that "this [was] an abusive situation, the staff the workers at Madison Square Garden – me – were abused here."  <u>See</u> Dkt. No. 43-6 at 30:23-35.

168.     This statement was untrue; Plaintiff made no abusive remarks to any Garden employee or attendee that evening.  <u>See</u> Oakley Decl. at ¶¶ 4-5.

Dated: February 19, 2021
      New York, New York                                    Respectfully submitted,

**WIGDOR LLP**

By: _____
      Douglas H. Wigdor
      Renan F. Varghese

85 Fifth Avenue
New York, New York 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
rvarghese@wigdorlaw.com

**PETRILLO KLEIN & BOXER LLP**


By: /s/ Nelson A. Boxer
      Nelson A. Boxer
      John Allen

655 3rd Avenue, #22
New York, NY 10017
Telephone: (212) 370-0330
nboxer@pkbllp.com
jallen@pkbllp.com

*Counsel for Plaintiff*