**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

CHARLES OAKLEY,

              Plaintiff,

       v.

MSG NETWORKS, INC., *et al.*,

            Defendants.

Case No. 17-cv-6903 (RJS)

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SPOLIATION SANCTIONS AGAINST
<u>PLAINTIFF CHARLES OAKLEY AND HIS COUNSEL</u>**

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT.................................................................................... 1

II.   FACTUAL AND PROCEDURAL BACKGROUND ....................................................... 6

    A.    Following His February 2017 Ejection From the Garden, Oakley and His Counsel Take No Steps to Preserve Relevant Evidence on His Cell Phone. ...........6

    B.    Four Years After Filing This Case, Oakley Destroys His Mobile Phone Data—Including Text Message Evidence—Relevant to This Action.......................7

    C.    On August 22, 2024, Oakley's Counsel Informs Defendants That Years' Worth of His Texts Were Destroyed and Then Obstructs Defendants' Investigation...............................................................................................................8

    D.    At His October 23, 2024 Deposition, Oakley Testifies That Neither He Nor His Counsel Attempted to Recover the Destroyed Text Messages.................9

    E.    At the December 19, 2024 Hearing, Oakley Confirms He Knew His Cell Phone Contained Relevant Evidence and Knew He Would Lose Evidence When He Traded It In. .......................................................................................10

III.  ARGUMENT ............................................................................................................ 12

    A.    Oakley Should be Sanctioned for Intentionally Spoliating Evidence Under Rule 37(e)(2)............................................................................................12

    B.    At a Minimum, Oakley Should Be Sanctioned for Spoliation Under Rule 37(e)(1). .........................................................................................................15

    C.    Oakley's Counsel Should be Sanctioned for Failing to Fulfill Their Preservation Duties and Impeding Defendants' Efforts to Investigate the Spoliation They Caused. ...................................................................................19

    D.    The Court Should Grant Severe and Proportional Sanctions................................24

IV.   CONCLUSION.......................................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ahamed v. 563 Manhattan,*
  2024 WL 3061962 (E.D.N.Y. June 17, 2024) .......................................................................25

*Brewer v. Leprino Foods,*
  2019 WL 356657 (E.D. Cal. Jan. 29, 2019) ..........................................................................14

*Bryant v. Gen. Cas. Co. of Wis.,*
  337 F.R.D. 1 (N.D.N.Y. 2020)...............................................................................................24

*CBF Industria de Gusa S/A v. AMCI Holdings,*
  2021 WL 4190628 (S.D.N.Y. Aug. 18, 2021) .......................................................................19

*Chan v. Triple 8 Palace,*
  2005 WL 1925579 (S.D.N.Y. Aug. 11, 2005) ..................................................................19, 21

*Charlestown Cap. Advisors v. Acero Junction,*
  337 F.R.D. 47 (S.D.N.Y. 2020) .............................................................................................12

*Doe v. Wesleyan Univ.,*
  2022 WL 2656787 (D. Conn. July 8, 2022) ..........................................................................13

*DR Distribs. v. 21 Century Smoking,*
  513 F. Supp. 3d 839 ...............................................................................................................20

*Europe v. Equinox Holdings,*
  592 F. Supp. 3d 167 (S.D.N.Y. 2022)................................................................................5, 19

*Experience Hendrix v. Pitsicalis,*
  2018 WL 6191039 (S.D.N.Y. Nov. 28, 2018-).......................................................................25

*GFI Acquisition v. Am. Federated Title,*
  2010 Bankr. LEXIS 1217 (Bankr. S.D.N.Y. Apr. 7, 2010)...................................................20

*Google v. Starovikov,*
  2022 WL 16948296 (S.D.N.Y. Nov. 15, 2022).................................................................13, 24

*Laub v. Horbaczewski,*
 2020 WL 9066078 (C.D. Cal. July 22, 2020) ..................................................................14

*Malletier v. Dooney & Bourke,*
 525 F. Supp. 2d 558 (S.D.N.Y. 2007) .............................................................................21

*Moody v. CSX Transp.,*
 271 F. Supp. 3d 410 (W.D.N.Y. 2017) ...............................................................13, 14, 25

*Ottoson v. SMBC Leasing & Fin.,*
 268 F. Supp. 3d 570 (S.D.N.Y. 2017) .............................................................................14

*Paisley Park Enters. v. Boxill,*
 330 F.R.D. 226 (D. Minn. 2019) .....................................................................................15

*Phx. Four v. Strategic Res.,*
 2006 U.S. Dist. LEXIS 32211 (S.D.N.Y. May 22, 2006) ...............................................20

*Resnik v. Coulson,*
 2019 WL 2256762 (E.D.N.Y. Jan. 4, 2019) ....................................................................12

*Richard Green (Fine Paintings) v. McClendon,*
 262 F.R.D. 284 (S.D.N.Y. 2009) ....................................................................................12

*Ronnie Van Zant v. Pyle,*
 270 F. Supp. 3d 656 (S.D.N.Y. 2017) .................................................................15, 18, 25

*Rossbach v. Montefiore Med. Ctr.,*
 2021 WL 3421569 (S.D.N.Y. Aug. 5, 2021), *aff'd in part, vacated in part,* 81
 F.4th 124 (2d Cir. 2023) ..................................................................................................24

*Schnatter v. 247 Grp.,*
 2022 WL 2402658 (W.D. Ky. Mar. 14, 2022) ................................................................15

*Sines v. Kessler,*
 2021 WL 4943742 (W.D. Va. Oct. 22, 2021), *order approved,* 2021 WL
 5492826 (W.D. Va. Nov. 19, 2021)..................................................................................14

*Telecom Int'l Am. v. AT&T,*
 189 F.R.D. 76 (S.D.N.Y. 1999) .......................................................................................19

*West v. Goodyear Tire & Rubber,*
 167 F.3d 776 (2d Cir. 1999)............................................................................................25

**Statutes**

28 U.S.C. § 1927.......................................................................................................................5, 24

**Other Authorities**

Fed. R. Civ. P. 26 ....................................................................................................................5, 23

Fed. R. Civ. P. 37 ........................................................................................................... *passim*

Fed. R. Civ. P. 56 .................................................................................................................16, 24

Fed. R. Evid. 702 .................................................................................................................21

Defendants MSG Networks, Inc., Madison Square Garden Sports Corp., and Sphere Entertainment Group, LLC (collectively, "MSG" or "Defendants"), by and through undersigned counsel, submit this Memorandum of Law in Support of their Motion for Spoliation Sanctions.

## I.    <u>PRELIMINARY STATEMENT</u>

This is a motion for spoliation sanctions against Plaintiff Charles Oakley ("Oakley") and his counsel over the conscious destruction of critical evidence in this case: five years' worth of Oakley's unguarded text messages with numerous friends, family, advisors, and professional contacts regarding his February 8, 2017 ejection from Madison Square Garden (the "Garden"), including those in the immediate aftermath of the incident. This evidence was destroyed because, for the entire time that this case has been litigated, Oakley and his counsel ignored their duties to preserve relevant electronically stored information ("ESI") on his cell phone. Both Oakley and his counsel failed to take any steps—let alone "reasonable steps," as required by the Federal Rules of Civil Procedure—to preserve this highly relevant text message evidence, even though they chose to file this case and even though both agreed, per Oakley's engagement letters with his lawyers, that relevant text messages must be saved.

