```
                                                              Page 1

 1
 2              UNITED STATES DISTRICT COURT
 3              SOUTHERN DISTRICT OF NEW YORK
 4
 5   -------------------------------
     CHARLES OAKLEY,
 6
                    Plaintiff,
 7
 8         vs.                              Case No.:
                                            17-cv-6903(RJS)
 9
     MSG NETWORKS, INC., THE MADISON
10   SQUARE GARDEN COMPANY and MSG
     SPORTS & ENTERTAINMENT, LLC,
11
                    Defendants.
12   -------------------------------
13
14                              January 13, 2025
                                11:01 a.m.
15
16        Remote video-teleconference deposition of KORI
17   KEATON, a Nonparty Witness, taken by Plaintiff, held
18   at New York, New York, pursuant to notice and order,
19   before Elizabeth F. Tobin, a Registered Professional
20   Reporter and Notary Public of the State of New
21   York.
22
23   JOB NO. 7107101
24
25
```

Page 2

```
 1
 2   A P P E A R A N C E S:
 3        (Present via video-teleconference)
 4
 5   On behalf of the Plaintiff:
 6        WIGDOR, LLP
 7        85 Fifth Avenue
 8        New York, New York 10003
 9        212.257.6800
10        BY:   VALDI LICUL, ESQ.
11              vlicul@wigdorlaw.com
12              JOSEPH GOLDSTEIN, ESQ.
13              jgoldstein@wigdorlaw.com
14
15              - and -
16
17        PETRILLO KLEIN & BOXER, LLP
18        655 Third Avenue, 22nd Floor
19        New York, New York 10022
20        212.370.0330
21        BY:   NELSON A. BOXER, ESQ.
22              nboxer@pkbllp.com
23
24
25
```

Page 3

1
2  A P P E A R A N C E S: (Continued)
3       (Present via video-teleconference)
4
5  On behalf of the Defendants and the Nonparty Witness
6  Kori Keaton:
7       KING & SPALDING, LLP
8       1185 Avenue of the Americas, 34th Floor
9       New York, New York 10036
10      212.556.2100
11      BY:   JESSICA BENVENISTY, ESQ.
12            jbenvenisty@kslaw.com
13            SARAH MOSELEY, ESQ.
14            smoseley@kslaw.com
15
16
17 ALSO PRESENT:
18            LEAH AARONSON ESQ., In-House Counsel
19            Madison Square Garden
20
21
22
23
24
25

