# **EXHIBIT 11**

Page 1

```
 1
 2              UNITED STATES DISTRICT COURT
 3              SOUTHERN DISTRICT OF NEW YORK
 4
 5   -------------------------------
     CHARLES OAKLEY,
 6
                      Plaintiff,
 7
 8           vs.                          Case No.:
                                          17-cv-6903(RJS)
 9
     MSG NETWORKS, INC., THE MADISON
10   SQUARE GARDEN COMPANY and MSG
     SPORTS & ENTERTAINMENT, LLC,
11
                      Defendants.
12   -------------------------------
13
14                        January 13, 2025
                              11:01 a.m.
15
16        Remote video-teleconference deposition of KORI
17   KEATON, a Nonparty Witness, taken by Plaintiff, held
18   at New York, New York, pursuant to notice and order,
19   before Elizabeth F. Tobin, a Registered Professional
20   Reporter and Notary Public of the State of New
21   York.
22
23   JOB NO. 7107101
24
25
```

```
 1
 2   A P P E A R A N C E S:
 3        (Present via video-teleconference)
 4
 5   On behalf of the Plaintiff:
 6        WIGDOR, LLP
 7        85 Fifth Avenue
 8        New York, New York 10003
 9        212.257.6800
10        BY:   VALDI LICUL, ESQ.
11              vlicul@wigdorlaw.com
12              JOSEPH GOLDSTEIN, ESQ.
13              jgoldstein@wigdorlaw.com
14
15              - and -
16
17        PETRILLO KLEIN & BOXER, LLP
18        655 Third Avenue, 22nd Floor
19        New York, New York 10022
20        212.370.0330
21        BY:   NELSON A. BOXER, ESQ.
22              nboxer@pkbllp.com
23
24
25
```

```
 1
 2   A P P E A R A N C E S: (Continued)
 3       (Present via video-teleconference)
 4
 5   On behalf of the Defendants and the Nonparty Witness
 6   Kori Keaton:
 7       KING & SPALDING, LLP
 8       1185 Avenue of the Americas, 34th Floor
 9       New York, New York 10036
10       212.556.2100
11       BY:   JESSICA BENVENISTY, ESQ.
12             jbenvenisty@kslaw.com
13             SARAH MOSELEY, ESQ.
14             smoseley@kslaw.com
15
16
17   ALSO PRESENT:
18             LEAH AARONSON ESQ., In-House Counsel
19             Madison Square Garden
20
21
22
23
24
25
```

1                    K. Keaton
2  your work phone?
3       A.    All day every day.  I mean, you know, I
4  can't put a number on it.  Either call, text or
5  email.  So depending on, you know, the
6  circumstances.  But, you know, I don't think any
7  more or any less than anybody else.  Yeah, I used
8  text for work.
9       Q.    Did you ever text with Jim Dolan?
10      A.    On rare occasions, yes.
11      Q.    What were those occasions?
12      A.    If I needed some information regarding an
13 activity on that particular day.  But that was very
14 rare.  I would either call him or I'd have the
15 office call him.
16      Q.    What office?
17      A.    His office in New York.  But there were a
18 handful of occasions, I guess, where I texted him.
19      Q.    So the work phone that you had had
20 Mr. Dolan's cell phone information on it; correct?
21      A.    Yes, sir.
22      Q.    When you communicated with his office via
23 text, who would you text?
24            MS. BENVENISTY:  Objection.
25      Mischaracterizes the testimony.  He didn't

```
                                                      Page 20
 1                       K. Keaton
 2         specify that he texted with the office.
 3              MR. LICUL:  Jessica, we've been through
 4         this.  It's his testimony.  He can clarify it.
 5         You don't have to put words in his mouth.
 6         Q.   Did you understand my question?
 7         A.   His office, we went through a few admin
 8    people.  But a majority of the time it was Chrissie
 9    Boyle.  I would text her.
10         Q.   You would text her?
11         A.   Correct.
12         Q.   And did he have other admins other than
13    Ms. Boyle that you would text?
14         A.   I don't remember their names.  But, yeah,
15    there were other admins from the day that I started
16    until the day that I ended.  But Chrissie was there
17    for the bulk of the time.
18         Q.   Did you ever text with Mr. Dolan about
19    Charles Oakley?
20         A.   No.
21         Q.   How do you know that?
22         A.   You're asking if I texted him --
23         Q.   Yes.
24         A.   No.
25         Q.   How do you know if you haven't gone back
```

```
                                                    Page 21
 1                     K. Keaton
 2   and checked the text messages?
 3        A.    Because I would have written it.  So I
 4   would have remembered if I had texted him about
 5   Charles about the incident and I wouldn't have
 6   texted him about that.
 7        Q.    Did he text you about Charles Oakley?
 8        A.    No.  No.
 9        Q.    How do you know that if you haven't gone
10   back to look?
11        A.    I'm confident that that is not something
12   that James Dolan and I would have texted about.
13        Q.    What kind of things would you text
14   Mr. Dolan about?
15        A.    As I said earlier, if there was a
16   conflict in a schedule, perhaps he was in a meeting
17   and it was urgent and I couldn't call him.  So I
18   would send a text.  Again, that was rare.  So it
19   would have to have been something pressing
20   concerning the schedule that I would text him about.
21        Q.    Would you also communicate with Mr. Dolan
22   via email?
23        A.    I'm not going to say I never did.  But
24   that's not something that I would do.  No.  Because
25   typically a communication that I needed from him
```

```
                                                    Page 22
 1                        K. Keaton
 2   would either be a phone call or a -- you know, like
 3   I said, on the rare occasion a text.  If it was an
 4   email, I would send it through -- I would send it
 5   through the office.  I'd go through the admins in
 6   the office.
 7        Q.    Do you recall any emails about
 8   Mr. Oakley?
 9        A.    No, I don't.
10        Q.    Does that mean that there were none or
11   you just don't recall any?
12        A.    If I might ask you, I don't mean to be
13   rude.  Are you talking about in general or just
14   between me and him or me and the office?
15        Q.    So do you recall any emails between you
16   and Mr. Dolan or you and the office regarding
17   Charles Oakley?
18        A.    No, I don't.
19        Q.    Do you recall any emails with any MSG
20   employee about Mr. Oakley?
21        A.    I don't recall.  You know, that's
22   probably an issue where after that day emails would
23   have been sent regarding the incident.  But, I mean,
24   that's a long time ago.  I don't remember the
25   emails.
```

