**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

CHARLES OAKLEY,

                      Plaintiff,

v.

MSG NETWORKS, INC., *et al.*,

                      Defendants.

Case No. 17-cv-6903 (RJS)

Oral Argument Requested

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
OF THEIR MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT.................................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 4

    A.    On February 8, 2017, Oakley Attended a Knicks Game at the Garden. ................. 4

    B.    Soon After Taking His Seat, Oakley Began Cursing Profusely at Security. ........... 5

    C.    MSG Security Asked Oakley to Leave the Garden and Gave Him an Opportunity to Do So, But He Refused. ..................................................................... 5

    D.    Oakley Physically Escalated the Situation.............................................................. 6

    E.    Rather than Comply with MSG Security's Further Requests that He Leave, Oakley Attempted to Return to his Seat and Fell to the Floor. ............................. 7

    F.    Oakley Assaulted Multiple MSG Employees, and an NYPD Police Officer Decided to Place Him Under Arrest.......................................................................... 7

    G.    Oakley Resisted the Efforts of the NYPD and MSG Security to Escort Him out of the Garden and Threw Himself to the Floor by the Arena Exit........... 8

    H.    Oakley Refused to Stand Up for Over One Minute, Then Continued to Resist His Removal by Grabbing Onto a Railing. ................................................. 9

    I.    The NYPD Escorted Oakley to a Nearby Police Station, Where He Was Charged With Multiple Crimes. ............................................................................. 10

PROCEDURAL HISTORY ............................................................................................... 10

LEGAL STANDARD ........................................................................................................ 13

ARGUMENT ..................................................................................................................... 15

I.    MSG Had The Right to Use Reasonable Force To Remove Oakley Because He Refused to Leave When Given the Opportunity. ............................................................................. 15

II.    The Undisputed Facts Prove That MSG Used Objectively Reasonable Force................. 16

    a.    The Record Disproves Oakley's Outlandish Allegations of Force. .......... 17
    b.    The Limited Force Used by MSG Was Reasonable. ................................ 19

III.    Oakley's Claims Are Disproven by All Evidence Except His Own Testimony, Which Is Inconsistent and Contradicted by Previous Admissions. .................................................. 22

IV.    There Is No Genuine Issue of Material Fact Regarding Oakley's Damages. ................... 23

    a.    Nothing in the Record Supports Compensatory Damages. ...................... 23
    b.    Nothing in the Record Supports Punitive Damages. ................................ 24

CONCLUSION................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........................................................................................14

*Arnow v. Aeroflot Russian Airlines*,
980 F. Supp. 2d 477 (S.D.N.Y. 2013)...........................................................22

*Barnes v. Felix*,
605 U.S. __ 1, 4 (2025)..................................................................................21

*Blackwell v. Actor's Playhouse*,
2016 WL 11483834 (S.D.N.Y. Apr. 4, 2016), *report and recommendation
adopted*, 2016 WL 5239623 (S.D.N.Y. Sept. 22, 2016)................................24

*CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*,
735 F.3d 114 (2d Cir. 2013)...........................................................................14

*Cosby v. City of White Plains, New York*,
2007 WL 853203 (S.D.N.Y. Feb. 9, 2007)....................................................17

*Coxum v. City of New York*,
2015 WL 1134213 (N.Y. Sup. Ct. Bronx Cty. Mar. 12, 2015) .....................22

*Demand Elec., Inc. v. Innovative Tech. Holdings, LLC*,
665 F. Supp. 3d 498 (S.D.N.Y. 2023)............................................................22

*Duna v. City of New York*,
2019 WL 4735354 (S.D.N.Y. Sept. 27, 2019)...............................................20

*Escoffier v. Whole Foods Mkt. Grp., Inc.*,
2024 WL 3012480 (S.D.N.Y. June 13, 2024) ...............................................17

*Feaster v. City of Middletown*,
2016 WL 10570984 (S.D.N.Y. Nov. 28, 2016)..............................................17

*Franks v. City of New York*,
2017 WL 1194500 (E.D.N.Y. Mar. 31, 2017).................................................20

*Impasto v. Hellman Enters., Inc.*,
147 A.D.2d 788 (3d Dep't 1989)....................................................................15

*Knight v. U.S. Fire Ins. Co.*,
804 F.2d 9 (2d Cir. 1986) ...............................................................................14

*Ladoucier v. City of New York*,
   2011 WL 2206735 (S.D.N.Y. June 6, 2011) ........................................................17

*Marcoux v. Farm Serv. & Supplies, Inc.*,
   283 F. Supp. 2d 901 (S.D.N.Y. 2003)..................................................................25

*Marinaccio v. Town of Clarence*,
   20 N.Y.3d 506 (2013) ..........................................................................................25

*Mitchell v. N.Y. Univ.*,
   2014 WL 123255 (N.Y. Sup. Ct. N.Y. Cnty. Jan. 8, 2014), *aff'd*, 129 A.D.3d
   542 (1st Dep't 2015), *leave to appeal denied by* 26 N.Y.3d 908 (N.Y. 2015) ...........15, 17, 22

*Noonan v. Luther*,
   206 N.Y. 105 (1912) .............................................................................................15

*Oakley v. Dolan*,
   2023 WL 3263618 (2d Cir. May 5, 2023) ............................................................12

*Oakley v. Dolan*,
   980 F.3d 279 (2d Cir. 2020)..................................................................................10

*Patrolmen's Benevolent Ass'n. of City of New York v. City of New York*,
   310 F.3d 43 (2d Cir. 2002)....................................................................................24

*Podell v. Citicorp Diners Club, Inc.*,
   112 F.3d 98 (2d Cir. 1997)....................................................................................14

*Ryan v. City of New York*,
   2018 WL 3364580 (N.Y. Sup. Ct. N.Y. Cty. July 5, 2018)...................................21

*Schaeffer v. Cavallero*,
   54 F. Supp. 2d 350 (S.D.N.Y. 1999).....................................................................20

*Scott v. Harris*,
   550 U.S. 372 (2007)...............................................................................................14

*Southwick Clothing LLC v. GFT (USA) Corp.*,
   2004 WL 2914093 (S.D.N.Y. Dec. 15, 2004) .......................................................24

*Sullivan v. Gagnier*,
   225 F.3d 161 (2d Cir. 2000)..................................................................................20

*Tardif v. City of New York*,
   2017 WL 571016 (S.D.N.Y. Feb. 6, 2017)............................................................19

*That's What She Said, Inc. v. Gutter Games Ltd.*,
   2024 WL 3678473 (S.D.N.Y. Aug. 5, 2024)..........................................................22

*U.S. Comm. Futures Trading Comm'n v. eFloorTrade, LLC*,
  2018 WL 10625588 (S.D.N.Y. Sept. 21, 2018)........................................................22

*Wellner v. City of New York*,
  2019 WL 1511022 (S.D.N.Y. Mar. 22, 2019) ........................................................24

*Williams v. City of New York*,
  508 F.2d 356 (2d Cir. 1974).................................................................................25

*Willis v. City of New York*,
  2004 WL 555685 (S.D.N.Y. Mar. 19, 2004) .........................................................20

*Wright v. Goord*,
  554 F.3d 255 (2d. Cir. 2009)................................................................................13

*Wrobel v. County of Erie*,
  692 F.3d 22 (2d Cir. 2012)...................................................................................14

## Other Authorities

Fed. R. Civ. P. 56..................................................................................................13

Defendants MSG Networks, Inc., Madison Square Garden Sports Corp., and Sphere Entertainment Group, LLC (collectively, "MSG") respectfully submit this Memorandum of Law in support of their motion for summary judgment.

