## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

CHARLES OAKLEY,

                Plaintiff,

v.

MSG NETWORKS, INC., *et al.*,

                Defendants.

Case No. 17-cv-6903 (RJS)

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## <u>RULE 11 SANCTIONS</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND ................................................................ 4

      A.     In September 2017, Oakley Filed This Action, Alleging A Variety of Torts against MSG and Its Executive Chairman. ..............................................................4

      B.     Only Oakley's Assault and Battery Claims Survived His Second Circuit Appeal. ...................................................................................................................5

      C.     MSG Moved for Summary Judgment as to Oakley's Assault and Battery Claims. .................................................................................................................5

      D.     In November 2021, the Court Granted Summary Judgment, and MSG Notified Oakley and His Counsel That It Intended to Move for Rule 11 Sanctions. ............................................................................................................7

      E.     In May 2023, the Second Circuit Reversed This Court's Grant of Summary Judgment, Finding That Discovery Was Needed. ..................................8

      F.     Between May 2024 and April 2025, The Parties Engaged in Extensive Discovery, All of Which Disproved the False Narrative. .........................................9

      G.     In Discovery, MSG Learned That Doug Wigdor Personally Revised the Final Draft of Oakley's Autobiography to Line Up with Oakley's False Declaration. .........................................................................................................12

      H.     At an April 2025 Conference, Oakley's Counsel Repeated the False Narrative and Made the Frivolous Argument That "Slipped" and "Pushed" Are One in the Same. ...........................................................................................14

LEGAL STANDARD ............................................................................................................ 15

ARGUMENT ......................................................................................................................... 17

      A.     Sanctions Are Warranted Under Rule 11(b)(3) Because This Case Has Persisted Due to False Statements and Representations to the Court. ...................17

      B.     Sanctions Are Warranted Under Rule 11(b)(2) Because This Case Is Based On Frivolous Arguments With No Chance of Success. .......................................21

      C.     Sanctions Are Warranted Under Rule 11(b)(1) Because Oakley and His Counsel Brought, and Have Continued, This Case to Harass MSG and Gin Up Publicity. ......................................................................................................23

CONCLUSION ...................................................................................................................... 25

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Adams v. N.Y.S. Educ. Dep't*,
  2010 WL 4970011 (S.D.N.Y. Dec. 8, 2010), *report and recommendation
  adopted as modified sub nom.*, 855 F. Supp. 2d 205 (S.D.N.Y. 2012), *aff'd
  sub nom. Hochstadt v. N.Y. State Educ. Dep't,* 547 F. App'x 9 (2d Cir. 2013) ..........16, 17, 21

*Alali v. DeBara*,
  2008 WL 4700431 (S.D.N.Y. Oct. 24, 2008) .........................................................................23

*Baker v. Urb. Outfitters, Inc.*,
  431 F. Supp. 2d 351 (S.D.N.Y. 2006), *aff'd*, 249 F. App'x 845 (2d Cir. 2007)...............23, 24

*Bressler v. Liebman*,
  1997 WL 466553 (S.D.N.Y. Aug. 14, 1997) .........................................................................21

*Chien v. Skystar Bio Pharm. Co.*,
  256 F.R.D. 67 (D. Conn. 2009), *aff'd*, 378 F. App'x 109 (2d Cir. 2010)...............................18

*China AI Cap. Ltd. v. DLA Piper LLP (US)*,
  2024 WL 964596 (S.D.N.Y. Mar. 6, 2024) ...........................................................................16

*Colliton v. Cravath, Swaine & Moore LLP*,
  2008 WL 4386764 (S.D.N.Y. Sept. 24, 2008), *aff'd*, 356 F. App'x 535 (2d
  Cir. 2009) ...............................................................................................................................23

*DAG Jewish Directories, Inc. v. Y&R Media, LLC*,
  2010 WL 3219292 (S.D.N.Y. Aug. 12, 2010) .......................................................................20

*Dakus v. Koninklijke Luchtvaart Maatschappij, N.V.*,
  2024 WL 4265646 (S.D.N.Y. Sept. 23, 2024)..................................................................15, 18

*Dimitri Enters., Inc. v. Spar Ins. Agency LLC*,
  2022 WL 5237811 (2d Cir. Oct. 6, 2022).........................................................................16, 17

*Esposito v. Suffolk Cnty. Cmty. Coll.*,
  517 F. Supp. 3d 126 (E.D.N.Y. 2021), *aff'd*, 2023 WL 192671 (2d Cir. Jan.
  17, 2023) ..............................................................................................................................4, 20

*Gambello v. Time Warner Commc'ns, Inc.*,
  186 F. Supp. 2d 209 (E.D.N.Y. 2002) ...................................................................................21

*In re Kunstler*,
  914 F.2d 505 (4th Cir. 1990) .................................................................................................24

*Lawrence v. City of New York*,
2018 WL 3611963 (S.D.N.Y. July 27, 2018) ........................................................21

*Margo v. Weiss*,
1998 WL 765185 (S.D.N.Y. Nov. 3, 1998), *aff'd*, 213 F.3d 55 (2d Cir. 2000) ...........1, 18, 20

*Mata v. Avianca, Inc.*,
678 F. Supp. 3d 443 (S.D.N.Y. 2023) ...............................................................16, 21

*McMunn v. Memorial Sloan-Kettering Cancer Ctr.*,
191 F. Supp. 2d 440 (S.D.N.Y. 2002) .......................................................................20

*Oakley v. Dolan*,
980 F.3d 279 (2d Cir. 2020) ........................................................................................5

*Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*,
2002 WL 59434 (S.D.N.Y. Jan. 16, 2002) ..............................................................18

*Pentagen Techs. Int'l Ltd. v. U.S.*,
172 F. Supp. 2d 464 (S.D.N.Y. 2001), *aff'd*, 63 F. App'x 548 (2d Cir. 2003) ........17

*Pfizer, Inc. v. Y2K Shipping & Trading, Inc.*,
2004 WL 896952 (E.D.N.Y. Mar. 26, 2004) ...........................................................18

*Safe-Strap Co. v. Koala Corp.*,
270 F. Supp. 2d 407 (S.D.N.Y. 2003) ......................................................................15

*In re Sept. 11th Liab. Ins. Coverage Cases*,
243 F.R.D. 114 (S.D.N.Y. 2007) ........................................................................16, 17

*Star Mark Mgmt., Inc. v. Koon Chun Hing Chee Soy & Sauce Factory, Ltd.*,
682 F.3d 170 (2d Cir. 2012) ......................................................................................21

*Torah Soft Ltd. v. Drosnin*,
2001 WL 1506013 (S.D.N.Y. Nov. 27, 2001) .........................................................24

*U.S. v. Int'l Bhd. Of Teamsters*,
948 F.2d 1338 (2d Cir. 1991) ..............................................................................16, 24

**Other Authorities**

Fed. R. Civ. P. 11 ..............................................................................15, 16, 17 21, 23

Fed. R. Civ. P. 56 ...............................................................................................8, 13

Defendants MSG Networks, Inc., Madison Square Garden Sports Corp., and Sphere Entertainment Group, LLC (collectively, "MSG") respectfully submit this Memorandum of Law in support of their motion for Rule 11 sanctions.

## PRELIMINARY STATEMENT

This motion seeks monetary sanctions against Plaintiff Charles Oakley's counsel at Wigdor LLP and Petrillo, Klein & Boxer, LLP for their "objectively unreasonable conduct" in advocating a false narrative and furnishing false testimony to "prolong what had become"—and is now, more than ever—"objectively baseless litigation" as well as case-terminating sanctions. *Margo v. Weiss,* 1998 WL 765185, at *3 (S.D.N.Y. Nov. 3, 1998) (Mukasey, J.) (dismissing action as sanction), *aff'd*, 213 F.3d 55 (2d Cir. 2000).

