UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

No. 17-cv-6903 (RJS)

---

CHARLES OAKLEY,

*Plaintiff*,

v.

MSG NETWORKS, INC., ET AL.,

*Defendants*.

---

OPINION AND ORDER
July 23, 2025

---

RICHARD J. SULLIVAN, Circuit Judge:

Before the Court is a motion by defendants MSG Networks, Inc., Madison Square Garden Sports Corp., and Sphere Entertainment Group, LLC (collectively, "MSG") for spoliation sanctions against plaintiff Charles Oakley related to the destruction of text messages sent or received by Oakley between February 8, 2017 and February 2022. (*See* Doc. No. 253.) As Oakley himself has admitted, he took no steps to preserve any potentially discoverable materials on his phone after his phone broke and he upgraded to a new device. (*See* Doc. No. 286 at 1–2.)[1] He did not image his phone, nor did he back up his phone to a cloud-based storage service. (*See* Doc. No. 255-1 at 114–15.) In Oakley's own words, "[i]t was more important to have a phone" than it was to preserve the data saved on his device. (*Id.* at 32.)

Based on this loss of discoverable information, MSG now seeks sanctions in the form of either (1) the dismissal of Oakley's complaint or (2) the preclusion of evidence related to Oakley's core allegations in this case, permission to present evidence related to Oakley's loss of his text messages, and an adverse-inference instruction. (*See* Doc. No. 254 at 29–30.) MSG also seeks attorneys' fees and costs associated with this spoliation motion, which he argues should be apportioned between Oakley and his counsel, Wigdor LLP ("Wigdor") and Petrillo Klein & Boxer LLP ("Petrillo"). (*See id.* at 24–28, 30.)

---

[1] All pincites are to the ECF pagination.

For the reasons set forth below, MSG's motion for spoliation sanctions is GRANTED in part and DENIED in part.

I. BACKGROUND

Oakley, a former star power-forward for the New York Knicks, attended a Knicks game at Madison Square Garden on February 8, 2017. (*See* Doc. No. 164 ¶ 3.) During the game, Oakley was approached by MSG security guards and New York City Police Department officers, who physically removed him from the arena, purportedly because of his inappropriate behavior. (*See id.* ¶ 66.) On September 12, 2017, Oakley commenced this action, bringing a number of claims against MSG, including for defamation, libel, slander, assault, and battery. (*See* Doc. No. 1.) MSG then moved to dismiss the case in its entirety for failure to state a claim (*see* Doc. No. 41), and the Court granted that motion (*see* Doc. No. 68). The Second Circuit affirmed the Court's ruling with respect to all but Oakley's assault and battery claims. *See Oakley v. Dolan*, 833 F. App'x 896, 902 (2d Cir. 2020); *Oakley v. Dolan*, 980 F.3d 279, 284 (2d Cir. 2020).

On remand, MSG moved for summary judgment on the assault and battery claims. (*See* Doc. No. 102.) As part of his opposition to MSG's motion, Oakley submitted a sworn declaration in which he stated that he was "grabbed by [MSG] security personnel without provocation," "pushed to the ground," and ultimately "dragg[ed] . . . out of" Madison Square Garden. (Doc. No. 114 at 2–3.) In November 2021, the Court granted MSG's motion for summary judgment after concluding that the video evidence conclusively rebutted Oakley's version of events. (*See* Doc. No. 121.) However, the Second Circuit disagreed and, in May 2023, vacated the Court's grant of summary judgment and remanded the case for further proceedings. *See Oakley v. Dolan*, No. 21-2939, 2023 WL 3263618, at *3 (2d Cir. May 5, 2023). Following the Second Circuit's decision, MSG filed an answer (*see* Doc. No. 166), and the parties commenced discovery on the assault and battery claims.

On July 10, 2024, Oakley's counsel discovered that all text messages sent to or from Oakley's phone prior to February 2022 had been destroyed; on August 22, 2024, Oakley's counsel disclosed this fact to counsel for MSG. (*See* Doc. No. 286 at 2–3.) The parties then met and conferred on September 16, 2024, at which point counsel for Oakley represented that Oakley routinely traded in his mobile phone for a newer model, upgraded his iPhone at a Verizon store in February 2022, and then lost all his text messages in the process of transferring devices. (*See* Doc. No. 255-8 at 3; Doc. No. 256 at 1–2.) In response to these revelations, MSG submitted a letter to the Court on October 21, 2024, requesting a pre-motion conference in contemplation of a motion for spoliation sanctions against Oakley and his counsel. (*See* Doc. No. 194.)

Days later, Oakley sat for a deposition where he explained that he has always used an Android phone, that his cell-service provider was AT&T, and that he only upgraded his phone when it broke. (*See* Doc. No. 255-2 at 18–19.) Oakley further testified that he "do[es]n't text a lot" and only "get[s] maybe six, seven texts a day." (*Id.* at 10.) He recounted that he upgraded his phone twice in the past eight years – first in 2020 and then again in 2024 (*see id.* at 20, 28–29) – and he admitted that he took no steps to preserve the data on his phone (*see, e.g.*, *id.* at 19, 24). The day after that deposition, Oakley's counsel submitted a letter to the Court arguing that MSG's contemplated motion for spoliation sanctions was meritless because Oakley took reasonable steps to secure the data on his phone, MSG was not prejudiced by the loss of the text messages, and Oakley

2

did not intentionally destroy his texts. (*See* Doc. No. 196 at 2–3.)

