# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

---

No. 17-cv-6903 (RJS)

---

CHARLES OAKLEY,

*Plaintiff,*

*v.*

MSG NETWORKS, *ET AL.*,

*Defendants.*

---

OPINION AND ORDER
August 14, 2026

---

RICHARD J. SULLIVAN, Circuit Judge:

After security guards removed him from a New York Knicks basketball game in February 2017, Plaintiff Charles Oakley sued Defendants MSG Networks, Inc., Madison Square Garden Sports Corp., and Sphere Entertainment Group, LLC (collectively, "MSG"). Oakley initially brought a grab bag of claims, all of which the Court dismissed in February 2020. On appeal, the Second Circuit affirmed the Court's dismissal except as to Oakley's assault-and-battery claim.

MSG then moved for pre-discovery summary judgment based on video footage showing Oakley's removal. The Court granted that motion, and Oakley again appealed. The Second Circuit reversed, explaining that the videos alone did not provide a clear enough picture of events to warrant summary judgment, and that

additional evidence gleaned from discovery might clear up any remaining factual disputes.

That discovery is now complete, and MSG again moves for summary judgment. MSG points to new video evidence, numerous sworn declarations from eyewitnesses, and multiple depositions, all confirming that Oakley was not assaulted. Indeed, even though the alleged assault occurred in the middle of Madison Square Garden and in front of nineteen thousand fans and scores of video cameras, Oakley concedes that "there is *no* other witness" – besides himself – "who says that [he] was pushed" to the ground. (Doc. No. 429 at ¶ 127 (emphasis added and internal quotation marks omitted).) Because Oakley has produced no evidence to support his claim that he was assaulted by MSG security

guards, MSG's motion for summary judgment is GRANTED.

## I. BACKGROUND

### A. Facts

Charles Oakley, a former All-Star power forward for the New York Knicks, attended a Knicks game at Madison Square Garden (the "Garden") on February 8, 2017. (Doc. No. 429 at ¶¶ 1, 11.) During the game, Oakley was approached by MSG security guards and New York City Police Department ("NYPD") officers, who physically removed him from the arena, purportedly because he was behaving inappropriately. (*Id.* at ¶¶ 66–202.) While the parties contest whether Oakley had been belligerent prior to his removal – and whether he was intoxicated – there is no dispute that Oakley was asked to leave the arena and that he refused to comply.

On September 12, 2017, Oakley filed a complaint asserting defamation, libel, slander, abuse-of-process, false-imprisonment, and denial-of-public accommodation claims against both MSG and its Executive Chairman, James Dolan. (Doc. No. 1 ¶¶ 8, 77–93, 100–20.) This original complaint also asserted assault-and-battery claims against MSG alone, alleging that stadium guards used unwarranted physical force to eject Oakley from the premises, including by "push[ing] him to the ground," "throw[ing him] onto the ground," and "dragging him to the ground." (*Id.* ¶¶ 47–48, 94–99.)

On February 9, 2018, Oakley amended his complaint, adding new details alleging that the guards used excessive force in removing him. (Doc. No. 36 at ¶¶ 43–50.) The Defendants responded by moving to dismiss on March 30, 2018. (Doc. No. 41.)

On February 19, 2020, the Court issued an opinion and order granting Defendants' motion to dismiss all of Oakley's claims. *See Oakley v. Dolan*, No. 17-cv-6903 (RJS), 2020 WL 818920, at *1 (S.D.N.Y. Feb. 19, 2020). Regarding Oakley's assault-and-battery claims, the Court held that "[t]he law is clear that the MSG Defendants had the right to expel Oakley from the Garden and that his refusal to leave justified their use of reasonable force to remove him." *Id.* at *13. The Court then explained that the only remaining question was "whether Defendants used unnecessary force or intended to injure [Oakley]." *Id.* Presuming the truth of Oakley's allegations, as required at that stage of the litigation, *Ferran v. Town of Nassau*, 11 F.3d 21, 22 (2d Cir. 1993), and without consulting extrinsic evidence such as the videos, the Court nevertheless held that Oakley's allegations of excessive force were conclusory and did not support a plausible inference of unnecessary force or injurious intent. *Oakley*, 2020 WL 818920, at *13–14.