Any responsible counsel would have imaged the phone of their individual celebrity client on whose behalf they were bringing the lawsuit at the outset of the case to make sure the evidence on it was preserved. *See, e.g.*, Decl. of P. Favro ("Favro Decl.") ¶¶ 36, 41. Instead, as his lawyers have admitted, they did nothing to compile or preserve evidence at the beginning of the case, other than have Oakley sign engagement letters that left to him alone responsibility to save it. And his counsel did no follow-up with him to ensure he was preserving relevant evidence. As Oakley admitted during his hearing testimony, "nobody, not [him], not [his] lawyers, took any steps to

preserve" his text messages at any time. Ex. 1 (12/19/2024 Tr.) 38:8-10; *id*. 37:22-38:5.[1] The same

went for Oakley's messages on Facebook, Instagram, Twitter, and WhatsApp, none of which were

subject to any preservation efforts by Oakley or his counsel. *See id*. 123:22-129:8.

Though Oakley and his counsel made no attempt to secure the evidence on his cell phone,

it wasn't inevitable that his text messages would be lost. For the first four years of this case,

Oakley's texts remained on his cell phone. Then, in December 2021, Oakley traded in his "broken"

AT&T phone for a new one, knowing from the store's staff that he would likely lose data in the

process. *See id*. 10:15-17; 106:3-4. He admitted during his hearing testimony that, by then, he had

texted with many individuals about this incident. *See, e.g.*, *id*. 46:2-3; 54:4-71:10. He also admitted

he knew that he was supposed to preserve relevant evidence. *See id*. 104:13-7. And there were

steps that he could have easily taken to back up his device or copy the data before attempting a

transfer of it to a new phone, but he chose not to take them. *See* Favro Decl. ¶ 41. But as Oakley

readily admitted, it was "more important" to him "to have a phone" than save the data on the old

one. Ex. 1 31:8-19. In addition to the one and only thing Oakley's counsel did, which was to inform

him in buried language in their engagement letters of his obligation to preserve relevant evidence,

Oakley also admitted that he knew of his preservation obligations from his being a party in multiple

other litigations. *Id*. 25:5-12; 83:15-18; 93:17-20; 100:4-6. Hence, he acted with conscious

disregard of his preservation obligations and, therefore, conscious intent to deprive MSG of

relevant evidence, warranting sanctions. *Id*. 40:15-17 (THE COURT: So you understood that you

could lose data when you got a new phone? A. Yes, sir.).

There is no question that, besides videos of the incident capturing Oakley's conduct that

---

[1] References to "Ex. __" refer to the exhibits to the January 9, 2025 Declaration of Randy M.
Mastro.

night, Oakley's contemporaneous text messages would have been the best evidence of Oakley's impressions of what really happened—before he lawyered up and got scripted by counsel. Oakley has testified that texting is one of the "two principal ways" he communicates, and that he texts more than he emails. Ex. 2 467:5-20. In fact, he admitted to texting with more than a dozen people (and likely many more) about the subject matter of this case in its immediate aftermath and later. *See, e.g.*, Ex. 1 54:4-71:10. Indeed, his incidentally-saved texts from January 2023 show remarkable candor about Oakley's "suing the shit out of Dolan" and pursuing an aggressive PR/discovery strategy to try to pressure MSG into "settlement talks." ECF 185-6; ECF 185-8. One could reasonably expect Oakley's contemporaneous exchanges to have been even more candid. For months now, MSG has been left trying to chase down, unsuccessfully, the missing texts from Oakley's contacts and from AT&T, while Oakley and his counsel sat on the sidelines, belatedly giving us some names to subpoena and reaching out to AT&T only *after* the Court's spoliation hearing. *See, e.g.*, Ex. 3 at 1; Ex. 4. But AT&T has confirmed that the content of Oakley's text messages cannot be recovered, and there is, therefore, virtually no contemporaneous record of what Oakley said in private about the incident at the time it happened and for years after.

This loss of contemporaneous evidence is especially acute because it leaves MSG unable to challenge the veracity of Oakley's dubious, after-the-fact claims. As this Court knows, the Second Circuit reversed this Court's summary judgment decision on the ground that a February 19, 2021 declaration submitted by Oakley—which Oakley recently confirmed was drafted by his lawyers—created disputed fact issues requiring discovery. As discovery has proceeded, the few unguarded statements by Oakley that MSG has obtained—including drafts of his "ghostwritten" autobiography, in which he admits he "slipped" and fell when first approached by MSG security guards—reveal that key statements in the declaration, including that Oakley was supposedly

"pushed" to the ground by MSG security, were contrived simply to survive summary judgment. *See* Exs. 5-6 (comparing drafts of autobiography before and after counsel's review). Now, MSG is litigating with its hands tied behind its back, against a plaintiff who can continue to manipulate the record with counsel-crafted testimony, knowing whatever he said in confidence to his friends, family, PR professionals, managers, and others about what really happened that night will never come to light. Thus, the prejudice to MSG caused by this spoliation cannot be overstated.

It is bad enough that Oakley and his counsel completely disregarded their preservation obligations throughout this case. Making matters even worse, though, has been the conduct of Oakley's counsel after disclosing Oakley's destruction of text messages. Oakley's counsel refused at least five times to answer most of MSG's straightforward questions about the spoliation in writing—*see, e.g.*, Ex. 7 at 3; Ex. 3 at 3—and the questions they ultimately did answer during a "meet and confer" contained outright falsehoods designed to send MSG on a wild goose chase. For example, Oakley's counsel misdirected MSG to subpoena Verizon for Oakley's cell phone records when Oakley's provider was AT&T. ECF 194 at 2. At the same time, Oakley's counsel failed to take even the most basic step of contacting AT&T to get Oakley's phone records until *after* this Court's December 19, 2024 hearing. And now, Oakley's counsel is taking the outrageous position that the only thing they had to do to fulfill their preservation obligations was bury a line in their engagement letters "direct[ing their] client to preserve" and "then to take steps if there is a problem, to then go back and try to recreate that information," which they only first attempted to do *after* facing a spoliation sanctions hearing. Ex. 9 22:25-23:3; *see also* Ex. 10; Ex. 4. Telling a client to preserve evidence is not a "step" toward preservation and comes nowhere close to discharging an attorney's preservation obligations in a case like this, as overwhelming case law and MSG's renowned ESI preservation expert, Philip Favro, confirm. *See, e.g.*, Favro Decl. ¶ 43.