Page 102

|   |   |
|---|---|
| 1 | K. Keaton |
| 2 | Q. Does it also appear that you said |
| 3 | something to them? |
| 4 | A. Without audio, no. Could have. |
| 5 | Q. And then you walk over to Mr. Oakley; |
| 6 | correct? |
| 7 | A. Yes, sir. |
| 8 | Q. And they follow you; correct? |
| 9 | A. Yes. |
| 10 | MR. LICUL: Okay. Let's take a 10-minute |
| 11 | break. |
| 12 | MS. BENVENISTY: Thanks. |
| 13 | (A recess was taken from 1:19 p.m. to |
| 14 | 1:31 p.m.) |
| 15 | Q. So when you approached Mr. Oakley at |
| 16 | about 7:56 of the video, what do you say to him? |
| 17 | A. Explained to him that he can't curse like |
| 18 | that in the arena. It's an NBA policy. And I asked |
| 19 | him that -- I told him that he was going to have to |
20 leave.
21 Q. What else did you say to him, if
22 anything?
23 A. I don't remember exactly what else I
24 said. There was just basically, you know, can't
25 curse like that. It's an NBA policy. And I'm going

```
                                                    Page 103
 1                      K. Keaton
 2   to have to ask you to leave.
 3        Q.    What's your basis for saying it's an NBA
 4   policy?
 5              MS. BENVENISTY:  Objection.
 6        A.    I was aware that there's an NBA policy of
 7   cursing in the arenas.  Can't do it.
 8        Q.    And how many other people have you asked
 9   to leave because they were cursing in the arena?
10        A.    None.
11        Q.    Have you heard people curse next to the
12   bench arena before?
13        A.    Yes.
14        Q.    How many times?
15        A.    A number of times.
16        Q.    Does it pretty much happen every game?
17        A.    That I hear it, no.  But it happens.
18   It's not -- it's not anything uncommon.
19        Q.    What do you say to Mr. Oakley --
20   withdrawn.
21              What does Mr. Oakley say to you?
22        A.    I don't remember exactly what he said.
23   But the one part that I do remember is when he said,
24   FU.  I'm not F-ing going anywhere and he stood up.
25        Q.    Do you recall anything else he said to
```

```
                                              Page 104
 1                    K. Keaton
 2   you before he stood up?
 3        A.    No, sir.
 4              MR. LICUL:  Let's play the video, Joe,
 5        until 8:15 -- 8:19, rather.
 6              (Video recording played.)
 7              MR. LICUL:  Stop it there.  It's stopped
 8        at 8:19.
 9        Q.    When Mr. Oakley stands up, you put up
10   both your right and left hand; correct?
11        A.    I see my right hand go up, yes.
12        Q.    And your left hand as well; correct?
13        A.    It moves from my side, yes.
14        Q.    And you push Mr. Oakley in the chest;
15   correct?
16        A.    Absolutely not.
17        Q.    And then after you push him in the chest
18   the first time, you then extend your right hand all
19   the way out and push him in the chest again;
20   correct?
21              MS. BENVENISTY:  Objection.
22        Mischaracterizes his testimony and compound.
23        A.    I didn't push Mr. Oakley.
24        Q.    So what did you do when you put your
25   hands up in front of his chest?
```

```
                                                    Page 105
 1                      K. Keaton
 2        A.    I took a step back in a defensive manner.
 3        Q.    And do you see in that clip that
 4   Mr. Oakley goes backwards?  Do you see that?
 5        A.    Right now in this still frame?
 6        Q.    In the clip that I just showed you, when
 7   he stands up and you put your hands up, Mr. Oakley
 8   goes backwards away from you; correct?
 9              MS. BENVENISTY:  Objection.
10        Mischaracterizes his testimony.  And if you
11        want to play the clip again, play the clip
12        again.
13              MR. LICUL:  Did he ask to see the clip
14        again, Jessica?
15              (Simultaneous speakers.)
16              MR. LICUL:  Are you suggesting to him
17        that he should ask to see the clip again?
18        A.    Honestly, sir, I didn't know that -- if
19   you could play it again, I'd appreciate it.
20        Q.    Is the reason you said that is because
21   counsel just said that?
22        A.    Sir, I apologize.  I'm not here to get
23   into anything or argue about anything.  It would be
24   helpful if I could see it again.
25        Q.    I'll play the clip again.
```

Page 106

1              K. Keaton
2      A.    In the beginning you said you wouldn't
3  step on my answers.  I'm just trying to be as
4  thorough as possible and I don't want to give you
5  the wrong answer.  I did not see me -- I did not see
6  Mr. Oakley going backwards.  It would be helpful if
7  I saw it again because I know I didn't touch
8  Mr. Oakley ever.
9            MR. LICUL:  Joe, can you play it from
10      7:54 to 8:19, please.
11            (Video recording played.)
12            MR. LICUL:  Okay.  Stop it.
13      Q.    Do you see you put your -- both hands up.
14  Then your right hand goes forward and Mr. Oakley
15  goes backwards away from you.
16            Do you see that?
17            MS. BENVENISTY:  Objection.
18      A.    No.  I appreciate you playing it again.
19  Because what I actually saw was Mr. Oakley put his
20  right hand up and that's why I put my hands up.  And
21  then the other person steps in between the two of
22  us.  I never touched Mr. Oakley.  He puts his hand
23  up.  I'm stepping backwards.  Never touched him.
24      Q.    And do you see that Mr. Oakley goes
25  backwards away from you?  Do you see that in the

Page 135

```
 1
 2                    CERTIFICATE
 3
 4   STATE OF NEW YORK )
 5                    ) ss.
 6   COUNTY OF SUFFOLK)
 7
 8           I, Elizabeth F. Tobin, a Registered
 9   Professional Reporter and Notary Public within and
10   for the State of New York, do hereby certify:
11           That Kori Keaton, the witness whose
12   deposition is hereinbefore set forth, was duly sworn
13   by me remotely and that such deposition is a true
14   record of the testimony given by such witness.
15           I further certify that I am not related
16   to any of the parties to this action by blood or
17   marriage and that I am in no way interested in the
18   outcome of this matter.
19
20
21                    [signature: Elizabeth F. Tobin]
22                    ELIZABETH F. TOBIN, RPR
23
24
25
```