Page 62

1                    K. Keaton
2   you have a phone in your hand?
3        A.    Sir, I apologize.  But based off that
4   video, I can't see what I'm actually holding.
5        Q.    Do you recall that when Mr. Oakley walked
6   down the aisle and sat in his seat, you, in fact,
7   did have a phone in your hand?
8        A.    No, sir.
9        Q.    You don't recall --
10       A.    I don't recall.  I'm not saying I didn't.
11  I'm saying I don't recall.
12             MR. LICUL:  Joe, play the video to about
13        1:17, please.
14             (Video recording played.)
15       Q.    Sir, I just played the clip through 1:17.
16             Does that refresh your recollection,
17  Mr. Keaton, that you had your phone in your hand and
18  you were texting after Mr. Oakley took his seat?
19             MS. BENVENISTY:  Objection to form and
20        mischaracterizes the video.
21       A.    Sir, I'm sorry.  I don't know what I'm
22  doing.  I could have been looking at a piece of
23  paper.  I'm looking at a tablet that's like, you
24  know -- I don't see it.  So -- I can't say one way
25  or another.

```
                                                      Page 63
 1                        K. Keaton
 2        Q.    You don't know?
 3        A.    I don't.
 4        Q.    And you said you're looking at a tablet.
 5   Did you have a tablet --
 6        A.    No.  No.  Right now.  Right now.  I'm
 7   looking at the big screen up there and I'm looking
 8   at this tablet.  And I can't definitively say I'm
 9   texting on my phone.
10        Q.    Is the reason you can't say it because
11   counsel objected and said I'm mischaracterizing the
12   video?
13              MS. BENVENISTY:  Objection.
14        A.    Sir, I'm here to answer your questions as
15   truthful as possible.  I don't need anybody to
16   clarify this for me.  I genuinely cannot see whether
17   that is a phone in my hand.  If it is a phone, I
18   cannot tell you that I was texting.  I just don't.
19        Q.    If it was a phone, you might have been
20   just looking at it?
21              MS. BENVENISTY:  Objection.  Calls for
22        speculation.
23        A.    That could be true.
24              MR. LICUL:  Joe, play the video to 1:34.
25              (Video recording played.)
```

```
                                                    Page 81
 1                    K. Keaton
 2        A.    Right.
 3        Q.    Do you have any idea how they knew to
 4   follow you?
 5             MS. BENVENISTY:  Objection.
 6        A.    I'm not sure if I told Jason -- I don't
 7   remember I spoke to.  But at this point I had to
 8   make the decision to ask Mr. Oakley to leave.  So I
 9   don't remember who I told or if I -- who I told.
10        Q.    Who is Jayson?
11        A.    He's a supervisor.
12        Q.    Do you remember his last name?
13        A.    Jacknow.
14        Q.    Isn't it true, Mr. Keaton, that when you
15   went over to speak to Mr. Dolan, he directed you to
16   have Mr. Oakley ejected?
17        A.    No.
18        Q.    Are you aware that he testified that he
19   told you and the security personnel that you gotta
20   do what you gotta do?
21             MS. BENVENISTY:  Objection.
22        Mischaracterizes the record.
23             MR. LICUL:  Withdrawn.
24        Q.    Are you aware that Mr. Dolan stated
25   publicly that when you spoke to him, he said, you
```

```
                                                    Page 82
 1                       K. Keaton
 2   gotta do what you gotta do?
 3             MS. BENVENISTY:  Objection.
 4        A.   I'm not aware that he said that.
 5        Q.   If he said that, would he be lying?
 6             MS. BENVENISTY:  Objection.
 7        A.   He might have said that.  But again,
 8   that's not him directing me to tell Mr. Oakley to
 9   leave.  The decision to ask Mr. Oakley to leave was
10   my own.  If Mr. Dolan said that -- I'm not going to
11   say he didn't.  But to me, that's not a directive to
12   throw Mr. Oakley out.
13        Q.   He's your boss; right?  Mr. Dolan is;
14   correct?
15        A.   Yes, sir.
16        Q.   You report to him and only him; correct?
17        A.   He is the -- he is the person that --
18   yeah, I guess so.  Technically.
19        Q.   Up through this point in the video, you
20   don't see Mr. Oakley drawing any attention to
21   himself; do you?
22        A.   Without any audio, I can't -- no, I think
23   the question was earlier, was when do I see him
24   start to draw attention or say things to Mr. Dolan.
25   I can't definitively tell you that without audio.
```