## PRELIMINARY STATEMENT

More than eight years ago, former Knicks player Charles Oakley attended a basketball game at Madison Square Garden Arena (the "Garden"), yelled and cursed at MSG employees, was asked to leave, refused to leave, and then attacked and injured members of MSG's security team, which led the New York City Police Department ("NYPD") to arrest Oakley and charge him with criminal assault. *Oakley* then had the audacity to sue *MSG* for assault and battery (among a grab-bag of other claims that were dismissed) in a case that has persisted after two appeals to the Second Circuit, which found that the record, pre-discovery, was not yet "conclusive" enough to "conclude" that the force used to remove Oakley was "reasonable." But now, fully developed, the record militates that summary judgment be granted. Indeed, discovery has consisted of thousands of pages of documents, numerous videos of the incident from different angles (many with audio), and direct eyewitness accounts in the form of deposition testimony and sworn declarations from more than a dozen witnesses who have conclusively and consistently sworn that Oakley refused to leave after being asked to do so, and then assaulted and battered MSG security guards, compelling them to use reasonable force to remove him, and showing remarkable restraint in the process. And all of this was confirmed by Oakley himself in a series of damning admissions he made under oath, in press interviews, and in drafts of his own autobiography. Put simply, Oakley's case has been debunked.

***Every eyewitness who has testified about Oakley's removal***—including multiple independent witnesses who have no affiliation with MSG, such as an NYPD Police Officer, former employees of MSG, and bystanders like tennis great John McEnroe and Oakley's seatmate (who

gave Oakley his ticket to that night's game)—all confirm the same account: Oakley was approached by MSG security and asked to leave the Garden multiple times. He was given a reasonable opportunity to depart—again, multiple times. And, when Oakley refused to leave and violently resisted his removal, MSG's employees used the minimum amount of force necessary to eject him, which was far less force than they reasonably were entitled to use under the circumstances. This uncontroverted record of testimonial and documentary evidence is corroborated by video recordings of the incident from multiple angles, which put the lie to Oakley's allegations about what happened that night. And, when Oakley has spoken candidly about this case over the past eight years, he has contradicted his own bogus allegations. In sum, now that the evidence is in, there is no dispute that the force used to remove Oakley was objectively reasonable under the circumstances.

MSG's previous motion for summary judgment came prior to discovery and was based "solely on the video footage documenting Oakley's removal from the Garden." ECF 121 at 4. In reversing this Court's grant of summary judgment, the Second Circuit held only that "choppy and degraded" video evidence, ***standing alone***, was insufficient to grant immediate dismissal, given that Oakley had submitted a sworn declaration (which we now know sets forth a false factual narrative) that he was "grabbed" and "push[ed]" to the ground by MSG security guards. ECF 140 at 6–9. The Second Circuit directed the parties to proceed with fact discovery, because it would be likely to yield "additional videos showing other camera angles, as well as helpful eyewitness testimony to overcome the limitations in the video record and give context." *Id.* at 9.

Following the Second Circuit's directive, the parties engaged in months of voluminous discovery, during which MSG produced hundreds of documents to Oakley (in contrast to the evidence Oakley affirmatively destroyed), and Oakley's counsel took or defended 15 fact witness

depositions, two expert depositions, and issued multiple third-party subpoenas. As the Second Circuit foresaw, discovery uncovered additional videos showing other camera angles, including a video from a fan seated immediately behind Oakley "clearly show[ing] Oakley's feet and lower legs" around the time of his first fall in the stands—satisfying the Second Circuit's desire for such a video (*id.*)—which established that Oakley slipped on a nearby step and was not pushed to the floor. Furthermore, as previously explained, the discovery adduced included uncontroverted eyewitness testimony that overcame "the limitations" in the previous video-only record. *Id.* These witnesses all testified that Oakley was the aggressor on the evening in question and likewise confirmed that the force used to remove Oakley from the arena was reasonable in light of his aggression and refusal to leave the Garden on February 8, 2017.

Despite this extensive discovery record, ***there is not a single witness*** who corroborates the false narrative Oakley espoused in his previous declaration and continues to espouse in his Second Amended Complaint (the "SAC"). In fact, discovery has caused Oakley's false narrative to crumble, revealing several damning admissions from Oakley following his ejection, including repeated acknowledgments in videotaped interviews and drafts of his autobiography that (i) he was asked to leave the Garden and refused; (ii) he regretted touching MSG security guards; and (iii) he "slipped," rather than being pushed to the floor by security, as he previously claimed in the sworn declaration his lawyers drafted. Critically—and contrary to what he stated in his self-serving declaration and SAC—in these interviews and many iterations of his book, Oakley never claimed that he was pushed or inappropriately touched by MSG security at all. Oakley's lead counsel, recognizing how harmful these admissions and omissions were to Oakley's case, went so far as to personally ***re-write the final manuscript*** of Oakley's autobiography so that it matched the false litigation narrative his lawyers crafted for him. Even if Oakley's narrative were true (and it is not),

discovery has proven Oakley was not damaged in any way from his ejection, yet another independent reason to grant summary judgment.

Aware that he no longer has a case, Oakley is left grasping at straws, taking the very same video evidence he tried to discount earlier in the case on appeal and arguing it *supports* his claims. But Oakley's proffered interpretations of these videos (which plainly show Oakley slipping to the ground, not being pushed)—and his claim that he meant he was "pushed" when he repeatedly admitted in his autobiography draft that he "slipped"— strain credulity and led this Court to observe "[t]hese are words that have meaning." Ex. 32 (4/23/25 Conf. Tr.) at 44:15–16.[1]

There can no longer be any genuine dispute of material fact that the force used by MSG security was reasonable. MSG therefore respectfully requests that the Court end this eight-year saga and grant summary judgment on Oakley's sole remaining assault and battery claims.

## STATEMENT OF FACTS

### A.    On February 8, 2017, Oakley Attended a Knicks Game at the Garden.[2]

On the night of February 8, 2017, after consuming several alcoholic drinks over the course of the early evening, Oakley arrived at the Garden to attend a nationally televised Knicks basketball game. 56.1 ¶¶ 11, 15–18. Oakley had obtained his ticket free of charge through Timothy Oberweger, with whom he had a mutual connection. *Id.* ¶ 12. The back of Oakley's ticket (like all Knicks tickets) stated that it was a "license revocable in MSG's sole discretion," and that MSG reserves the right "to eject any person . . . who uses vulgar or abusive language." *Id.* ¶¶ 13–14.

---

[1] References to "Ex." refer to exhibits to the accompanying Declaration of Damien Marshall in support of MSG's motion for summary judgment, dated May 30, 2025.

[2] MSG recounts only the most essential facts for the Court's consideration in this memorandum. MSG has also submitted a more fulsome 56.1 statement of undisputed facts (hereinafter, "56.1").

**B.    Soon After Taking His Seat, Oakley Began Cursing Profusely at Security.**

Midway through the first quarter of the game, Oakley took his seat in the front row of Section 7, across from the Knicks bench. *Id.* ¶¶ 32, 37. Oakley was seated two seats over from a young child. *Id.* ¶ 35. MSG Chairman and CEO James Dolan and MSG VIPs, including tennis star John McEnroe, were seated courtside one row in front of Oakley. *Id.* ¶ 36. Upon taking his seat, Oakley expressed frustration to his seatmates about not being granted access to MSG's luxury suite floor, looked towards several MSG security guards, and began to yell profanities at them. *Id.* ¶¶ 38–40. Specifically, Oakley yelled at the guards, "What the f*ck are you looking at?" and told them to, among other things, "Stop f*cking looking at me" and "Watch the f*cking game!" *Id.* ¶¶ 39–40. When an MSG server came to take Oakley's food and drink order, Oakley asked her: "Where Dolan at?"; "Do you know who I am?"; and "Why the hell these f'n security guards in my face[?]" *Id.* ¶ 42.