There is no question that Oakley has felt aggrieved as a result of his ejection from the Madison Square Garden Arena (the "Garden") more than eight years ago. But sore feelings are not enough to substantiate a lawsuit—and certainly not one that, as proven by overwhelming discovery, has absolutely no basis in law or fact. Indeed, Oakley *never* had a colorable claim for assault or battery, so his counsel contrived false allegations, and later submitted false testimony, claiming Oakley was not given a reasonable opportunity to leave the Garden before he was ejected and that he was "thrown" and "pushed" to the ground by MSG security in the process. But *all* of the evidence in the fully-developed record, including videos newly-produced in discovery and testimony from numerous, disinterested third party witnesses, proves that MSG security used no more than the necessary force—and, in fact, less force than they could have—to remove Oakley from the Garden (especially in light of Oakley's criminal assault of three MSG personnel), and that MSG security did not "push" him to the ground but that he instead slipped and fell on his own, as Oakley himself admitted in a media interview and in draft after draft of his autobiography.

Oakley also previously and repeatedly admitted that he was first asked to leave the Garden and then refused, using profanities and offensive language.

Oakley's counsel have been well aware that the two factual predicates of Oakley's case—as distilled by the Second Circuit in its opinion ordering discovery—had no foundation. Indeed, and incredibly, Oakley's counsel went so far as to substantively revise the final draft of his autobiography relating to these points in an effort to continue their made-for-litigation narrative. MSG learned about their revisions to Oakley's book just this year, after the Court rejected their baseless claim of attorney-client privilege over their communications regarding the manuscript. As opposed to making their changes to the autobiography and then trying to cover their tracks, Oakley's counsel should have, as a matter of ethics and in compliance with their duty of candor to the Court, withdrawn Oakley's false, attorney-drafted declaration, and voluntarily dismissed this case years ago.

Instead, Oakley's lawyers have doubled and tripled down on a story they can't seem to give up. As noted above, in July 2021, years into this litigation, Oakley's counsel Doug Wigdor personally revised the final version of Oakley's autobiography—which had been based on "verbatim" notes of interviews Oakley had with his ghostwriter—to line up with the false declaration that counsel drafted and submitted for Oakley in an effort to avoid summary judgment and proceed to fuller discovery. Of course, if Wigdor (whose namesake law firm is already facing sanctions motions in this District seeking sanctions for other similar, grave misconduct including witness tampering and making knowingly false allegations) left the draft as is, their case would have been exposed as a fraud when the book was published. And then, when not a single witness of the more than 20 in this case offered testimony that aligned with their false narrative, his counsel pivoted to the frivolous argument (one contrary to his arguments to the Second Circuit about how

full discovery was necessary) that video "actually is [the] equivalent of a witness." ECF 388-3 at 48:5–25. But Oakley's counsel know full well that the videos in *no way* support the claims in Oakley's false declaration. For example, the videos show MSG personnel and an NYPD officer calmly talking to Oakley before he was removed; Oakley refusing and responding with significant profanity including that he would not "f*cking leave," and MSG personnel and the NYPD officer trying to de-escalate the situation. The videos also reflect that MSG security tried to *prevent* Oakley from falling when he slipped, contrary to Oakley's tortured interpretations. On that point, Oakley's counsel are now taking the remarkable position that the words "slipped" and "pushed" are indistinguishable, such that Oakley's admissions harmful to his case should be ignored. And they have even invented new theories based on allegations not made in Oakley's complaint (which they amended twice), such as that Oakley was "punched" by an MSG guard and that Oakley was assaulted merely because multiple security personnel approached him (even before he was touched following his violent behavior).

Despite what Oakley's counsel will contend in their opposition, this motion is not premised on MSG's position that it is entitled to summary judgment on the full discovery record (although that is true). Since this case was filed, Oakley's counsel have worked to fabricate an alternative version of Oakley's ejection and do everything they could to bury the truth and their culpability. The Court has already recognized Oakley's counsel's positions as "sanctionable," "dishonest," "comical," and "almost ridiculous." ECF 135 at 12:6–9; ECF 388-3 at 30:5–10, 52:21–53:10. This is to say nothing of the fact that Oakley's counsel took *no steps* to preserve evidence in connection with this case and tried to obscure that Oakley destroyed essentially *all* of his written communications contemporary to the incident. It should now grant MSG monetary sanctions in the form of its fees and costs for defending against this case since its inception (or no later than

July 21, 2021, when Oakley's counsel revised key parts of his autobiography), as well as case-terminating sanctions on account of their submitting false testimony and subsequent attempts to cover it up. *See, e.g.*, *Esposito v. Suffolk Cnty. Cmty. Coll.*, 517 F. Supp. 3d 126, 137 (E.D.N.Y. 2021), *aff'd*, 2023 WL 192671 (2d Cir. Jan. 17, 2023) (granting terminating sanctions).

## FACTUAL AND PROCEDURAL BACKGROUND

MSG acknowledges the Court's familiarity with the facts of this case and includes background pertinent to this Motion.

### A.    In September 2017, Oakley Filed This Action, Alleging A Variety of Torts against MSG and Its Executive Chairman.

On September 12, 2017, Oakley filed a 10-count complaint against various MSG entities and MSG Chairman James Dolan seeking relief in connection with his February 8, 2017 ejection from the Garden, including, most prominently, a series of defamation claims related to MSG's and Dolan's statements about the ejection after the fact. ECF 1. In the complaint, Oakley alleged that he was ordered to leave the Garden in a "clear[] attempt[] to publicly humiliate him in front of" his fans, despite the fact that "he had done nothing more than sit among friends in publicly available seats." *Id.* ¶¶ 39–41. Oakley claimed that, in the course of his ejection, MSG security "grabbed him and pushed him to the ground" and "roughly threw him out of the Garden, again dragging him to the ground in the process." *Id.* ¶¶ 43–48. Following a January 12, 2018 pre-motion conference on then-Defendants MSG and Dolan's planned motion to dismiss, Oakley filed his Amended Complaint with virtually the same allegations. ECF 36.

On March 30, 2018, MSG and Dolan moved to dismiss Oakley's Amended Complaint. ECF 42. This Court granted the motion with prejudice as to all ten counts in the Amended Complaint. ECF 68. In so holding, this Court observed that "[f]rom its inception, this case has had the feel of a public relations campaign," and while fans "are free to form their own opinions about

who was in the right" regarding Oakley's ejection, "the fact remains" that Oakley failed to allege any plausible legal claim. *Id.* at 21. In its decision, the Court noted: "The law is clear that the MSG Defendants had the right to expel Oakley from the Garden and that his refusal to leave justified their use of reasonable force to remove him - a licensee who became a trespasser by refusing to leave their property after being directed to do so." *Id*. at 15–16.

## B. Only Oakley's Assault and Battery Claims Survived His Second Circuit Appeal.

On November 16, 2020, the Second Circuit affirmed the dismissal of all but the assault and battery claims against MSG. *Oakley v. Dolan*, 980 F.3d 279, 284 (2d Cir. 2020) ("*Oakley I*"). With respect to those claims, the Second Circuit credited—as it was required to at the motion to dismiss stage—Oakley's allegation that he had been "'thrown to the ground' by actions that 'greatly exceeded the amount of force that was necessary,'" and found that it, and related allegations, were enough to "defeat a motion to dismiss the assault and battery claims." *Id*. at 283–84. The Second Circuit emphasized, however, that the only question remaining in the case was whether "the security guards used excessive force in *accomplishing* the removal." *Id.* at 283 (emphasis added). It expressly rejected as "incorrect[]" Oakley's contention that "the *act* of removal was unreasonable," thereby reaffirming this Court's conclusion that that MSG had an absolute legal right to remove Oakley from its property. *See id.* (emphasis added).