On November 20, 2024, the Court held a pre-motion conference at which Oakley's counsel again argued that Oakley was merely required to (1) "[n]ot purposefully destroy [the data on his phone], and . . . [(2)] in a situation where he needs to preserve it, to transfer that data to a new device." (Doc. No. 225 at 15.) The Court then ordered the parties to appear for a hearing on December 19, 2024, where Oakley would testify regarding the loss of his text messages. (*See* Doc. No. 222.)

At that hearing, Oakley reiterated that he "do[es]n't really do a lot of texting" (Doc. No. 255-1 at 10), but he admitted that he did in fact text about his removal from MSG immediately following the incident (*see id.* at 48–49, 159). In contrast to his deposition testimony, Oakley explained that he traded in his phone *three* times during the past eight years, including once in 2021. (*See id.* at 13–17, 108.) He also admitted that he did not instruct AT&T to preserve the data on his old phone when transferring devices (*see, e.g.*, *id.* at 17, 30, 39–40, 107) and that he took no steps to image or back-up his phone (*see, e.g.*, *id.* at 114–15). Oakley further acknowledged that he knew he had a duty to preserve documents, including text messages, for this litigation. (*See id.* at 105–06.)

On January 9, 2025, MSG filed its motion for spoliation sanctions against Oakley and his counsel. (*See* Doc. Nos. 253, 254.) While that motion was pending, MSG received returns from its subpoena to AT&T, which included 10,200 pages of records containing the metadata – but not the content – of Oakley's text messages. (*See* Doc. No. 265.) Counsel for MSG and Oakley each submitted declarations regarding how to interpret the AT&T records. (*Compare* Doc. Nos. 272, 305, *with* Doc. No. 294.) In light of the discrepancies between how the parties calculated the number of text messages that Oakley sent and received between February 8 and March 1, 2017, the Court scheduled a second day of testimony for March 21, 2025 (*see* Doc. No. 324), at which counsel for both MSG and Oakley testified regarding their calculation methods (*see* Doc. No. 339).

In particular, MSG's counsel represented that, according to the metadata from the AT&T records, Oakley sent 1,113 text messages and received 6,658 text messages during the three weeks following his removal. (*See* Doc. No. 342 at 7.) Even accounting for potentially duplicative messages with an identical time and date stamp, MSG's counsel estimated that Oakley sent at least 866 text messages and received at least 4,233 text messages during the relevant period. (*See id.* at 8.) Oakley's counsel reached a similar conclusion, estimating that Oakley sent 826 text messages from February 8 to March 1, 2017. (*See* Doc. No. 341 at 2 n.3.) Oakley's counsel did not attempt to calculate the number of unique messages that he received during this time period.

The AT&T records also revealed that Oakley upgraded to a new phone model *seven* times in the past eight years on the following dates: April 17, 2017 (upgrade to Samsung Galaxy S7); May 17, 2018 (upgrade to Samsung Galaxy S9); November 25, 2020 (upgrade to Samsung Galaxy S20); July 12, 2021 (upgrade to Samsung Note 20); December 6, 2021 (upgrade to Samsung Galaxy S21); August 22, 2022 (upgrade to Samsung Galaxy S22); and July 7, 2024

3

(upgrade to Samsung Galaxy S24).² (*See* Doc. No. 272-2; Doc. No. 289-5.) Following the March 21, 2025 hearing, the parties submitted supplemental briefs (*see* Doc. Nos. 341, 342), and MSG's spoliation motion was fully briefed on March 28, 2025.

## II. Legal Standard

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). Under Federal Rule of Civil Procedure 37(e),

> If electronically stored information ["ESI"] that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
> (A) presume that the lost information was unfavorable to the party;
>
> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>
> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

Under this rule, a court must engage in a three-part inquiry. *First*, the court must "decide if the rule applies at all – that is, if a party failed to take reasonable steps to preserve [ESI] that should have been preserved in the anticipation or conduct of litigation." *Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 59 (S.D.N.Y. 2020) (internal quotation marks omitted). *Second*, the court must determine whether "there has been prejudice to another party from loss of the information, in which case the [c]ourt may order measures no greater than necessary to cure the prejudice." *Id.* (internal quotation marks omitted). *Third*, the court must consider – "regardless of prejudice to any other party" – "whether the destroying party acted with the intent to deprive another party of the information's use in the litigation, in which event a court may consider whether to impose the most

---

² The AT&T records include the IMEI number and phone model associated with Oakley's cell-phone number at the time he sent or received text messages. An IMEI number is a "number that uniquely identifies an individual wireless device." (Doc. No. 343-2 at 10.) On each of the above-referenced dates, the AT&T records show a change in both the phone model and IMEI number, supporting the inference that Oakley traded in his phone on those dates.

severe" sanctions of dismissal or an adverse-inference instruction. *Id.* (internal quotation marks omitted).

### III. DISCUSSION

#### A. Threshold Findings

##### 1. Duty to Preserve

The first part of the spoliation inquiry "requires the moving party to demonstrate that the spoliating party had an obligation to preserve the evidence at the time it was destroyed." *Id.* at 60–61 (internal quotation marks omitted). Accordingly, a court must determine (1) *when* the duty to preserve arose and (2) *what* evidence the party had a duty to preserve. *See Lokai Holdings LLC v. Twin Tiger USA LLC*, No. 15-cv-9363 (ALC) (DF), 2018 WL 1512055, at *9 (S.D.N.Y. Mar. 12, 2018).