Oakley appealed the dismissal of his amended complaint to the Second Circuit (Doc. No. 70), which affirmed this Court's decision in all respects except for its dismissal of Oakley's assault-and-battery claims. *See Oakley v. Dolan*, 980 F.3d 279, 280 (2d Cir. 2020); *Oakley v. Dolan*, 833 F. App'x 896, 898 (2d Cir. 2020). As to those claims, the Second Circuit concluded that the *act* of Oakley's removal was not itself unreasonable, but that Oakley's claim that "security guards used excessive force in *accomplishing* the removal" survived dismissal. *Oakley*, 980 F.3d at 283 (emphasis added). The Second Circuit emphasized those portions of Oakley's amended complaint "that allege[d] that he was 'thrown to the ground' by actions that 'greatly exceeded the amount of force that was necessary' and 'clearly exceeded the bounds of reasonable behavior,' and that he

2

'ha[d] suffered and continues to suffer harm[.]'" *Id*. (quoting Doc. No. 36 at ¶¶ 43, 47, 50, 125.)    The Second Circuit accordingly remanded the case for further proceedings on the assault-and-battery claim.

On January 22, 2021, MSG moved for pre-discovery summary judgment based solely on the video footage documenting Oakley's removal from the Garden. (Doc. No. 102.)  On November 8, 2021, the Court granted that motion.    The Court first explained that "when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Oakley v. MSG Networks*, No. 17-cv-6903 (RJS), 2021 WL 5180229, at *4 (S.D.N.Y. Nov. 8, 2021) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  It then held that "the video footage conclusively rebuts Oakley's version of events – and vindicates Defendants' version." *Id.* at 7 (relying on videos reattached to current motion at Doc. No. 400, Ex. 21 (hereinafter "*Stadium Vid.*") and Ex. 29 (hereinafter "*Fan Vid. 1*")).)

Oakley appealed again. (Doc. No. 123.) This time, the Second Circuit reversed via summary order.  The Circuit explained that the video of Oakley's initial encounter with MSG guards had "a choppy and degraded . . . quality" and did not "record the initial conversation between Oakley and the MSG security guards," making it "difficult to see clearly what happened" during that interaction. *Oakley v. Dolan*, No. 21-2939, 2023 WL 3263618, at *3 (2d Cir. May 5, 2023) (hereinafter "*Oakley II*").  But it also emphasized that "additional discovery [might] yield[] additional videos showing other camera angles, as well as helpful

eyewitness testimony to overcome the limitations in the video record and give context." *Id.*

On remand, Oakley moved to file a second amended complaint. (Doc. No. 148.) The court granted that motion in part (Doc. No. 158), and on April 18, 2024, Oakley filed the operative complaint.  (Doc. No. 164.)

Meanwhile, the parties proceeded to discovery, exchanging "thousands of documents, including contemporaneous witness statements, sworn declarations of multiple witnesses to Oakley's ejection, and numerous videos from MSG and other sources, such as media and fans." (Doc. No. 398 at 13.)    The parties also submitted expert reports and "t[ook] depositions of fifteen fact witnesses and two experts." (*Id.*)

At the conclusion of discovery, MSG again moved for summary judgment, which Oakley opposed.

## II.  MOTION FOR SUMMARY JUDGMENT

### A.  Legal Standard

Courts grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).    While this standard generally leaves "choices between conflicting versions of the events" up to the jury, *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996), summary judgment is nonetheless appropriate if no rational jury would "credit the [non-moving party's] allegations," *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005).  Indeed, the Supreme Court has recognized that a rational jury would reject allegations that are "blatantly contradicted by the record." *Scott*, 550 U.S. at 380.  And the Second Circuit has held that summary judgment is appropriate where the

3

non-movant "rel[ies] almost exclusively on his own testimony" and that testimony suffers from "inconsistencies and improbabilities," *Jeffreys*, 426 F.3d at 551 (internal quotation marks omitted).

### B.  Scope of the Issue

This case turns solely on the question of "whether [MSG] security guards used *excessive force* in accomplishing [Oakley's] removal." *Oakley II*, 2023 WL 3263618 at *2 (emphasis added and internal quotation marks omitted); *see id.* (explaining that MSG indisputably had the "right to use reasonable force to eject" Oakley).  An officer's "[a]pplication of force is excessive . . . if it is objectively unreasonable." *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004); *see also Posr v. Doherty*, 944 F.2d 91, 95 (2d Cir. 1991) (explaining that "the essential elements" of state and federal excessive-force claims are "substantially identical").  As discussed below, there is no genuine issue of material fact as to whether MSG guards used such force:  all of the post-discovery evidence – including multiple videos and the consistent testimony of every witness except Oakley – shows that they did not.