Given that Oakley's misconduct was intentional and has had such profound consequences, MSG respectfully submits that a sanction of dismissal under Federal Rule of Civil Procedure 37(a)(2) is warranted. Whether or not Oakley acted intentionally, the prejudice from this misconduct is so severe that MSG alternatively requests the Court preclude Oakley from asserting certain facts from his manufactured declaration that are inconsistent with his prior unguarded statements—namely, that (1) he was "pushed" to the ground by MSG security guards when they first approached him, instead of "slipping" on his own, as he admitted in drafts of his autobiography; and (2) he was "defend[ing] himself" when he hit MSG security guards, when he admitted in drafts of his autobiography that he regretted "touch[ing]" them. If this case proceeds to trial, MSG also requests a jury instruction that Oakley destroyed his text messages and an adverse inference that the missing texts would be unfavorable to Oakley. *See Europe v. Equinox Holdings*, 592 F. Supp. 3d 167, 178 (S.D.N.Y. 2022) (finding spoliation, while not "intentional," was prejudicial, and therefore imposing sanction limiting spoliating party's arguments to the jury and authorizing jury instruction that spoliating party lost evidence that should have been preserved). In addition, this Court should award MSG's fees and costs dating back to August 2024 relating to this motion, its inquiries into Oakley's destroyed texts, and steps taken to obtain the missing evidence elsewhere, pursuant to 28 U.S.C. § 1927.

Finally, MSG requests that this Court also impose sanctions on Oakley's counsel, pursuant to its inherent authority, Federal Rule of Civil Procedure 26(g)(3), and/or 28 U.S.C. § 1927, for: (1) their failure to take reasonable steps to ensure Oakley's relevant text messages were preserved; and (2) their misconduct since realizing these texts were destroyed, forcing MSG to expend even more resources to try to chase down the missing texts they should have preserved in the first place and that they should have attempted to track down themselves.

5

## II.    <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

**A. Following His February 2017 Ejection From the Garden, Oakley and His Counsel Take No Steps to Preserve Relevant Evidence on His Cell Phone.**

On February 8, 2017, Oakley was ejected from Madison Square Garden (the "Garden") by MSG security and New York City Police Department. ECF 103 at 4-8. That night, Oakley was criminally charged for his conduct at the Garden. Ex. 1 159:4-7; ECF 164 ¶ 55. He was represented by criminal counsel in connection with the incident. *See, e.g.*, Ex. 1 22:23-23:4.

By August 8, 2017, Oakley had retained Wigdor LLP ("Wigdor") in connection with this litigation. *See* Ex. 10. Pursuant to his four-page engagement letter with Wigdor, Oakley agreed, on the bottom of page 3, that "as a condition to [Wigdor] undertaking this matter," he understood his "legal obligation to locate, retain, and preserve all documents in [his] possession or control"— including "text messages"—that "are related in any way to [his] claims against [MSG]." *Id.* at PL00003056. On September 12, 2017, Oakley filed this action. ECF 1. On August 26, 2019, Oakley signed a superseding engagement letter, this time with both law firms that currently represent him: Wigdor and Petrillo Klein & Boxer LLP ("Petrillo"). That letter contained the same language regarding Oakley's legal obligation to preserve text messages. Ex. 10 at PL00003060.

As Oakley has testified, besides talking on the phone, texting is his primary method of communication, Ex. 2 467:5-20, and he texted about the February 8, 2017 incident with friends, professional contacts, and family members.[2] He also admitted that his Facebook, WhatsApp, Twitter, and Instagram accounts may have had relevant information. *See, e.g.*, Ex. 1 123:22-129:8.

---

[2] Oakley has confirmed he texted with the following people regarding the incident, at a minimum: his friends Nate Gray, MJ Pedone, Jayson Williams, Steve Burnett, Akhtar Farzaie, Marilyn Crawford, Joe Masters, Eric Price, Tanya Williams, John Kelly, Jimmy Rodriguez; manager, Alex Koblenz; ghostwriter, Frank Isola; wife, Angela Oakley; and others at the Midtown South NYPD Precinct on February 8, 2017. *See* Ex. 1 54:4-56:6; 57:18-23; 63:16-65:21; 66:12-67:9; 69:5-18; 70:15-71:10. Farzaie read texts with Oakley during his deposition, Ex. 12 51:17-63:6, and later produced texts with him, Ex. 11.

Nevertheless, as both Oakley and his counsel admitted, they took no steps to preserve his cell phone data (including his text messages) *at any time*—in 2017, 2019, or subsequently. *See, e.g.*, Ex. 1 37:22-38:5 ("Q. Mr. Oakley, back in 2017, nobody, not you, not your lawyers, took any steps to preserve the data on your phone; isn't that a fact? A: Yeah."); Ex. 8; Ex. 9 11:25-12:2 ("Mr. Licul: There was no effort to back [] up [Oakley's phone].") They did not, for instance, image his phone, take screenshots, or create transcriptions of his text messages or back up his data to the cloud. *See, e.g.*, Ex. 9 22:17-19 (THE COURT: You took no steps to preserve the phone, to image the phone, to -- Mr. Licul: We did not image the phone). Oakley and his counsel also never had any follow-up discussion—oral or otherwise—regarding his duty to preserve. *See, e.g.*, Ex. 2 476:2-8 ("Q: And nobody told you you should be preserving all of your texts because you are bringing and pursuing litigation ... over the February 8, 2017 incident? A: No."); Ex. 1 143:19-24.

**B. Four Years After Filing This Case, Oakley Destroys His Mobile Phone Data—Including Text Message Evidence—Relevant to This Action.**

More than four years into this litigation, on December 6, 2021, Oakley turned in his cell phone to an AT&T store for a new device. Ex. 13; Ex. 1 12:22-13:3. On August 22, 2022, Oakley once again purchased a new phone at the same AT&T store and turned in his old one. Ex. 13; Ex. 1 14:1-4. Both times, Oakley was informed, prior to him trading in his previous phone, that it was likely he would lose data from his old phone—and that not all data would be transferred. Ex. 1 30:4-11; 106:3-4.[3] Despite this, and despite knowing there was information relevant to this case on his phone, Oakley did not ask the AT&T employees to attempt to retain his data, *see* Ex. 1 16:8-11; 38:24-39:1, nor did he ask whether it could be preserved, Ex. 1 39:2-8. Oakley also did not ask

---

[3] AT&T's website makes clear that customers are responsible for backing up their devices. *See* Ex. 14 ("You are responsible for removing all confidential, proprietary, or personal information sending in your device."). Another page instructs customers how to conduct such data transfers. Ex. 15; *see also* Ex. 16 (instructions on Samsung's website on how to conduct a data transfer).

his attorneys if his data could be preserved before the exchanges. Instead, Oakley instructed AT&T to proceed with the exchanges because, as he testified, it was "more important" to him to "have a phone" than preserve his data. Ex. 1 31:8-19.

On May 31, 2024, Defendants served document requests on Oakley seeking various categories of documents and communications (including texts). Ex. 17. On June 20, 2024, Defendants proposed a protocol that would require Oakley to search and produce his texts. Ex. 9 55:8-24. On July 7, 2024, Oakley once again purchased a new cell phone at a different AT&T store and turned in his old device. Ex. 13.

## C. On August 22, 2024, Oakley's Counsel Informs Defendants That Years' Worth of His Texts Were Destroyed and Then Obstructs Defendants' Investigation.

On August 22, 2024, following Oakley's production of 231 documents (many of which were drafts of his autobiography), Oakley's counsel informed Defendants that they "were not able to obtain any text messages from Mr. Oakley from before February of 2022," because "he traded in his previous phone that would have contained text messages from before this date." Ex. 3.