Page 90

1      K. Keaton
2          MS. BENVENISTY:  Valdi, it's tantamount
3      to an admission that you're intentionally
4      asking him to confirm testimony that you know
5      isn't true so he can then correct it.
6          (Simultaneous speakers.)
7          MS. BENVENISTY:  Which is inappropriate,
8      too.
9          MR. LICUL:  That's false.  You just keep
10     doing the same things for the purpose of
11     leading the witness to a particular result.
12     It's not appropriate to do that.  All right.
13     Q.    Mr. Keaton, is it your testimony that you
14  on your own decided to walk over to Mr. Oakley?
15     A.    That is correct.
16     Q.    So it wasn't Mr. Dolan who directed you
17  to do that; correct?
18     A.    Correct.
19     Q.    And he didn't say, you gotta do what you
20  gotta do; correct?
21     A.    I didn't say that.
22     Q.    You didn't say that?
23     A.    No.
24     Q.    So --
25     A.    I said he could have said that.  I don't

```
                                                   Page 91
 1                    K. Keaton
 2   remember.  To me, that's not a directive to throw
 3   him out.  The decision was mine.  I made the
 4   decision to ask Mr. Oakley to leave.
 5         Q.    And your testimony is that the reason the
 6   other -- withdrawn.
 7               Do you know why the other guards followed
 8   you?
 9               MS. BENVENISTY:  Objection.
10         A.    They would have -- if I was going to
11   approach Mr. Oakley after he had been cursing at me
12   and Mr. Dolan, they would have came over to support
13   me.
14         Q.    How would they know that that's the
15   reason you are approaching Mr. Oakley?
16               MS. BENVENISTY:  Objection.
17         A.    As I said earlier, I might have said
18   something to Jason Jacknow or somebody else.  I
19   would have given somebody a heads up that I'm asking
20   him to leave.  I don't remember if I did or who I
21   spoke to about it.
22         Q.    Do you see anywhere in this video that
23   you gave Jayson the heads up?
24               MS. BENVENISTY:  Objection.
25         A.    Sir, just without audio, I don't
```

## CERTIFICATE

STATE OF NEW YORK )
                  ) ss.
COUNTY OF SUFFOLK )

I, Elizabeth F. Tobin, a Registered Professional Reporter and Notary Public within and for the State of New York, do hereby certify:

That Kori Keaton, the witness whose deposition is hereinbefore set forth, was duly sworn by me remotely and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

*Elizabeth F. Tobin*

ELIZABETH F. TOBIN, RPR