Then-MSG Director of Executive Protection Kori Keaton, who had heard much of Oakley's yelling and cursing, walked over to Dolan to inform him about Oakley's conduct. *Id.* ¶ 51. When Oakley saw Keaton walking towards Dolan, Oakley called out to Keaton that he was a "rat bastard" and "always sucking on Dolan's d*ck." *Id.* ¶ 52. Dolan left the decision about how to address the situation to Keaton, and then Keaton made the decision to ask Oakley to leave the Garden. *Id.* ¶¶ 53–54. As Keaton walked back to his post near the Garden exit, Oakley made an obscene gesture in Keaton's direction—bringing his thumb and pointer finger close together in a gesture meant to indicate the size of Keaton's genitalia—and yelled obscenities at Keaton, calling him Dolan's "bitch," a "f*cking snitch," and a "rat f*ck," among other things. *Id.* ¶¶ 56–59.

**C.    MSG Security Asked Oakley to Leave the Garden and Gave Him an Opportunity to Do So, But He Refused.**

At approximately 8:19 p.m., consistent with best security practices and MSG's ejection

policy and Event Security Operations Manual (which calls for "overwhelming presence" of security when de-escalation is needed, as here), Keaton, along with six other MSG personnel and an NYPD Police Officer, Officer Maher, approached Oakley. *Id.* ¶¶ 9, 66, 68–72. Oakley was still shouting expletives when Keaton arrived at Oakley's seat, and Keaton first told Oakley to "settle down." *Id.* ¶¶ 73–75. In a calm manner, Keaton told Oakley: "This is over, you need to come with us to the back and talk." *Id.* ¶ 76. Keaton explained to Oakley that he "can't curse like that in the arena" as it is prohibited by NBA policy. *Id.* ¶ 77. Indeed, the NBA Fan Code of Conduct prohibits "disruptive behavior" at games, "including foul or abusive language or obscene gestures," and MSG's Ejection Policy lists "disorderly conduct" and "foul language and gestures" as bases for ejection (recognizing that MSG may eject any guest for any or no reason under New York law). *Id.* ¶¶ 78, 80. Keaton then informed Oakley "that he was going to have to leave." *Id.* ¶ 77.

Oakley refused to comply with Keaton's request that he leave, responding "F*ck you, I ain't leaving" and "This is bullshit, I'm not going f*cking nowhere," among other things. *Id.* ¶ 85. Other MSG security personnel also requested that Oakley leave the Arena, but Oakley repeatedly refused, continuing to declare, among other things, "I'm not f*cking leaving." *Id.* ¶ 86. Keaton then motioned for Officer Maher to come closer to Oakley. *Id.* ¶ 87.

### D.    Oakley Physically Escalated the Situation.

Before Officer Maher could step forward, Oakley told Keaton "I'm not leaving" and abruptly stood up, thrusting his arm and hand outward and directly toward Keaton's face. *Id.* ¶¶ 92–93. In response, Keaton put his hands up in a defensive manner and stepped backwards, then stepped forward with his arm out to regain balance. *Id.* ¶ 94. Keaton never touched Oakley during this interaction, nor did he or any other member of MSG security push Oakley. *Id.* ¶¶ 95–97.

Officer Maher, who was standing behind Oakley, observed Oakley's movement toward Keaton and restrained Oakley from behind, moving Oakley backwards and away from Keaton. *Id.*

¶ 100. After Officer Maher had moved Oakley backwards, MSG security officer Jayson Jacknow assisted him in restraining Oakley, while a member of the Knicks' security team, Todd Jackson, stepped in between Oakley and Keaton. *Id.* ¶ 101. Jackson told Oakley "Come on, Oak. Come on," to which Oakley responded "f*ck you" and "I'm not f*cking leaving." *Id.* ¶ 102.

### E.    Rather than Comply with MSG Security's Further Requests that He Leave, Oakley Attempted to Return to his Seat and Fell to the Floor.

Following Oakley's confrontation of Keaton, MSG Director of Arena Operations Thomas Redmond, who had been watching the interaction from nearby, walked toward Oakley to speak with him directly. *Id.* ¶ 111. When Redmond arrived at Oakley's row, Oakley was standing, shouting, and flailing his arms. *Id.* ¶ 112. Redmond, standing behind Oakley, gently placed one hand on Oakley's back and another on his left arm to get his attention, then asked Oakley to walk with him to the "back-of-house" area where they could talk. *Id.* ¶¶ 113–14. Oakley refused Redmond's request and began walking to his seat, insisting he was going to sit down. *Id.* ¶ 115.

While Oakley was moving back toward his seat—and as he repeatedly admitted in contemporaneous interviews and autobiography drafts—he slipped and fell to the floor. *Id.* ¶¶ 121–38. Oakley was not pushed to the ground; rather, he fell because he caught his footing on the lip of the Section 7 riser. *Id.* ¶¶ 121–23. Redmond asked Oakley if he was okay and attempted to help him back up from the ground, but Oakley refused Redmond's assistance. *Id.* ¶ 139. Oakley then stood on his own, pointed to his seat, and said: "I'm going to sit here." *Id.* ¶ 140.

### F.    Oakley Assaulted Multiple MSG Employees, and an NYPD Police Officer Decided to Place Him Under Arrest.

After Oakley stood, Officer Maher told Oakley to accompany him "to an exit gate" where he and Oakley "could speak one-on-one," but Oakley ignored Officer Maher's request and continued to move back toward his seat. *Id.* ¶¶ 141–42. Meanwhile, Redmond also asked Oakley to "walk with him" so that they could talk elsewhere, placing an open hand on Oakley's arm in an

attempt to lead Oakley out of the arena. *Id.* ¶¶ 143–44. Oakley shouted at Redmond to "get the f*ck out of my face" and pointed his finger toward Redmond's face, pushing Redmond's forehead. *Id.* ¶ 145, 147. Redmond took a step backward to create distance from Oakley, but Oakley responded by standing up taller and shoving his chest into Redmond's, pointing his finger near Redmond's eye. *Id.* ¶ 148. Redmond then turned his face away from Oakley, giving no reaction as Oakley screamed in his face. *Id.* ¶ 149.

With Redmond's face still turned away from him, Oakley forcefully shoved Redmond's head backward by pushing his fingers against Redmond's left temple. *Id.* ¶¶ 150–52. Oakley's shove left a bruise near Redmond's eye, and Redmond was later treated by a doctor for the injury. *Id.* ¶ 153. After attacking Redmond, Oakley turned around and brought his hands down in a chopping motion on the right forearm of Jacknow, who was standing behind Oakley. *Id.* ¶¶ 154–56. Oakley then forcefully shoved Jacknow in the chest twice, pushing Jacknow backward. *Id.* ¶ 157–58. Jacknow was also injured by Oakley; he sustained a cut on his left hand and a bruised right forearm, for which he received medical treatment. *Id.* ¶ 159. Oakley then attempted to remove his watch and hand it to his seatmate. *Id.* ¶ 160. Having observed Oakley's attacks on Redmond and Jacknow, Officer Maher determined that Oakley had committed criminal assault and should be arrested and removed from the Garden. *Id.* ¶¶ 161–62.