## C. MSG Moved for Summary Judgment as to Oakley's Assault and Battery Claims.

Following the Second Circuit's remand, MSG moved for summary judgment of the remaining assault and battery claims based solely on video footage documenting Oakley's removal from the Garden. ECF 103. MSG argued that because video evidence disproved Oakley's allegations that he was "grabbed," "pushed," "thrown onto the ground," or "roughly" ejected from the Arena, summary judgment was appropriate, without additional discovery. *Id.*

Oakley opposed MSG's summary judgment motion, arguing (among other things) that Oakley was entitled to further discovery before dismissal of his remaining claims. ECF 110 at 20–25. In support of Oakley's opposition, Wigdor submitted a declaration that stated that "because no discovery has been taken in this case and no answer has been filed, [Oakley] lack[ed] substantial evidence necessary to fully oppose" MSG's motion. ECF 112 ¶ 10. Wigdor swore that in order to adequately oppose the motion, Oakley would "require[]" written discovery, deposition testimony, document discovery, video and/or audio footage "from other sources, including Defendants, media and fans who were present," witness statements, statements by MSG security guards, and expert testimony. *Id.* ¶¶ 11–18. Oakley also filed a declaration, dated February 19, 2021, that purported to "summarize what happened" on February 8, 2017 at MSG. ECF 114 ¶ 1. As Oakley later confirmed at his deposition, Oakley's counsel drafted the declaration for him. Ex. 10 at 367:24–368:2. In it, "Oakley" swore that while he was watching the game "unobtrusively," MSG security "surrounded [him] for no apparent reason" and "demanded" he leave the Garden. ECF 114 ¶¶ 5–7. "Oakley" also swore that security refused to tell him why he was being asked to leave, and "[i]mmediately after [he] stood up," he was "pushed" and "grabbed by Defendants' security personnel without provocation and pulled backward." *Id.* ¶¶ 8–11. According to "Oakley," he then "raised [his] hands in a defensive position and moved towards the stairs," but "felt a security guard push [him] from behind, which caused [him] to fall and feel pain." *Id.* ¶¶ 12–13. In "Oakley's" words: "I did not trip and fall on my own." *Id.* ¶ 14. Finally, "Oakley" said he was "dragg[ed]" out of the Garden and once again "push[ed] and pull[ed] to the ground." *Id.* ¶¶ 16–20.

At the same time, Oakley moved to amend his complaint in order to join Dolan as a defendant to Oakley's remaining assault and battery claims, which had previously been asserted only against MSG and not Dolan. ECF 107.

### D. In November 2021, the Court Granted Summary Judgment, and MSG Notified Oakley and His Counsel That It Intended to Move for Rule 11 Sanctions.

On November 8, 2021, this Court granted MSG's motion for summary judgment, dismissing Oakley's assault and battery claims. ECF 121 at 4. In its opinion, this Court held that the "video footage unambiguously demonstrates that the force used to remove Oakley was by no possible assessment objectively unreasonable" and "no reasonable jury could, in light of the videos, determine that MSG guards used unreasonable force to remove Oakley from the premises." *Id.* at 9 (quotation marks omitted).

Following the Court's order, MSG filed a pre-motion conference letter notifying the Court and Oakley of its intent to seek Rule 11 sanctions. ECF 124. MSG wrote that its motion would be based on the fact that "Oakley and his counsel were aware *for years* that the central claims in this case were premised on outright lies." *Id.* at 3 (emphasis in original). In response, Oakley's counsel claimed they did not believe Oakley's allegations to be false (because, in their view, the video evidence was not "conclusive"). ECF 125 at 2–3. In defending themselves, his counsel came close to acknowledging Oakley fell on his own. *Id.* (arguing that "[w]ithout discovery, including any other videos from different angles or with sound throughout the entire incident, counsel could not dismiss, out of hand, [] Oakley's statements about what had occurred").

The Court held a premotion conference on MSG's sanctions motion on January 3, 2022. During the conference, this Court noted to Nelson Boxer, Oakley's counsel at Petrillo, Klein & Boxer LLP: "I don't think anybody could look at this video and conclude that Mr. Oakley was thrown to the ground. I think that is sanctionable. I think that was really dishonest, frankly. I really think so." ECF 135 at 12:6–9. This Court observed that counsel should "be afraid" of being sanctioned. *Id.* at 12:24–13:2. Following that conference, the parties agreed to delay the formal

filing of MSG's sanctions motion until Oakley's then-pending appeal of the Court's decision on summary judgment had been decided. *See* ECF 133, 134.

**E.    In May 2023, the Second Circuit Reversed This Court's Grant of Summary Judgment, Finding That Discovery Was Needed.**

In May 2023, the Second Circuit reversed this Court's summary judgment decision on the grounds that that the video evidence then in the record did not "'blatantly contradict' Oakley's Rule 56 declaration" such that it was not "compel[led] as a matter of law the conclusion that the MSG Defendants' use of force was reasonable." ECF 140 at 6–7. The Second Circuit's analysis of whether MSG used reasonable force focused on Oakley's sworn declaration testimony that he was grabbed and pulled backwards, and then pushed from behind, by MSG security. *Id.* at 7. In reaching its conclusion, the Second Circuit relied on Oakley's testimony that "immediately after he stood, he was grabbed and pulled backward by the security guards" and then "felt a security guard push him from behind." *Id*. at 7.

Because of the "choppy and degraded video quality," the lack of audio in the "Stadium Video" footage, and the fact that the other videos in the record did not capture the initial conversation with Oakley or "clearly show [his] feet and lower legs," the Second Circuit held that the then-record did not "unequivocally establish that Oakley" was afforded the opportunity to leave and "merely lost his footing" when he had first stood to face MSG security guards, such that it could not "conclude as a matter of law that no reasonable jury could conclude that the defendants gave Oakley a reasonable opportunity to depart, and that they used only reasonable force." *Id.* at 8–9. The Second Circuit ordered more fulsome discovery, which "could have yielded additional videos showing other camera angles, as well as helpful eyewitness testimony to overcome the limitations in the video record and give context." *Id.* at 9.

On April 19, 2024, Oakley filed his Second Amended Complaint ("SAC"), alleging, *inter alia*, that he "did not [] refuse to leave the Garden" when approached by MSG security, and that, when he first stood from his seat, "two of the security guards grabbed [] Oakley and pushed him to the ground." SAC ¶¶ 44–45.

### F. Between May 2024 and April 2025, The Parties Engaged in Extensive Discovery, All of Which Disproved the False Narrative.

Following the Second Circuit's directive to engage in fuller discovery, the parties exchanged thousands of documents (the vast majority from MSG), including contemporaneous witness statements (again from MSG), sworn declarations of numerous eyewitnesses to Oakley's ejection (same), and—as the Second Circuit contemplated—new videos of Oakley's ejection, with audio, and from different angles. The parties also took the depositions of 15 fact witnesses.