"The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). Typically, a party's duty to preserve relevant evidence is triggered when the action is commenced. *See Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998). Because Oakley filed the instant suit on September 12, 2017, his duty to preserve arose no later than that date. He was then required to preserve "what [he] kn[ew], or reasonably should [have] know[n], [was] relevant in the action, [was] reasonably calculated to lead to the discovery of admissible evidence, [was] reasonably likely to be requested during discovery[,] and/or [was] the subject of a pending discovery request." *Arista Recs. LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 433 (S.D.N.Y. 2009) (internal quotation marks omitted). Oakley does not contest – nor could he credibly contest – that he had an obligation to preserve his text messages. As MSG has correctly argued, Oakley's text messages obviously could be "relevant to [his] state of mind during, and his reaction to, his ejection – not to mention [his] claimed damages for his physical pain, mental anguish, humiliation, stress and anxiety, emotional pain and suffering, and emotional distress." (Doc. No. 194 at 3 (internal quotation marks omitted).)

Therefore, Oakley had a duty – at the latest – from September 12, 2017 onwards to preserve any text messages pertaining to his removal from MSG.

##### 2. Failure to Take Reasonable Steps to Preserve Text Messages

"Once the obligation to preserve relevant ESI attaches, the party in possession of that ESI must take 'reasonable steps' to preserve it." *Charlestown*, 337 F.R.D. at 61 (quoting Fed. R. Civ. P 37(e)). While that obligation runs first to the party, "[c]ounsel is obligated to oversee compliance with [a preservation notice], monitoring the party's efforts to retain and produce the relevant documents." *Id.* (internal quotation marks omitted). Oakley argues that he took reasonable steps to preserve his text messages because he did not purposefully delete those messages and attempted to transfer them when upgrading cell phones. (*See* Doc. No. 225 at 15.) He further argues that Wigdor and Petrillo complied with their obligations under Rule 37(e) by including a paragraph in their retainer agreements – first in 2017 and then again in 2019 when Petrillo was retained as additional counsel – that Oakley had a "legal obligation [(1)] to locate, retain[,] and preserve all documents in [his] possession or control, whether in paper or electronic/email form (including all hard copies, computer files, emails, text messages, voice messages[,] and instant messages), that are

related, in any way, to [his] claims against MSG," and (2) to "not alter, discard[,] or destroy any documents that relate to [his] claims against[] MSG." (Doc. No. 255-10 at 4; *see also id.* at 8 (same).)

To assist the Court in determining the reasonableness of Oakley's and his counsel's actions, the parties have each submitted reports from expert witnesses. MSG has retained Philip Favro, an attorney and a Principal Consultant for Innovative Driven, LLC, which is "an international electronic discovery consulting firm." (Doc. No. 257 ("Favro Decl.") at 1.) Oakley has retained Roy D. Simon, Jr., an emeritus Distinguished Professor of Legal Ethics at Hofstra University's Maurice A. Deane School of Law. (*See* Doc. No. 291 at 1.) After carefully reviewing both expert reports, the Court finds Mr. Favro's report and analysis to be more persuasive by a wide margin. For starters, Professor Simon is "an expert in the field of legal ethics and professional responsibility" – not the discovery obligations imposed by Federal Rule of Civil Procedure 37(e). (*Id.* at 2.) And while Professor Simon has written extensively regarding the rules of professional conduct and served on committees regarding ethical standards for lawyers, he has not written a single article, to the Court's knowledge, regarding Rule 37(e). (*See id.* at 14–17.) Indeed, much of his professional experience predates the enactment of Rule 37(e) in 2015. (*See id.*) And while Professor Simon asserts that he "frequently advise[s] lawyers regarding issues of professional conduct, including conflicts of interest, confidentiality, fees, communication, and other issues," he makes no mention of *ever* having advised attorneys regarding electronic discovery or the requirements of Rule 37(e). (*See id.* at 3.)

Professor Simon's lack of relevant experience stands in stark contrast to Mr. Favro's background as "a prolific commentator on issues relating to [ESI], including as an author of numerous law review and other articles on [Rule] 37(e) and its predecessors," some of which have been cited by state and federal courts. (Favro Decl. at 1–2.) Likewise, Mr. Favro has "lectured to the National Conference of Magistrate Judges on spoliation," served as a special master on issues related to electronic discovery and ESI, and "regularly offer[ed] expert testimony and consulting services in the areas of data preservation practices, litigation holds, data collection strategies, search methodologies for ESI, security and privacy considerations regarding discovery of ESI, and protocols regarding the preservation, identification, and production of relevant ESI." (*Id.* at 2–3.) And unlike Professor Simon, who provides no basis for any of the assertions in his report regarding the relevant standard of care for preserving ESI and whether Oakley and his counsel took reasonable steps in this case (*see* Doc. No. 291 at 4–11), Mr. Favro supports each of his conclusions by citing to district court decisions from around the country as well as secondary sources from experts on electronic discovery (*see* Favro Decl. at 8–16).

Given Mr. Favro's extensive experience and rigorous analysis, the Court credits his conclusions in this case. As a threshold matter, Mr. Favro correctly notes that "[w]hat constitutes 'reasonable steps' under Rule 37(e) is subject to interpretation in the context of specific litigation and is highly dependent on the facts and circumstances of a particular matter." (*Id.* at 8.) Likewise, "Rule 37(e) 'does not call for perfection.'" (*Id.* (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment).) Nevertheless, Mr. Favro concluded – and the Court agrees – that "neither [Oakley] nor [his] counsel took reasonable steps to preserve [his] mobile phone data (including text messages) in 2017 or at any subsequent time." (*Id.* at 4.)