Oakley attempts to avoid this problem by (i) asserting that the Second Circuit "h[eld] that a trial is necessary" here (Doc. No. 431 ("Oakley Br.") at 21); (ii) attempting to muddy the record enough to survive summary judgment on his physical assault-and-battery claims; and (iii) concocting a new claim of non-physical assault found nowhere in the amended complaint (*id.* at 10).  None of these arguments is persuasive.

### C.  Mandate Rule

Oakley first points to *Oakley II*, where the Second Circuit explained that "once a jury

sorts out *what* exactly happened, it must make a determination as to whether the force used to eject Oakley was reasonable." *Oakley II*, 2023 WL 3263618, at *3. Invoking the mandate rule, which "compels compliance on remand with the dictates of the superior court," *United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001) (internal quotation marks omitted), Oakley contends that the Second Circuit foreclosed the possibility of a second, post-discovery motion for summary judgment and instead directed that this case go "to a jury." (Oakley Br. at 21.)

But the Second Circuit's reference to a "jury" came in a paragraph where it was analyzing whether summary judgment was appropriate – not conclusively prescribing the identity of the factfinder.  The Second Circuit first explained the legal standard that would apply at a potential trial, noting that a jury would need to "determin[e] . . . whether the force used to eject Oakley was reasonable." *Oakley II*, 2023 WL 3263618, at *3.  It then considered the question of whether a "reasonable jury could conclude that the defendants gave Oakley a reasonable opportunity to depart, and that they then used only reasonable force." *Id.* And it finally decided that, given the underdeveloped record, it could not yet rule that no reasonable jury would side with Oakley.  *Id.*  That bread-and-butter summary-judgment analysis – describing the standard at trial, weighing whether a reasonable jury could find in favor of the non-movant on the pre-discovery record, and then denying early summary judgment – hardly *mandated* that Oakley's case proceed to trial.

Nor could it have.  To begin, the mandate rule does not even apply when a district court is weighing "new evidence." *United States v. Carr*, 557 F.3d 93, 102 (2d

Cir. 2009). And even more fundamentally, Oakley has cited no case where any court has precluded a party from making a post-discovery motion for summary judgment and instead compelled it to go directly to trial. That is hardly surprising, since Federal Rule of Civil Procedure 56 expressly provides that a defendant "may move for summary judgment" on any claim for which "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). And, as the Supreme Court recently explained, such motions are typically made "[d]uring or after" the close of discovery. *Dupree v. Younger*, 598 U.S. 729, 731 (2023). In fact, the Second Circuit appears to have contemplated just such a sequence here when it emphasized that "additional discovery [might] yield[] additional videos showing other camera angles, as well as helpful eyewitness testimony to overcome the limitations in the video record and give context." *Oakley II*, 2023 WL 3263618, at *3.

In short, the mandate rule does not permit courts to short-circuit discovery or otherwise ignore the Federal Rules of Civil Procedure.

### D. Physical Assault and Battery

Oakley next argues that genuine issues of material fact exist regarding whether MSG used excessive force in removing him from the Garden. Oakley's excessive-force claims turn on three distinct incidents where his accounts of the facts differ from MSG's. But as discussed in detail below, the vast amount of post-discovery evidence – including multiple videos and the uniform sworn testimony of every witness – "blatantly contradict[s]" Oakley's "stor[y]," *Scott*, 550 U.S. at 380, which is "unsubstantiated by any other direct evidence" and suffers from "inconsistencies

and improbabilities," *Jeffreys*, 426 F.3d at 551 (internal quotation marks omitted).

### 1. MSG's Initial Contact with Oakley

Oakley first asserts that there is "sufficient evidence . . . for a jury to find that [he] suffered a battery when guards initiated physical contact with [him] by pushing and pulling him as he stood up from his seat." (Oakley Br. at 13.) To support this claim, Oakley insists that, in one of the videos, MSG security guard Kori Keaton "can be seen pushing Oakley in the chest as Oakley stands while the other guards begin pulling at [him]." (*Id.* at 14 (citing *Stadium Vid.* at 7:54–8:15).)