In a September 10, 2024 letter, Defendants requested basic follow-up information regarding the loss of Oakley's text messages, such as whether any attempt was made to image any of his cell phones at any point and whether Oakley's data was ever backed up to the cloud. Ex. 7. Oakley's counsel refused to respond in writing but said it would be prepared to "fully discuss the questions on Monday." Ex. 31. During a September 16, 2024 meet and confer, a Wigdor attorney made multiple material misrepresentations, including that: (1) Oakley's service provider was thought to be Verizon (but as Defendants learned later, Oakley's service provider has always been AT&T, Ex. 2 490:11-14); (2) Oakley used an Apple iPhone (but as Defendants learned later, Oakley at all relevant times used an Android device, *id.* 475:11-17); and (3) it was Oakley's "routine" practice to trade in his phone at consistent intervals to update it (but as Defendants later learned,

Oakley exchanged his phone because he "dropped it," although it still functioned when he exchanged it, *id.* 484:22-485:17; 486:2-4, Ex. 1 28:3-29:15). *See* Decl. of J. Benvenisty ("Benv. Decl.") ¶¶ 2-6.[4] Oakley's counsel either failed to investigate the destroyed text messages and gave incorrect information, or knowingly gave false information designed to send Defendants down multiple rabbit holes. They also did not answer questions about, for example, whether Oakley's texts had been preserved for other cases or the model of every phone Oakley used from 2017 onwards. Ex. 8. Oakley's counsel promised to send a list of people with whom Oakley texted and said that MSG should subpoena them. Benv. Decl. ¶ 11.

On October 4, 2024, in advance of Oakley's deposition, Defendants sent a second letter detailing their concerns that Oakley spoliated evidence. Ex. 8. Oakley did not respond. Defendants also sent Oakley requests for production about his missing text messages. *Id*. On October 14, 2024 (a month after the meet and confer), Oakley's counsel sent Defendants an email identifying a list of people whom "Oakley believes, to the best of his recollection, he may have texted with about the events of February 8, 2017," and directed Defendants locate copies of the missing text messages "via the subpoena process." Ex. 3. Oakley later testified at his deposition that he did not prepare this list and was never even asked about it. Ex. 2 474:12-475:6.

**D.    At His October 23, 2024 Deposition, Oakley Testifies That Neither He Nor His Counsel Attempted to Recover the Destroyed Text Messages.**

On October 21, 2024, Defendants filed a pre-motion conference letter in connection with this motion. ECF 194. At his deposition two days later, Oakley testified that no one did anything to preserve his text messages in 2017 or 2018, Ex. 2 475:7-10, and that no one told him he had a duty to preserve his text messages*, id*. 476:2-8; 477:16-20. He also testified that—despite his

---

[4] Oakley's counsel also misinformed Defendants that it was during a February 2022 trade-in that Oakley lost all of his text messages. Benv. Decl. ¶¶ 4-6. Defendants later learned from AT&T records that Oakley did not trade in a phone that month. Ex. 13.

counsel's statements to Defendants that they had confirmed there were no "backups" of his data—no one ever asked him to try to recover his text messages, *id.* 491:5-9, nor had he made any attempts to recover his texts*, id.* 491:2-4; Ex. 1 32:9-13.

On November 11, 2024 (after Oakley's deposition), Oakley's counsel responded to Defendants' document requests regarding Oakley's text messages. Ex. 18. These responses again called into question his counsel's statements at the meet and confer; for instance, while counsel had previously referenced a "Google Drive" supposedly in Oakley's possession, ECF 196, Oakley claimed to have "no responsive documents" to Defendants' request for any "cloud-based and/or physical backups" for Oakley's devices. *Id.* Oakley's counsel also objected to the production of Oakley's phone for forensic examination to identify evidence of deletion and possible data recovery. *Id.* Ultimately, Oakley produced only three documents in response to Defendants' requests: (i) heavily redacted versions of his two engagement agreements with his counsel, and (ii) a redacted receipt for his AT&T store purchases. Ex. 10; Ex. 13.

Following a November 20, 2024 pre-motion conference, Oakley was ordered to sit for examination at a December 19, 2024 evidentiary hearing.

**E.  At the December 19, 2024 Hearing, Oakley Confirms He Knew His Cell Phone Contained Relevant Evidence and Knew He Would Lose Evidence When He Traded It In.**

During the December 19 hearing, Oakley made several key admissions regarding his spoliation and his counsel's failure to satisfy their preservation obligations. Oakley testified that he communicates via text message more than email, Ex. 1 41:4-6, and that he texts at least six or seven times a day, *id.* 72:3-5. He testified that people texted him in the immediate aftermath of the February 8, 2017 incident, *id.* 43:5-8, and that he texted them back, *id.* 46:2-3. He also testified

that he texted about the incident at later dates. *Id.* 47:20-48:12; 158:17-23.[5]

In addition, Oakley confirmed that in trading in his phone at AT&T, he *knew* that data would be lost. *Id.* 30:10-11; 106:3-4 ("Q. [AT&T] told you you might lose data, correct? A. Yes."). Oakley also testified that he never spoke to his counsel about his Facebook, Instagram, WhatsApp, Twitter and Google Drive accounts and was unaware whether they were searched for relevant information. *See, e.g., id.* 131:3-7; *id.* 123:22-130:17; *see also id.* 131:18-131:14 (ruling on relevance objection, "THE COURT: I think the conclusions one could draw from this is that there was a deliberate attempt not to preserve documents.").[6]

Finally, Oakley's counsel at Petrillo gave a proffer confirming they did not have any discussions with Oakley relating to his duty to preserve. *Id.* 143:19-24. Although the Court invited Wigdor, which attended the hearing, to make its own proffer about similar discussions it may have had with Oakley, that firm failed to do so. *See id.* 143:10-12; 171:4-8.

## LEGAL STANDARDS

Sanctions for spoliation of ESI, such as the cell phone data at issue here, are governed by Rule 37 of the Federal Rules of Civil Procedure, which provides: "If [ESI] that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," the court: "(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or (2) only upon finding that the party acted with the

---

[5] Plaintiff produced only 25 emails from 2017—none from February 8-9, 2017—and only five in which Oakley wrote to others. *See* ECF 194 at 3 n.5. In one email about the incident, Oakley responded "text me" and provided his phone number. Ex. 19.

[6] Oakley testified that he did not personally search his Facebook, Instagram, Twitter, or WhatsApp accounts. Ex. 1 123:25-127:6. On December 27, 2024, Oakley's counsel wrote to the Court that Oakley had produced three Instagram direct messages. He never produced any other documents from these sources.

intent to deprive another party of the information's use in the litigation may: (A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment." Fed. R. Civ. P. 37(e). Furthermore, sanctions should be tailored to the prejudice suffered by the party seeking sanctions and the destroyer's degree of culpability. *Richard Green (Fine Paintings) v. McClendon*, 262 F.R.D. 284, 292 (S.D.N.Y. 2009).