### G.    Oakley Resisted the Efforts of the NYPD and MSG Security to Escort Him out of the Garden and Threw Himself to the Floor by the Arena Exit.

To remove Oakley from the Garden, Officer Maher and Jackson took hold of Oakley's left arm, *id.* ¶ 163. Jacknow held Oakley's front torso, and Redmond and MSG security officer Kevin Heussler held Oakley's right arm. *Id.* ¶ 164. Officer Maher and these MSG personnel began to escort Oakley towards the nearest arena exit, which is known as the "Zamboni Gate." *Id.* ¶ 163. Oakley physically resisted his removal by refusing to pick up his feet and using his body weight

to make it more difficult for Officer Maher and MSG security to walk him to the Zamboni Gate. *Id.* ¶¶ 165–67. Oakley's legs eventually became tangled with those of the security team, and he threw himself to the floor in front of the Zamboni Gate, pulling Officer Maher towards the floor with him. Once again, Oakley was not pushed to the ground. *Id.* ¶¶ 168–72.

### H.    Oakley Refused to Stand Up for Over One Minute, Then Continued to Resist His Removal by Grabbing Onto a Railing.

While Oakley was on the ground in front of the Zamboni Gate, Redmond and other members of the MSG security team repeatedly asked him to get up, and even offered to help him up, but Oakley refused to stand and rejected their offers of help. *Id.* ¶¶ 173–74. While Oakley verbalized that he wanted to get up, he did not actually make any attempt to stand, even after one member of MSG's security team informed Oakley that he was "not cooperating." *Id.* ¶¶ 175, 179. Oakley remained on the floor for over one full minute. *Id.* ¶ 176. No one from MSG's security team was holding Oakley down on the floor during this time. *Id.* ¶ 177.

While Oakley was on the floor, Officer Maher attempted to place a handcuff on Oakley's wrist. *Id.* ¶ 181. Oakley resisted by flailing his arms and moving his hands erratically. *Id.* ¶ 182. As Oakley finally stood back up, Officer Maher succeeded in attaching one handcuff to Oakley's right wrist. *Id.* ¶ 183. By then, a second NYPD Officer had joined Officer Maher and MSG security. *Id.* ¶ 184. Then, Oakley stood and pulled back his left hand, balled it into a fist, and swung it at Officer Maher's face, stopping inches short of striking Officer Maher. *Id.* ¶ 185. Oakley attempted to prevent security from continuing to escort him out of the arena by gripping both hands onto the raised railing separating the Zamboni Gate area from spectators seated above. *Id.* ¶ 186. As only one of Oakley's wrists was handcuffed, the other end of the handcuff was dangling, creating a potentially dangerous weapon and a security risk. *Id.* ¶ 189. Furthermore, the railing that Oakley was holding on to was bolted at the bottom, with fans immediately behind it. *Id.* ¶ 190. MSG

security on scene knew that if Oakley managed to pry the railing off of its bolts, there could have been a catastrophic collapse of the railing. *Id.* ¶ 190.

Officer Maher was eventually able to pry Oakley's right hand from the railing, while Antonio simultaneously removed Oakley's left hand from the railing by applying a downward force to Oakley's left arm. *Id.* ¶¶ 191, 193. In the process, Oakley squeezed Antonio's hand beneath his, aggravating an injury to Antonio's finger. *Id.* ¶ 192. The NYPD Police Officers and MSG security then continued to escort Oakley through the Zamboni Gate to MSG's back-of-house area, during which time Oakley smashed Antonio's hand against a piece of sharp metal, giving Antonio a second injury for which he later received treatment. *Id.* ¶¶ 196–97.

### I.    The NYPD Escorted Oakley to a Nearby Police Station, Where He Was Charged With Multiple Crimes.

Once in MSG's back-of-house area, Officer Maher handcuffed both of Oakley's hands. *Id.* ¶ 198. Oakley was escorted to a holding area, where MSG security and NYPD Police Officers waited with him until an NYPD van arrived to take him to the NYPD Midtown South Precinct. *Id.* ¶¶ 199–201. There, Oakley was charged with criminal assault, aggravated harassment, and trespass for his conduct at the Garden that evening. *Id.* ¶¶ 201–02.

## PROCEDURAL HISTORY

On September 12, 2017, Oakley filed a 10-count complaint against various MSG entities and MSG Chairman James Dolan seeking relief in connection with his February 8, 2017 removal from MSG. ECF 1; *see also* ECF 36 (Amended Complaint). On February 19, 2020, on MSG's motion to dismiss, this Court dismissed all of Oakley's claims with prejudice. ECF 68 at 21.

On November 16, 2020, the Second Circuit affirmed dismissal of all but the assault and battery claims. *Oakley v. Dolan*, 980 F.3d 279, 283 (2d Cir. 2020) ("*Oakley I*"). With respect to those claims, the court credited Oakley's allegation that he had been "'thrown to the ground' by

actions that 'greatly exceeded the amount of force that was necessary,'" and found that those and related allegations were enough to "defeat a motion to dismiss the assault and battery claims." *Id.* at 284. The Second Circuit emphasized, however, that the only question remaining in the case was whether "the security guards used excessive force in *accomplishing* the removal." *Id.* (emphasis added). It expressly rejected as "incorrect[]" Oakley's contention that "the *act* of removal was unreasonable," thereby reaffirming this Court's conclusion that MSG had an absolute legal right to remove Oakley from its property. *See id.* (emphasis added); *see also* ECF 68 at 15–16 ("The law is clear that the MSG Defendants had the right to expel Oakley from the Garden and that his refusal to leave justified their use of reasonable force to remove him - a licensee who became a trespasser by refusing to leave their property after being directed to do so.").

Following the Second Circuit's remand, MSG moved for summary judgment of the remaining assault and battery claims based solely on video footage documenting Oakley's removal from the Garden. ECF 103. In support of his opposition to MSG's motion, Oakley submitted an attorney declaration by his counsel, Doug Wigdor, which stated that "because no discovery has been taken in this case and no answer has been filed, [Oakley] lack[ed] substantial evidence necessary to fully oppose" MSG's motion. ECF 112 ¶ 10. Wigdor swore that in order to adequately oppose a summary judgment motion in this case Oakley would "require[]" written discovery, deposition testimony, document discovery, video and/or audio footage "from other sources, including Defendants, media and fans who were present," witness statements, statements by MSG security guards, and expert testimony. *Id.* ¶¶ 11–18. Oakley also filed a Rule 56 declaration that purported to "summarize what happened" on February 8, 2017 at MSG. ECF 114 ¶ 1. Oakley's counsel drafted the declaration for him. 56.1 ¶ 210. In it, "Oakley" swore, among other things, "I felt a security guard push me from behind, which caused me to fall and feel pain," and "I did not

trip and fall on my own."[3] ECF 114 ¶¶ 13–14. On November 8, 2021, this Court granted MSG's motion for summary judgment, dismissing Oakley's assault and battery claims. ECF 121 at 4.