In discovery, every single eyewitness to Oakley's ejection confirmed that Oakley acted belligerently in his seat, making loud and offensive remarks at MSG security (including calling them "p*ssies," "f*ggots," and "f*cking rats" and yelling that then-Director of Executive Protection Kori Keaton was "always sucking on Dolan's d*ck"); was given a reasonable opportunity to leave; yelled profanities at MSG security (including "I'm not f*cking going anywhere)"; and steadfastly refused to leave the Garden. Rule 56.1 Statement ("56.1") ¶¶ 38–40, 49–50, 52, 62, 75–76, 85–91. These eyewitness accounts also confirmed that it was Oakley who instigated a physical confrontation with MSG security—resulting in several MSG security officers seeking medical treatment for their injuries—and that he was ultimately removed from the Garden using an objectively reasonable amount of force under the circumstances. Specifically, every eyewitness to Oakley's initial fall in the stands confirms he was not pushed to the floor by any

employee of MSG, but slipped and fell on his own.[1] *Id.* ¶¶ 121–125. As Oakley's counsel admitted at the April 23, 2025 post-discovery conference, there is no "witness anywhere" (other than Oakley, of course) "that says he was pushed." ECF 388-3 at 48:13–19.

Other discovery revealed that Oakley himself had repeatedly admitted that he was asked to leave and refused to do so prior to any physical contact with MSG security, and that during the process of his removal from MSG, he slipped and fell. In an interview with Fox 5 New York the day after the incident, Oakley stated that while he was "sitting down," long before any physical interaction took place, MSG security said to him that "they had orders that I had to leave the gym," and his reaction was not to comply, but rather to "think[] to myself, if I'm going to leave the gym, there's New York police right there. Won't he come over and tell me I have to leave the gym, not seven guys, eight guys in a suit." Ex. 11 (Fox 5 Interview) at 0:22–1:13.[2] Likewise, in a February 4, 2022 interview on Rich Eisen's radio show to promote his autobiography, Oakley explained: "I sit down [. . .] I was there about eight minutes. Next thing I know there was eight guys surrounding me. Like, 'you gotta leave.' I'm like, 'for what? I have a ticket.' 'You gotta leave.' And I said, 'I'm not leaving.'" Ex. 28 ("Rich Eisen Show") at 0:48–1:06. Oakley then told Eisen that "next thing, one thing happened, *I slipped down and fell*, a few more guys came, they took me to the back." *Id.* at 1:12–1:19 (emphasis added). And at his deposition, contrary to his earlier declaration, Oakley testified he did not recall what MSG security guards said to him or vice versa when they first

---

[1] Every eyewitness to Oakley's second fall, by the "Zamboni Gate" exit of the Garden, also confirms that Oakley was not pushed to the ground by any MSG employee, but rather threw himself to the ground after refusing to pick up his feet and walk with security to the exit. 56.1 ¶¶ 165–69.

[2] References to "Ex. ___" are to the exhibits to the Decl. of Damien Marshall, dated May 30, 2025. References to other declarations were filed in support of MSG's motion for summary judgment today.

approached him. *See* Ex. 10 at 58:24–59:8 (Oakley testifying he did not recall "anything" that either he or the security guards said before he had "gotten up" "about leaving the arena"). Although Oakley and his counsel spoliated what amounts to the entire record of his contemporaneous communications about his ejection, *see, e.g.*, ECF 254, these admissions make abundantly clear that Oakley's prior declaration and his SAC—particularly the critical statements therein that Oakley did not refuse to leave the Garden, and that he was pushed to the floor by MSG security— are false, and that Oakley's counsel knew they were false when filed (on February 19, 2021 and April 19, 2024, respectively).

Following discovery, when it had become evident that Oakley's allegations were crumbling in the face of overwhelming evidence to the contrary, they began coming up with entirely new theories of assault and battery, demonstrating their willingness to shift to any narrative that suits his claims, regardless of the truth. For example, Oakley's counsel now claim that Keaton (who was standing in front of Oakley) pushed him in the chest when Oakley first stood, purportedly constituting yet another battery during Oakley's ejection. ECF 388-3 at 34:12–15; ECF 353 at 2. But Oakley did not allege in his SAC (nor in his first complaint, nor in his media interviews) that Keaton (or anyone else) pushed him when he first stood; rather, he alleged that "as he rose from his seat, the security personnel grabbed [] Oakley and roughly *pulled him backwards*." SAC ¶ 40 (emphasis added). And Oakley made no mention of this "push" by Keaton at his deposition. As a matter of fact, every eyewitness to Oakley's initial interaction with Keaton confirms that when Oakley first rose from his seat, Keaton did not push Oakley—rather, Oakley abruptly stood up, thrusting his arm and hand outward and directly toward Keaton's face, who stepped backward and then put his arm out in a defensive manner and to regain balance (without touching Oakley), at which time NYPD Officer John Maher restrained Oakley from behind, separating him from

Keaton. 56.1 ¶¶ 93–100. Indeed, they recently invented a new theory of assault, in which Oakley supposedly feared for his safety when he was "confronted in an ominous way" by MSG security. ECF 388-3 at 32:1–17; 45:03–47:21; ECF 353 at 2. Not only is this theory preposterous—as the Court observed, Oakley apparently believes he is entitled to a jury trial on assault merely because "there were six people" from MSG who approached him, ECF 388-3 at 45:19–25—but it is also nowhere in the SAC or in Oakley's previous declaration, in which he claimed to have been only "confused" by the approaching guards. SAC ¶ 37; ECF 114 ¶ 8.

### G. In Discovery, MSG Learned That Doug Wigdor Personally Revised the Final Draft of Oakley's Autobiography to Line Up with Oakley's False Declaration.

Among the most damning pieces of evidence demonstrating that Oakley's counsel have known that Oakley's sworn testimony and allegations are false and frivolous are Oakley's statements to the ghostwriter of his autobiography, Frank Isola. Isola testified that he took verbatim notes of interviews with Oakley and used them as the basis for describing the Oakley's ejection in drafts of the book. *See* Ex. 22 (Isola Dep.) at 76:8–81:3. In the published version, Oakley admits that, prior to any physical altercation with MSG security, "I was told that I had to leave the building" and, rather than comply, "I asked why, and they said they had been ordered to make me leave. More and more guards and cops kept coming at me. *I was standing my ground.* I asked again, 'Why do I have to leave?' They repeated, I had to leave." Ex. 27 (June 13, 2022, Manuscript of *The Last Enforcer*) at PL00001247 (emphasis added). This admission contradicts Oakley's allegation that he did not "refuse to leave the Garden." SAC ¶ 44.

But Oakley's unvarnished version of what happened—comprising various other admissions damaging to his case—did not make the final published edition of his book because Wigdor personally edited the narrative. For example, Oakley had admitted in draft after draft of his book that he "slipped" and fell on his own that night when first approached—rather than being

pushed to the ground by MSG security guards. *See, e.g.*, ECF 255-5 (drafts containing the language "When I slipped they began to carry me out" and "I slipped and ended up on my back. They carried me out."). Oakley also admitted that it was *he* who pushed MSG security guards and that he regretted "touch[ing]" them *See, e.g.*, ECF 255-6 (drafts containing the language "One security guard placed his hand on my right arm and I pushed him away. I never should have touched anyone but there were eight guys in front of me and on both sides."). These admissions survived multiple book drafts that Oakley reviewed and approved over the course of over a year.

Just four months before, on February 19, 2021, Wigdor had submitted Oakley's Rule 56 declaration that advanced a narrative in stark contrast to the one Oakley furnished and approved time and again his autobiography. *See* ECF 114; Ex. 10 (Oakley Dep.) at 37:2–10. So, when Wigdor received the draft autobiography in June 2021 and saw that it conflicted with the declaration—which formed the basis for the Second Circuit's reversal of this Court's summary judgment decision—he rewrote it to match the false narrative in Oakley's declaration (which his counsel had drafted, too). *See* ECF 303 at App'x A (also attached hereto as Appendix A). Wigdor then tried to cover up his tracks by claiming he "spoke with Charles" and his edits "accurately reflect what happened on the night in question." *Id*. This claim is absurd given that Wigdor's edits are a complete 180 from what Oakley told Isola and approved time and again.