6

*First*, Oakley and his counsel should have taken affirmative steps to preserve his text messages. This could have been done by imaging Oakley's phone at the time the complaint was filed, which would have imposed a *de minimis* cost of approximately $500. (*See id.*) Alternatively, Oakley and his counsel could have "tak[en] screenshots of the text messages; imag[ed] the phone at a later date; ensur[ed] that text messages were backed up to a cloud-based server (such as Google Drive); confirm[ed] that any automatic deletion functions on [Oakley's] phone were turned off; or even transcrib[ed] the contents of the text messages." (*Id.* at 5.) The Court need not identify which of these actions would have constituted reasonable efforts because it is clear that the complete failure to take *any* affirmative steps to protect the data on Oakley's phone was "unreasonable given the ever-present risk of losing or breaking mobile devices, the relative ease of preserving relevant information on such devices, and the fact that [Oakley] texted [multiple] individuals regarding the incident." (*Id.* at 15.) Indeed, there can be no doubt that litigants in 2017 "were aware that phones could be lost, stolen, or susceptible to physical damage, resulting in data loss." (*Id.* at 16.) And while Oakley makes much of the fact that the core allegations in this case do not pertain to his text messages, Mr. Favro made clear that "in 2017 (and earlier)[,] lawyers would often image clients' cell phones to ensure that relevant data was preserved," "even in cases that were not focused on issues surrounding text message communications." (*Id.* at 12.)

*Second*, Wigdor and Petrillo's inclusion of a single paragraph in their retainer agreement – without more – was not sufficient to comply with their preservation obligations. As Mr. Favro explained, "[c]ounsel must take actual, actionable steps to make sure evidence is retained and to avoid the possibility of deletion of relevant evidence." (*Id.* at 14.) Moreover, preservation is "a process" that requires "attorneys to take follow-up steps to ensure electronic evidence is preserved after the issuance of a litigation hold." (*Id.* at 10 (internal quotation marks omitted).) In other words, "it is not enough [for counsel] to issue a hold and assume the client took adequate steps to preserve relevant data." (*Id.*) *See Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) ("Counsel must oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant documents."); Matthew Plant, *Spoliation of Evidence: The Surest Route to Sanctions*, Am. Bar Ass'n (Nov. 20, 2018), https://perma.cc/Q37L-JK4F ("[C]ounsel should, at a bare minimum, . . . follow up with the client to ensure that any litigation holds have been followed."); Dalila Hoover, *Spoliation Sanctions and How to Avoid Them*, Am. Bar Ass'n (June 18, 2020), https://perma.cc/2G9Q-XVJV ("To satisfy the preservation obligation of discoverable information in a client's possession, control, or custody, attorneys must do more than advise the client of its duty to preserve. . . . [O]ngoing monitoring remains critical."); Lindsay J. Calhoun, *Avoiding Discovery Sanctions in an Ever-Evolving Technological World*, Am. Bar Ass'n (Aug. 24, 2023), https://perma.cc/XCD7-99WW ("[An] attorney must . . . make a good faith effort to ensure that the attorney's advice is being followed and that all relevant and responsive information is preserved."); Crinesha B. Berry, *A Reminder to Take Evidence-Preservation Obligations Seriously*, Am. Bar Ass'n (July 12, 2024), https://perma.cc/G52V-48KZ ("It is counsel's responsibility to monitor efforts to preserve documents."). Because Wigdor and Petrillo concede that they did not take *any* steps to monitor or otherwise ensure Oakley's compliance with his preservation obligations, the Court finds that they too

failed to take reasonable steps under Rule 37(e).

### 3. Impossibility of Restoring or Replacing Lost Text Messages Through Additional Discovery

The Court must next consider whether Oakley's text messages can be restored or replaced through additional discovery. Although MSG issued subpoenas to numerous individuals whom Oakley's counsel identified as potentially having texted with Oakley about his removal from MSG, only one of those individuals – Akhtar Farzaie – still had text messages dating back to 2017. (*See* Doc. No. 254 at 21 n.10.) And there is reason to doubt that even Farzaie's production of text messages was complete and accurate. For starters, the text messages were not collected by an ESI vendor but rather consisted of screenshots from Farzaie's phone. (*See* Doc. No. 255-11.) It is also clear from the screenshots that portions of certain messages have been cut off, raising concerns as to whether some text messages may have been omitted or obscured. (*See id.*)

Additionally, as Oakley testified at the December 19, 2024 hearing, he texted with "a lot of people" about the incident, including five individuals who were not included on the list his counsel provided to MSG. (Doc. No. 255-1 at 68; *see also id.* at 65–68 (identifying Marilyn Crawford, Joe Masters, Eric Price, Tanya Williams, and John Kelly).) In fact, Oakley could not remember all the individuals with whom he texted (*see id.* at 68), and MSG subsequently established that Oakley texted with 273 different phone numbers in the weeks following his removal (*see* Doc. No. 342 at 11). And while MSG subpoenaed Oakley's cell-service provider, AT&T, the record reflects that AT&T does not retain or possess the content of its customers' text messages. (*See* Doc. No. 254 at 21 n.10.) In light of MSG's diligent – though ultimately futile – efforts, it is clear that Oakley's text messages cannot be restored or replaced through additional discovery.