But the record "blatantly contradict[s]," *Scott*, 550 U.S. at 380, this version of events. For starters, the video does *not* show Keaton pushing Oakley. (*See Stadium Vid.* at 7:54–8:19.) On the contrary, frame-by-frame analysis reveals Keaton standing back, *Oakley* lunging toward him, and Police Officer John Maher restraining Oakley in response. (*See id.*; Doc. 434 at App'x A.) And while the Second Circuit found that this footage has a somewhat "choppy and degraded . . . quality," *Oakley II*, 2023 WL 3263618, at *3, it underscored that "helpful eyewitness testimony" could "overcome the limitations in the video record." *Id.* That is precisely what happened here; the fully developed record shows that MSG employees repeatedly asked Oakley to leave, and refrained from making *any* physical contact with him *until* he became aggressive:

- Keaton testified that (i) he "didn't push Mr. Oakley"; (ii) he instead "took a step back in a defensive manner"; and (iii) Oakley "put[] his hand up," causing Keaton to "step[] backwards" so as to avoid Oakley's

hand (Doc. No. 400, Ex. 24 at 104:14–106:23);

- Former MSG security guard Todd Jackson testified that (i) "Mr. Keaton stepp[ed] backwards with his hands up in a defensive posture to avoid Mr. Oakley's outstretched arm"; and (ii) none of the guards "pushed Mr. Oakley to the ground . . . at any . . . point during the incident" (Doc. No. 402 at ¶¶ 11, 23);

- New York City Police Officer John Maher testified that (i) when Oakley stood up he was "clearly angry and belligerent[] and appeared as though he was about to strike members of the MSG security team"; (ii) Maher accordingly "attempted to restrain [Oakley]"; and (iii) "[a]t no point did [Maher] observe any members of MSG security push[ing] or shov[ing] Mr. Oakley" (Doc. No. 404 at ¶¶ 10–11);

- MSG security guard Jayson Jacknow stated that MSG personnel asked Oakley to leave, but Oakley responded by cursing at them and saying "I'm not going anywhere" (Doc. No. 399 at ¶ 85 (internal quotation marks omitted));

- Another security guard, Thomas Redmond, testified that (i) he saw Oakley "standing, shouting, and flailing his arms"; (ii) he then approached Oakley, got his attention, and asked him to leave; and (iii) Oakley refused (Doc. No. 407 at ¶¶ 7–8);

- Tennis legend John McEnroe, who attended the game as a spectator and was seated a few rows away from Oakley, testified that MSG employees "approached Oakley and asked him to leave" and that Oakley responded by swearing at them and refusing to comply with their directives (Doc. No. 405 at ¶ 7);

- Timothy Obeweger – Oakley's acquaintance who had invited him to the game – testified that (i) Oakley seemed "agitat[ed]"; (ii) MSG security guards subsequently "approached" him, "ask[ed] him to settle down[,] and eventually request[ed] that he leave"; (iii) Oakley "refused to comply"; and (iv) Oakley "appeared very agitated and was yelling and pushing the [guards] back." (Doc. No. 406 at ¶¶ 6–7.)

Faced with this testimony, Oakley argues that "a court '*must disregard all evidence favorable to the moving party that the jury is not required to believe.*'" (Oakley Br. at 17 (quoting *Porter v. Dartmouth-Hitchcock Med. Ctr.*, 92 F.4th 129, 147 (2d Cir. 2024).) But Oakley only half-articulates the rule: the Court *is* required to credit "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (internal quotation marks omitted). And while Oakley also insists that the eyewitnesses are not "neutral" because some of them are MSG guards, that argument goes only so far. (Oakley Br. at 17.) Keaton, Redmond, and Jackson have not been employed by MSG for years, and McEnroe, Maher, and Obeweger were never employed by MSG (though Maher was a paid-detail officer compensated by MSG pursuant to the NYPD's Paid Detail Policy). (Doc. No. 434 at 7 n.5; Doc. No. 429 at ¶¶ 10, 63.)

Finally, Oakley's *own* complaint and sworn deposition testimony contradict his summary judgment papers. In his brief,

6

Oakley claims that "Keaton can be seen pushing Oakley in the chest as Oakley stands." Oakley Br. at 14 (citing *Stadium Vid.* at 7:54–8:15). But in his complaint, Oakley does not allege that *anyone* pushed him – he asserts only that he was "grabbed . . . and roughly pulled . . . backwards." (Doc. No. 164 at ¶ 40.)