### III.    ARGUMENT

**A.  Oakley Should be Sanctioned for Intentionally Spoliating Evidence Under Rule 37(e)(2).**

Where, as here, there is a clear basis to issue sanctions for failure to preserve evidence, the severity of the sanctions depends upon the spoliating party's intent. If the court finds that the spoliating party "acted with intent to deprive another party" of the evidence, it may impose severe sanctions. *Id.*[7] Courts will find intent to deprive where: "(1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator." *Charlestown Cap. Advisors v. Acero Junction*, 337 F.R.D. 47, 67 (S.D.N.Y. 2020). A finding of intent may be based on circumstantial evidence, as there is rarely direct evidence of spoliation. *See, e.g.*, *Resnik v. Coulson*, 2019 WL 2256762, at *13 (E.D.N.Y. Jan. 4, 2019). All of the elements for intent are met here.

***First***, as explained above, the record has established that Oakley's text messages once existed and could have been material to this case. *See, e.g.*, *supra* p. 6 n.2 (Oakley testifying to

---

[7] If the Court finds that Oakley intended to deprive, MSG need not separately demonstrate prejudice. *See* Fed. R. Civ. P. 37, advisory committee's note.

having texted with over a dozen individuals about his ejection); Ex. 30.

*Second*, Oakley's phone trade-ins during this litigation, while knowing he would likely lose data, were affirmative acts of evidence destruction. *See, e.g.*, *Google v. Starovikov*, 2022 WL 16948296, at \*9, \*11 (S.D.N.Y. Nov. 15, 2022) (turning over a laptop with relevant information while on notice of litigation was an "affirmative act" supporting a finding of intent and a sanction of default judgment); *Moody v. CSX Transp.*, 271 F. Supp. 3d 410, 431 (W.D.N.Y. 2017) ("destroy[ing] or recycl[ing]" laptop without confirming its data had been preserved while knowing of preservation duty was affirmative act supporting a finding of intent and adverse inference). It does not matter whether Oakley set out to destroy relevant cell phone evidence in particular: "[W]hether the spoliator affirmatively destroys the data, *or passively allows it to be lost*, that party may be sanctioned for the spoliation of evidence." *Doe v. Wesleyan Univ.*, 2022 WL 2656787, at \*15 (D. Conn. July 8, 2022) (emphasis added) (finding intent to deprive and awarding attorneys' fees where plaintiff lost a forensic image of her cell phone). Indeed, Oakley testified that he knew it was possible that he would lose data when he traded in his phone three times, but he did so regardless, because it was *"more important…[to him] to have a phone" than preserve his data*. Ex. 1 31:16–19; 106:3–4 (emphasis added).

*Third*, there is no dispute that Oakley was under an affirmative duty to preserve relevant text messages. The duty to preserve is triggered once a party knows or should know that the evidence is relevant to "pending or reasonably anticipated litigation." *See* Fed. R. Civ. P. 37(e), advisory committee's note; *see also* Favro Decl. ¶ 23. Given that Oakley was a criminal defendant in connection with the February 8, 2017 incident, his duty to preserve was triggered immediately. Regardless, Oakley testified that he read his two engagement letters prior to signing them, and specifically understood the language informing him of his obligation to preserve, including text

messages. Ex. 10; Ex. 1 25:5-12; *see also id*. 101:19-22. Not only that, Oakley is a serial litigant who, by his own admission, has been informed of his duty to preserve evidence in prior litigations. *See, e.g.*, Ex. 1 83:15-18 (Oakley confirming he understood his "obligation to preserve documents and evidence" in case he filed against his former financial adviser); *id*. 93:17-20 (same with respect to case against Aria Hotel and Casino).

**Fourth**, Oakley's conduct cannot credibly be explained as involving anything other than bad faith, which can be inferred when the spoliating party acts with a conscious dereliction of a known duty to preserve. *See Moody*, 271 F. Supp. 3d at 432 ("[D]efendants' repeated failure over a period of years to confirm that the data had been properly preserved despite its ongoing and affirmative . . . obligations, particularly before discarding [key employee's] laptop, is so stunningly derelict as to evince intentionality."); *Ottoson v. SMBC Leasing & Fin.*, 268 F. Supp. 3d 570, 582 (S.D.N.Y. 2017) (failure to "intentionally take any steps to preserve [ESI] ... satisfies the requisite level of intent required by [Rule 37(e)]").[8] Oakley admitted that he did not take *any* steps to preserve relevant text messages on his cell phone at any point (nor was he told by counsel to do so, other than in his engagement letters), beginning with his February 2017 ejection, when he filed a lawsuit in September 2017, or any time since. *See* Ex. 1 38:8-10.

Oakley's failure to take any steps toward preserving relevant cell phone data was patently unreasonable in light of his obligations as a litigant, as Philip Favro, confirms. *See* Favro Decl. ¶¶

---

[8] Courts around the country have confirmed that a litigant's failure to preserve cell phone data demonstrates intent to deprive. *See, e.g.*, *Laub v. Horbaczewski*, 2020 WL 9066078, at *4 (C.D. Cal. July 22, 2020) (recommending sanctions where litigant "chose not to backup his text messages" on his iPhone); *Brewer v. Leprino Foods*, 2019 WL 356657, at *10 (E.D. Cal. Jan. 29, 2019) (sanctioning litigant who "made no effort to back up or preserve [his phone] prior to its loss" (cleaned up)); *Sines v. Kessler*, 2021 WL 4943742, at *10 (W.D. Va. Oct. 22, 2021), *order approved*, 2021 WL 5492826 (W.D. Va. Nov. 19, 2021) (sanctions warranted where defendant failed to confirm phone data was properly preserved).

46-47 ("It is my opinion that this failure [to make any attempts to preserve relevant data] was unreasonable given the ever-present risk of losing or breaking mobile devices, the relative ease of preserving relevant information on such devices, and the fact that Plaintiff texted at least 12 individuals regarding the incident."). Oakley knew that texting was his primary method of written communication and that he texted with numerous people about his ejection from the Garden, including in the critical period just after the incident. *See, e.g.*, Ex. 2 467:5-20; Ex. 1 43:5-8, 54:4-71:10. In other words, Oakley knew there was relevant evidence on his cell phone and that he was required to preserve it, yet he did not. *See Paisley Park Enters. v. Boxill*, 330 F.R.D. 226, 234 (D. Minn. 2019) ("In the contemporary world of communications . . . the Court is baffled as to how [a party] can reasonably claim to believe that [their] text messages would be immune from discovery."); *Schnatter v. 247 Grp.*, 2022 WL 2402658, at *8 (W.D. Ky. Mar. 14, 2022) (plaintiff was on notice of obligation to preserve relevant cell phone evidence after acknowledging receipt of hold notice). Oakley's failure to take basic steps toward preservation is all the more egregious because, as the plaintiff, he *chose* to become a litigant and assume all obligations attendant thereto.[9]

## B. At a Minimum, Oakley Should Be Sanctioned for Spoliation Under Rule 37(e)(1).

Whether or not Oakley acted with intent to deprive, he should still be sanctioned for spoliation under Rule 37(e)(1), as the prejudice to MSG is undeniable.