On May 5, 2023, the Second Circuit reversed this Court's order on the narrow ground that summary judgment was premature because the video evidence in the record at that time did not so "blatantly contradict" claims Oakley made in his Rule 56 declaration—namely, that he was "grabbed" and "push[ed]" to the ground by MSG security guards—to warrant immediate dismissal. *Oakley v. Dolan*, 2023 WL 3263618, at *2–3 (2d Cir. May 5, 2023) ("*Oakley II*"); *see also* ECF 114 at ¶¶ 11, 13. The Second Circuit reasoned that, given the "choppy and degraded video quality," the lack of audio in the only footage capturing this incident from its beginning, and the absence of any video "clearly show[ing] Oakley's feet and lower legs" when he initially fell to the floor, the video record, on its own, did not "unequivocally establish that Oakley" was afforded the opportunity to leave and "merely lost his footing" when he first rose. *Oakley II*, 2023 WL 3263618, at *3. Accordingly, the Second Circuit sent the case back for full discovery, which "could have yielded additional videos showing other camera angles, as well as helpful eyewitness testimony to overcome the limitations in the video record and give context." *Id.* The Second Circuit explained that, ultimately, the factfinder in this case "must make a determination as to whether the

---

[3] These statements are contrary to earlier admissions from Oakley in drafts of his autobiography, *The Last Enforcer*, which had been drafted by Oakley's ghostwriter Frank Isola based on "verbatim" notes of extensive interviews with Oakley, and which Oakley had repeatedly reviewed and approved for accuracy. 56.1 ¶¶ 132–35, 137. Four months after filing his declaration on Oakley's behalf, on June 21, 2021, Wigdor obtained a pre-publication manuscript of *The Last Enforcer* and personally made numerous changes to the section addressing Oakley's ejection, including: (i) he replaced Oakley's recollection that security guards told him "someone" had ordered him to leave with an affirmative statement that the guards told him "Dolan" had ordered him to leave; (ii) he removed Oakley's statement that he "never should have touched" MSG security and replaced it with language that Oakley is "not a violent person" but needed to "defend [himself] so something really bad didn't happen," and (iii) he changed Oakley's sentence "I slipped and ended up on my back" to "I was eventually pushed down by Dolan's guys and ended up on my back.*" Id.* ¶¶ 213–15.

force used to eject Oakley was reasonable." *Id.*

On April 18, 2024, Oakley filed a Second Amended Complaint alleging only claims for assault and battery, in which he described the predicate facts underlying both claims using identical terms: that MSG "physically and forcibly removed Plaintiff from the Garden and subsequently detained him until police could arrive to unjustifiably arrest him." ECF 164 ¶¶ 96, 100.

Over the past year, the parties have conducted fulsome discovery far more robust than the video-only record previously before this Court and the Second Circuit. The parties have exchanged substantial written discovery, and (along with third-parties) have collectively produced thousands of documents, including contemporaneous witness statements, sworn declarations of multiple witnesses to Oakley's ejection, and numerous videos from MSG and other sources, such as the media and fans. In addition, the parties have exchanged expert reports and taken depositions of fifteen fact witnesses and two experts.

Over the course of this extensive discovery, this Court has repeatedly reaffirmed that the only remaining issue in this case is whether the force used by MSG personnel to remove Oakley from the Garden on February 8, 2017 was objectively reasonable. *See* ECF 174 at 4; ECF 181 at 6–9; ECF 218 at 5; ECF 264 at 4. Oakley himself has acknowledged and agreed with the scope of these holdings, confirming in a January 2025 filing that the only "remaining factual disputes" in this action relate to MSG's use of force in ejecting Oakley. *See* ECF 287 at 17.

## LEGAL STANDARD

Summary judgment must be granted if "no genuine dispute as to any material fact" exists and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party demonstrates the absence of a genuine issue of material fact, the burden shifts to the party opposing summary judgment to set forth specific facts showing that there is a genuine issue for trial. *See Wright v. Goord*, 554 F.3d 255, 266 (2d. Cir. 2009). Where, as here, "the burden of proof

at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," at which point "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013). "Only disputes over facts that might affect the outcome of the suit under governing law" are "material" such that they can preclude entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). For a dispute to be "genuine," it must be supported by "evidence [] such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. A party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986); *see also Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) ("[t]o survive a [summary judgment] motion ..., [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct" (citation omitted)). Indeed, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380; *see also Oakley II*, 2023 WL 3263618, at *1 ("[W]e do not accept Plaintiff's facts to the extent that they are 'blatantly contradicted by the record.'" (quoting *Scott*)); *Podell v. Citicorp Diners Club, Inc*., 112 F.3d 98, 101 (2d Cir. 1997) ("The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forth some affirmative indication that his version of relevant events is not fanciful.").

## ARGUMENT

**I.    MSG Had The Right to Use Reasonable Force To Remove Oakley Because He Refused to Leave When Given the Opportunity.**

Under settled New York law, property owners have the right to remove individuals from their property for any reason. *See Impasto v. Hellman Enters., Inc.*, 147 A.D.2d 788, 789 (3d Dep't 1989) ("[A] ticket to a place of public amusement is merely a license which is revocable, without cause, at the will of the proprietor."). If a licensee refuses to leave when given the opportunity to do so, the property owner "ha[s] the right to use reasonable force to eject [the licensee]." *Noonan v. Luther*, 206 N.Y. 105, 108 (1912); *accord, e.g.*, *Mitchell v. N.Y. Univ.*, 2014 WL 123255, at *1 (N.Y. Sup. Ct. N.Y. Cnty. Jan. 8, 2014) (holding that private university "ha[d] the right to use reasonable force to eject [plaintiff] from its premises"), *aff'd*, 129 A.D.3d 542 (1st Dep't 2015), *leave to appeal denied by* 26 N.Y.3d 908 (N.Y. 2015); *Oakley II*, 2023 WL 3263618, at *2. For these reasons, this Court has previously explained that "the MSG Defendants had the right to expel Oakley from the Garden and [] his refusal to leave justified their use of reasonable force to remove him." ECF 68 at 15–16; *see also Oakley I*, 980 F.3d at 283 (Second Circuit rejecting as "incorrect[]" Oakley argument that MSG's "act of removal was unreasonable"); *Oakley II*, 2023 WL 3263618, at *2 (Second Circuit noting that reasonableness of force was only issue remaining).

The comprehensive, undisputed discovery record in this case confirms that, on February 8, 2017, Oakley was asked to leave the Garden by MSG employees and that Oakley refused to leave, despite ample opportunity to do so. As an initial matter, Oakley himself alleges in the SAC that "members of Madison Square Garden's security team [] ordered him to leave" and, rather than doing so, he (according to Oakley) instead asked "why he was being forced to leave" and argued "he had done nothing wrong." SAC ¶¶ 36–37, 39. Oakley has also admitted that he was asked to leave (and refused to do so) in his Rule 56 declaration filed in this case, his autobiography, and in

multiple media interviews given after his ejection. *See* 56.1 ¶ 82 (admitting that MSG security personnel "demanded that I leave MSG"); *id.* ¶ 90 (admitting he was told he "had to leave the building," and, instead, he "was standing his ground"); *id.* ¶ 83 (admitting that MSG security "told me I had to leave"); *id.* ¶ 91 (admitting he was told "you gotta leave," to which he responded "I'm not leaving"). Furthermore, the fact that Oakley was asked to leave the Garden has also been corroborated by multiple witnesses. *See, e.g.*, *id.* ¶ 75–77, 85–86, 114, 141–42, 204. The same goes for the fact that Oakley refused ample opportunity to leave of his own volition. Several witnesses reported that Oakley verbally (and profanely) refused MSG security guards' repeated requests that he leave the Garden, saying, among other things, "F*ck you, I ain't leaving," "f*ck you, I'm not going anywhere," "This is bullshit, I'm not going f*cking nowhere, I'm not going nowhere," and "I'm not f*cking leaving." *Id.* ¶ 85.