Given the overwhelming discovery record showing that the facts are, and always have been, directly in opposition to Oakley's claims of assault and battery—and the evidence that Oakley's counsel has known as much since at least the moment they manipulated the record, MSG served a notice of this motion on Oakley on March 13, 2025, requesting that he withdraw his complaint within the 21-day "safe harbor" period provided by Rule 11. Oakley did not do so, and on April 4, 2025, MSG filed a letter requesting a pre-motion conference for this motion. ECF 350.

**H.** **At an April 2025 Conference, Oakley's Counsel Repeated the False Narrative and Made the Frivolous Argument That "Slipped" and "Pushed" Are One in the Same.**

At the pre-motion conference for this motion, Oakley's counsel insisted that a video produced in discovery that clearly shows Oakley falling somehow depicted Oakley being pushed—in contrast with the three third-party declarations obtained by MSG. ECF 388-3 at 26:11–13.

And then, in an attempt to explain away Oakley's damning admissions in his book drafts and interviews that he "slipped," Oakley's counsel took even more outlandish positions. With respect to that language in particular, Oakley's counsel claimed that it appeared in multiple drafts because *Isola* chose what to say (*id.* at 29:16–22), despite that Isola testified that the book was based *verbatim* on several interviews with Oakley (Ex. 22 (Isola Dep.) at 76:8–81:3), and despite that Oakley himself reviewed the drafts for accuracy and apparently took no issue with them (Ex. 10 (Oakley Dep.) at 37:2–10). (This was, of course, just one of the multiple changes Wigdor made to align with Oakley's declaration that, if left as is, would have revealed their case to be a fraud.)

Later, when confronted with Oakley's public statement "I slipped down and fell" on the Rich Eisen show, his counsel repeated an absurd claim—one made in his response to MSG's pre-motion conference letter in advance of the April 23, 2025 conference, *see* ECF 353 at 2–3—that because Oakley did not specifically say "I slipped on my own," the word "slipped" had the same meaning as the phrase "was pushed." ECF 388-3 at 31:6–22. The Court described this argument as "comical" because "[t]hese are words that have meaning." *See* ECF 388-3 at 30:5–10; 44:10–22; *see also id.* 44:1 ("THE COURT: Your view is a push is a slip is a throw."). After the Court read out the dictionary definition of "slip"—"[t]o slide unintentionally for a short distance, typically losing ones balance or footing"—Oakley's counsel tried to weasel their way out,

claiming: "One could lose one's balance because somebody pushes them from behind," which, incidentally, is not the same as slipping. *See id.* at 32:18–25.

Oakley's counsel ultimately conceded that "an average reader" would not "understand 'slipped' means you were pushed and tripped by somebody else," and then claimed the draft autobiography was "corrected" by Wigdor—which, at the very least, proves that *Wigdor* understood the "slipped" language to be damning to Oakley's case. ECF 388-3 at 52:4–10.[3]

## LEGAL STANDARD

A Court may "impose an appropriate sanction on any attorney, law firm, or party that violate[s] the rule or is responsible for [a] violation" under Rule 11. Fed. R. Civ. P. 11(c)(1).

Sanctions are warranted under Rule 11(b)(3) when a litigant and/or counsel flagrantly breaches their obligations to make "an inquiry reasonable under the circumstances" into the facts alleged and to verify that "the factual contentions have evidentiary support." Fed. R. Civ. P. 11(b)(3). Accordingly, "[a] party or an attorney violates Rule 11(b)(3) when he falsely represents to the Court that the allegations and other factual contentions he made have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." *Safe-Strap Co. v. Koala Corp.*, 270 F. Supp. 2d 407, 412 (S.D.N.Y. 2003) (Knapp, J.); *see also Dakus v. Koninklijke Luchtvaart Maatschappij, N.V.*, 2024 WL 4265646, at *6–7 (S.D.N.Y. Sept. 23, 2024) (Abrams, J.) (sanctions warranted where counsel "had 'actual knowledge' that the allegations were false" and "[d]espite this knowledge, [] declined

---

[3] Contrary to Oakley's counsel's claims at the hearing, Isola did not review and approve of Wigdor's changes—nor would any such approval be relevant, as Isola has no firsthand knowledge of the incident—because Isola testified that he reviewed only the final manuscript prior to any legal review, including Wigdor's modifications. Ex. 22 (Isola Dep.) at 161:21–162:13; 210:9–21; 223:8–224:2; *see also* ECF 304-5 (email from Oakley's business manager to D. Wigdor requesting any final changes to the book).

to withdraw or amend the complaint"). Thus, "baseless factual contention[s]" and "advocating positions contained in [] pleadings and motions after learning that they cease to have any merit" necessitate sanctions. *In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 124 (S.D.N.Y. 2007) (Hellerstein, J.); *Dimitri Enters., Inc. v. Spar Ins. Agency LLC*, 2022 WL 5237811, at *2 (2d Cir. Oct. 6, 2022); *see also Adams v. N.Y.S. Educ. Dep't*, 2010 WL 4970011, at *12 (S.D.N.Y. Dec. 8, 2010) (Peck, M.J.), *report and recommendation adopted as modified sub nom.,* 855 F. Supp. 2d 205 (S.D.N.Y. 2012), *aff'd sub nom. Hochstadt v. N.Y. State Educ. Dep't,* 547 F. App'x 9 (2d Cir. 2013) (imposing a "substantial monetary sanction" on attorney who "willful[ly] persiste[d]" in advocating claims "despite warnings that [they] lacked evidentiary support").

Furthermore, sanctions are appropriate under Rule 11(b)(2) when a litigant and/or counsel have pursued "frivolous legal arguments" in support of claims that have "no chance of success" and "clearly lack[] foundation." *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 459–60 (S.D.N.Y. 2023) (Castel, J.) (citations omitted). "An argument constitutes a frivolous legal position for purposes of Rule 11 sanctions if, under an objective standard of reasonableness, it is clear that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands." *China AI Cap. Ltd. v. DLA Piper LLP (US)*, 2024 WL 964596, at *7 (S.D.N.Y. Mar. 6, 2024) (Marrero, J.) (citation omitted). This portion of the rule "establishes an objective standard, intended to eliminate any 'empty-head pure-heart' justification for patently frivolous arguments." 1993 Advisory Committee Note, Fed. R. Civ. P. 11(b)(2).

Finally, conduct is sanctionable under Rule 11(b)(1) where a baseless action is instituted and prolonged for an "improper purpose," including "harass[ing]" an adversary. Fed. R. Civ. P. 11(b)(1). Rule 11 sanctions are thus appropriate as a means to "curb[] abuses of the judicial system" and "reimburse the party against whom the offending papers have been interposed." *U.S. v. Int'l*

*Bhd. Of Teamsters*, 948 F.2d 1338, 1343–44 (2d Cir. 1991) (citation omitted). Moreover, case-limiting sanctions may be warranted where "monetary sanctions will not alone be an effective means of deterring future frivolous litigation." *Pentagen Techs. Int'l Ltd. v. U.S.*, 172 F. Supp. 2d 464, 474 (S.D.N.Y. 2001) (Sprizzo, J.), *aff'd*, 63 F. App'x 548 (2d Cir. 2003).

## ARGUMENT

### A.     Sanctions Are Warranted Under Rule 11(b)(3) Because This Case Has Persisted Due to False Statements and Representations to the Court.