### B. Sanctions Under Rule 37(e)(1)

### 1. Prejudice

"After the threshold requirements have been satisfied, Rule 37(e)(1) permits the imposition of sanctions only when there is prejudice to another party from loss of the information." *Europe v. Equinox Holdings, Inc.*, 592 F. Supp. 3d 167, 178 (S.D.N.Y. 2022) (internal quotation marks omitted). Although Rule 37(e) does not define prejudice, the Advisory Committee's Note explains that "[a]n evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation." Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment. And while the burden of proof typically lies on the moving party to establish each of the elements of a spoliation motion, the Advisory Committee's Note cautions that Rule 37(e)(1) "does not place a burden of proving or disproving prejudice on one party or the other" because "[d]etermining the content of lost information may be a difficult task in some cases, and placing the burden of proving prejudice on the party that did not lose the information may be unfair." *Id.*; *see also Europe*, 592 F. Supp. 3d. at 178 ("[E]ven where the spoliator acted with mere negligence, as between the innocent and negligent parties, courts recognize that the negligent party has no right to benefit from its negligence."). As a result, courts in this Circuit have regularly held that the moving party "need not . . . establish that a smoking gun [piece of ESI] was irretrievably destroyed." *Charlestown*, 337 F.R.D. at 66 (alterations accepted and internal quotation marks omitted). Instead, the moving party

8

need only "provide[] evidence that plausibly suggests that the spoliated ESI could support its case." *Id.* (alterations accepted and internal quotation marks omitted).

MSG has amply demonstrated that it was prejudiced by the loss of Oakley's text messages because it is more than plausible that such text messages would have supported MSG's defenses. Both parties agree that Oakley sent *at least* 826 text messages in the three weeks following his removal from MSG, which amounts to an approximate average of thirty-nine text messages per day. (*See* Doc. No. 341 at 2 n.3.) In fact, Oakley sent at least sixty-four text messages in the first twenty-four hours following his removal and forty more messages over the course of the next day. (*See id.*) The AT&T records further revealed that the average number of text messages that Oakley sent increased over 250% in the three-week period following his removal as compared to the days leading up to the incident. (*See* Doc. No. 342 at 10.) This increase was even more pronounced during the first full day after the incident, which supports the inference that Oakley sent text messages related to the claims at the heart of this case. (*See id.*) Indeed, Oakley himself ultimately admitted that he texted about his removal and specifically identified at least thirteen individuals with whom he texted about the incident. (*See* Doc. No. 255-1 at 48–49, 54–58, 62–68.)

Because Oakley's text messages were lost, MSG did not have access to evidence that might have undermined Oakley's version of events. Courts have regularly recognized that "private statements [in text messages] may reflect [a party's] views unfiltered for publication" and thus "provide a different perspective on his state of mind than those he made publicly." *United States v. Hunt*, 534 F. Supp. 3d 233, 246 (E.D.N.Y. 2021). (*See also* Favro Decl. at 13 ("[T]ext messages generally memorialize unguarded communications and contemporaneous observations that cannot be replicated through other forms of discovery.").) There is strong reason to believe that Oakley's unguarded communications in his text messages would have undermined his assertion that he was assaulted at MSG, particularly since Oakley's statements after the incident contradicted his allegations that he was "pushed" to the ground by MSG security personnel. (Doc. No. 114 at 2–3.) For example, in an interview on The Rich Eisen Show, Oakley stated that he "slipped down and fell." (*See* Doc. No. 254 at 22 n.11.) Likewise, in three early drafts of his autobiography, Oakley stated that he "slipped and ended up on [his] back." (Doc. No. 255-25 at 3; *see also* Doc. No. 255-24 at 3; Doc. No. 255-26 at 3.) It was only after Oakley's counsel reviewed the manuscript of the autobiography that the reference to Oakley slipping was removed and replaced with an assertion that Oakley was "pushed down by" MSG security. (Doc. No. 304-2 at 234.) Accordingly, it is at least plausible that Oakley's lost text messages contained admissions that would be similarly damaging to his case. And even if none of Oakley's text messages pertained to what occurred on the evening of February 8, 2017, MSG has, at the very least, been deprived of the opportunity to argue that Oakley's failure to discuss an assault in the over 800 text messages that he sent following his removal supports the inference that no such assault occurred.

In response, Oakley argues that "text messages in [his] cell phone were unlikely to contain evidence relevant to the open issues in this case." (Doc. No. 287 at 22.) He relies heavily on the screenshotted text messages produced by his close friend and public-relations manager, Akhtar Farzaie, which revealed that Oakley did not respond to twenty-eight of the thirty text messages that Farzaie sent to Oakley and that Oakley's

9

response to the two other messages consisted of a "terse phrase." (*Id.*)  But even if the Court were to presume the reliability of Farzaie's production, there is no reason to assume that Oakley's texting habits with Farzaie were representative of his communications with the 272 other individuals he texted during the weeks following his removal.  In fact, Oakley's more recent text messages from 2024 – which *were* preserved – reveal that he has substantively discussed this litigation with friends and family via text message.  (*See* Doc. No. 185-7 at 3.)  Oakley further relies on the deposition testimony of three other friends and associates who assert that Oakley is "not a huge texter" and "isn't really a big texter."  (Doc. No. 287 at 22 (internal quotation marks omitted).)  But this argument has already been contradicted by the AT&T records.  It also conflates the frequency of Oakley's text messaging generally with the volume and content of those messages at a highly relevant time.

For all these reasons, the Court is persuaded that MSG was prejudiced by the loss of Oakley's text messages.

2. Remedies

Having found that MSG was prejudiced by the loss of Oakley's text messages, the Court must now craft sanctions that will be "no greater than necessary to cure the prejudice" to MSG.  Fed. R. Civ. P. 37(e)(1).