The same is true of Oakley's deposition, during which MSG's counsel showed Oakley the video of the initial encounter with Keaton. When pressed by counsel to identify where on the video he was assaulted, Oakley refused to swear that Keaton pushed him – even when asked point-blank over twenty-five times. (Doc. No. 400, Ex. 10 at 334–56.) Indeed, Oakley repeatedly implied that Keaton *did not* push him. (*See, e.g., id.* at 342:5–9 (Oakley explaining that "[it] is the guy on the inside" who is "touching" him), 346:25–347:7 (Oakley explaining that "it's the guy behind who pushed" him).) And when MSG's counsel followed up with direct questions about who touched Oakley, with what degree of force, and where, Oakley provided virtually no additional information, and instead vaguely repeated the assertion that he was "trying to protect" himself, and that he "felt force." (*See, e.g., id.* at 342:10–17, 351:14–18.)

In sum, Oakley's counterarguments as to why the Court should not credit evidence favorable to Defendants regarding his initial contact with MSG officials are unpersuasive. *See Taylor v. Ridley*, 904 F. Supp. 2d 222, 232 (E.D.N.Y. 2012) (granting summary judgment on excessive-force claim where allegations in complaint were "unexplainedly inconsistent and contradictory with [non-movant's] testimony . . . and [his] deposition, at least in terms of the force allegedly used during his arrest, and are uncorroborated by any independent evidence in the record").

### 2. Pushing Oakley to the Ground

Oakley next argues that he was "pushed down from behind" after he stood up from his seat and that the "new videos" "corroborat[e]" his account. (Oakley Br. at 15.) But the videos show the exact opposite. They depict then-MSG Director of Arena Operations Thomas Redmond attempting to guide Oakley *backward*, only for Oakley to slip *forward* and out of his grasp – nearly dragging Redmond down to the floor on top of him. (*See* Doc. No. 400, Ex. 30 (hereinafter "*Fan Vid. 2*") at 00:01–00:18.) The Court has repeatedly reviewed this new, close-up video, attempting to ferret out any potential ambiguity as to what transpired. There is none: indeed, it is hard to imagine a clearer depiction of an accidental slip.

As the primary new video shows, Redmond attempted to hold Oakley's left bicep, while MSG guard Jayson Jacknow lightly placed his open hand on Oakley's upper back. (*Id.* at 0:03–0:12.) At that point, Oakley turned toward his seat, only to trip and fall to the ground, pulling Redmond – who was still holding his arm – with him, so that Redmond doubled over and lurched into the aisle. (*Id.* at 0:13–0:16.) Oakley then sat for a few seconds on the lip of the stadium stairs, before rising to his feet without assistance. (*Id.* at 0:14–0:22.) Tellingly, though Oakley had been highly agitated and confrontational with the MSG guards from the outset, at no point on the video did he accuse anyone of having pushed him to the ground. (*Id.*)

Eyewitness evidence also confirms that Oakley was not pushed. McEnroe testified that he "saw Oakley slip and fall to the floor." (Doc. No. 405 at ¶ 8.) So did Officer Maher, Redmond, Jackson, and

others. (*See, e.g.*, Doc. No. 404 at ¶ 11 ("I observed [Oakley] trip and fall on his own."); Doc. No. 407 at ¶ 8 ("I observed Mr. Oakley catch his footing on the lip of the riser, slip, and fall to the ground."); Doc. No. 402 at ¶ 23 (similar).)

Oakley's own statements suggest the same thing. In drafts of his autobiography – which were altered only after his counsel in this litigation directed him to re-write them – Oakley explained that he "slipped," and in a February 2022 interview, Oakley noted that he "slipped down and fell." (*See* Doc. No. 429 at ¶¶ 132–34; Doc. No. 400, Ex. 28 at 01:13–01:14.) And while Oakley now argues that "the terms 'push' and 'slip' are not mutually exclusive" and that "Redmond's push . . . caused Oakley" to slip (Oakley Br. at 16), a reasonable factfinder could not be expected to "undertake the suspension of disbelief necessary to credit [Oakley's] allegations," *Jeffreys*, 426 F.3d at 551. In short, Oakley's "conclusory and self-serving statements" hardly suffice to create a genuine issue of material fact when pitted against the vast amount of blatantly contradictory evidence in the record. *Wyatt v. Zuckerman*, 240 F. App'x 885, 887 (2d Cir. 2007).