Oakley's text messages, especially in the immediate aftermath of the incident, would have constituted the best evidence of Oakley's perspective of what actually happened during the

---

[9] The fact that Oakley managed to preserve *other data* on his phone, including photos from 2017, is further circumstantial evidence of his intent to spoliate. *See* Ex. 2 478:22-479:4; *Ronnie Van Zant v. Pyle*, 270 F. Supp. 3d 656, 670-71 (S.D.N.Y. 2017) (sanctions and a finding of intentionality warranted where plaintiff backed up pictures but not text messages).

incident—but nearly all are irretrievably lost.[10] Such text message evidence is critical because, as MSG's expert Philip Favro confirms, "text messages generally memorialize unguarded communications and contemporaneous observations that cannot be replicated through other forms of discovery." Favro Decl. ¶ 37 (citing *Schmalz v. Vill. of N. Riverside*, 2018 WL 1704109, *4 (N.D. Ill. Mar. 23, 2018) ("The content of text messages cannot be replaced simply by eliciting testimony from the Defendants, and by having Plaintiff accept that testimony rather than relying on the actual messages to use as they deem fit.") and *Ronnie Van Zant*, 270 F. Supp. 3d at 670 (documents produced in discovery could not replace l text message)).

But there is a far more specific reason that Oakley's text messages regarding what happened on February 8, 2017 would have been essential evidence. As this Court is aware, this case continues today because of sworn statements Oakley submitted in opposition to Defendants' summary judgment motion; specifically, it was Oakley's Rule 56 declaration (Ex. 22) that caused the Second Circuit to reverse this Court's summary judgment decision. *See* ECF 140 at 6-7 (finding that "the video evidence does not 'blatantly contradict' Oakley's Rule 56 declaration and does not compel as a matter of law the conclusion that the MSG Defendants' use of force was reasonable"). As discovery has proceeded, the evidence that *does exist* has revealed that: (a) Oakley's declaration was an intentional manipulation of the record by Oakley and his counsel, and (b) when Oakley has spoken candidly about the incident, his statements have contradicted his declaration, proven to be

---

[10] At Oakley's counsel's urging, MSG issued subpoenas to several individuals identified by his counsel as having texted with Oakley about the incident. Ex. 3. After expending significant efforts to serve the subpoenas and confer with the recipients—none of whom were under an obligation to preserve seven-year-old text messages, unlike Oakley—MSG's counsel have been able to obtain very few text messages, and only from one third party (Akhtar Farzaie). MSG also subpoenaed AT&T seeking information regarding Oakley's text messages. Ex. 20; Ex. 21. AT&T has not yet responded to the revised subpoena, but AT&T informed MSG's counsel that it does not retain or possess the content of the missing text messages. Hence, the best MSG can hope for is that AT&T provides records of phone numbers with whom Oakley texted and when.

damning to his case, and have been supportive of MSG's defense.

First, Oakley swore in his February 19, 2021 declaration that during the incident, he "felt a security guard push [him] from behind, which caused [him] to fall and feel pain," and that he "did not trip and fall on [his] own," Ex. 22 ¶¶ 13-14. But on numerous occasions, in private, Oakley had said the opposite. For example, Oakley produced the second draft of his ghostwritten autobiography (dated July 20, 2020), which stated: "When I slipped they began to carry me out." Ex. 23 at PL00001649. In other words, prior to submitting his declaration, Oakley admitted that he was not "push[ed]" by MSG security guards but, rather, "slipped." That same "slipped" language remained in the next, July 2020 draft (Ex. 24 at PL00000163), and in the April 2021 draft, which made the "slipped" reference clearer: "I slipped and ended up on my back." (Ex. 25 at PL00000452). That language appeared again in a June 2021 draft. *See* Ex. 26 at PL0000711. Oakley confirmed at his deposition that he was interviewed by his ghostwriter and approved drafts as they were written. *See, e.*g., Ex. 2 35:10-37:10. Indeed, the only way his ghostwriter could have known to write that Oakley "slipped" was by hearing that from Oakley. However, after Oakley's counsel, Douglas Wigdor, reviewed the draft in late June and July of 2021 (*see* Ex. 27 at 5 (Priv. Log Entries 20-23)), it appears Wigdor instructed the ghostwriter to change that language to conform with the bogus claim in his February 19, 2021 declaration that counsel drafted for him that he was "push[ed]" to the ground by MSG security, instead of "slipping," as he repeatedly admitted in earlier drafts. But the final version of Oakley's book, apparently at counsel's insistence, contains no such reference to "slipping." Ex. 28 at PL00001248; Ex. 5.[11]

Second, Oakley swore in his declaration that he "did not lunge at the security guards" but,

---

[11] Oakley also confirmed, in an unscripted, candid comment on the "Rich Eisen" podcast in February 2022, that he "slipped down and fell." DX041 (submitted at 12/19 Hearing) 1:12 -15.

instead, was "grabbed by Defendants' security personnel without provocation and pulled backward," and "was not attempting to make contact with any of Defendants' security personnel" during the incident. Ex. 22 ¶¶ 10-11. The drafts of his autobiography also contradict his testimony in that regard: Oakley admitted that "[o]ne security guard placed his hand on my right arm and I pushed him away. I never should have touched anyone, but there were eight . . . guys in front of me and on both sides." Ex. 23 at PL00001649; Ex. 24 at PL00000163. And by the April 15, 2021 draft, that language changed only slightly: "I never should have touched them, but there were so many guys in front of me and on both sides." Ex. 25 at PL0000452; *accord* Ex. 26 at PL0000711 (same language in July 16, 2021 draft). But once again, following Oakley's counsel's review (*see* Ex. 27 at 5 (Priv. Log Entries 20-23)), the final language in the book was scrubbed to remove any reference to Oakley having "touched" or "pushed away" MSG security guards and regretting doing so ("I never should have touched them"). *See* Ex. 28 at PL00001248; Ex. 6.[12]

Given what Oakley apparently told his ghostwriter in private, Oakley's contemporaneous private text communications would likely have proven, once and for all, that the key statements in his declaration were false. Indeed, Oakley's texts are the critical missing "piece of this puzzle"— they would reflect his unguarded, *contemporaneous* accounts of what happened. *See Ronnie Van Zant*, 270 F. Supp. 3d at 670. In fact, the text exchanges that Oakley *has* produced demonstrate a level of unguarded candor in texting that stands in sharp contrast to his rehearsed testimony. *See, e.g.*, ECF 185-6 at PL00000054 (in a May 6, 2023 text exchange, Oakley forwarded an article about this case to one of his long-time advisors and received this text response: "Bro sue the Shit out of Dolan"); ECF 185-7 at PL00000043 (in a May 10, 2024 text, Oakley wrote to eight

---

[12] The day after the incident, a reporter from FOX 5 News asked Oakley "did anybody [from MSG] touch you?" Oakley equivocated, did not claim MSG security guards did so, and then made the bizarre statement: "Anything can happen." DX042 (submitted at 12/19 Hearing) 1:13-1:23.

individuals: "The judge finally issued his decision. He isn't letting us add Dolan individually as a defendant but he is letting us add the facts about his specific conduct to hold MSG liable which is fine . . . Off to the races !"); ECF 185-8 at PL00000039 (extensive text message thread from May 15, 2024 between Oakley and a PR representative who comments, "if discovery is done impactfully . .. the public relations, social media . . . toll it could take on the NBA brand, you might be able to engage in settlement talks"). Therefore, even if the Court does not find Oakley acted with intent to deprive, this Court should still grant relief under Rule 37(e)(1) to cure the prejudice from the absence of these text messages. *See, e.g.*, *Equinox Holdings*, 592 F. Supp. 3d at 178.