On this record—and based on the law of the case—there can be no genuine issue of material fact that MSG was entitled to use reasonable force to eject Oakley from the Garden.[4]

## II.    The Undisputed Facts Prove That MSG Used Objectively Reasonable Force.

Because MSG was justified in using reasonable force to remove Oakley from the Garden, the sole inquiry regarding Oakley's assault and battery claims is whether "the security guards used *excessive force* in accomplishing [the] removal." *Oakley I*, 980 F.3d at 283 (emphasis added); *Oakley II*, 2023 WL 3263618, at *2.[5] As this Court has previously held, under New York law, this

---

[4] As this Court has held, MSG's "rationale for removing Oakley is not at issue." ECF 121 at 5; *see also id.* at 6 (MSG was "not required to supply a reason for expelling Oakley"). But even if it were, there is ample record evidence proving that Oakley's aggressive and belligerent conduct in his seat violated MSG and NBA policies. 56.1 ¶¶ 73–76.

[5] Despite the Court's mandate about the scope of the remaining issues in this case, Oakley has attempted time and again to introduce new ones. At the pre-motion conference for this motion, Oakley's counsel suggested that Oakley's assault claim is based on the alleged fact that, prior to any touching, "he felt in danger [when he was] approached by six guards, who were effectively

inquiry turns on whether, "from an objective perspective" the "use of force was reasonable under the circumstances." ECF 218 at 5; *see also Cosby v. City of White Plains, New York*, 2007 WL 853203, at *5 (S.D.N.Y. Feb. 9, 2007) (Yanthis, M.J.) [6]; *Mitchell*, 2014 WL 123255, at *1 (dismissing assault and battery claims where private university's security officers "use[d] reasonable force to eject [plaintiff] from its premises"); *cf. Escoffier v. Whole Foods Mkt. Grp., Inc.*, 2024 WL 3012480, at *3–4 (S.D.N.Y. June 13, 2024) (Subramanian, J.) (dismissing battery claim on summary judgment where contact by defendants' employee was not of the kind a "'reasonable person would find offensive,'" i.e., "wrongful under all the circumstances"). Here, there is no genuine issue of material fact that MSG's force in removing Oakley from the Garden was objectively reasonable.

        a.    <u>The Record Disproves Oakley's Outlandish Allegations of Force.</u>

First and foremost, the undisputed record in this case belies Oakley's core allegation that he was "pushed to the ground" by MSG employees in the course of his removal from the Garden,

---

surrounding him." Ex. 32 (4/23/2025 Conf. Tr.) at 32:1–5. This theory is absent from Oakley's SAC, which invokes identical facts involving allegations of physical touch to support both Oakley's assault claim and his battery claim (*compare* ECF 164 ¶ 96 *with id.* ¶ 100), and—far from describing any alleged "fear"—only states that Oakley was "confused" when the group approached him. SAC ¶ 37. It is also absent from Oakley's previous declaration in opposition to summary judgment, which similarly stated only that Oakley was "confused" by the approaching group. ECF 114 ¶ 8. And Oakley did not mention being in fear due to the approaching security guards during interviews he gave to the media the day after the incident or in 2022 to promote his book. 56.1 ¶ 67. Moreover, because MSG had the right to use reasonable force once Oakley became a trespasser, to succeed on this theory, Oakley would need to establish a "*reasonable* fear" of "*unreasonable* wrongful physical contact," which he does not allege. *See, e.g.*, *Ladoucier v. City of New York*, 2011 WL 2206735, at *6 (S.D.N.Y. June 6, 2011) (Holwell, J.) (emphases added).

[6] "The standard for determining the reasonableness of the force applied is effectively identical in both New York state tort claims and Fourth Amendment excessive force claims brought pursuant to 42 U.S.C. § 1983." ECF 121 at 5; *see also Feaster v. City of Middletown*, 2016 WL 10570984, at *3 (S.D.N.Y. Nov. 28, 2016) (Smith, M.J.) (explaining that Fourth Amendment excessive force claims and "assault and battery claims under New York law" are evaluated on the "same standard" and require a showing "that 'the amount of force used was objectively unreasonable'").

an issue that previously precluded the Second Circuit's affirmance of summary judgment. *See Oakley II*, 2023 WL 3263618, at *2–3 (reversing summary judgment because "material disputes about whether and when the security guards pushed Oakley"). Instead, the evidence—multiple video angles and extensive witness testimony alike—confirms Oakley was not pushed by MSG staff on either of the two occasions that he fell during his ejection; he fell on his own. There is no evidence to the contrary, which, is itself indicative of the fact that Oakley was never pushed.

The first time Oakley fell was while attempting to return to his seat after being asked to leave the Garden. As captured in video footage (including videos not before the Court in connection with the prior summary judgment motion) and corroborated by witness testimony, Oakley fell because he caught his footing on the lip of the elevated riser adjacent to the seats in his section. 56.1 ¶¶ 121–23. Multiple witnesses to the fall—including several independent witnesses with no affiliation to MSG—described seeing Oakley "slip" or "trip" before falling to the ground. *Id.* And as Oakley's counsel has admitted in court, "there is no other witness," aside from Oakley, "who says that [Oakley] was pushed" during this encounter. *Id.* ¶ 127 (quoting 4/23/25 Conf. Tr. at 48:05); *see also id.* ¶ 128. (In fact, as discussed *infra*, even Oakley admitted multiple times—in drafts of his autobiography and in a 2022 media interview—that he "slipped" before falling to the ground.) Not only that, but video evidence also confirms that none of the MSG guards surrounding Oakley at the time *could have* pushed Oakley, given their positions and bodily movements relative to Oakley immediately preceding and during his fall. *See id.* ¶¶ 122–26. Oakley's claim that he was pushed near his seat is a made-for-litigation lie conjured to create an issue of fact for this case.

Oakley fell for the second time while MSG guards and Officer Maher attempted to escort him to the Zamboni Gate, immediately following Oakley's violent physical assault of two MSG employees. *Id.* ¶¶ 161–69. Multiple guards and Officer Maher provided sworn testimony and

contemporaneous witness statements describing that Oakley used his body weight to impede the security team's efforts and refused to walk, causing his legs to eventually become tangled with those of the security team around him. *Id*. ¶¶ 167–68. Oakley then threw himself to the ground in front of the Zamboni Gate in an attempt to stop his removal, pulling Officer Maher towards the ground with him. *Id.* ¶ 169. These statements are consistent with multiple angles of video, which show that, as Oakley was being moved towards the Zamboni Gate, he physically resisted by turning his body in opposition to the movement of the guards and Officer Maher. *Id.* ¶¶ 168–69. The record leaves no room to dispute that it was Oakley himself (once again) who caused his fall.[7]

Because the evidence conclusively disproves Oakley's allegations that he was pushed to the ground—the core allegations that allowed Oakley to survive summary judgment before—this Court should grant summary judgment in favor of MSG. *See Tardif v. City of New York*, 2017 WL 571016, at *12 (S.D.N.Y. Feb. 6, 2017) (Fox, M.J.) ("Since the undisputed evidence disproves the plaintiff's allegations of assault and battery [], summary judgment . . . is warranted.").

          b.      <u>The Limited Force Used by MSG Was Reasonable.</u>

The record also conclusively shows that the level of force MSG employees *actually* used to remove Oakley from the Garden was objectively reasonable. Force is objectively reasonable when, under the circumstances, it is "reasonably related to the nature of the resistance and the force

---

[7] Oakley contended at the April pre-motion conference that there is another alleged instance of battery, in which he was "pushed in the chest" by Kori Keaton when Oakley first stood. Ex. 32 (4/23/25 Conf. Tr. ) at 48:19–23. This argument should be disregarded because Oakley did not allege in his SAC that he was pushed in the chest when he stood; instead, he alleged that he was "pulled [] backward." 56.1 ¶ 98. In any case, the allegation is false and belied by the video evidence showing that Oakley lunged at Keaton before Keaton stepped back and extended his arm (without making contact with Oakley) to regain balance. *Id.* ¶ 94. The allegation is also contrary to the account of every witness testifying to that moment, who all confirm Keaton did not push Oakley (including Oakley himself, who agreed at his deposition that Keaton was "not pushing" him and claimed "*It's the guy behind* who pushed"). *Id.* ¶ 104. Oakley moved backward in that moment because, after Oakley lunged at Keaton, Officer Maher (who is not a Defendant or an employee of MSG) restrained him from behind, moving him backward away from Keaton. *Id.* ¶ 100.

used [or] threatened" by the person from whom compliance is sought—in this case, Oakley. *Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir. 2000).