Sanctions are warranted because Oakley's counsel have repeatedly violated their obligations to make "an inquiry reasonable under the circumstances" into the facts alleged and to verify that "the factual contentions have evidentiary support." Fed. R. Civ. P. 11(b)(3). Courts have made clear that a "baseless factual contention" warrants severe sanctions because it "poses a greater threat to justice than a baseless legal contention." *In re Sept. 11th*, 243 F.R.D. at 124. Moreover, "[u]nder Rule 11, 'a litigant's obligations with respect to the contents of [filings] are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit.'" *Dimitri*, 2022 WL 5237811, at *2 (quoting Fed. R. Civ. P. 11 Advisory Committee's Note (1993)).

There is no longer a shred of doubt that Oakley's counsel have knowingly submitted to this Court numerous filings with outright lies about Oakley's ejection, including (but not limited to) Oakley's declaration and the SAC. Indeed, discovery has proven that Oakley's counsel have long been aware that the two bases on which the Second Circuit allowed Oakley's case to proceed—that he was not given a reasonable opportunity to leave and was "pushed" to the floor—are false. Their "baseless factual contention[s]" more than justify the imposition of sanctions on them. *In re Sept. 11th*, 243 F.R.D. at 124, 131 (awarding "substantial amount" of monetary sanctions,

including for attorneys' fees); *see also, e.g.*, *Adams*, 2010 WL 4970011, at *12 (imposing "substantial monetary sanction" on counsel); *Margo*, 1998 WL 765185, at *3 (sanctioning plaintiffs and their counsel for their submission of false affidavits that they knew were material and awarding attorneys' fees); *Chien v. Skystar Bio Pharm. Co.*, 256 F.R.D. 67, 75 (D. Conn. 2009), *aff'd*, 378 F. App'x 109 (2d Cir. 2010) (sanctioning attorney who "continued to advocate for [a] ... complaint" once he knew it contained falsehoods rather than amend or withdraw it); *Dakus*, 2024 WL 4265646, at *5 (sanctioning attorney for continuing to advance false allegations in a complaint after being put on notice of their falsity); *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 2002 WL 59434, at *9 (S.D.N.Y. Jan. 16, 2002) (Martin, J.) (sanctioning party and counsel for furnishing and relying on false affidavit); *Pfizer, Inc. v. Y2K Shipping & Trading, Inc.*, 2004 WL 896952, at *11 (E.D.N.Y. Mar. 26, 2004) (same).

As this Court recognized back in 2022, based on video in the record prior to discovery, the assertion that Oakley was "pushed" by MSG security to the floor was always frivolous. *See* ECF 135 at 12:6–9 ("I don't think anybody could look at this video and conclude that Mr. Oakley was thrown to the ground. I think that is sanctionable"). ECF 135 at 12:6–9. Discovery yielded additional videos from different angles, which confirm that rather than pushing Oakley to the floor, Oakley slipped on his own and, in fact, MSG security tried to *prevent* him from falling. *See, e.g.*, ECF 358-12 at 0:11–0:20 (showing Oakley falls forward while security personnel try to hold him upright or reflexively move to try and catch him); Ex. 31[4] at 0:04–0:12 (showing MSG security personnel expressing surprise and concern as Oakley falls to the ground and they try to hold him

---

[4] This video was posted on the Instagram account of a friend of Oakley's—coincidentally, the owner of the bar that Oakley went to after he was released from NYPD custody the night of his ejection. ECF 304-3 at 14. After MSG used the video at Oakley's deposition, the bar owner was apparently instructed to take it down from his account, so it is no longer publicly available.

back or catch him). Furthermore, every single witness who has testified about Oakley's interaction with MSG guards—including multiple independent witnesses such as NYPD Officer John Maher—confirmed that Oakley was not pushed to the floor, but in fact slipped.[5] For his part, Oakley could not identify at his deposition from where he supposedly "felt force" or who, specifically, "pushed" him. *See* Ex. 10 at 342:2–353:18.

The record is clear that Oakley previously, and repeatedly, admitted that he "slipped" and fell. And Oakley's counsel's response to the incontrovertible fact that they *knew* the declaration they drafted for him was false—that is, that "slipped" and "pushed" are indistinguishable—is frivolous in and of itself. Putting aside that those words carry different meanings, *see* ECF 388-3 at 44:15–16, if counsel truly believed that those concepts were indistinguishable, Wigdor would not have been compelled to revise the autobiography to change "slipped" to "pushed"—among his many other changes. *See* App'x A; *see also* ECF 388-3 at 53:1–10 (the Court calling "almost ridiculous" the suggestion that Wigdor "adopted" the language he did "for accuracy").

The same goes for the false claim that Oakley was not given a reasonable opportunity to depart. Oakley's counsel knew that he admitted to the media, and in his autobiography, that he was asked to leave and refused. *See* Appendix A ("I was standing my ground."). But these statements were contrary to Oakley's declaration and the SAC, and so, here too, Wigdor personally changed

---

[5] Similarly, every eyewitness who has testified confirms that Oakley was also not pushed to the floor later on by the Zamboni Gate, but that he rather threw himself to the ground in an effort to prevent his ejection. 56.1 ¶¶ 165–69. And in Oakley's candid discussions about the incident outside of the context of this litigation—such as in drafts of his book and during his description of his ejection on the Rich Eisen show—Oakley did not mention being pushed or dragged to the ground by the Zamboni Gate, instead stating only that security "carried me out" and "handcuffed me and took me away from the court." 56.1 ¶¶ 170–72. If Oakley had been pushed to the floor by the Zamboni Gate, the Court can be sure that he would have thought to mention it in these contexts. But Oakley only remembers to mention these so-called "facts" when his lawyers do the talking for him.

Oakley's admissions in his book drafts that he was "asked to leave" to "I was told that I had to leave the building."[6] Again, the only reason to make that change was because the unedited draft would have laid the lie to one of Oakley's core allegations.

Given their pattern of distorting and misrepresenting evidence, the Court should have "no confidence" that Oakley's counsel will "not continue to engage in misconduct." *Esposito*, 517 F. Supp. 3d at 137. Indeed, because Oakley's counsel—who are apparently repeat offenders—have been willing to offer false and misleading testimony to this Court, there is little reason to doubt they would do so before a jury. *See id*.; *DAG Jewish Directories, Inc. v. Y&R Media, LLC,* 2010 WL 3219292, at *5 (S.D.N.Y. Aug. 12, 2010) (Holwell, J.) (intentional fraud on court and subsequent lies to cover it up showed that "further misconduct [was] likely"); *McMunn v. Memorial Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 462 (S.D.N.Y. 2002) (Buchwald, J.) (litigant's "lies and misconduct [would] almost certainly continue in the future if this action is permitted to go forward . . . nullifying any chance for a fair adjudication of the merits"). And it bears mention that the Wigdor firm, in particular, is no stranger to accusations that it invented false allegations and narratives in an effort to "prolong what had become objectively baseless litigation." *Margo*, 1998 WL 765185, at *3.[7]

---

[6] Wigdor also revised, *inter alia*, a sentence that had read: "*I was asked why, and they said, you have to leave because someone ordered you to leave*" to ". . . *Dolan ordered you to leave*," *see* Appendix A, in line with their relentless (and baseless) conspiracy theory that Dolan made the decision to eject Oakley. Ex. 23 at 154:7–11; 176:10–14; 179:4–19; Ex. 24 at 81:14–82:12; 82:9–12.