MSG first requests that Oakley be precluded from asserting or introducing any evidence that he was pushed to the ground by MSG security or that he acted in self-defense.  (*See* Doc. No. 254 at 29.)  MSG argues that it has been deprived of the ability to disprove these allegations using Oakley's text messages.  (*See id.* at 29–30.)  However, MSG points to no case law – nor is the Court aware of any – that would permit such a sweeping preclusion of evidence under Rule 37(e)(1).  Indeed, the Advisory Committee's Note makes clear that "an order . . . precluding a party from offering any evidence in support of[] the central or only claim . . . in the case" is "inappropriate" under Rule 37(e)(1).  Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment.  Therefore, MSG's request to preclude Oakley from offering any testimony or evidence that he was pushed and that he acted in self-defense is DENIED.

Alternatively, MSG requests permission to present evidence related to Oakley's failure to preserve his text messages.  The Court agrees that this remedy, which is explicitly contemplated in the Advisory Committee's Note, is appropriate here.  *See id.*  Indeed, courts in this District regularly allow the disadvantaged party to put on evidence related to the loss of ESI.  *See, e.g.*, *Charlestown*, 337 F.R.D. at 68–69; *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 528–29 (S.D.N.Y. 2022); *Doubleline Cap. LP v. Odebrecht Fin., Ltd.*, No. 17-cv-4576 (GHW) (BCM), 2021 WL 1191527, at *9–10 (S.D.N.Y. Mar. 30, 2021); *Karsch v. Blink Health Ltd.*, No. 17-cv-3880 (VM) (BCM), 2019 WL 2708125, at *27–28 (S.D.N.Y. June 20, 2019); *Leidig v. Buzzfeed, Inc.*, No. 16-cv-542 (VM) (GWG), 2017 WL 6512353, at *14 (S.D.N.Y. Dec. 19, 2017).  The purpose of such a sanction is to "ensure that the finder of fact will have the full context for the evidentiary imbalance that will become apparent at trial."  *Charlestown*, 337 F.R.D. at 69 (internal quotation marks omitted).  Therefore, MSG's request to present evidence related to Oakley's loss of his text messages is GRANTED.

MSG also seeks reimbursement for its attorneys' fees and costs incurred while pursuing this spoliation motion.  Rule 37(e)(1) "authorizes an award of attorneys'

10

fees and costs to the moving party to the extent reasonably necessary to address any prejudice caused by the spoliation." *Id.* at 68. The purpose of this remedy is to "ameliorate[] the economic prejudice imposed . . . and also serve[] as a deterrent to future spoliation." *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 502 (S.D.N.Y. 2016). Accordingly, MSG's request for attorneys' fees and costs expended in prosecuting this spoliation motion and pursuing discovery related to Oakley's loss of text messages, such as by subpoenaing AT&T, subpoenaing third-party witnesses, and deposing those witnesses, is GRANTED.

MSG further argues that Wigdor and Petrillo should be ordered to pay part of this monetary sanction. (*See* Doc. No. 254 at 24–28.) While the Court has "wide discretion to apportion Rule 37 monetary sanctions between a party and its counsel," *Fashion Exch. LLC v. Hybrid Promotions, LLC*, No. 14-cv-1254 (SHS) (OTW), 2019 WL 6838672, at *9 (S.D.N.Y. Dec. 16, 2019) (internal quotation marks omitted), MSG has not established that it was prejudiced *because of* counsel's failure to take reasonable steps to ensure the preservation of Oakley's text messages. In other words, even if Wigdor and Petrillo had instructed Oakley to back up his phone or otherwise preserve his text messages, there is no reason to think that Oakley would have complied with those directives. In fact, Oakley admitted that he knew he had an obligation to preserve his text messages (*see* Doc. No. 255-1 at 105), and yet he still allowed those text messages to be destroyed when he upgraded his phone. This conduct not only supports a finding, as described further below, that Oakley acted with the intent to deprive MSG of his text messages in this litigation; it also suggests that Wigdor's and Petrillo's negligence, though troubling, did not cause the destruction of Oakley's messages.

Accordingly, Oakley should bear full responsibility for his spoliation. *See Charlestown*, 337 F.R.D. at 69 n.19. And to the extent Oakley seeks to shift any blame to his attorneys, "it is well-settled that a litigant chooses counsel at his peril." *Id.* (alterations accepted and internal quotation marks omitted). For these reasons, MSG's request for sanctions against Wigdor and Petrillo is DENIED.

C. Sanctions Under Rule 37(e)(2)

1. Intent to Deprive

MSG also seeks sanctions in the form of dismissal of this case or, in the alternative, an adverse-inference instruction. The Second Circuit has recently held that the imposition of these more severe sanctions "requires a finding of intent to deprive another party of the information's use in the litigation." *Hoffer v. Tellone*, 128 F.4th 433, 438 (2d Cir. 2025) (internal quotation marks omitted). Although "[a]n intent to deprive can be found either from a conscious act of destruction or a conscious dereliction of a known duty to preserve electronic data," *Fashion Exch.*, 2019 WL 6838672, at *5 (internal quotation marks omitted), "[a] party's acting negligently or knowingly will not suffice to justify [such] sanctions," *Hoffer*, 128 F.4th at 438.

A party seeking sanctions under Rule 37(e)(2) need only establish the requisite intent by a preponderance of the evidence, and such intent may be proven through circumstantial evidence. *See id.* at 440. For example, "[i]ntent can be inferred when a party has significantly failed in its obligation to preserve and collect documents." *Europe*, 592 F. Supp. 3d at 175. Likewise, courts have found that a party acted with the requisite intent where:

11

(1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator.

*Charlestown*, 337 F.R.D. at 67 (internal quotation marks omitted).