### 3. Oakley's Removal from the Garden

Finally, Oakley contends that MSG guards "continued to manhandle" him as they escorted him out of the Garden, inappropriately "loom[ed]" over him after he again fell to the ground, and improperly attempted to pry his hands free from a railing to which he was clinging. (Oakley Br. at 18–19.) But as Oakley himself concedes, by the time the guards forcibly ejected him from the Garden, he had (i) repeatedly been asked – and refused – to leave; (ii) cursed at the guards; and (iii) "push[ed]" them, "slapped" them, and "chopped down" on their limbs. (Doc. No.

429 at ¶¶ 83, 90–91, 132–34, 140, 146–47, 150–52, 155–58 (internal quotation marks omitted); *see also* Oakley Br. at 20.)

Indeed, as the videos of the incident reveal, it was *Oakley* – who is six feet, nine inches tall and weighs roughly 270 pounds (*see* Doc. No. 429 at ¶ 71) – who struck the guards, not the other way around. (*See Fan Vid. 1* at 00:42–01:00.) After falling and standing back up, Oakley stepped toward the much-smaller Redmond, shoved his finger close to Redmond's eye, shouted "get the [expletive] out of my face," bumped his chest into Redmond, and then, finally, jabbed Redmond's face with his index finger, causing Redmond's head to snap backward. (*Id.* at 0:41–0:49; Doc. No. 429 at ¶ 147; Doc. No. 400, Ex. 35 at 0:17–32.) In response, Jacknow – who was still standing behind Oakley – took hold of Oakley's upper bicep and attempted to pull him away from Redmond. (*Fan Vid. 1* at 0:49–0:51.) But Oakley then whirled around, chopped downward on Jacknow's arm, and pushed him – twice – causing Jacknow to stumble back several paces and prompting nearby fans to gasp audibly. (*Id.* at 0:53–0:58.) It was only at that point that several other security personnel endeavored to step in and grab both of Oakley's arms. (*Id.* at 0:59–1:01.)

Oakley attempts to justify his use of violence by arguing that he "only took those actions after he had been pushed and pulled . . . and pushed in the back." (Oakley Br. at 21.) But as described above, that assertion is contradicted by incontrovertible video evidence, and no reasonable jury could credit Oakley's account of the earlier stages of his removal. *See Scott*, 550 U.S. at 380.

The video further shows that the guards "proceeded with caution, remained in control of the situation and their emotions, showed considerable restraint, and used

8

[appropriate] force . . . as occasioned by Oakley's behavior at each juncture." (Doc. No. 398 at 20 (internal quotation marks omitted); *Fan Vid. 1* at 01:01–03:04.) After being guided several yards onto the exit ramp, Oakley again fell – despite at least one guard's effort to keep him upright – this time in the aisle below the railing where one of the fan videographers was standing. (*Id.* at 1:10.) As the video shows, from an angle directly above the scene, security personnel crowded around Oakley, repeatedly telling him to "get up" and "stand up." (*Id.* at 1:15–1:35.) Several security personnel then tried to take hold of Oakley's wrists to pull him up, but Oakley cradled his arms close to his body and resisted their efforts. (*Id.* at 1:15–1:40.) At one point, Oakley even stated "I don't want to stand up." (*Id.* at 1:34.)

Finally, after roughly seventy-five seconds on the ground, Oakley pulled himself to his feet, using the stadium railing as support. (*Id.* at 2:29.) But he then moved just a few paces toward the exit before again stopping, at which point he refused to accompany the guards the rest of the way and clasped the railing with both hands to maintain his position. (*Id.* at 2:29–2:47.) After approximately fifteen more seconds, during which an NYPD officer twice attempted to pry Oakley's hands from the railing (*id.* at 2:47–2:59), Oakley was finally ushered out of the stadium.