**C. Oakley's Counsel Should be Sanctioned for Failing to Fulfill Their Preservation Duties and Impeding Defendants' Efforts to Investigate the Spoliation They Caused.**

### i.  Oakley's Counsel Failed to Advise Him of His Preservation Obligations.

It is hornbook law that the "obligation to preserve evidence runs *first to counsel*, who then has a duty to advise and explain to the client its obligations to retain pertinent documents that may be relevant to the litigation." *Telecom Int'l Am. v. AT&T*, 189 F.R.D. 76, 81 (S.D.N.Y. 1999) (emphasis added); *see also Chan v. Triple 8 Palace*, 2005 WL 1925579, at *6 (S.D.N.Y. Aug. 11, 2005). To that end, "a litigation hold is only the *first step*," and counsel are "obligated to 'oversee compliance with [a] litigation hold, monitoring the party's efforts to retain and produce the relevant documents.'" *CBF Industria de Gusa S/A v. AMCI Holdings*, 2021 WL 4190628, at *15 (S.D.N.Y. Aug. 18, 2021) (emphasis added and citations omitted); *see also* Favro Decl. ¶¶ 28, 42-43. Setting aside that Oakley's counsel failed to take any steps to preserve Oakley's data (*see* Section II.A *infra*), they violated their duties by failing to advise Oakley of *his* own obligations and ensure *he* was taking steps to preserve the relevant evidence at the outset.

Oakley's counsel claim they fulfilled their duties by including a statement in their engagement letters informing Oakley of his preservation obligation. *See* Ex. 10; Ex. 9 22:8-23; Ex.

1 141:23-24; *id.* 142:20-22. But Oakley's counsel admitted they never confirmed that Oakley actually read that portion of the letter, nor did they ever communicate directly with him about his preservation duties as to text messages, WhatsApp, Facebook, Instagram, or Twitter messages. *See* Section II.A, *supra*. Furthermore, if Oakley's counsel did not instinctively know that his cell phone likely contained relevant evidence (which they should have), a most rudimentary investigation— which Oakley's counsel was required to undertake—would have confirmed that. *See also* Favro Decl. ¶¶ 12, 39. And had Oakley's counsel asked him any number of simple questions regarding his cell phone data retention practices, they would have known far earlier than 2024 that his phone was not being preserved as this case made its way to the Second Circuit and back, twice. Ex. 2 481:19-25; 485:20-22. Counsel's complete failure to familiarize themselves with Oakley's ESI and monitor his preservation (and lack thereof) warrants sanctions against them. *See, e.g.*, *DR Distribs. v. 21 Century Smoking*, 513 F. Supp. 3d 839, 964 ("The absolute complete lack of monitoring is evidenced by this simple fact: During . . . this case, significant and relevant ESI… [was] destroyed.").

### ii.    Oakley's Counsel Took No Steps to Preserve His Cell Phone Evidence.

Oakley's counsel also had—and failed to meet—their own duty to preserve relevant evidence on Oakley's mobile phone. As with any other source of ESI, when the duty to preserve is triggered, counsel must take "reasonable steps" to preserve relevant cell phone data. *See* Fed. R. Civ. P. 37(e), advisory committee's note; *see also* Favro Decl. ¶ 12. Failure to fulfill preservation obligations is sanctionable conduct by the attorney. *See, e.g.*, *GFI Acquisition v. Am. Federated Title*, 2010 Bankr. LEXIS 1217, at *21 (Bankr. S.D.N.Y. Apr. 7, 2010) (imposing monetary sanctions for attorneys' failure to locate and produce relevant data); *Phx. Four v. Strategic Res.*, 2006 U.S. Dist. LEXIS 32211, at *29 (S.D.N.Y. May 22, 2006) (same)*.* This is especially true when this failure "results in the destruction of evidence," as here. *Chan,* 2005 WL 1925579, at *6.

By their own admission, Oakley's counsel took *no steps* to preserve relevant information on Oakley's phone. *See, e.g.*, Ex. 9 11:25-12:2, *see also* Ex. 8. As Philip Favro puts it: "including a directive to preserve in a retention agreement is not a 'step' towards preservation at all. Counsel must take actual, actionable steps to make sure relevant evidence is retained." Favro Decl. ¶ 43. And the notion that their only *means* to preserve relevant evidence was imaging Oakley's phone is flat out wrong. Beyond imaging his device, they could have backed it up to the cloud, screenshotted or transcribed relevant text messages, or disabled any autodelete functions. *See id.* ¶ 41. As Philip Favro further explains, courts were "well acquainted with relevant phone data preservation in the years prior to 2017 and required litigants to preserve such data with much the same rigor required for other ESI." *Id.* ¶ 29; *see also id.* ¶¶ 30-34 (discussing cases where courts required preservation of cell phone data before or around 2017). In fact, since 2017 (and earlier), lawyers have frequently imaged their client's cell phones to preserve relevant data. *Id.* ¶¶ 28, 36-37.

Attempting to explain their failure to take any steps to preserve Oakley's cell phone evidence, Plaintiffs rely on a declaration of Professor Roy D. Simon, Jr., but it should be disregarded in full. Simon is not qualified to opine on issues related to ESI preservation; his report and CV reflect that he is "an expert in the field of legal ethics and professional responsibility"— not ESI or spoliation. Simon Decl. ¶ 7; *see also id.* ¶¶ 8-13, Ex. A. Because the question he claims to answer is whether Oakley's counsel took reasonable steps to preserve ESI, *see id.* ¶ 3, his qualifications are inapplicable. *See* Fed. R. Evid. 702; *Malletier v. Dooney & Bourke*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007) ("An expert qualified in one subject matter does not thereby become

an expert for all purposes.").[13] Even if Simon's declaration were considered, it looks at Oakley's counsel's obligations through an exceedingly narrow lens, *i.e.* whether imaging a phone was the "standard" in 2017. But that was not only means to preserve cell phone evidence in 2017. Nor did counsel's obligations *end* in 2017—apparently, Oakley had the same phone until he traded it in on December 6, 2021, leaving ample time to preserve evidence before it was destroyed. Simon's unsubstantiated conclusion that counsel went "above and beyond the standard of care [in 2017]" by including an instruction on preservation in their engagement letters, Simon Decl. ¶ 36—ignores that courts have long required parties to take actual steps to preserve relevant cell phone data and that practitioners have long been preserving it. *See* Favro Decl. ¶¶ 27-45.

Oakley's counsel's suggestion, now, that it had no obligation to take actual steps to preserve text messages, is also belied by a spoliation motion filed by *Wigdor* in November 2023 for a party's failure to preserve its text messages from 2020. *See* Ex. 29. The brief was signed by the very lawyer at Wigdor (John S. Crain) who met and conferred with (and misled) Defendants on September 16, 2024. In that case, Wigdor sought sanctions because defendants allegedly "deliberately replaced their phones, causing the loss of all 'text messages' between them 'beyond the few that were initially extracted.'" *Id.* at 6. Wigdor argued "the highest level of sanctions" were warranted because the "surrendering of phones during the litigation" is a strong indication of "a conscious dereliction of duty, from which the Court may infer intent to spoliate." *Id.* at 11.