In light of the overwhelming evidence reflecting Oakley's belligerent conduct at his seat leading up to his ejection, defiance in the face of MSG's requests to leave, physical resistance to his removal, and multiple violent assaults on MSG security personnel, there can be no genuine dispute that the actions taken by MSG to eject Oakley were reasonable under the circumstances and proportionate to *Oakley's* actions. *See, e.g.*, *Duna v. City of New York,* 2019 WL 4735354, at *5 (S.D.N.Y. Sept. 27, 2019) (Schofield, J.) ("forcibl[e]" removal of the plaintiff from a subway turnstile by "twist[ing] Plaintiff's arm" and "pushing him through the turnstile" "not unreasonable under the circumstances"); *Willis v. City of New York*, 2004 WL 555685, at *2–3 (S.D.N.Y. Mar. 19, 2004) (Lynch, J.) (emphasizing plaintiff's "refus[al] to comply" with a request to leave and "hostil[ity]" in determining that officers did not use "objectively unreasonable" force); *Franks v. City of New York*, 2017 WL 1194500, at *3–4 (E.D.N.Y. Mar. 31, 2017) (finding "it was objectively reasonable" to use force against a plaintiff who "not only resisted arrest, but exhibited violent behavior towards the police officers who were attempting to restrain him"); *Schaeffer v. Cavallero*, 54 F. Supp. 2d 350, 352 (S.D.N.Y. 1999) (Rakoff, J.) (dismissing battery claim where plaintiff refused to leave airplane as directed and was "escort[ed] . . . from the airplane").[8]

The record is uncontroverted that each instance of physical force by MSG security and the NYPD was preceded by—and in direct reaction to—Oakley's own physical and verbal escalation,

---

[8] MSG's expert on use of force, Timothy Gallagher, confirms that in the law enforcement and private security sectors alike, reasonableness of force is measured by comparing the officer's *perception* of the non-compliant subject's actions against the officer's *response*, ordinarily through a "Use of Force Model." After reviewing the evidence here, Gallagher concluded that "MSG security guards proceeded with caution, remained in control of the situation and their emotions, showed considerable restraint, and used force at or below the levels set forth in the Use of Force Model as occasioned by Oakley's behavior at each juncture." Ex. 45 (Gallagher Report) at 21.

making it reasonable under the totality of the circumstances. *Barnes v. Felix*, 605 U.S. __ 1, 4 (2025) ("totality of circumstances" inquiry considers "the history of the interaction" between the officer using force and the subject, "as well as other past circumstances known to the officer"):

- After profusely cursing at MSG employees, being asked to leave, and refusing to do so, Oakley rose from his seat and aggressively thrust his arm and hand directly toward Keaton's face. 56.1 ¶¶ 40, 42, 49–50, 56–62, 73, 75–77, 86, 92–93. In response to Oakley's attempt at physical violence (and with the full context of Oakley's belligerent behavior and language towards Keaton immediately prior), Officer Maher restrained Oakley from behind and moved him backwards, away from Keaton. *Id.* ¶ 100. Once Oakley had been moved backwards, Jacknow assisted Maher in restraining Oakley for a few seconds before releasing him again. *Id.* ¶ 101.

- After Oakley rose from the ground following his initial fall, he thrust his finger in Redmond's face, shoved his chest into Redmond's, then shoved Redmond's face backward by pushing his fingers against Redmond's left temple. *Id.* ¶ 150. Oakley then turned around and chopped down on Jacknow's forearm, and proceeded to shove Jacknow twice in the chest. *Id.* ¶ 157. Both men were medically treated for their injuries after the incident. *Id.* ¶¶ 153, 159. Only after these forceful attacks on MSG's employees did Officer Maher and members of MSG's security team hold on to Oakley's arms and torso and begin to escort him to the Zamboni Gate. *Id.* ¶¶ 163–64.

- Oakley threw himself to the ground at the Zamboni Gate and he refused to stand for over one minute, despite the fact that no one was holding down. *Id.* ¶¶ 176–77. At this time, in response to the threat Oakley presented to the public in light of his previous assault of MSG security, belligerent conduct throughout the evening, and ongoing active resistance to his peaceful removal, Officer Maher attempted to place a handcuff on Oakley's wrist (which Oakley resisted by flailing his arm around). *Id.* ¶¶ 181–82.

- After Oakley finally stood, he pulled back his non-handcuffed hand, made a fist, and swung it at Officer Maher's face, which stopped inches short of striking him. *Id.* ¶ 185. At the same time, Oakley gripped with both hands the raised railing separating the Zamboni Gate area from spectators above. *Id.* ¶ 186. Fearing Oakley would take down the railing and harm patrons, Antonio was able to remove Oakley's left hand from the railing only by applying a downward force to Oakley's left arm, while Officer Maher pulled Oakley's right hand off of the railing. *Id.* ¶¶ 191–93.

On this record, there can be no doubt that the minimal use of force used by MSG (and Officer Maher, who is not a defendant or employee of MSG) to accomplish Oakley's ejection was "objectively reasonable." This is further underscored by the fact that Oakley suffered *no physical injuries* for which he is now claiming damages. *Ryan v. City of New York*, 2018 WL 3364580, at

*1 (N.Y. Sup. Ct. N.Y. Cty. July 5, 2018) (dismissing assault and battery claims where "plaintiff fail[ed] to demonstrate that the force allegedly used" by hospital's employees in removing him from hospital property "was excessive"); *Mitchell*, 2014 WL 123255, at *1 (finding that private security officers "use[d] reasonable force to eject [plaintiff] from its premises" where complaint did not allege that plaintiff "sustained any injuries"); *cf. DC ex rel. Coxum v. City of New York*, 2015 WL 1134213, at *6 (N.Y. Sup. Ct. Bronx Cty. Mar. 12, 2015) (granting summary judgment against excessive force claim where force used resulted in bruising but no medical attention).

### III.  Oakley's Claims Are Disproven by All Evidence Except His Own Testimony, Which Is Inconsistent and Contradicted by Previous Admissions.