[7] *See, e.g.*, *Doe v. Black*, 1:23-cv-06418 (S.D.N.Y.), ECF 258 (Judge Clarke noting that pending sanctions motion seeking case-terminating sanctions against Wigdor LLP "raises serious questions about the validity of [the] action" because it "calls into question the veracity of key evidence cited in the operative Amended Complaint and raises questions about the plausibility of the allegations raised here"); *id.* ECF 241 (granting Wigdor firm's motion to withdraw as counsel but requiring firm to "remain in this case in light of the Sanctions Motion"); *id.* ECF 255 (accusations that Wigdor firm, *inter alia*, abused the discovery process and failed to keep client apprised of material updates); *Parker v. Bursor*, 1:24-cv-245 (S.D.N.Y.) (Tarnofsky, J.), ECF 243-1 (proposed order for

## B.    Sanctions Are Warranted Under Rule 11(b)(2) Because This Case Is Based On Frivolous Arguments With No Chance of Success.

Oakley's counsel have also violated Rule 11(b)(2) because they have continued to pursue "frivolous legal arguments" in support of claims that have "no chance of success" and "clearly lack[] foundation." *Mata*, 678 F. Supp. 3d at 459–60; *Star Mark Mgmt., Inc. v. Koon Chun Hing Chee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 178 (2d Cir. 2012) (affirming sanction for frivolous claims that "clearly lacked foundation"). MSG should not be put to the burden and expense of having to move for summary judgment under these circumstances.

As detailed in MSG's motion for summary judgment, there is absolutely no evidence in the record—except Oakley's prior declaration (which has already been proven false)—that would support a jury finding that MSG used excessive force in connection with his ejection.[8] That makes Oakley's claims frivolous as a matter of law. *See, e.g.*, *Bressler v. Liebman*, 1997 WL 466553, at *8 (S.D.N.Y. Aug. 14, 1997) (Preska, J.) (sanctions warranted where plaintiff "continued to press" claims "after information provided by opposing counsel and analysis by the court indicated" their "questionable merit"); *Gambello v. Time Warner Commc'ns, Inc.*, 186 F. Supp. 2d 209, 229 (E.D.N.Y. 2002) (sanctions imposed where, after being "confronted" with relevant facts, plaintiff's

---

sanctions against Wigdor LLP for, among other violations, "tampering with witnesses, spoliation of evidence, [and] failure to produce information from relevant sources"). These accusations "apparently have not impressed upon [Wigdor] the seriousness of [its] actions, or deterred [it] from similar misconduct." *Adams*, 2010 WL 4970011, at *12.

[8] Because Oakley's deposition testimony was non-specific and non-responsive, *see, e.g.*, Ex. 10 at 24:8–25 (in response to questions about what he said to security after he was approached, testifying "[a]nything could have happened" and "things happened that night and you know it did"); *Id.* at 54:6–20 (when asked whether he was asked to leave the Garden, testifying "they could have said a lot of things" and "I'm trying to protect myself"), and because his prior declaration has been proven false, there is "no way of knowing what story [he] would offer if this case went to trial." *Lawrence v. City of New York*, 2018 WL 3611963, at *7 (S.D.N.Y. July 27, 2018) (Pauley, J.).

counsel refused to withdraw claim and made "arguments about what plaintiff 'thought' and 'believes,' which [were] completely contradicted by his sworn [] testimony").

Again, the discovery record proves that Oakley was given an opportunity to leave the Garden by MSG employees; that Oakley repeatedly refused to do so; and that Oakley was *not* pushed to the ground by MSG security. Because Oakley has *no* evidence to point to in support of his false allegations, he is likely to argue, as he did in response to MSG's pre-motion conference letter on summary judgment (and his counsel repeated at the pre-motion conference), that the "video footage has created a factual dispute." ECF 353; *see also* ECF 388-3 at 48:5–25 (Oakley's counsel admitting there are no witnesses that support Oakley's narrative and claiming that the "video actually is equivalent of a witness here"). But as this Court recognized in 2022, and as the Second Circuit impliedly recognized in reversing summary judgment *based on Oakley's declaration alone*, Oakley's counsel's interpretation of videos themselves are preposterous. The same goes for the new videos, and especially given that all other evidence disproves Oakley's allegations.[9]

Oakley's counsel's willingness to continue to contrive new factual and legal theories to try to rehabilitate their losing case is sanctionable, too. Indeed, recognizing that the evidence disproves their core allegations (and false testimony), Oakley's counsel have ginned up newfound "assaults" and "batteries." For example, at the April 23, 2025 hearing, counsel claimed that they amended

---

[9] In his response to MSG's pre-motion conference letter regarding its anticipated motion for summary judgment, Oakley argued that the Second Circuit's decisions showed that MSG's Rule 11 motion was "baseless." *See* ECF 354 at 3. The Second Circuit's first decision was on a motion to dismiss, in which all of Oakley's allegations were taken as true, and thus in no way vindicated Oakley or corroborated his story. And Oakley fails to appreciate—or intentionally ignores—that the *only reason* the Second Circuit reversed this Court's decision on summary judgment was because Oakley put in a sworn declaration (which his counsel knew was false) that was not "blatantly contradicted" by the video then in the record. ECF 140 at 6.

Oakley's complaint for a second time to include a "push in the chest." ECF 388-3 at 36:16–23. But nowhere in the SAC is such a "push in the chest" alleged. (Similarly, Oakley's purported expert based his assessment in part on a "punch" that Keaton allegedly "threw" at Oakley—which is not alleged anywhere in the SAC or even Oakley's declaration and is certainly not supported by third-party affidavits, the video itself, or Oakley's non-responsive deposition testimony.) Likewise, Oakley's counsel have recently started claiming that Oakley was "assaulted" without even being touched, because he was supposedly "fearful" when MSG security approached him—a theory that is nowhere in his SAC. The reality that Oakley does not have a case as a matter of law is underscored by their attempt to "concoct" even more new facts and arguments to keep this case going. *Colliton v. Cravath, Swaine & Moore LLP*, 2008 WL 4386764, at *13 (S.D.N.Y. Sept. 24, 2008) (Buchwald, J.), *aff'd*, 356 F. App'x 535 (2d Cir. 2009) (granting sanctions); *cf. Alali v. DeBara*, 2008 WL 4700431, at *3 n.6 (S.D.N.Y. Oct. 24, 2008) (Seibel, J.) ("[I]t is inappropriate to consider claims not pleaded in the complaint in opposition to summary judgment.").

C. **Sanctions Are Warranted Under Rule 11(b)(1) Because Oakley and His Counsel Brought, and Have Continued, This Case to Harass MSG and Gin Up Publicity.**

Not only is dismissal of this case warranted, but monetary sanctions against Oakley's counsel under Rule 11(b)(1) (comprising MSG's fees and costs from the start of the case, or at minimum, from when Wigdor rewrote portion's of Oakley's autobiography) are likewise appropriate, because they have instituted and prolonged this baseless action for the "improper purpose[s]" of "harass[ing]" MSG and garnering publicity. Fed. R. Civ. P. 11(b)(1). This lawsuit has resulted in seven and half years' of wasted judicial time and resources. Indeed, "rather than pursuing resolution of a fairly minor dispute in good faith, the record suggests that [Oakley] (and his counsel) filed and maintained this suit in an attempt to extract a significant payment from perceived 'deep pocketed' [MSG] (and in an attempt to garner publicity for [Oakley] and for his

lawyer[s].""). *Baker v. Urb. Outfitters, Inc.*, 431 F. Supp. 2d 351, 358 (S.D.N.Y. 2006) (Preska, J.), *aff'd*, 249 F. App'x 845 (2d Cir. 2007) (awarding and affirming sanctions); *U.S. v. Int'l Bhd. Of Teamsters*, 948 F.2d 1338, 1343 (2d Cir. 1991) (citation omitted) (sanctions are an appropriate means to "curb[] abuses of the judicial system").