The Court concludes that MSG has established by a preponderance of the evidence that Oakley acted with the intent to deprive MSG of his text messages in this litigation. As an initial matter, Oakley's intent can be inferred from his significant failure to preserve his text messages. As Oakley acknowledged at the December 19, 2024 spoliation hearing, he knew after signing the 2017 and 2019 retainer agreements with his counsel that he "had a duty to preserve documents relating to [his] claims, including texts." (Doc. No. 255-1 at 105; *see also id.* at 106.) Despite this knowledge, Oakley never imaged his phone or attempted to back up his messages to a cloud-based storage service. (*See id.* at 114–15.) Moreover, Oakley testified that he knew that he would likely lose at least some of his data when upgrading his phone because not all of it would transfer to the new device. (*See id.* at 30–31, 33, 41, 121–22.) Despite this knowledge, Oakley admitted that he never asked AT&T to back up his phone or store his data in the cloud before he attempted to transfer devices. (*See id.* at 39–40, 107.) Rather, he proceeded with the upgrade because, in his words, it was "[m]ore important for me to have a phone." (*Id.* at 32;

*see also id.* at 40.) On this record, the Court concludes that Oakley's failure to take any steps whatsoever to preserve his text messages is "so stunningly derelict as to evince intentionality." *Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410, 432 (W.D.N.Y. 2017).

The Court would reach the same conclusion by applying the four-step process set forth in *Charlestown*. *First*, as outlined earlier in this Opinion, text messages once existed that could fairly have been material to MSG's defense because it is plausible that Oakley made admissions in those text messages that would have undermined his core allegations in this case. *Second*, Oakley engaged in affirmative acts – trading in his phone – that caused his text messages to be lost. While Oakley makes much of the fact that he did not delete any text messages, the case law is clear that "*passively* allow[ing] [ESI] to be lost" can still support an inference of intentionality. *Ungar v. City of New York*, 329 F.R.D. 8, 13 (E.D.N.Y. 2018). Indeed, courts within this Circuit have readily found intentionality when the spoliating party turned over electronic devices without first taking any effort to preserve discoverable information. *See, e.g.*, *Google LLC v. Starovikov*, No. 20-cv-10260 (DLC), 2022 WL 16948296, at *11 (S.D.N.Y. Nov. 15, 2022). *Third*, as described above, Oakley admitted that he knew he had an obligation to preserve his text messages.

*Fourth*, the Court concludes that Oakley's loss of his text messages cannot be credibly explained as involving anything other than bad faith. Oakley has repeatedly argued that he lost his text messages because his phone broke and he had no choice but to upgrade to a new device. (*See, e.g.*, Doc. No. 287 at 9.) This explanation is simply not credible. It is undisputed that Oakley lost all his text messages sent or received before February 2022. (*See* Doc. No. 286 at 2.) But

the AT&T records reveal that Oakley did not change his phone in February, thus undermining his contention that he lost his text messages because of an upgrade. (*See* Doc. No. 255-13.) And even if the Court were to assume that Oakley lost his text messages during an earlier upgrade, Oakley does not identify during which of the preceding *five* upgrades – in April 2017, May 2018, November 2020, July 2021, or December 2021 (*see* Doc. No. 272-2) – he lost his text messages. Nor does Oakley adequately explain what happened to his device. He simply stated that "sometimes . . . numbers come up on" the screen and that "sooner or later it['s] going to go blank." (Doc. No. 255-1 at 28; *see also id.* at 29 ("Th[e] phone was blanking on and off.").) Courts in this District have previously inferred intentionality when the spoliating party's explanations about an electronic device breaking were "shockingly vague about what actually happened" and did not "provid[e] any details or factual support." *Am. Lecithin Co. v. Rebmann*, No. 12-cv-929 (VSB) (JW), 2023 WL 7160729, at *6 (S.D.N.Y. Oct. 31, 2023). Indeed, courts have refused to rely on the spoliating party's conclusory assertion that a device was lost or damaged. *See id.*

In fact, in a case filed in the Eastern District of New York involving different parties, Oakley's counsel argued that a remarkably similar series of events supported a finding of bad faith and intentionality. As Oakley's counsel then explained:

> [I]n assessing the circumstances surrounding destruction, there is a great and decisive difference between a pre-litigation loss, perhaps owing to a company's deletion policy or coming at a time when a duty to preserve was less clear, and a post-litigation loss caused by an affirmative act, as in [the spoliating party's] surrendering of phones during the litigation. The latter strongly bespeaks a conscious dereliction of duty, from which the Court may infer intent to spoliate. The latter is exactly what the record here shows. [The spoliating parties] handed in their phones *years* after receiving a litigation hold and, indeed, *years* after the filing of this case. They did so as sophisticated parties represented by able counsel – parties, moreover, who had understood direct instructions to preserve evidence, as they admitted at their depositions. Conveniently for them, neither had taken any steps to ensure that their [cloud] accounts were backing up their texts.

Mem. of Law in Supp. of Pl.'s Mot. for Disc. Sanctions at 11–12, *Ronen v. Redroute, Inc.*, No. 21-cv-2732 (RPK) (E.D.N.Y. Nov. 10, 2023), ECF No. 33 (citations omitted).