Oakley's arguments that MSG guards (i) did not "giv[e] him a chance to rise," (ii) tried to "drag [him] down again," and (iii) attempted to prevent him from "holding himself up" on the railing are therefore contradicted by the clear video evidence. (Oakley Br. at 19.) Instead, that evidence shows that the guards attempted to help Oakley to his feet and to shuttle him as swiftly as possible out of the Garden, and that it was *Oakley* who stayed on the ground, resisted the guards' efforts to assist

him, and clung to the railings to avoid removal. (*Fan Vid. 1* at 01:12–03:04.) Oakley cannot now transform this conflict – which he himself both initiated and prolonged – into a viable assault-and-battery claim merely by asserting (without evidence) that he was unreasonably touched.

### E. Non-Physical Assault

Finally, Oakley advances a new theory of assault, premised not on the *actual* force used by the MSG guards while removing him from the Garden, but rather on the *threat* of force that he feared when the MSG guards initially "surrounded" him. (Oakley Br. at 11.) But while it is possible to prove an "assault" under New York law by showing that a defendant "intentional[ly] plac[ed] [a plaintiff] in fear of imminent harmful or offensive contact," *United Nat. Ins. Co. v. Waterfront New York Realty Corp.*, 994 F.2d 105, 108 (2d Cir. 1993), Oakley's non-physical assault claim fails for two reasons.

*First*, it is "well settled that a [c]ourt should not on summary judgment consider factual allegations and legal theories not raised in the complaint." *Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400, 413 (S.D.N.Y. 2012) (internal quotation marks omitted); *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006). And the record is clear that Oakley articulated his non-physical theory of assault for the first time in his opposition to MSG's motion for summary judgment – not in his Second Amended Complaint. (*See* Doc. No. 164.) *See Valentine Props. Assocs., LP v. U.S. Dep't of Hous. & Urb. Dev.*, 785 F. Supp. 2d 357, 372 (S.D.N.Y. 2011) (rejecting as forfeited "claims [that] do not appear to stem from the Amended Complaint[] but are being raised for the first time in Plaintiffs' motion papers"), *aff'd*, 501 F. App'x 16 (2d Cir. 2012).

9

Oakley seeks to salvage this theory by pointing to language in his complaint alleging that several guards "converg[ed] on" him and "intentionally place[d] [him] in imminent fear of harmful and/or offensive conduct." (Oakley Br. at 11 (quoting Doc. No. 164 at ¶¶ 35, 96).) But this effort fuses disparate paragraphs in the complaint into a single allegation that strips each of its surrounding context. Indeed, Oakley refers to "security personnel . . . converg[ing] on" him in the complaint's narrative description of his removal from MSG – a sequence in which he *nowhere* alleges that he feared the security guards would use unreasonable force, but merely explains that he was "confused" and gradually realized that the guards were "seeking to oust him from the Garden." (Doc. No. 164 at ¶¶ 35–38.) By contrast, when Oakley's complaint *does* arrive at his *physical* assault claim, it clearly alleges that "[MSG] intentionally placed [Oakley] in imminent fear of harmful and/or offensive conduct when, *inter alia*, *they physically and forcibly removed [him] from the Garden.*" (*Id.* at ¶ 96 (emphasis added).)

*Second*, even if Oakley had pleaded this "[i]nitial [a]ssault" (Oakley Br. at 10), his claim would still fail because there is no genuine issue of material fact as to whether he was assaulted. Under New York law, "assault is the *intentional* placing of another person in *reasonable* apprehension of imminent *harmful* or *offensive* contact." *Schoolcraft v. City of New York*, 133 F. Supp. 3d 563, 569 (S.D.N.Y. 2015) (emphasis added). In his summary-judgment papers, Oakley argues that (i) Dolan told Keaton to "do what [you] have to do" (apparently out of Oakley's earshot), (ii) there were several different security guards, and (iii) Oakley himself was worried that he would be attacked. (Oakley Br. at 12 (internal quotation marks omitted).) The problem for Oakley is that

none of these assertions creates a genuine issue of material fact as to whether he was non-physically assaulted. To begin, Oakley never persuasively suggests that MSG *intended* to place him in fear of physical harm at this moment (as opposed to merely intending to eject him from the arena with sufficient security to avoid an incident). To the contrary, Oakley himself notes that Dolan ordered that he be ejected (*see* Oakley Br. at 12), not attacked. What is more, Oakley's allegation that he *subjectively* feared that he would be attacked is beside the point; Oakley must show that such apprehension was "reasonable." *Schoolcraft*, 133 F. Supp. 3d at 569. And the only non-subjective fact Oakley offers to explain why his apprehension was reasonable is that he was approached by "a small army" of guards. (Oakley Br. at 12.) But that fact alone hardly creates an issue of material fact as to whether Oakley – sitting in the middle of Madison Square Garden amongst nineteen thousand fans – *reasonably* apprehended that he would fall victim to imminent harmful or offensive contact. Indeed, if the Court were to adopt Oakley's theory, a plaintiff would have a viable assault claim under New York law *any time* a large group of security guards, in view of thousands of spectators, approached him. That is not the law.