Oakley's counsel should accordingly be sanctioned pursuant to this Court's inherent authority and/or based on counsel's improper certification of discovery disclosures and

---

[13] Defendants have not located a single article or publication by Simon on these topics. By contrast, Philip Favro is a "nationally recognized expert and thought leader in the field of electronic discovery" and has "been a prolific commentator on issues relating to [ESI], including as an author of numerous law review and other articles on [Rule 37(e)] and its predecessors, for nearly 20 years." Favro Decl. ¶ 3.

responses—which failed to disclose Oakley's and counsel's inadequate preservation efforts—pursuant to Federal Rule of Civil Procedure 26(g)(3).

### iii. Oakley's Counsel Obstructed Defendants' Efforts to Investigate and Remediate Oakley's Spoliation.

Adding to the severity of Oakley's counsel's misconduct here is the fact that once they disclosed Oakley had "no text messages before February 2022," his counsel actively obstructed Defendants' investigation into the destruction. *See* Section II.C, *supra*. After failing to respond to Defendants' requests for information in writing, Oakley's counsel gave Defendants incorrect information, such as that Oakley's provider was supposedly Verizon (misdirecting us to pursue relevant information from Verizon, instead of AT&T) and that he had an Apple iPhone (misdirecting us to investigate how it was possible that his texts were not retained as iMessages, instead of realizing he was using a different device all along). They failed to conduct even the most basic diligence into the facts, giving Defendants an incomplete list of individuals with whom Oakley texted. Oakley's counsel also refused to provide his phone for a forensic investigation.

In addition, Oakley's counsel declined to seek alternative sources of the missing text messages themselves, such as asking Oakley's contacts if they have copies of their messages with him regarding the incident. Instead, Plaintiff directed Defendants to pursue the texts through subpoenas. And, once Oakley testified at his deposition that his provider is actually AT&T, his counsel never even took the most basic step of contacting AT&T to see whether it could provide relevant records. In fact, it was only *after* Defendants advised Oakley's counsel that AT&T could provide records in response to a "customer request" that Oakley finally submitted one—*after* the December 19, 2024 hearing. Ex. 4. The extent and severity of Oakley's counsel's misconduct in connection with Defendants' investigation warrants the most severe form of spoliation sanctions, including but not limited to dismissal and attorneys' fees, including for proceedings "unreasonably

and vexatiously" under 28 U.S.C. § 1927.

**D.  The Court Should Grant Severe and Proportional Sanctions.**

Because of Oakley's intentional spoliation and his and his counsel's complete dereliction of their duties to preserve relevant evidence, the Court should dismiss this case. Fed R. Civ. P. 37(e)(2); *see also, e.g.*, *Bryant v. Gen. Cas. Co. of Wis.*, 337 F.R.D. 1, 8 (N.D.N.Y. 2020) (dismissing action as sanction for spoliation); *Google*, 2022 WL 16948296, at *9 (same).

As detailed above, Oakley's case has only survived to this point—where he now faces this spoliation sanctions motion—because he made intentional misrepresentations, crafted for him by his "team," in a sworn declaration. *See* Ex. 2 367:24-368:5. Were it not for those misrepresentations, the Second Circuit would not have reversed this Court's decision on summary judgment. And now, because of Oakley's spoliation, Defendants are deprived of critical evidence regarding his unguarded state of mind and impressions of the incident in its immediate aftermath and over the subsequent five years. *See Rossbach v. Montefiore Med. Ctr.*, 2021 WL 3421569, at *7 (S.D.N.Y. Aug. 5, 2021), *aff'd in part, vacated in part*, 81 F.4th 124 (2d Cir. 2023) (dismissing case where lawyers failed to take sufficient steps to ensure that relevant cell phone data was preserved and party sought to defraud the Court and the defendants through a "willful and persistent campaign of fabrication, spoliation and perjury").

In the alternative, Defendants submit that an appropriate sanction would be to preclude Oakley from asserting certain statements from his attorney-drafted declaration in this case that are inconsistent with Oakley's prior inconsistent statements in his book drafts and interviews, namely: (1) Oakley was pushed to the ground by MSG security, rather than slipping and falling on his own during the incident, and (2) Oakley never pushed MSG security or did so only in self-defense. These statements from Oakley's Rule 56 declaration are directly contradicted by prior drafts of Oakley's autobiography, indicating that they are almost certainly false. Without Oakley's text

24

messages, however, MSG has been deprived of a highly likely source of evidence to disprove them. This Court is entitled to grant this relief under its power to craft a sanction that effectively alleviates the prejudice MSG has suffered from Oakley's spoliation. *See, e.g.*, *West v. Goodyear Tire & Rubber*, 167 F.3d 776, 779 (2d Cir. 1999).

Defendants also request that, if this case proceeds to trial, the jury should be instructed that (1) Oakley intentionally destroyed all of his text message evidence relevant to this case, and (2) the destroyed text messages would have been unfavorable to Oakley. *See, e.g., Experience Hendrix v. Pitsicalis*, 2018 WL 6191039, at *10-11 (S.D.N.Y. Nov. 28, 2018) (ordering adverse inference for intentional text message spoliation); *Ahamed v. 563 Manhattan*, 2024 WL 3061962, at *4 (E.D.N.Y. June 17, 2024) (granting adverse inference where party and counsel gave inconsistent explanations of missing evidence and acted with intent to deprive); *Ronnie Van Zant*, 270 F. Supp. 3d at 667-69; *Moody*, 271 F. Supp. 3d at 432.

Finally, regardless of any other sanction imposed, Oakley's failure to preserve relevant cell phone evidence, combined with its obstruction into Defendants' investigation, warrants an award of attorneys' fees and costs under Fed. R. Civ. P. 37(a)(5)(A). *See, e.g.*, *Experience Hendrix*, 2018 WL 6191039, at *11 (awarding attorneys' fees "given the resources plaintiffs again have had to expend . . . bringing and litigating" their spoliation motion).

## IV.    CONCLUSION

For the above reasons, Defendants respectfully request that the Court issue sanctions against Oakley and his counsel at Wigdor LLP and Petrillo, Klein & Boxer LLP.

Respectfully submitted,

*/s/ Randy M. Mastro*

Randy M. Mastro
Jessica Benvenisty
John Goodwin
Lauren K. Myers
1185 Avenue of the Americas,
34th Floor
New York, NY 10036
Tel. (212) 556-2100
Fax (212) 556-2222

*Attorneys for Defendants*

26

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that according to the word count feature of the word processing program used to prepare this brief, the brief contains 8723 words (exclusive of the cover page, certificate of compliance, table of contents, and table of authorities), and complies with Local Civil Rule 7.1 of the Southern District of New York, as well as with this Court's Individual Practice Rule 2.D.

*/s/ Randy M. Mastro*

Randy M. Mastro