Oakley hopes to survive summary judgment by creating factual discrepancies in the robust discovery record that offers no support for his assault and battery claims using only his own narrative about what happened. *See* ECF 353 at 3. But a plaintiff's self-serving affidavit alone "does not a lawsuit make—more is required to survive summary judgment." *Arnow v. Aeroflot Russian Airlines*, 980 F. Supp. 2d 477, 480 (S.D.N.Y. 2013) (Forrest, J.). Indeed, "'[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper.'" *Demand Elec., Inc. v. Innovative Tech. Holdings, LLC*, 665 F. Supp. 3d 498, 504 (S.D.N.Y. 2023) (Figueredo, J.) (quoting *Gallo v. Prudential Res. Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994)); *see also That's What She Said, Inc. v. Gutter Games Ltd*., 2024 WL 3678473, at *20 (S.D.N.Y. Aug. 5, 2024) (Failla, J.) (granting summary judgment where "[t]here is nothing in the record, other than Plaintiff's own declarations, that supports [Plaintiff's theory]"); *U.S. Comm. Futures Trading Comm'n v. eFloorTrade, LLC*, 2018 WL 10625588, at *9 (S.D.N.Y. Sept. 21, 2018) (Gardephe, J.) ("Court is not required to credit at summary judgment" party's affidavit filled with "conclusory, self-serving statements").

Even if Oakley's word were enough to survive summary judgment, however, his word has been neither consistent nor credible enough to support his claims. For example, although Oakley now claims he was pushed by MSG security and that caused his aggressive behavior, when presented with video footage of the incident at his deposition, Oakley could not identify from where he supposedly felt "force" or who, specifically, pushed him. 56.1 ¶ 107. In addition, though Oakley now claims that he was not told to leave or given a reasonable opportunity to do so when approached by MSG security, in his deposition he testified that he actually "wasn't listening" to MSG security when they first approached him and he could not recall anything about the conversation. *Id.* ¶ 84. And in response to direct questions like "What is that guy doing in front of you" or "Is this guy touching you? Yes or no," Oakley obfuscated, refusing to answer and simply repeating the mantra "I'm trying to protect myself." Ex. 10 at 339:5-9; 344:3-5. Furthermore, discovery has revealed that at least some of Oakley's inconsistences are due to Oakley's and his counsel's blatant attempts to craft a false narrative to survive summary judgment. While Oakley filed a declaration in this case in opposition to Defendants' first summary judgment motion that stated "I felt a security guard push me from behind, which caused me to fall and feel pain," and "I did not trip and fall on my own," ECF 114 ¶¶ 13–14, Oakley has previously admitted on multiple occasions that he slipped during the incident while making no mention of any push by MSG security. *See* 56.1 ¶¶ 138 (Oakley stating that he "slipped down and fell" when describing the incident in a February 2022 interview)*, 132–34 (Oakley admitting in drafts of his autobiography that he "slipped," prior to his counsel's revisions to remove all references to slipping).

## IV.    There Is No Genuine Issue of Material Fact Regarding Oakley's Damages.

### a.    Nothing in the Record Supports Compensatory Damages.

Summary judgment should be granted for the independent reason that there is no evidence in the record whatsoever to support Oakley's claim for compensatory damages, which Oakley has

confirmed to this Court are limited to garden-variety emotional distress damages. ECF 242. *First*, Oakley's SAC does not even allege that Oakley suffered any emotional distress as a result of the alleged assault and battery but rather focuses entirely on Oakley's reaction to post-incident statements that are irrelevant to Oakley's claims. *See* SAC ¶¶ 86–94 ("The Effect of Defendants' Statements on Mr. Oakley").[9] *Second,* Oakley has stated that he "intends to rely on his testimony" alone to support his claim for damages. 56.1 ¶ 223; *see also id.* ¶ 219 (admitting that Oakley has not produced documentation of any emotional distress). But at his deposition, Oakley provided nothing more than passing reference to the fact that he "felt like something" following his ejection that he characterized as "the stress and the aftereffect." *Id.* ¶ 225. This generic and conclusory testimony comes nowhere close to establishing that he suffered an *actual* injury, as he must to obtain an award of even the most nominal garden-variety emotional distress damages. *Patrolmen's Benevolent Ass'n. of City of New York v. City of New York*, 310 F.3d 43, 55 (2d Cir. 2002); *see also, e.g.*, *Blackwell v. Actor's Playhouse*, 2016 WL 11483834, at *8 (S.D.N.Y. Apr. 4, 2016) (Maas, M.J.), *report and recommendation adopted*, 2016 WL 5239623 (S.D.N.Y. Sept. 22, 2016) (Schofield, J.) (awarding only a small amount of garden-variety damages even where plaintiff alleged, *inter alia*, extreme stress and anxiety, depression, impaired relationships, and sleep loss).

      b.   <u>Nothing in the Record Supports Punitive Damages.</u>

To the extent Oakley's assault and battery claims survive summary judgment (and they

---

[9] Oakley has consistently claimed only physical assault in this case, and the Court should reject his attempt to assert a new theory of emotional distress constituting assault, which Oakley first raised in the pre-motion conference on this motion (and did not allege in his SAC). *See* Ex. 32 (4/23/25 Hr.) at 31:1–5; 42:12–44:3; *Southwick Clothing LLC v. GFT (USA) Corp.*, 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) (Daniels, J.) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' [summary judgment] opposition papers, and hence such new allegations and claims should not be considered in resolving the motion."); *cf. Wellner v. City of New York*, 2019 WL 1511022, at *3 (S.D.N.Y. Mar. 22, 2019) (Koeltl, J.) ("[A] statement at a premotion conference about a possible theory of liability is not a substitute for amending a pleading to contain that new theory of liability.").

should not), this Court should nevertheless grant summary judgment as to Oakley's request for punitive damages. Under New York law, the standard for imposing punitive damages is "strict" and such damages "will be awarded only in exceptional cases." *Marinaccio v. Town of Clarence*, 20 N.Y.3d 506, 511 (2013). To justify such an award, the complained-of conduct must manifest "spite or malice, or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wil[l]ful or wanton." *Id.* (citation and internal quotation marks omitted). Where, as here, the claims upon which the punitive damages are sought derive from vicarious liability, punitive damages are "assessed against the employer with far greater reluctance." *Williams v. City of New York*, 508 F.2d 356, 360 (2d Cir. 1974). In order to collect punitive damages against an employer based on the employee's conduct, the plaintiff must show that "persons in a position of authority . . . in some way authorized, ratified or fostered the acts complained of." *Id.* at 361.

The record here contains no evidence that meets this high threshold for punitive damages. There is no evidence whatsoever that *anyone* at MSG acted with malice in connection with Oakley's (meritless) claims for assault and battery, let alone someone in a position of "authority." Accordingly, Oakley has not raised a triable issue of fact as to whether MSG's conduct was so wanton or willful as to warrant an award of punitive damages, and his punitive damages claim should be dismissed. *See, e.g.*, *Marcoux v. Farm Serv. & Supplies, Inc.*, 283 F. Supp. 2d 901, 912 (S.D.N.Y. 2003) (Conner, J.) (granting summary judgment as to punitive damages where record did not reflect the "high degree of wantonness, malice and conscious disregard for the rights and safety of others needed for the imposition of punitive damages in New York").

## CONCLUSION

For the foregoing reasons, the Court should grant MSG's motion for summary judgment.

Dated: May 30, 2025
      New York, New York

Respectfully submitted,

*/s/ Damien Marshall*
Damien Marshall
Jessica Benvenisty
John Goodwin
Lauren Myers
KING & SPALDING LLP
1185 Avenue of the Americas,
34th Floor
New York, NY 10036
Tel. (212) 556-2100
Fax (212) 556-2222
DMarshall@kslaw.com
JBenvenisty@kslaw.com
JGoodwin@kslaw.com
LMyers@kslaw.com

*/s/ Randy M. Mastro*
Randy M. Mastro, Esq.
21 East 83rd Street
New York, N. Y. 10028
rndmastro@gmail.com
(212) 671-0029

*Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with this Court's Individual Practice Rule 2.B regarding page limits and formatting.

/s/ Damien Marshall

Damien Marshall