Back in 2020, the Court commented "this case has had the feel of a public relations campaign." ECF No. 68 at 21. And now, in 2025, discovery has disproven every factual predicate of Oakley's claims, and there is no question that this case persists because Oakley's counsel are set on milking their narrative story for all it is worth. In fact, MSG recently learned that Oakley has been trying to sell his story about the ejection and this case in the form of a documentary; there is every reason to believe that his counsel would feature prominently in it and use the film to advance the same false narrative they invented. *See* ECF 388-3 at 20:4–6.

Moreover, that Oakley has failed to identify *any* specific damages as a result of the alleged assault and battery betrays that this action has been brought and continued for reasons *other* than vindicating his legal rights. *See, e.g.*, *In re Kunstler*, 914 F.2d 505, 518 (4th Cir. 1990) ("[T]he purpose to vindicate rights in court must be central and sincere."); ECF 398 at Section IV. Oakley's counsel seem to have no reason to pursue this case other than that it could potentially lead to a high profile trial covered in the media. (After all, Oakley's only claimed damages are of the garden-variety.) Indeed, they have gambled on baseless legal and factual theories, and dragged MSG through years of litigation, in order to achieve their own "secondary gain[s]"—namely, to garner publicity for themselves, and, most likely, to wrest a settlement. *Torah Soft Ltd. v. Drosnin*, 2001 WL 1506013, at *5 (S.D.N.Y. Nov. 27, 2001) (Francis, M.J.); *Baker*, 431 F. Supp. 2d at 358.

**CONCLUSION**

This Court should grant MSG's Rule 11 motion and impose on Oakley's counsel monetary sanctions amounting to its fees for litigating this case from its beginning (or, at the least, from the date Oakley's counsel revised his autobiography), as well as dismissal.

Dated: May 30, 2025                                    Respectfully submitted,
      New York, New York

*/s/ Damien Marshall*

Damien Marshall
Jessica Benvenisty
John Goodwin
Lauren Myers
KING & SPALDING LLP
1185 Avenue of the Americas,
34th Floor
New York, NY 10036
Tel. (212) 556-2100
Fax (212) 556-2222
DMarshall@kslaw.com
JBenvenisty@kslaw.com
JGoodwin@kslaw.com
LMyers@kslaw.com

*/s/ Randy M. Mastro*
Randy M. Mastro, Esq.
21 East 83rd Street
New York, N. Y. 10028
rndmastro@gmail.com
(212) 671-0029

*Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with this Court's Individual Practice Rule 2.B regarding page limits and formatting.

*/s/ Damien Marshall*

Damien Marshall

# APPENDIX A

| | |
|---|---|
| **From**: | Douglas Wigdor [dwigdor@wigdorlaw.com] |
| on behalf of | Douglas Wigdor <dwigdor@wigdorlaw.com> [dwigdor@wigdorlaw.com] |
| **Sent**: | 6/21/2021 8:08:32 AM |
| **To**: | 'alex@7x.media' [alex@7x.media] |
| **CC**: | 'coak34@aol.com' [coak34@aol.com] |
| **Subject**: | FW: Oak Book |
| **Attachments**: | The Last Enforcer_Oakley_Wigdor_Edits.docx |

Alex – I spoke with Charles who is copied in this email and the changes accurately reflect what happened on the night in question. I did not review the entire manuscript – only the sections that apply to our case.

**Douglas H. Wigdor**
*Partner*

**WIGDOR LLP**
85 Fifth Avenue, New York, NY 10003
T: (212) 257-6800 | F: (212) 257-6845

dwigdor@wigdorlaw.com
www.wigdorlaw.com

   

   

This communication may contain Confidential or Attorney-Client Privileged Information and/or Attorney Work Product. If you are not the addressee indicated in this message or its intended recipient (or responsible for delivery of the message to such person(s)), do not read, copy, or forward this message to anyone and, in such case, please immediately destroy or delete this message, including any copies hereof, and kindly notify the sender by reply e-mail, facsimile or phone. Thank you.

> **From:** Alex Koblenz <alex@7x.media>
> **Date:** June 16, 2021 at 5:22:24 PM EDT
> **To:** Douglas Wigdor <dwigdor@wigdorlaw.com>
> **Subject:** Re: Oak Book
>
> Please use this version of the manuscript
>
> On Wed, Jun 16, 2021 at 3:40 PM Alex Koblenz <alex@7x.media> wrote:
>> Doug,
>> Oak wanted me to send this over to you. Please let me know if you have any issues around his case based on what is written. There is a lot of mentions of Dolan in it Please keep this confidential.

 PL00002350

Need all changes by Saturday that you would want to make.

PL00002351

a guy at the dinner who invited me to the game. I was going to be in town for a few days so I agreed to go.

The game was starting at 8 p.m. because it was on ESPN, so we met at 7:30 and then headed over to MSG. There were four people in our group, and I had no idea our seats were right behind Dolan's. We walked down to our seats and the game had already started. A waitress asked me if I wanted something to drink, so I ordered a Pepsi and some popcorn. We were sitting close to the Knicks bench so I looked over at Mike Martinez, the Knicks equipment manager, and he nodded at me.

It was about midway through the first quarter when I noticed there were cops and security guards looking me. Then there was a time-out, and I said hello to John McEnroe, the tennis player who is a big Knicks fans, who was sitting nearby. He always came to our games.

"What's up, John?"

"Hey Oak, what's up?" he said.

We were talking, and then some fans approached, I took some pictures with them, and all of a sudden, there were eight security guys around me.

"Why are there so many of you?" I asked. "Is Obama here?"

I was ~~asked to leave~~ told that I had to leave the building. I asked why, and they said, "~~Y~~you have to leave because ~~someone~~ Dolan ordered you to leave."

More and more guards and cops kept coming at me. I was standing my ground. I asked again, "Why do I have to leave?" They said they were carrying out ~~an~~ Dolan's order. I had to leave.

It wasn't the first time I'd had the experience of being surrounded by a lot of security guards. In 2010, I had five security guards at the Aria hotel in Las Vegas beat me up when I tried

Confidential

to reenter the VIP pool area at closing time. I got a back injury from that fight, so I'm not comfortable being surrounded by that many guys. No one would be. If more than two or three people walk up to you, no matter how tough you are, you'd be right to feel threatened. And this was a lot more than two or three.

Unfortunately, I ended up having a similar experience at MSG to that time at the Aria hotel. Security started grabbing at me and it made me uncomfortable. I didn't know what was going to happen. ~~I didn't like that Dolan's guys were touching me. I never should have touched them~~ I am not a violent person, but there were so many guys in front of me and on both sides and I needed to defend myself so something really bad didn't happen to me. I ~~slipped and~~ was eventually pushed down by Dolan's guys and ended up on my back. They carried me out. Total disrespect. And by then the crowd, including the players from both the Knicks and the Clippers, were watching it go down. They handcuffed me and took me away from the court, near the loading dock.

Phil Jackson was still president of the Knicks, and he came over and said, "Oak, what happened?"

"Ask your fucking boss what happened," I told him. ~~I was certain that the orders to kick me out could only have come from Dolan.~~

World Wide Wes and Spike Lee were there, too, and they came down the ramp to check on me. Then Wes called Michael Jordan. I didn't get a chance to say much to Michael before I was taken to the Midtown South Precinct, which is on 35th Street, just a block away from the Garden. The cops were actually great to me. I told them I didn't have a beef with the cops. My problem was with Dolan. I read the next day that one of the cops outside the station house was chanting "Free Charles Oakley!" That's pretty cool. I was released just a few minutes before

Confidential