The Court's finding of bad faith here is further supported by Oakley's repeated misrepresentations regarding his texting habits and phone trade-ins. At his deposition, Oakley declared that he "do[es]n't text a lot" and only "get[s] maybe six, seven texts a day." (Doc. No. 255-2 at 10.) Similarly, at the December 19, 2024 hearing, Oakley repeatedly stated that he "do[es]n't really do a lot of texting." (Doc. No. 255-1 at 10.) But the subsequently obtained AT&T records revealed that these statements were gross misrepresentations. Contrary to Oakley's assertion that he received only six or seven messages per day, the AT&T records revealed that in the three weeks following his removal from MSG, Oakley received at least 202 messages per day – or 4,233 messages in total (*see* Doc. No. 343-3 at 3) – and sent at least thirty-nine messages per day – or 826 messages in total (*see* Doc. No. 341 at 2 n.3). In other words, Oakley received *thirty-one*

13

times more messages than he testified to under oath. Likewise, Oakley first testified at his deposition that he only traded in his phone *twice* in the past eight years. (*See* Doc. No. 255-2 at 20, 29.) Then, at the December 19, 2024 hearing, he testified that he traded in his phone *three* times. (*See* Doc. No. 255-1 at 15.) However, the AT&T records revealed that he had traded in his phone *seven* times during this period – more than double his sworn testimony. (*See* Doc. No. 272-2; Doc. No. 289-5.) These glaring inconsistencies on issues central to this spoliation motion undermine Oakley's credibility and support the inference that he willfully obfuscated his intentional destruction of discoverable material.

These patent misrepresentations are part of a broader pattern of Oakley making sworn statements to the Court that are then contradicted by subsequently unearthed evidence. *See supra* p. 9 (noting the contradictions between Oakley's sworn declaration and statements that he made during a sports radio show and in early drafts of his autobiography). Such contradictions further support the inference that Oakley intentionally misled the Court.

On this record, the Court readily concludes that Oakley acted with the intent to deprive MSG of his text messages. Courts in this Circuit have found that a spoliating party acted with intent to deprive when "the alleged chronology of events was highly improbable and [the party's] story was filled with inconsistencies." *Moody*, 271 F. Supp. 3d at 432 (alterations accepted and internal quotation marks omitted). That is precisely the situation here.

### 2. Remedies

To remedy Oakley's intentional loss of his text messages, MSG requests that the Court dismiss Oakley's complaint. But dismissal is a "drastic remedy" that "should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." *West*, 167 F.3d at 779 (internal quotation marks omitted). The Second Circuit has noted that an adverse-inference instruction may better serve "prophylactic, punitive, and remedial rationales . . . based on the . . . commonsensical proposition that the drawing of an adverse inference against parties who destroy evidence [(1)] will deter such destruction, [(2)] will properly plac[e] the risk of an erroneous judgment on the party that wrongfully created the risk," and (3) will "restor[e] the prejudiced party to the same position [it] would have been in absent the wrongful destruction of evidence by the opposing party." *Kronisch*, 150 F.3d at 126. (internal quotation marks omitted). The Court therefore concludes that an adverse-inference instruction is a less drastic sanction that "appropriately addresses the evidentiary gap caused by [Oakley's] loss of" his text messages. *Moody*, 271 F. Supp. 3d at 432.

Accordingly, MSG's request to dismiss Oakley's case is DENIED, but MSG's request for an adverse-inference instruction is GRANTED. The precise content of that instruction will be determined by the Court prior to trial.

### D. Sealing

In connection with his opposition to MSG's motion for spoliation sanctions, Oakley preliminarily moved to file certain exhibits under seal pursuant to the parties' confidentiality agreement. (*See* Doc. No. 288.) Oakley and MSG both subsequently submitted letters to the Court indicating that they did not wish to maintain those exhibits under seal. (*See* Doc. Nos. 295, 384.) Accordingly, Oakley's motion to seal is DENIED as moot; Oakley is directed to

promptly file the relevant exhibits on the public docket.

\* \* \*

For the reasons stated above, MSG's motion for spoliation sanctions is GRANTED in part and DENIED in part. In particular:

1) MSG's request to preclude Oakley from presenting certain evidence at trial is DENIED.

2) MSG's request to introduce evidence related to Oakley's loss of his text messages at any future trial is GRANTED.

3) MSG's request for Oakley to pay its attorneys' fees and costs in connection with pursuing this spoliation motion and seeking to obtain his lost text messages is GRANTED. MSG shall submit a motion, along with supporting declarations and documentation, setting forth its recoverable fees and costs no later than July 30, 2025. Oakley may file a response – limited to the amount of MSG's recoverable fees and costs – no later than August 6, 2025.

4) MSG's request for monetary sanctions against Wigdor LLP and Petrillo Klein & Boxer LLP is DENIED.

5) MSG's request to dismiss Oakley's complaint is DENIED.

6) MSG's request for an adverse-inference instruction at any future trial is GRANTED. The content of that instruction shall be decided at the time of trial.

7) Oakley's motion to file under seal certain exhibits submitted with his opposition to MSG's motion for spoliation sanctions is DENIED as moot. Oakley shall promptly file the relevant exhibits on the public docket.

The Clerk of Court is respectfully directed to terminate the motions pending at Doc. Nos. 253 and 288.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States Circuit Judge
Sitting by Designation

Dated: July 23, 2025
       New York, New York

\* \* \*

Plaintiff Charles Oakley is represented by Douglas H. Wigdor, Valdi Licul, John S. Crain, and Katherine Vask of Wigdor LLP, 85 Fifth Ave., 5th Fl., New York, New York 10003; and Nelson A. Boxer and Marcelo Triana of Petrillo Klein & Boxer LLP, 655 Third Ave., 22nd Fl., New York, New York 10017.

Defendants MSG Networks, Inc., The Madison Square Garden Sports Corp., and Sphere Entertainment Group, LLC are represented by Randy M. Mastro, 21 E. 83rd St., New York, NY 10028; and Damien Marshall, Jessica Benvenisty, John Goodwin, Lauren K. Myers, and Lillian Klatskin of King & Spalding LLP, 1185 Avenue of the Americas, 34th Fl., New York, New York 10036.