In short, no rational jury could conclude that Oakley reasonably feared himself at risk of wrongful physical contact – let alone that MSG *intended* to stir such an apprehension.[1]

---

[1] Relying on *Phoenix Light SF Ltd. v. Bank of New York Mellon*, Oakley contends that MSG forfeited its ability to challenge his non-physical assault theory because it attacked that claim "only in a footnote." (Oakley Br. at 10 (quoting No. 14-cv-10104 (VEC), 2017 WL 3973951, at *20 n.36 (S.D.N.Y. Sep. 7, 2017).) But Oakley ignores the next sentence in *Phoenix Light*, which clarified that while "[m]erely mentioning or simply stating an issue is insufficient" to preserve it, "*advanc[ing] an argument*" suffices.

### III. CONCLUSION

On Oakley's previous appeal, the Second Circuit explained that discovery might "yield[] additional videos showing other camera angles, as well as helpful eyewitness testimony to overcome the limitations in the video record and give context." *Oakley II*, 2023 WL 3263618, at *3. That is exactly what happened here. Ample evidence – including videos from multiple angles and the unanimous testimony of every witness (even, to some extent, Oakley himself) – shows that Oakley had a reasonable opportunity to depart the Garden, that he instead resorted to physical violence, and that he was never pushed to the ground.

The Court recognizes, of course, that the "question of whether the use of force was reasonable under the circumstances is generally best left for a jury to decide." *Id.* at *1. But when, after nine years of litigation, an accumulated tidal wave of evidence – including the first draft of the plaintiff's own autobiography – "blatantly contradict[s]" that plaintiff's allegations, *Scott*, 550 U.S. at 380, the Court must award summary judgment.

---

2017 WL 3973951, at *20 (emphasis added and internal quotation marks omitted). MSG did just that here by providing the Court with a roughly 150-word footnote fully advancing its arguments against Oakley's non-physical assault theory. (*See* Doc. No. 398 at 24 n.9; *cf. In re Demetriades*, 58 F.4th 37, 54 (2d Cir. 2023) (explaining that when an "issue is adverted to only in a perfunctory manner, unaccompanied by any effort at developed argumentation, it must be deemed waived – or, more precisely, forfeited" (alterations adopted and citation and internal quotation marks omitted)).) Furthermore, MSG can be excused for devoting no more than a footnote to a novel and untimely argument that Oakley never previously articulated – either in this Court or during his two trips to the Second Circuit.

For the reasons stated above, IT IS HEREBY ORDERED that MSG's motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the motion pending at Doc. No. 397. The case, however, shall remain open while the Court adjudicates Oakley's motion for Rule 11 sanctions (Doc. No. 422), MSG's motion for Rule 11 sanctions (Doc. No. 410), and MSG's motion for contempt (*see* Doc. Nos. 473, 483).

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States Circuit Judge
Sitting by Designation

Dated: August 14, 2026
       New York, New York

\*    \*    \*

Plaintiff Charles Oakley is represented by Douglas H. Wigdor, Valdi Licul, and Katherine Vask of Wigdor LLP, 85 Fifth Ave., 5th Fl., New York, New York 10003; and Nelson A. Boxer and Marcelo A. Triana of Petrillo Klein & Boxer LLP, 655 Third Ave., 22nd Fl., New York, New York 10017.

Defendants MSG Networks, Inc., The Madison Square Garden Company, and Sphere Entertainment Group are represented by Randy M. Mastro of Dechert LLP, Three Bryant Park, 1095 Avenue of the Americas, New York, NY 10036; Jessica C. Benvenisty, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019; and Damien Jerome Marshall, John Thomas

Goodwin, and Lauren Kobrick Myers of King & Spalding LLP, 1290 Avenue of the Americas Fl 14, New York, NY 10104.